**ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**
_____
**Nos. 11-1479, 12-1069, 12-1070, 12-1073,
12-1086, 15-1101, 15-1105, 15-1107
(Consolidated)**
_____

**UNITED AIRLINES, INC., *ET. AL.*,**

**Petitioners,**

**v.**

**FEDERAL ENERGY REGULATORY COMMISSION AND
UNITED STATES OF AMERICA,**

**Respondents.**
_____

**ON PETITION FOR REVIEW OF ORDERS OF
THE FEDERAL ENERGY REGULATORY COMMISSION**
_____

**BRIEF OF PETITIONER SFPP, L.P.**
_____

| | |
|---|---|
| Daniel W. Sanborn | Charles F. Caldwell |
| Assistant General Counsel | Dean H. Lefler |
| Kinder Morgan, Inc. | Caldwell Boudreaux Lefler PLLC |
| 1001 Louisiana St., Suite 1000 | 1800 West Loop South, Suite 1680 |
| Houston, TX  77002 | Houston, TX  77027 |
| (713) 420-6024 | (713) 357-6228 |

**ATTORNEYS FOR SFPP, L.P.**

September 4, 2015

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**Nos. 11-1479, 12-1069, 12-1070, 12-1073,
12-1086, 15-1101, 15-1105, 15-1107
(Consolidated)**

_____

## UNITED AIRLINES, INC., *ET. AL.*,

**Petitioners,**

**v.**

## FEDERAL ENERGY REGULATORY COMMISSION AND
## UNITED STATES OF AMERICA,

**Respondents.**

## PETITIONER'S CERTIFICATE AS TO
## PARTIES, RULINGS AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), SFPP, L.P. ("SFPP"), the Petitioner

in the above-captioned proceeding, hereby submits its certificate as to parties,

rulings, and related cases.

**1.     Parties and Amici**

1.1    In addition to SFPP, the following parties appeared before the Federal

Energy Regulatory Commission in FERC Docket Nos. IS08-390, *et al*.:

> BP West Coast Products LLC
> Chevron Products Company
> Continental Airlines, Inc.
> ExxonMobil Oil Corporation
> Trial Staff of the Federal Energy Regulatory Commission
> Northwest Airlines, Inc.
> Phillips 66 Company, Successor to ConocoPhillips Company
> Southwest Airlines Co.

Tesoro Refining & Marketing LLC
U.S. Airways, Inc.
Valero Marketing and Supply Company

1.2    In addition to SFPP, the following are parties, intervenors and amici before

this Court in this proceeding:

Federal Energy Regulatory Commission
United States of America, U.S. Department of Justice
BP West Coast Products LLC
Tesoro Refining and Marketing Company
Valero Marketing and Supply Company
United Airlines, Inc.
Southwest Airlines Co.
Delta Air Lines, Inc.
US Airways, Inc.
ExxonMobil Oil Corporation
Phillips 66 Company, Successor to ConocoPhillips Company
Chevron Products Company

1.3    The following entities are parent companies and/or hold, directly or

indirectly, a 10 percent or greater ownership interest in SFPP:

A 99.5 percent general partner interest in SFPP is indirectly owned by

Kinder Morgan Energy Partners, L.P., a Delaware limited partnership

("KMP") and the general partner of KMP. The common equity of the

general partner of KMP is indirectly owned by Kinder Morgan, Inc., a

Delaware corporation.

ii

**2.    Ruling Under Review**

SFPP seeks review of the following orders of the Federal Energy Regulatory Commission ("FERC"):

a. *SFPP, L.P.*, Opinion No. 511-B, Order on Rehearing and Compliance Filing, 150 FERC ¶ 61,096; Docket Nos. IS08-390-004, *et al.*; issued on February 19, 2015 ("Opinion 511-B");

b. *SFPP, L.P.*, Opinion No. 511-A, Order on Rehearing and Compliance Filing, 137 FERC ¶ 61,220, Docket Nos. IS08-390-004, *et al.*, issued on December 16, 2011 ("Opinion 511-A"); and

c. *SFPP, L.P.*, Opinion No. 511, Opinion and Order on Initial Decision, 134 FERC ¶ 61,121, Docket No. IS08-390-002, issued on February 17, 2011 ("Opinion 511").

**3.    Related Cases**

Opinions 511-B, 511-A, and 511 were issued in FERC Docket Nos. IS08-390-002, IS08-390-004, IS08-390-006 and IS08-390-007, sub-dockets established by FERC to address issues related to filed rates on SFPP's West Line.

There are pending before this Court several petitions for review of Opinions 511-B, 511-A, and 511 that have been consolidated with the instant proceedings. Those petitions for review are Case Nos. 12-1069, 12-1070, 12-1073, 12-1086, 15-1101, 15-1105, and 15-1107.

In addition, FERC issued Opinions 522 and 522-A in Docket Nos. IS09-437-000, *et al*., which was established to address issues related to filed rates on SFPP's East Line.  *SFPP, L.P.*, 140 FERC ¶ 61,220 (2012) ("Opinion 522"); *SFPP, L.P.*, 150 FERC ¶ 61,097 (2015) ("Opinion 522-A").  Petitions for review of Opinions 522 and 522-A have been consolidated and are pending before this Court in Case Nos. 12-1455, *et al*.

To the best of SFPP's knowledge and belief, there are no other related proceedings pending before this Court, or any other federal or state court.

Respectfully submitted,

/s/ Charles F. Caldwell_____
Charles F. Caldwell
Dean H. Lefler
Caldwell Boudreaux Lefler PLLC
1800 West Loop South, Suite 1680
Houston, TX  77027

ATTORNEYS FOR SFPP, L.P.

September 4, 2015

## <u>RULE 26.1 CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 15(c)(6), SFPP, L.P. respectfully submits this Corporate Disclosure Statement.

SFPP, L.P. ("SFPP") is a Delaware limited partnership, with its principal place of business at 1001 Louisiana Street, Suite 1000, Houston, TX 77002. A 99.5 percent general partner interest in SFPP is indirectly owned by Kinder Morgan Energy Partners, L.P., a Delaware limited partnership ("KMP"), and Kinder Morgan G.P, Inc., a Delaware corporation and the general partner of KMP. The common equity of the general partner of KMP is indirectly owned by Kinder Morgan, Inc., a Delaware corporation. A 0.5 percent limited partner interest in SFPP is owned by Santa Fe Pacific Pipelines, Inc. SFPP is a common carrier oil pipeline subject to the authority of the Federal Energy Regulatory Commission ("FERC"). SFPP has tariffs on file with FERC for the transportation of refined petroleum products from points of origin in California, Oregon and Texas to destinations throughout the southwestern and western United States.

Respectfully submitted,

*Charles F. Caldwell*_____
Charles F. Caldwell
Dean H. Lefler
Caldwell Boudreaux Lefler PLLC
1800 West Loop South, Suite 1680
Houston, TX  77027

ATTORNEYS FOR SFPP, L.P.

September 4, 2015

**TABLE OF CONTENTS**

TABLE OF CONTENTS ........................................................................ vii

TABLE OF AUTHORITIES .................................................................. ix

GLOSSARY OF ABBREVIATIONS .................................................... xiv

JURISDICTIONAL STATEMENT ........................................................ 1

STATEMENT OF ISSUES .................................................................... 2

STATUTES AND REGULATIONS ....................................................... 3

STATEMENT OF THE CASE ................................................................ 3

    A.    Facts Relating to FERC's Decision to Depart from Its Policy to
        Use the Most Recent Equity Rate of Return Data in the Record ......... 5

    B.    Facts Relating to FERC's Decision Denying SFPP the Right to
        Set Its 2009 Rate Using the Full 2009 Rate Indexing
        Adjustment ................................................................................. 12

I.    SUMMARY OF ARGUMENT ..................................................... 19

II.    STANDING ................................................................................ 21

III.    ARGUMENT ............................................................................... 21

    A.    The Applicable Standard of Review ................................................. 21

    B.    FERC Erred by Departing from Its Policy to Use the Most
        Recent Equity Rate of Return Data in the Record, Not Justifying
        the Equity Rate of Return and Inflation Factors It Adopted, and
        Selecting an Anomalous Inflation Factor .......................................... 22

    C.    FERC's Ruling Regarding Application of the 2009 Index Is Not
        the Product of Reasoned Decision-Making and Should Be
        Overturned ................................................................................. 28

        1.    FERC's ruling regarding application of the 2009 index
            reflects a misunderstanding of the purpose of FERC's
            indexing methodology. ......................................................... 28

        2.    FERC's ruling regarding application of the 2009 index
            conflicts with its prior orders allowing full application of
            the rate index for establishing going-forward rates and
            calculating refunds. ............................................................. 31

       3.    FERC's reasoning for denying SFPP the ability to apply the full amount of the 2009 Index is inconsistent with its indexing regulations. ................................................................ 32

IV.   CONCLUSION ................................................................................. 36

# TABLE OF AUTHORITIES

## FEDERAL CASES

*ANR Pipeline Co. v. FERC*,
    771 F.2d 507 (D.C. Cir. 1985).......................................................23

*Association of Oil Pipe Lines v. FERC*,
    83 F.3d 1424 (D.C. Cir. 1996) ("*AOPL v. FERC*") ...........................14,16,29

*Association of Oil Pipe Lines v. FERC*,
    281 F.3d 239 (D.C. Cir. 2002)....................................................14

*BP West Coast Products v. FERC*,
    374 F.3d 1263 (D.C. Cir. 2004)...................................................16

*Central of Ga. R.R. v. U.S.*,
    379 F. Supp. 976 (D.D.C. 1987)..................................................27

*Chrysler Corp. v. Brown*,
    441 U.S. 281 (1979).............................................................35

*Columbia Gas Transmission Corp. v. FERC*,
    628 F.2d 578 (D.C. Cir. 1979)...................................................23

*ExxonMobil Oil Corp. v. FERC*,
    487 F.3d 945 (D. C. Cir. 2007)....................................................4

*Fed. Power Comm'n v. Hope Natural Gas Co.*,
    320 U.S. 591 (1944).............................................................7

**\*Authorities upon which we chiefly rely are marked with asterisks**.

*Flying J Inc. v. FERC,*

    363 F.3d 495 (D.C. Cir. 2004)................................................................16,29

*Hamilton v. Paulson,*
    542 F. Supp. 2d 37 (D.D.C. 2008)..............................................................10

*Koch Gateway Pipeline Co. v. FERC,*
    136 F.3d 810 (D.C. Cir. 1998)....................................................................21

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992).....................................................................................21

*Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.,*
    463 U.S. 29 (1983).......................................................................................21

*Pub. Serv. Comm'n of New York v. FERC,*
    813 F.2d 448 (D.C. Cir. 1987)................................................................22,32

*Tennessee Gas Pipeline Co.  v. FERC,*
    860 F.2d 446 (D.C. Cir. 1988)....................................................................27

*United States ex rel. Dingle v. BioPort Corp.,*
    270 F. Supp. 2d 968 (W.D. Mich. 2003)....................................................10

### ADMINISTRATIVE CASES

*Composition of Proxy Groups for Determining*
*Gas and Oil Pipeline Return on Equity,*
    123 FERC ¶ 61,048 (2008)...........................................................................7

*Five-Year Review of Oil Pipeline Pricing Index,*
    93 FERC ¶ 61,266 (2000)...............................................................15,16,29

*Five-Year Review of Oil Pipeline Pricing Index,*
    102 FERC ¶ 61,195 (2003)..........................................................................14

*Panhandle Eastern Pipe Line Co.,*
    74 FERC ¶ 61,109 (1996).............................................................................7

*Policy Statement on Income Tax Allowances*,
   111 FERC ¶ 61,139 (2005)................................................................4

*Portland Natural Gas Transmission Sys.*,
   134 FERC ¶ 61,129 (2011)................................................................7

*Revisions to Oil Pipeline Regulations Pursuant to the Energy Policy Act of 1992*,
FERC Stats. & Regs. [Regs. Preambles, 1991-1996]
      ¶ 30,985 (1993) ("Order 561") *on reh'g*,
      Order 561-A, FERC Stats. & Regs.
      [Regs Preambles, 1991-1996] ¶ 31,000 (1994),
      59 Fed.Reg. 40243 (Aug. 8, 1994) ("Order 561-A") ........................14,16,29

*Revisions to Oil Pipeline Regulations Pursuant to the Energy Policy Act of 1992*,
   151 FERC ¶ 61,136 (2015)................................................................15

*SFPP, L.P.*,
   80 FERC ¶ 63,014 (1997)................................................................13,31

*\*SFPP, L.P.*,
   86 FERC ¶ 61,022 (1999) ("Opinion 435") ............................................13,31

*\*SFPP, L.P.*,
   91 FERC ¶ 61,135 (2000) ("Opinion 435-A")..............................13,16,31,32

*SFPP, L.P.*,
   96 FERC ¶ 61,281 (2001) ("Opinion 435-B") ......................................13,16

*SFPP, L.P.*,
   122 FERC ¶ 61,133 (2008)................................................................16,32

*SFPP, L.P.*,
   129 FERC ¶ 63,020 (2009) ("ID") ......................................................4,8

*SFPP, L.P.*,
   134 FERC ¶ 61,121 (2011) ("Opinion 511") .............iii,1,3,4,7,9,12,17,23,24

*SFPP, L.P.,*
    137 FERC ¶ 61,220 (2011) ("Opinion 511-A") ........ iii,1,8,10,11,12,18,23,25

*SFPP, L.P.,*
    140 FERC ¶ 61,220 (2012) ("Opinion 522") .................................................iv

*SFPP, L.P.,*
    150 FERC ¶ 61,096 (2015) ("Opinion 511-B") ................................... iii,2,19

*SFPP, L.P.,*
    150 FERC ¶ 61,097 (2015) ("Opinion 522-A").............................................iv

*Tesoro Refining & Marketing Company v. Calnev Pipe Line LLC,*
    134 FERC ¶ 61,214 (2011)....................................................................17,32

*Tesoro Refining & Marketing Company v. Calnev Pipe Line LLC,*
    136 FERC ¶ 61,083 (2011)....................................................................17,32

*Trunkline Gas Co.,*
    90 FERC ¶ 61,017 (2000).........................................................................6

*Williams Pipe Line Co.,*
    31 FERC ¶ 61,377 (1985).........................................................................5

*Williston Basin Interstate Pipeline Co.,*
    84 FERC ¶ 61,081 (1998).........................................................................7

*Williston Basin Interstate Pipeline Co.,*
    104 FERC ¶ 61,036 (2003).........................................................................6

## STATUTORY AUTHORITY

Energy Policy Act of 1992,
    Pub. L. 102-486 § 1801(a), 106 Stat. 2776 (1992),
    reprinted in 42 U.S.C. § 7172 Note ...............................................................14


Interstate Commerce Act
    49 U.S.C. app. § 1 ........................................................................................2

49 U.S.C. app. § 15.................................................................................12

Other Federal Statutes
5 U.S.C. 553...................................................................................35,36
28 U.S.C. § 2321(a)...........................................................................2
28 U.S.C. § 2342...............................................................................2

## REGULATORY AUTHORITY

18 C.F.R. § 342.3(d)(1).........................................................................15,33

*18 C.F.R. § 342.3(d)(5).......................................................................33,34

18 C.F.R. § 346.2..................................................................................12

## GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| ALJ | Administrative Law Judge |
| FERC or Commission | Federal Energy Regulatory Commission |
| ICA | Interstate Commerce Act |
| KMP | Kinder Morgan Energy Partners, L.P. |
| PPI-FG | Producer Price Index for Finished Goods |
| SFPP | SFPP, L.P. |
| TOC | Trended Original Cost |

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

**Nos. 11-1479, 12-1069, 12-1070, 12-1073,**
**12-1086, 15-1101, 15-1105, 15-1107**
**(Consolidated)**

_____

**UNITED AIRLINES, INC., *ET. AL.*,**

**Petitioners,**

**v.**

**FEDERAL ENERGY REGULATORY COMMISSION AND**
**UNITED STATES OF AMERICA,**

**Respondents.**

_____

ON PETITION FOR REVIEW OF AN ORDER OF
THE FEDERAL ENERGY REGULATORY COMMISSION

_____

**BRIEF OF PETITIONER SFPP, L.P.**

_____

**JURISDICTIONAL STATEMENT**

On February 17, 2011, the Federal Energy Regulatory Commission ("FERC" or "Commission") issued *SFPP, L.P.,* Opinion No. 511, Opinion and Order on Initial Decision, 134 FERC ¶ 61,121, Docket No. IS08-390-002 ("Opinion 511"), and on December 16, 2011, the Commission issued *SFPP, L.P.*, Opinion No. 511-A, Order on Rehearing and Compliance Filing, 137 FERC ¶ 61,220, Docket Nos. IS08-390-004, *et al.* ("Opinion 511-A").   SFPP, L.P. ("SFPP") petitioned this Court for review of Opinions 511 and 511-A on February

13, 2012.  SFPP's petition, docketed as Case No. 12-1090, was dismissed because SFPP sought rehearing of Opinion 511-A.

On February 19, 2015, the Commission issued *SFPP, L.P.*, Opinion No. 511-B, Order on Rehearing and Compliance Filing, 150 FERC ¶ 61,096; Docket Nos. IS08-390-004, *et al.* ("Opinion 511-B").  SFPP petitioned this Court for review of Opinions 511, 511-A, and 511-B on April 20, 2015.  Opinions 511, 511-A, and 511-B deal with rates for interstate oil pipeline transportation and the Commission's authority under the Interstate Commerce Act ("ICA").  The Commission has subject matter jurisdiction over those issues under 49 U.S.C. app. § 1.  This Court has jurisdiction to review orders of the Commission under 28 U.S.C. §§ 2321(a) and 2342.

## STATEMENT OF ISSUES

Issues relating to the Equity Return Calculation:

1.     Did FERC, once it determined not to follow its policy of using the most recent equity rate of return evidence in the record, fail to engage in reasoned decision-making in adopting an equity rate of return and inflation factor without determining that they met FERC's own requirement that the equity rate of return and inflation factor represent "a reasonable forecast of the pipeline's future cost of service"?

2

2.      Did FERC act in an arbitrary and capricious manner in adopting an inflation factor (for use in calculating the real equity rate of return) that was shown not to be a reasonable forecast of the economic conditions that will exist during the period SFPP's West Line interstate rates will be in effect?

Issue relating to the indexing of SFPP's 2009 rates:

3.      Did FERC fail to engage in reasoned decision-making and depart from its governing precedent and regulations by prohibiting SFPP from applying the full amount of FERC's 2009 rate index adjustment in calculating rates, and associated refunds, for the period July 1, 2009 through June 30, 2010?

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are set forth in the addendum attached to this brief.

## STATEMENT OF THE CASE

SFPP's West Line interstate system transports refined petroleum products from Carson, California (in the Los Angeles area) to Colton, California and to points in Arizona, including Phoenix.  Exh. SFP-61 at 2, JA___; Exh. SFP-63; JA___.  At issue in this proceeding are tariffs that SFPP filed on June 30, 2008 to increase its rates for interstate transportation on its West Line effective August 1, 2008.  Opinion 511 at P 1, JA___.  SFPP made a separate tariff filing that same day to decrease its rates for transportation on SFPP's East Line, which transports

3

refined petroleum products from El Paso, Texas, to Phoenix, Arizona. Opinion 511 at P 3, JA___; Exh. SFP-61 at 3 & n.2, JA___. Both tariff filings resulted from an expansion that SFPP completed on its East Line, which went into service in December, 2008, and which resulted in increased throughput on the East Line and reduced throughput on the West Line. Opinion 511 at PP 3, 27, JA___.

Several shippers protested SFPP's West Line tariff filing and challenged numerous elements of SFPP's cost of service. Opinion 511 at P 2, JA___. Most of the issues shippers raised regarding SFPP's costs had been raised and decided in prior SFPP proceedings. Some of the shippers' arguments challenged established FERC policy, including the application of FERC's *Policy Statement on Income Tax Allowances*, 111 FERC ¶ 61,139 (2005), which was reviewed and upheld by this Court in *ExxonMobil Oil Corp. v. FERC,* 487 F.3d 945 (D.C. Cir. 2007).

FERC set the proceeding for hearing, and the administrative law judge ("ALJ") issued an Initial Decision on December 2, 2009. *SFPP, L.P.*, 129 FERC ¶ 63,020 (2009) ("ID"), JA___. FERC reviewed the ID in Opinion 511, and in Opinions 511-A and 511-B addressed requests for rehearing of Opinions 511 and 511-A. For the most part, Opinions 511, 511-A and 511-B resolved the issues the shippers raised in a manner that is consistent with FERC's rulings in prior SFPP cases.

The only issues that SFPP is raising in this appeal relate to FERC's decision to depart from (1) its long-standing policy to use the most recent equity rate of return data in the record, and (2) its established practice and regulations that would permit SFPP to calculate just and reasonable rates for 2009 by adjusting its 2008 rates by the full 2009 rate indexing adjustment.

**A. FERC's Decision to Depart from Its Policy to Use the Most Recent Equity Rate of Return Data in the Record**

1. Trended Original Cost ratemaking

FERC uses a Trended Original Cost ("TOC") methodology to calculate oil pipeline rates. Under TOC, the pipeline's return on equity—referred to as the "nominal equity rate of return"—is divided into two components, (1) inflation, and (2) the "real equity rate of return," which is the difference between the nominal equity rate of return and inflation. *Williams Pipe Line Co.*, 31 FERC ¶ 61,377, at p. 61,834 (1985). The inflation portion of the return on equity investment is not recovered through current rates and instead is deferred and recovered over time in a manner similar to depreciation. *Id.* The remaining portion—the portion reflecting the real equity rate of return—is included in the cost of service used to calculate the pipeline's current rates. For example, if the nominal equity return for an oil pipeline were 13 percent, and inflation were 2 percent, 2/13 of the return on equity investment would not be recovered immediately and instead would be recovered over time as

5

deferred return, with the pipeline earning a return on the deferred amounts. The remaining 11/13 of the return on equity investment would be recovered in the pipeline's current rates.

Deferring recovery of the inflation component can have a significant impact on the pipeline's current rates. Using the above example, if inflation were zero, the pipeline would be allowed to include the full 13 percent real return on equity in its cost of service. On the other hand, if inflation were 6 percent, the allowed real rate of return on equity would be 7 percent.

> 2.  <u>FERC's policy is to use the most recent rate of return data prior to the close of the record</u>

FERC relies on market data to determine a pipeline's equity rate of return. Since market data is constantly changing, an issue FERC has to decide is what period should be used to derive the market data to calculate the equity rate of return. For example, FERC could use the most recent data available as of the date of the pipeline's rate filing, the most recent data available when the initial testimony is filed, or the most recent data available when the hearing commences. Rather than having to decide what data to use on a case-by-case basis, FERC has adopted a policy that it will use the most recent equity rate of return data in the record, even when the data is more recent than other cost of service data. *E.g.*, *Trunkline Gas Co.*, 90 FERC ¶ 61,017, at p. 61,117 (2000); *Williston Basin Interstate Pipeline Co.*, 104 FERC ¶ 61,036, at PP 17-18, 20 (2003); *Williston*

6

*Basin Interstate Pipeline Co.*, 84 FERC ¶ 61,081, at p. 61,382 (1998); *Panhandle Eastern Pipe Line Co.*, 74 FERC ¶ 61,109 at pp. 61,362-63 (1996).  FERC confirmed that policy in Opinion 511.  Opinion 511 at P 208, JA___.  In an order FERC issued on the same day as Opinion 511, FERC explained the purpose of the policy:

> [T]he Commission uses the most recent data in the record, even if such data is from outside the test period, because the market is always changing and later figures more accurately reflect current investor needs.  Unlike cost-of-service and capital structure data, the Commission prefers the most recent financial data in the record for calculating a pipeline's ROE, recognizing that updates are not permitted once the record has been closed and the hearing has concluded.

*Portland Natural Gas Transmission Sys.*, 134 FERC ¶ 61,129 at P 242 (2011) (internal quotations and citations omitted).

The policy ensures that the rate of return on equity reflects the most recent data in the record regarding the state of the capital markets, thereby ensuring compliance with the fundamental tenets of *Hope* and other cases that the cost of capital be market-based.  *See, e.g.*, *Fed. Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 603-05 (1944); *Composition of Proxy Groups for Determining Gas and Oil Pipeline Return on Equity*, 123 FERC ¶ 61,048, at PP 47-48 (2008).

3.     FERC's decision on equity rate of return in this case

The hearing in this case commenced on June 2, 2009 and the record was closed on June 26, 2009.  ID at PP 577, 579, JA___.  Beginning in 2007 and continuing through 2009 and beyond, the United States economy experienced significant turbulence (*e.g.*, Exh. ACV-12 at 4, JA ___; Exh. SFP-219 at 3, JA ___; Exh. SFP-220 at 3, JA ___), which affected the data used to calculate the equity rate of return and inflation factor.  The effect on the inflation factor was particularly significant:  the 12-month inflation factor varied from 4.18 percent (12 months ending May, 2008) to 4.94 percent (12 months ending September, 2008), to 0.03 percent (12 months ending January, 2009).  Exh. SFP-84 at 7, JA___.  In April, 2009, the 12-month inflation factor was -0.74 percent (12 months ending April, 2009).  Exh. SFP-323 at 1, JA___.

FERC's policy of using the most recent evidence in the record would call for the use of April, 2009 data, for which the nominal equity rate of return was 14.09 percent and the inflation factor was -0.74 percent.  Exh. SFP-323 at 1, JA___.  The ALJ decided not to follow FERC's policy and instead adopted the equity rate of return and inflation factor for September, 2008 (ID at P 648), for which the nominal equity rate of return was 12.63 percent and the inflation factor was 4.94 percent (Opinion 511-A at P 255, JA ___).  SFPP excepted to the ALJ's conclusion and argued that FERC should follow its policy of using the most recent

8

data.  FERC upheld the ID in Opinion 511.  FERC said that the policy to use the most recent equity rate of return data in the record was "subject to the more fundamental principle of ratemaking that that cost of service adopted in rate proceeding be a reasonable forecast of the pipeline's future cost of service." Opinion 511 at P 208, JA___.

FERC cited real equity rate of return data—data that reflected the dramatic swings in the inflation factors during that period—and found that the most recent equity rate of return data—the data for April, 2009—"reflect[ed] the collapse of the stock market in late 2008 and early 2009 and the use of a negative inflation rate in calculating SFPP's ROE."  Opinion 511 at P 209, JA___.  FERC also reviewed SFPP's equity rate of return calculations from a separate, more recent, SFPP proceeding—which FERC "incorporated into the instant record"—as support for its conclusion that the effects of the stock market crash and negative inflation would not continue into the future.  Opinion 511 at P 209 & n.339, JA___.  (The data from the separate proceeding—referenced as Exhibit SPE-108 from Docket No. IS09-437-000—is attached as Exhibit A to this brief.)

SFPP sought rehearing and argued that FERC should follow its policy to use the most recent data in the record.  In the event FERC continued to refuse to follow its stated policy, SFPP argued FERC should modify the 4.94 percent inflation rate for September, 2008, which had been affected by the recession and

9

thus was not representative of future economic conditions. Request for Rehearing of SFPP, L.P., Docket No. IS08-390-002 (Apr. 11, 2011) at 11-14 ("SFPP 2011 Rehearing Request"), JA___. SFPP showed that the average inflation rate for the period August, 2008 through February, 2011 was 1.11 percent and, in the event that FERC was not going to use the most recent data in the record, proposed that FERC adopt that average inflation rate in lieu of the non-representative 4.94 percent inflation rate. SFPP 2011 Rehearing Request at 14-15, JA___.[1] Presented graphically below are the nominal equity rate of return (in blue), the inflation factor (in green) and the resulting real equity rate of return (in red) (1) for April,

---

[1] Attachment A to the SFPP 2011 Rehearing Request, JA___, shows the inflation factors for the period from August, 2008 through February, 2011 that were used to calculate the 1.11 percent figure. The inflation factors for the period from August, 2008 through January, 2009 are found in Exh. SFP-84 at 7, JA___, and Exh. SFP-323, JA___. Attachment A shows the inflation factors for the period from February, 2009 through February, 2011, and Attachment A and footnote 19 to the SFPP 2011 Rehearing Request describe the source and the calculation of the inflation factors. SFPP 2011 Rehearing Request at 13 n.19, Attachment A, JA__. SFPP requested that FERC take administrative notice of the data used to calculate the 1.11 percent inflation figure. FERC acknowledged this data in Opinion 511-A, but did not rule on SFPP's request. Opinion 511-A at P 254, JA ___. SFPP requests that this Court take judicial notice of this data. The inflation factors, which are based on the Consumer Price Index for All Urban Consumers, are capable of verification through the website shown on Attachment A to the SFPP 2011 Rehearing Request, which is maintained by the Department of Labor, Bureau of Labor Statistics, a source whose accuracy cannot be reasonably questioned. See FED. R. EVID. 201(b). Federal courts have taken judicial notice of documents located on official government websites. *E.g., Hamilton v. Paulson*, 542 F. Supp. 2d 37, 52 n.15 (D.D.C. 2008); *United States ex rel. Dingle v. BioPort Corp.*, 270 F. Supp. 2d 968, 972 (W.D. Mich. 2003).

2009 (the most recent evidence in the record), (2) for September, 2008 (the period selected by FERC), and (3) as proposed in the alternative by SFPP:



FERC denied SFPP's request for rehearing in Opinion 511-A. FERC concluded that the most recent economic data in the record was not representative of future economic conditions and would not "produce a just and reasonable, forward-looking rate, especially given that SFPP's West Line rates set in this proceeding may continue indefinitely." Opinion 511-A at P 258, JA___. FERC rejected SFPP's proposal to modify the inflation factor; FERC stated, "It would be incorrect to adjust one input into the ratemaking, the inflation factor, to account for an anomalous economic time period, without making corresponding modification to other inputs, for example applying the same modified period SFPP seeks to use

11

for the inflation factor, for the divided yield average for the DCF analysis to reflect the change in stock prices."  Opinion 511-A at P 259, JA ___.

## B.    FERC's Decision Denying SFPP the Right to Set Its 2009 Rate Using the Full 2009 Rate Indexing Adjustment

In this proceeding, as with prior proceedings in which oil pipelines filed to increase their rates, FERC had to determine under paragraphs (1) and (7) of Section 15 of the ICA whether the proposed rate is just and reasonable in relation to the rate determinants (principally, cost of service and throughput) and, if not, prescribe what the just and reasonable rate would be as of the effective date of the pipeline's tariff and direct the payment of refunds to shippers for shipments since the effective date of the rate. 49 U.S.C. app. § 15.  For such an evaluation, FERC relies upon a base period-test period methodology that requires a pipeline to calculate its cost of service using actual costs for a 12-month "base period," as adjusted for known and measurable changes that will become effective within nine months from the base period– the "test period."  18 C.F.R. § 346.2.

Such rate adjudications typically prove complex and lengthy, as FERC recognizes.   Opinion 511 at P 35 (noting the "protracted litigation that has historically involved SFPP").  As a result, by the time FERC has ruled with finality upon the just and reasonable rate level, a number of years may have passed during which the pipeline would have collected its proposed rate.  In the SFPP complaint proceeding that resulted in the Opinion 435 series of orders, the ALJ, facing a

12

similar range of years, concluded that, rather than endure "costly and protracted litigation over costs of service for each year," application of FERC's annual oil pipeline index adjustments would yield just and reasonable rates for those years. *SFPP, L.P.*, 80 FERC ¶ 63,014, at p. 65,203 (1997). FERC agreed and directed SFPP to use the annual index adjustments to determine the rate ceilings for the intervening years between the effective date of the cost-based rates set by FERC and the date those rates actually go into effect. *SFPP, L.P.*, 86 FERC ¶ 61,022, at pp. 61,112-13 and Ordering Paragraph (B) (1999) ("Opinion 435") (directing that, within 30 days of the order issue date, "SFPP shall file revised tariffs reflecting the changes to the calculation of its East Line rates required by this order for the years 1994, 1995, 1996, 1997, and 1998, as indexed to a current level pursuant to the Commission's indexing regulations published at 18 C.F.R. 342.3."); *SFPP, L.P.*, 91 FERC ¶ 61,135, at p. 61,516 (2000) ("Opinion 435-A") ("Under these circumstances the application of the Commission's indexing methodology to the rates established by the prior [Opinion 435] is appropriate."); *SFPP, L.P.*, 96 FERC ¶ 61,281, at p. 62,071 (2001) ("Opinion 435-B") ("Since the 1994 cost of service is being indexed, this results in a different rate level for the prevailing East Line shippers for each year between 1994 and August 1, 2000.").

13

FERC issued Order 561 to establish its rate indexing methodology in response to Congress' directive in the Energy Policy Act of 1992[2] that FERC create a simplified procedure for oil pipelines to adjust their rates. *Revisions to Oil Pipeline Regulations Pursuant to the Energy Policy Act of 1992*, FERC Stats. & Regs. [Regs. Preambles, 1991-1996] ¶ 30,985, at pp. 30,948-49 (1993) ("Order 561"); *on reh'g*, Order 561-A, FERC Stats. & Regs. [Regs Preambles, 1991-1996] ¶ 31,000 (1994), 59 Fed.Reg. 40243 (Aug. 8, 1994) ("Order 561-A"), *aff'd sub nom., Association of Oil Pipe Lines v. FERC*, 83 F.3d 1424 (D.C. Cir. 1996) ("*AOPL v. FERC*"); *aff'd Association of Oil Pipe Lines v. FERC,* 281 F.3d 239 (D.C. Cir. 2002); *order on remand*, *Five-Year Review of Oil Pipeline Pricing Index,* 102 FERC ¶ 61,195 (2003).

The rate indexing methodology gives oil pipelines the ability to adjust their rates by a certain percentage amount each "index year"—*i.e.*, the period from July 1 to the following June 30—to account for inflation-driven cost changes, without the need for developing individualized costs of service to support such adjustments.  Order 561 at p. 39,048.  The annual rate index adjustment is based on (i) the change in the Producer Price Index for Finished Goods ("PPI-FG") for the two preceding calendar years, plus (ii) an index adjustor intended to align the change in PPI-FG with the expected change in the oil pipeline industry costs.  This

---

[2] Energy Policy Act of 1992, Pub. L. 102-486 § 1801(a), 106 Stat. 2776, 3010 (1992), reprinted in 42 U.S.C. § 7172 Note.

index adjustor is evaluated and adjusted, if necessary, by FERC every five years, and is based on FERC's determination of the changes in pipeline industry costs expected to occur during the upcoming five-year period, based in part on the change in pipeline industry costs that occurred during the previous five-year period. *See, e.g., Five-Year Review of Oil Pipeline Pricing Index*, 93 FERC ¶ 61,266, at pp. 61,848-50 (2000). Accordingly, the indexing methodology relies on historical data as a proxy for cost changes expected to occur in future periods due to inflation.

FERC publishes the rate index in May of each year, following which each oil pipeline is required to establish a new ceiling level for each of its rates to be effective July 1 of that year by multiplying each rate's then-current ceiling level by the published FERC rate index. 18 C.F.R. § 342.3(d)(1). As of July 1 of each year, pipelines are permitted to adjust their rates to reflect the new FERC rate index, provided that any such adjustments do not exceed the applicable ceiling levels. For example, in May, 2015 FERC published a rate index of 4.5829 percent. The 2015 index was calculated by taking the percentage difference in the PPI-FG between 2013 and 2014 (+1.9329 percent), and adding that positive difference to FERC's index adjustor of 2.65 percent applicable to the five-year period July 1, 2011 to June 30, 2016. *Revisions to Oil Pipeline Regulations Pursuant to the Energy Policy Act of 1992*, 151 FERC ¶ 61,136 (2015). Pipelines used the 2015

15

index to calculate their rate ceiling levels and to adjust their rates for the period July 1, 2015 through June 30, 2016, in order to account for inflation-driven cost changes likely to occur during that period. *See, e.g.*, *Flying J Inc. v. FERC,* 363 F.3d 495, 498 (D.C. Cir. 2004); *AOPL v. FERC*, 83 F.3d at 1430 (citing Order 561 at p. 30,941); *Five-Year Review of Oil Pipeline Pricing Index*, 93 FERC ¶ 61,266, at p. 61,849 (2000) (citing Order 561 at pp. 30,948-49)*.*

In Opinion 435-A, FERC required SFPP to establish just and reasonable rates for 1994 based on a 1994 test period cost of service, and ordered SFPP to determine the rates for 1995 and forward by applying the full amount of FERC's rate indexing adjustment applicable to each year. Opinion 435-A at p. 61,516. FERC explained in Opinion 435-B that the cost of service for each year that is indexed is not, in itself, individually determined by actual costs but rather is indexed forward from the just and reasonable rate, yielding just and reasonable rates for each year in the intervening period. Opinion 435-B at p. 62,073. This Court reviewed Opinions 435, *et al*. and upheld FERC's use of a 1994 cost of service, indexed forward, to set just and reasonable rates. *BP West Coast Products v. FERC*, 374 F.3d 1263, 1302-04 (D.C. Cir. 2004). FERC adhered to this approach in subsequent proceedings prior to the issuance of Opinion 511-A. *See, e.g.*, *SFPP, L.P.*, 122 FERC ¶ 61,133, at P 12 (2008) (endorsing application of 1998 index to 1997 cost-of-service-based rates to determine 1998 reparations);

16

*Tesoro Refining & Marketing Co. v. Calnev Pipe Line LLC*, 134 FERC ¶ 61,214, at PP 78-79 (2011) (recognizing the appropriateness of applying FERC's indexing methodology to cost-based rates for purposes of calculating reparations), *order on reh'g*, *Tesoro Refining & Marketing Co. v. Calnev Pipe Line LLC*, 136 FERC ¶ 61,083, at PP 7-8 (2011) (noting that calculating individual cost-based rates for each year to calculate reparations, rather than applying the indexing methodology to the established just and reasonable rates, is "contrary to the Commission's established method for determining reparations").

To calculate the West Line cost of service for rates filed in this proceeding, SFPP used calendar year 2007 for the base period and the first nine months of 2008 (*i.e.*, January 1, 2008 through September 30, 2008) as the test period. SFPP made certain test period adjustments in its initial filing, and, in Opinion 511, FERC required SFPP to make additional adjustments. Opinion 511 at PP 27-30, 37, JA ___. SFPP used the resulting cost of service to calculate the West Line transportation rates as of the August 1, 2008 effective date of the tariff that initiated this proceeding.

SFPP calculated West Line rates for 2009 and subsequent years in the manner that FERC directed in Opinion 435. Compliance Filing Implementing Opinion No. 511, Docket No. IS08-390-002 (Apr. 25, 2011), JA ____ ("Opinion 511 Compliance Filing"). For the period July 1, 2009 through June 30, 2010,

SFPP multiplied the 2008 just and reasonable rates by FERC's 2009 rate indexing adjustment of 7.6025; for the period July 1, 2010 through June 30, 2011, SFPP multiplied the 2009 rates by FERC's 2010 rate indexing adjustment of 0.987026. Opinion 511 Compliance Filing at Schedule 22, JA ____.

The shippers and FERC trial staff challenged SFPP's application of the 2009 index, claiming that it was erroneous for SFPP to apply the 2009 index because, they alleged, SFPP's 2008 cost of service already reflected the cost changes that the 2009 index was intended to capture. Opinion 511-A at PP 399-400, JA ____. In Opinion 511-A, FERC rejected SFPP's proposal to apply the full 2009 index, instead allowing SFPP to apply only 25 percent of the 2009 index (*i.e.,* 1.9006 percent) to calculate the July 1, 2009 through June 30, 2010 West Line rates. FERC noted that the 2009 index was calculated by comparing the change in the PPI-FG from 2007 to 2008. Opinion 511-A at P 405, JA ____. FERC concluded that a significant portion of SFPP's 2008 cost of service reflected actual cost data for the period January 1, 2008 through September 30, 2008 and that, as a result, SFPP's 2008 rates already reflected 75 percent of the industry-wide cost changes the 2009 index was intended to capture. Opinion 511-A at PP 405-411, JA ____.

SFPP sought rehearing and argued that FERC's reasoning for permitting application of only 25 percent of the 2009 index was incorrect, in that the index was intended as a proxy to recover future inflationary cost changes, not prior cost

changes.  Further, SFPP pointed out that, in addition to misstating the purpose of the index adjustment, the claimed factual basis for FERC's selection of 25 percent was flawed, since only roughly 35 percent of its cost of service had been updated to reflect 2008 costs.  Request for Rehearing of SFPP, L.P., Docket Nos. IS08-390-004, 006 (Jan. 17, 2012), JA ____.  FERC denied rehearing in Opinion 511-B, largely relying on its assertion that applying the full amount of the 2009 index is inappropriate because a substantial amount of SFPP's 2008 cost of service contained actual data for the period January 1, 2008 through September 30, 2008.  Opinion 511-B at PP 29-32, JA ____.

## I.
## SUMMARY OF ARGUMENT

FERC erred in two limited respects in Opinion Nos. 511, *et al*.

First, FERC acted arbitrarily and capriciously in determining SFPP's equity rate of return.  FERC decided not to follow its established policy to use the most recent equity rate of return evidence in the record because, in its opinion, the most recent data did not represent "a reasonable forecast of the pipeline's future cost of service," but then adopted September, 2008 data without determining that that data is representative of SFPP's future cost of service.  The record indicates that the period that precedes September, 2008—the period on which the September, 2008 equity rate of return and inflation factor were based—was "an anomalous economic time period."  In addition, the evidence shows that the September, 2008 inflation

19

factor is well outside the range of recent economic experience and is much higher than the inflation factors for the period the rates in this proceeding were in effect.

Second, FERC's ruling precluding SFPP from applying the full amount of the 2009 index was not the product of reasoned decision-making and, therefore, was arbitrary and capricious. In ruling that, because SFPP's 2008 rates were based, in part, on actual 2008 costs for the period through September, 2008, and that SFPP, therefore, should not be permitted to apply the full 2009 index in establishing rates for the 2009 index year, FERC acted contrary to the fundamental purpose of the indexing methodology. The indexing methodology is intended to account for inflationary cost changes that are expected to occur during the upcoming index year, not to account for cost changes that pipelines have experienced in the past. Accordingly, the fact that SFPP's 2008 rates were based, in part, on 2008 actual costs is not a reasoned basis to deprive SFPP of a reasonable opportunity to recover inflationary cost changes expected to occur in the 2009 index year by applying the full 2009 indexing adjustment. In addition, in prohibiting SFPP from applying the full 2009 index, FERC departed from established precedent and the requirements of its indexing regulations. FERC's established precedent (affirmed by this Court) is to apply the full index adjustment to the Commission-mandated rates in each index year falling after the initial rate filing through the effective date of the prospective just and reasonable rates.

20

FERC's indexing regulations indeed require that SFPP apply the full 2009 index to its Commission-mandated 2008 rates to determine rates for the period July 1, 2009 through June 30, 2010.

## II.
## STANDING

Opinions 511, 511-A, and 511-B reduce the rates SFPP filed for interstate transportation on its West Line and require SFPP to pay refunds. SFPP has suffered an injury-in-fact that was directly caused by FERC's orders, and which can readily be redressed by action of this Court. SFPP thus meets all elements of standing necessary to challenge Opinions 511, 511-A, and 511-B in Court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

## III.
## ARGUMENT

### A.     The Applicable Standard of Review

"As an administrative agency, FERC is subject to the constraints of the Administrative Procedure Act and consequently is forbidden from acting in a way that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Koch Gateway Pipeline Co. v. FERC*, 136 F.3d 810, 815 (D.C. Cir. 1998). The pertinent inquiry is whether the Commission has "examine[d] the relevant data and articulate[d] a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "FERC bears the burden of explaining the

21

reasonableness of any departure from a long-standing practice, and any facts underlying its explanation must be supported by substantial evidence." *Pub. Serv. Comm'n of New York v. FERC*, 813 F.2d 448, 451 (D.C. Cir. 1987).

**B.** **FERC Erred by Departing from Its Policy to Use the Most Recent Equity Rate of Return Data in the Record, Not Justifying the Equity Rate of Return and Inflation Factors It Adopted, and Selecting an Anomalous Inflation Factor.**

FERC's policy of using the most recent equity rate of return data in the record is objective and does not favor either shippers or the pipeline. Sometimes the policy will result in an equity rate of return that is higher than the norm, and other times an equity rate of return that is lower than the norm. But as long as FERC consistently follows the policy, there is a presumption that FERC is engaging in even-handed regulation and, thus, not acting in an arbitrary and capricious manner.

One benefit of the policy is that FERC can adopt an equity rate of return and inflation factor without having to go through the burdensome process of determining which period should be used to determine the rate of return and inflation factor. The flip side, of course, is that when FERC departs from the policy, its decision does not enjoy any presumption of reasonableness. In that case—which is this case—FERC cannot arbitrarily pick an equity rate of return and inflation factor for some historical period. *See Pub. Serv. Comm'n of New York v. FERC*, 813 F.2d 448, 465 (D.C. Cir. 1987) (describing FERC's use of

22

obsolete data in making its determination on rate of return on equity as "result-oriented manipulation of an objective ratemaking calculation [that] is patently arbitrary and capricious decisionmaking"). Instead, FERC must provide a reasoned basis for choosing the equity rate of return and inflation factor it has selected. *See ANR Pipeline Co. v. FERC*, 771 F.2d 507, 516 (D.C. Cir. 1985) (the essential elements of the commission's order must be "reached by reasoned decisionmaking—that is, a process demonstrating the connection between the facts found and the choice made"). In addition, FERC must base its decision on substantial evidence. *Columbia Gas Transmission Corp. v. FERC,* 628 F.2d 578, 585-86 (D.C. Cir. 1979).

On this issue, FERC did neither. After deciding not to follow its policy of using the most recent data in the record, FERC gave no reason for selecting the September, 2008 nominal equity rate of return data and inflation factor and cited no evidence indicating that those figures are reasonable or appropriate. *See* Opinion 511 at P 209, JA ___. In response to SFPP's request for rehearing of Opinion 511, though FERC explained again why it declined to follow its policy of using the most recent data in the record, Opinion 511-A at P 258, JA ___, FERC again failed to provide a basis for adopting the September, 2008 data.

Furthermore, FERC did not even comply with the standard it proposed as justification for rejecting the most recent data in the record. In rejecting the most

23

recent data in the record—the equity rate of return and inflation factor for April, 2009—FERC reasoned that those factors were not "a reasonable forecast of the pipeline's future cost of service." Opinion 511 at P 208, JA ___. Yet in selecting the September, 2008 factors, FERC made no findings that such factors are "a reasonable forecast of the pipeline's future cost of service." Indeed, FERC did not even evaluate the September, 2008 equity rate of return or inflation factor on such grounds.

FERC may argue that it is not required to justify the use of the September, 2008 equity rate of return data or inflation factor because the data corresponds to the end of the test period in this proceeding. However, that fact does not demonstrate that the September, 2008 data represent "a reasonable forecast of the pipeline's future cost of service." And, to SFPP's knowledge, FERC has no fall-back policy to the effect that, if the most recent data is found to be not representative, FERC will use data that corresponds to the end of the test period. Therefore, once FERC declines to follow its stated policy of using the most recent data available in the record, FERC is obligated to determine the equity rate of return and inflation factor that would be reasonable and cite substantial evidence that supports that determination.

Moreover, even if there were such a fall-back policy indicating that FERC will use end-of-test period data, such a policy would not justify FERC's selection of

September, 2008 data in this case because the record shows that the September, 2008 data is not "a reasonable forecast of the pipeline's future cost of service." The record indicates that the period that precedes September, 2008—which is the period on which the September, 2008 equity rate of return and inflation factor were based—was not representative of future market conditions. FERC itself appeared to recognize that that period was "an anomalous economic time period." Opinion 511-A at P 259, JA ___. Economic analyses in the record confirm that economic troubles began in 2007 and continued beyond September, 2008. Exh. SFP-219 at 3-9, JA___; Exh. SFP-220 at 1-7, JA___; Exh. SFP-218 at 1-2, JA ___; Exh. ACV-12 at 4, JA___; Exh. ACV-9 at 5, JA ___.

In addition, SFPP presented evidence that the September, 2008 inflation factor was anomalous. As FERC acknowledged in Opinion 511-A, SFPP showed "that the data from the six months ending September, 2008 also reflects an anomalous inflation factor, specifically a 4.94 percent inflation factor which SFPP states is well outside the range of recent economic experience." Opinion 511-A at P 253, JA ___. Exhibit SFP-84 shows that for the 204 months between January, 1992 and December, 2008, the 12-month inflation factor was equal to or higher than 4.94 percent in only the four months of June, July, August and September of 2008. Exh. SFP-84, JA ___. Exhibit SFP-84 also shows that the year-end 12-month inflation factor for the 17 years from 1992 through 2008 are: 2.90 percent, 2.75 percent, 2.67

percent, 2.54 percent, 3.32 percent, 1.70 percent 1.61 percent, 2.68 percent, 3.39 percent, 1.55 percent, 2.38 percent, 1.88 percent, 3.26 percent, 3.42 percent, 2.54 percent, 4.08 percent and 0.09 percent, respectively.  Not only are all of those percentages lower than the 4.94 percent for September, 2008, but the lowest of the 17 is the 0.09 percent for December, 2008, which was the most recent available (at the time that exhibit was prepared) and arguably the most relevant.

SFPP also demonstrated in its request for rehearing of Opinion 511 that the average inflation factor for the two and a half year period from August, 2008 through February, 2011—a period during which the rates in this proceeding were in effect—was 1.11 percent.  SFPP 2011 Rehearing Request at 14, JA___.  FERC did not question in Opinion 511-A the accuracy of the 1.11 inflation factor or the governmental publications on which the figure was based.  Finally, FERC incorporated into this record equity rate of return calculations from another SFPP proceeding that showed inflation factors of 2.72 percent, 2.14 percent and 2.31 percent, for the periods ending in December, 2009, February, 2010 and March, 2010, respectively.  *See* Exhibit A at 1-3.  All of those inflation rates—which are for periods during which the rates at issue in this proceeding were charged—are well below the September, 2008 inflation factor of 4.94 percent.

FERC might argue that SFPP, as the proponent of its rate increase, bore the burden of establishing the equity rate of return and inflation factor that should be

used in this case and that SFPP failed to do so.  That argument would be without merit.  SFPP's position in this case has consistently been that FERC should follow its established policy of using the most recent data.  SFPP maintained that position even when the most recent equity rates of return and inflation factor in the record were unfavorable to SFPP.  Exh. SFP-5 at 9 (showing results for September, 2008), JA ___.  Consistent with its position and burden, SFPP presented testimony and evidence showing the most recent data available regarding the equity rate of return and the inflation factor, as required by FERC's policy.  Exh. SFP-5 at 9, JA ___; Exh. SFP-76, JA ___; Ex. SFP-323, JA ___.  It is FERC, not SFPP, that departed from the established policy.  As a result, SFPP does not have the obligation to prove what equity rate of return and inflation factor are representative of future market conditions or to present supporting evidence.  *See Central of Ga. R.R. v. U.S.*, 379 F. Supp. 976, 982 (D.D.C. 1987) (the commission cannot, after hearing, enlarge carrier's burden of proof by requiring the carrier to prove facts beyond "factors traditionally regarded as relevant" to the carrier's proposed tariff changes); *cf. Tennessee Gas Pipeline Co. v. FERC*, 860 F.2d 446, 456 (D.C. Cir. 1988) (when FERC imposes a rate on a pipeline, the order must be supported by a determination that the existing rate is unjust and unreasonable and a determination that the new rate is just and reasonable; FERC has the burden of proof with respect to both determinations).

FERC erred by simply assuming that it could fall back on the September, 2008 data without determining that the data is representative of future market conditions. In addition, FERC adopted an inflation factor that does not reasonably reflect future market conditions. FERC's actions in this regard are arbitrary and capricious and represent a failure of reasoned decision-making.

**C.     FERC's Ruling Regarding Application of the 2009 Index Is Not the Product of Reasoned Decision-Making and Should Be Overturned.**

  1.     FERC's ruling regarding application of the 2009 index is contrary to the purpose of FERC's indexing methodology.

FERC's basis for prohibiting SFPP from applying the full amount of the 2009 index directly conflicts with the principles underlying the establishment of the indexing methodology. FERC ruled that, because SFPP's 2008 rates were based on 2008 cost data updated, in part, through September 2008, SFPP should be prohibited from applying 75 percent of the 2009 index in indexing forward the FERC-mandated just and reasonable August 1, 2008 rates to determine the rates that would apply in the next index year, *i.e.*, from July 1, 2009 to June 30, 2010. In other words, FERC essentially ruled that the purpose of the 2009 index, which was calculated using 2007 and 2008 PPI-FG data, is to account for changes in pipeline industry costs that occurred from 2007 to 2008. In contrast to that ruling, the purpose of the 2009 index is not to account for cost changes that occurred in prior periods but to account for cost changes likely to incur during the 2009 index year.

FERC stated in Order 561 that the rate indexing methodology provides a simplified mechanism by which a pipeline can adjust its rates to reflect future "inflation-driven cost changes." Order 561 at p. 30,948. In Order 561-A, FERC supported the use of historical PPI-FG data to calculate going-forward indexing adjustments, stating:

> The cost increases experienced by oil pipelines, which essentially do business at the wholesale level, has more closely resembled the cost increase experience of goods producers in the past than that of the economy as a whole, and it will likely continue to do so in the future. Therefore, on a broad conceptual basis, the PPI-FG is a more appropriate choice than GDP for an oil pipeline industry-wide index.

Order 561-A at pp. 31,095-96. FERC described the benefits of an effective indexing methodology, such as the rate index methodology, as follows:

> [A]n index that tracks reasonably well the industry's weighted average cost provides assurance that pipelines' prices to shippers are not rising faster or falling slower than the cost of shipping a substantial portion of all crude oil or products being transported. This protection of shippers from rate increases greater than a measure of the rate of inflation is another benefit of indexing cited by the Commission.

*Five-Year Review of Oil Pipeline Pricing Index*, 93 FERC ¶ 61,266, at p. 61,849 (2000) (citing Order 561 at pp. 30,948-49).

Similarly, this Court recognized that the indexing methodology is "designed to enable pipelines to recover costs by allowing pipelines to raise rates at the same pace as they are predicted to experience cost increases." *AOPL v. FERC*, 83 F.3d at 1430 (citing Order 561 at p. 30,941); *see also*, *Flying J Inc. v. FERC*, 363 F.3d

29

495, 498 (D.C. Cir. 2004) (in describing FERC's index methodology, the Court noted that "the Commission was trying to predict the likely rate of change in the costs to be experienced by any given pipeline").  Accordingly, the rate index that FERC establishes each year pursuant to its indexing methodology serves as a proxy for the inflationary cost changes that are expected to occur during the coming index year.  They are not intended to permit pipelines to recover cost changes that pipelines experienced in the past.

FERC's decision to preclude SFPP from applying the full amount of the 2009 index appears to be grounded in a concern that allowing full application of the 2009 index would allow SFPP to double recover certain of its 2008 costs.  That concern might have merit if the purpose of the 2009 index were to recover inflationary costs changes that SFPP incurred during 2008.  However, as explained above, the 2009 index is intended to capture cost changes that the pipeline industry, including SFPP, is expected to experience during the 2009 index year (*i.e.*, July 1, 2009 to June 30, 2010), not the changes in costs that occurred from 2007 to 2008.  Therefore, allowing full application of the 2009 index would not result in SFPP's double recovery of 2008 costs, and FERC's order denying SFPP from applying the full 2009 index reflects a lack of reasoned decision-making.

2.     <u>FERC's ruling regarding application of the 2009 index conflicts with its established practice in prior orders of allowing full application of the rate index in establishing prospective rates and calculating refunds.</u>

Prior to Opinion 511-A, FERC has consistently permitted pipelines to apply the full rate indexing adjustment in circumstances similar to SFPP's position here. As noted above, this indexing-forward practice arose in the SFPP complaint case that gave rise to the Opinion 435, *et. al.* orders. To avoid "extensive hearings to determine an appropriate cost of service for each year" over the period at issue from 1990 to 1998, the ALJ recommended an approach advocated by one of the complainant-shippers and summarized in the initial decision:

> The test year cost of service in this case is based on a 1993 base year updated with certain 1994 data. If rates produced by this cost of service are just and reasonable for all future years after the Commission issues a final order in this case, those rates, indexed after January 1, 1995, also provide a just and reasonable basis for determining reparations for the period 1994 to the date of the final Commission order . . . .

*SFPP, L.P.*, 80 FERC ¶ 63,014, at pp. 65,202-03 (1997).

In Opinions 435 and 435-A, FERC adopted the ALJ's approach and established just and reasonable rates for 1994 based on a 1994 test period cost of service that incorporated actual 1994 costs "to the extent possible." Opinion 435 at p. 61,085. FERC then ordered SFPP to apply FERC's indexing methodology to calculate rates for 1995 and thereafter using the applicable rate index for each year. Opinion 435-A at p. 61,516. Therefore, notwithstanding that SFPP's 1994 cost of

service was based almost entirely on actual cost data for calendar year 1994 (which overlapped the data used to calculate the 1995 index), FERC did not require SFPP to forgo any portion of the 1995 index adjustment.

Indeed, in that proceeding, FERC addressed a shipper claim that the use of FERC's indexing methodology "permits the pipeline to both recover costs under the indexing methodology and to recover cost increases without having to file for a rate increase under the Commission's regulations."  Opinion 435-A at p. 61,516. FERC rejected that argument.  *Id.*  FERC reasoned that the rates determined using indexing were just and reasonable because the rate index adjustment was applied to the just and reasonable rate determined by FERC.  *Id.*

FERC erred by failing to follow its own precedent set forth in the Opinion 435 orders and adhered to in subsequent cases.  *See, e.g.*, *SFPP, L.P.*, 122 FERC ¶ 61,133, at P 12 (2008); *Tesoro Refining & Marketing Co. v. Calnev Pipe Line LLC*, 134 FERC ¶ 61,214, at PP 78-79 (2011); *Tesoro Refining & Marketing Co. v. Calnev Pipe Line LLC*, 136 FERC ¶ 61,083, at PP 7-8 (2011).  FERC also erred by failing to provide a reasoned explanation for its departure from past practice.  *See Pub. Serv. Comm'n of New York v. FERC*, 813 F.2d 448, 451 (D.C. Cir. 1987).

3.   <u>FERC's reasoning for denying SFPP the ability to apply the full amount of the 2009 index is inconsistent with its indexing regulations.</u>

FERC's ruling that SFPP is not permitted to apply 75 percent of the 2009 index in setting its prospective rates and calculating refunds is inconsistent with the

regulation that governs FERC's rate indexing adjustments. That regulation prescribes not only how oil pipelines will be permitted to adjust their rates to reflect the index, but also addresses how the indexing mechanism will operate if a pipeline uses a mechanism other than rate indexing to adjust its rates during a year, such as if the pipeline files to increase its rates by making a cost-of-service filing, as SFPP did here. Section 342.3(d)(5) explains how the index applies in that situation: "When an initial rate, or rate changed by a method other than indexing, takes effect during the index year, such rate will constitute the applicable ceiling level for that index year." 18 C.F.R. § 342.3(d)(5) (2015).

So, for example, had SFPP filed a cost-of-service rate increase to be effective as of August 1, 2014, the rates reflected in that cost-of-service filing would constitute the applicable ceiling level rates for the July 1, 2014 to June 30, 2015 index year. And, as of the beginning of the next index year on July 1, 2015, SFPP would be entitled to index those rates to reflect the 2015 index in accordance with Section 342.3(d)(1), which provides, "A carrier must compute the ceiling level for each index year by multiplying the previous index year's ceiling level by the most recent index published by the Commission." 18 C.F.R. § 342.3(d)(1). So, under the above example, SFPP would "compute the ceiling index level" for the July 1, 2015 through June 30, 2016 index year by applying the 2015 index to the ceiling level for the July 1, 2014 through June 30, 2015 index year—which, as

explained above, Section 342.3(d)(5) indicates are the rates SFPP filed, in this example, to be effective on August 1, 2014.

Permitting SFPP to take a full rate index adjustment for 2009 is fully consistent with this process.  The rates that FERC set for 2008 became effective during the July 1, 2008 to June 30, 2009 index year and therefore "constitute[d] the applicable ceiling level rate[s] for that index year."   Consistent with Section 342.3(d)(1), SFPP was entitled to index those rates to reflect the 2009 index, effective as of July 1, 2009, just as SFPP did in its Opinion 511 Compliance Filing. Opinion 511 Compliance Filing at Schedule 22, JA ___.

Moreover, FERC's indexing regulations prescribe exactly how the indexing regulations are to apply in cases such as this where FERC has established the just and reasonable rate as of the effective date of the pipeline's original rate filing. The remaining portion of Section 342.3(d)(5) provides as follows:

> If [a rate changed by a method other than indexing] is subsequently lowered by Commission order pursuant to the Interstate Commerce Act, the ceiling level based on such rate must be recomputed, in accordance with paragraph (d)(1) of this section, using the rate established by such Commission order as the ceiling level for the index year which includes the effective date of the rate established by such Commission order.

18 C.F.R. § 342.3(d)(5).  SFPP proposed to change its rates using a method other than indexing, and FERC's Opinions 511, 511-A and 511-B have lowered SFPP's rates, so there is no question that this language anticipated the situation presented

34

by this proceeding.  The remainder of the provision makes clear that (1) the rates FERC set—the just and reasonable 2008 rates which will be effective from August 1, 2008 forward—will be the ceiling levels for the July 1, 2008 to June 30, 2009 index year, and (2) the ceiling levels will be subject to indexing pursuant to Section 342.3(d)(1) in the subsequent index year.

SFPP submits that the rate indexing process set out in Sections 342.3(d)(5) and 342.3(d)(1) (and followed in Opinions 435, *et al.*) is correct and consistent with principles underlying the rate indexing mechanism.  However, even if FERC were to decide otherwise, FERC cannot simply ignore its regulations, which have the force of law.  *See, e.g., Chrysler Corp. v. Brown*, 441 U.S. 281, 295 (1979) ("It has been established in a variety of contexts that properly promulgated, substantive agency regulations have the 'force and effect of law.'") (internal citations omitted). Rather, if FERC wishes to revise its indexing regulations to state that they will operate in the manner FERC has ordered in Opinions 511-A and 511-B, FERC must do so in a procedurally sound manner—through a rule-making proceeding that provides notice of the proposed change in its regulations and an opportunity for comment.  5 U.S.C. § 553(b) ("General notice of proposed rule making shall be published in the Federal Register . . . ."); 5 U.S.C. § 553(c) ("After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or

arguments with or without opportunity for oral presentation."). Further, any change to the indexing regulations would apply only prospectively from the date the new regulations take effect. 5 U.S.C. § 553(d) ("The required publication or service of a substantive rule shall be made not less than 30 days before its effective date."). FERC's departure from its indexing regulations in this proceeding is arbitrary and capricious and does not constitute reasoned decision-making.

## IV.
## CONCLUSION

WHEREFORE, for the foregoing reasons, SFPP submits that the limited FERC rulings in Opinions 511, 511-A, and 511-B for which SFPP is seeking review were not the product of reasoned decision-making and therefore should be reversed by this Court.

Respectfully submitted,

*/s/ Charles F. Caldwell*

Daniel W. Sanborn                         Charles F. Caldwell
Assistant General Counsel                 Dean H. Lefler
Kinder Morgan, Inc.                       Caldwell Boudreaux Lefler PLLC
1001 Louisiana St., Suite 1000            1800 West Loop South, Suite 1680
Houston, TX 77002                         Houston, TX 77027
(713) 420-6024                            (713) 357-6228

ATTORNEYS FOR SFPP, L.P.

September 4, 2015

36

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

This brief contains 8,902 words, excluding parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and D.C. Cir. R. 32(a)(2), and complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B).

This brief has been prepared in proportionally spaced typeface using Microsoft Word in Times New Roman, 14 pt. typeface and complies with typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6).

*/s/ Deborah R. Repman*
Deborah R. Repman
Caldwell Boudreaux Lefler PLLC
1800 West Loop South, Suite 1680
Houston, TX 77027
(713) 357-6241

*Counsel for SFPP, L.P.*

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. App. P. 25(d) and the Court's Administrative Order Regarding Electronic Case Filing, I hereby certify that I have this day caused to be served copies of the foregoing brief upon counsel listed in the Service Preference Report via email through the Court's CM/ECF system.

Dated this 4th day of September, 2015.

*/s/ Deborah R. Repman*
Deborah R. Repman
Caldwell Boudreaux Lefler PLLC
1800 West Loop South, Suite 1680
Houston, TX  77027

| | |
|---|---|
| FEDERAL ENERGY REGULATORY COMMISSION | Robert H. Solomon, Solicitor<br>Office of the Solicitor<br>Federal Energy Regulatory Commission<br>888 First Street, NE<br>Room 9A-01<br>Washington, DC 20426<br>robert.solomon@ferc.gov<br><br>Elizabeth Evans Rylander, Attorney<br>Office of Solicitor<br>Federal Energy Regulatory Commission<br>888 First Street, NE<br>Washington, DC 20426<br>elizabeth.rylander@ferc.gov<br><br>Lisa Barbas Luftig, Attorney<br>Office of General Counsel<br>Federal Energy Regulatory Commission<br>888 First Street, NE<br>Washington, DC 20426<br>lisa.luftig@ferc.gov |
| UNITED STATES OF AMERICA | Robert J. Wiggers<br>U.S. Department of Justice<br>Antitrust Division, Appellate Sec.<br>950 Pennsylvania Avenue, NW<br>Room 3224<br>Washington, DC 20530-0001<br>robert.wiggers@usdoj.gov<br><br>James Joseph Fredricks<br>U.S. Department of Justice<br>Antitrust Division, Appellate Section<br>3224<br>950 Pennsylvania Avenue, NW<br>Washington, DC 20530-0001<br>james.fredricks@usdoj.gov |

| | |
|---|---|
| BP WEST COAST PRODUCTS LLC | Thomas J. Eastment<br>Gregory S. Wagner<br>Baker Botts LLP<br>1299 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20004-2400<br>tom.eastrnent@bakerbotts.com<br>gregory.wagner@bakerbotts.com |
| PHILLIPS 66 COMPANY, SUCCESSOR TO CONOCOPHILLIPS COMPANY | Marcus W. Sisk<br>Frederick G. Jauss<br>Dorsey & Whitney LLP<br>1801 K Street, NW<br>Suite 750<br>Washington, D.C. 20006<br>sisk.marcus@dorsey.com<br>jauss.fred@dorsey.com |
| CHEVRON PRODUCTS COMPANY | Steven A. Adducci<br>Venable LLP<br>575 7th St, NW<br>Washington, DC 20004-1601<br>saadducci@venable.com |
| EXXONMOBIL OIL CORPORATION | Thomas J. Eastment<br>Gregory S. Wagner<br>Baker Botts LLP<br>1299 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20004-2400<br>tom.eastrnent@bakerbotts.com<br>gregory.wagner@bakerbotts.com |
| UNITED AIRLINES, INC.,<br>DELTA AIR LINES, INC.,<br>SOUTHWEST AIRLINES CO.,<br>AND US AIRWAYS, INC. | Richard E. Powers, Jr.<br>Venable LLP<br>575 7th St NW<br>Washington, DC 20004-1601<br>repowers@venable.com |

| | |
|---|---|
| TESORO REFINING AND MARKETING COMPANY | Melvin Goldstein<br>Goldstein & Associates, P.C.<br>1757 P Street, NW<br>Washington, D.C. 20036<br>mgoldstein@goldstein-law.com |
| VALERO MARKETING AND SUPPLY COMPANY | Steven A. Adducci<br>Venable LLP<br>575 7th St, NW<br>Washington, DC 20004-1601<br>saadducci@venable.com |

# EXHIBIT A

Exh. No. SPE-108
Docket No. IS09-437-000
Page 1 of 3

**Pipeline Cost of Equity Using the FERC DCF Cost of Equity Method**
**Six-month Period Ending December 2009**

| Line | Company | Ticker | Jul-09 High | Low | Aug-09 High | Low | Sep-09 High | Low | Oct-09 High | Low | Nov-09 High | Low | Dec-09 High | Low | Average Price | Annual Distribution | Distribution Yield | I/B/E/S Growth | GDP Growth x 1/2 | Weighted Average Growth | Adjusted Yield | Cost of Equity |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Buckeye Partners, L.P. | BPL | 47.95 | 41.43 | 47.65 | 43.41 | 49.44 | 44.80 | 52.38 | 47.51 | 53.41 | 49.20 | 57.00 | 51.81 | 48.83 | 3.70 | 7.58% | 2.86% | 2.35% | 2.69% | 7.68% | 10.37% |
| 2 | Enbridge Energy Partners, L.P. | EEP | 46.82 | 36.90 | 48.20 | 42.02 | 46.00 | 41.80 | 49.00 | 44.05 | 49.68 | 45.03 | 54.44 | 49.12 | 46.09 | 3.96 | 8.59% | 3.00% | 2.35% | 2.78% | 8.71% | 11.50% |
| 3 | Enterprise Products Partners L.P. | EPD | 29.39 | 24.50 | 28.38 | 26.18 | 29.45 | 26.15 | 30.37 | 27.25 | 30.00 | 27.54 | 32.24 | 29.55 | 28.42 | 2.21 | 7.78% | 5.00% | 2.35% | 4.12% | 7.94% | 12.05% |
| 4 | Kinder Morgan Energy Partners, L.P. | KMP | 54.84 | 50.08 | 53.85 | 51.75 | 55.00 | 51.73 | 57.66 | 53.02 | 58.42 | 53.25 | 61.29 | 56.53 | 54.79 | 4.20 | 7.67% | 3.00% | 2.35% | 2.78% | 7.77% | 10.56% |
| 5 | Magellan Midstream Partners, L.P. | MMP | 38.99 | 33.75 | 39.92 | 35.68 | 38.67 | 35.29 | 40.20 | 36.55 | 41.21 | 37.81 | 43.70 | 40.11 | 38.49 | 2.84 | 7.38% | 4.60% | 2.35% | 3.85% | 7.52% | 11.37% |
| 6 | NuStar Energy L.P. | NS | 56.35 | 51.45 | 57.20 | 51.94 | 53.64 | 50.51 | 55.56 | 50.54 | 54.99 | 51.61 | 57.34 | 51.53 | 53.56 | 4.26 | 7.95% | 4.50% | 2.35% | 3.78% | 8.10% | 11.89% |
| 7 | Plains All American Pipeline, L.P. | PAA | 50.33 | 42.50 | 48.60 | 45.26 | 48.63 | 46.23 | 51.19 | 45.45 | 51.14 | 47.07 | 53.37 | 50.12 | 48.32 | 3.68 | 7.62% | 5.00% | 2.35% | 4.12% | 7.77% | 11.89% |
| 8 | Sunoco Logistics Partners LP | SXL | 59.95 | 53.76 | 59.92 | 52.72 | 59.96 | 54.45 | 62.11 | 57.27 | 62.45 | 57.00 | 69.87 | 61.69 | 59.26 | 4.26 | 7.19% | 8.00% | 2.35% | 6.12% | 7.41% | 13.53% |
| 9 | | | | | | | | | | | | | | | | | | | | | | |
| 10 | Median | | | | | | | | | | | | | | | | | | | | | 11.69% |
| 11 | Inflation previous 12 months through December 2009 | | | | | | | | | | | | | | | | | | | | | 2.72% |
| 12 | Real Median | | | | | | | | | | | | | | | | | | | | | 8.97% |
| 13 | | | | | | | | | | | | | | | | | | | | | | |
| 14 | Sources: I/B/E/S Thomson Reuters January 2010 | | | | | | | | | | | | | | | | | | | | | |
| 15 | GDP Growth Forecasts:EIA April 2009, Global Insight May 2009, SSA 2009 Trustee's Report | | | | | | | | | | | | | | | | | | | | | |
| 16 | Weighted average growth equals (2/3 x I/B/E/S growth) + (1/3 x GDP growth/.5). | | | | | | | | | | | | | | | | | | | | | |

Exh. No. SPE-108
Docket No. IS09-437-000
Page 1 of 3

Exh. No. SPE-108
Docket No. IS09-437-000
Page 2 of 3

**Pipeline Cost of Equity Using the FERC DCF Cost of Equity Method**
**Six-month Period Ending February 2010**

| Line | Company | September 2009 High | Low | October 2009 High | Low | November 2009 High | Low | December 2009 High | Low | January 2010 High | Low | February 2010 High | Low | Average Price | Annual Distribution | Distribution Yield | I/B/E/S Growth | GDP Growth x 1/2 | Weighted Average Growth | Adjusted Yield | Cost of Equity |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Buckeye Partners, L.P. | 49.44 | 44.80 | 52.38 | 47.51 | 53.41 | 49.20 | 57.00 | 51.81 | 58.32 | 54.51 | 58.83 | 51.68 | 52.41 | 3.75 | 7.16% | 4.00% | 2.28% | 3.43% | 7.28% | 10.70% |
| 2 | Enbridge Energy Partners, L.P. | 46.00 | 41.80 | 49.00 | 44.05 | 49.68 | 45.03 | 54.44 | 49.12 | 55.74 | 51.50 | 53.97 | 46.77 | 48.93 | 3.96 | 8.09% | 3.00% | 2.28% | 2.76% | 8.21% | 10.97% |
| 3 | Enterprise Products Partners L.P. | 29.45 | 26.15 | 30.37 | 27.25 | 30.00 | 27.54 | 32.24 | 29.55 | 33.40 | 30.59 | 32.77 | 29.44 | 29.90 | 2.24 | 7.49% | 5.00% | 2.28% | 4.09% | 7.65% | 11.74% |
| 4 | Kinder Morgan Energy Partners, L.P. | 55.00 | 51.73 | 57.66 | 53.02 | 58.42 | 53.25 | 61.29 | 56.53 | 65.49 | 59.81 | 64.30 | 58.00 | 57.88 | 4.20 | 7.26% | 3.00% | 2.28% | 2.76% | 7.36% | 10.12% |
| 5 | Magellan Midstream Partners, L.P. | 38.67 | 35.29 | 40.20 | 36.55 | 41.21 | 37.81 | 43.70 | 40.11 | 44.63 | 41.81 | 45.32 | 39.81 | 40.43 | 2.84 | 7.03% | 4.60% | 2.28% | 3.83% | 7.16% | 10.99% |
| 6 | NuStar Energy L.P. | 53.64 | 50.51 | 55.56 | 50.54 | 54.99 | 51.61 | 57.34 | 51.53 | 59.75 | 55.29 | 57.99 | 51.49 | 54.19 | 4.26 | 7.86% | 4.50% | 2.28% | 3.76% | 8.01% | 11.77% |
| 7 | Plains All American Pipeline, L.P. | 48.63 | 46.23 | 51.19 | 45.45 | 51.14 | 47.07 | 53.37 | 50.12 | 57.11 | 52.30 | 55.49 | 49.82 | 50.66 | 3.71 | 7.32% | 5.00% | 2.28% | 4.09% | 7.47% | 11.57% |
| 8 | Sunoco Logistics Partners, L.P. | 59.96 | 54.45 | 62.11 | 57.27 | 62.45 | 57.00 | 69.87 | 61.69 | 72.32 | 67.05 | 71.05 | 62.20 | 63.12 | 4.36 | 6.91% | 5.50% | 2.28% | 4.43% | 7.06% | 11.49% |
| 9 | | | | | | | | | | | | | | | | | | | | | |
| 10 | Median | | | | | | | | | | | | | | | | | | | | 11.24% |
| 11 | Inflation through February 2010 | | | | | | | | | | | | | | | | | | | | 2.14% |
| 12 | Real Median | | | | | | | | | | | | | | | | | | | | 9.09% |
| 13 | | | | | | | | | | | | | | | | | | | | | |
| 14 | Sources: I/B/E/S Thomson Reuters February 2010 | | | | | | | | | | | | | | | | | | | | |
| 15 | GDP Growth Forecasts:EIA 2010, Global Insight March 2010, SSA 2009 Trustee's Report | | | | | | | | | | | | | | | | | | | | |
| 16 | Weighted average growth equals (2/3 x I/B/E/S growth) + (1/3 x GDP growth/.5). | | | | | | | | | | | | | | | | | | | | |

| | |
|---|---|
| Global Insight March 2010 | 4.29% |
| Energy Information Adminstration Early Release 20 | 4.77% |
| Social Security Administration (2009 OASDI Truste | 4.62% |
| Average | 4.56% |
| 1/2 growth | 2.28% |

Inflation Factor:
http://data.bls.gov/PDQ/servlet/SurveyOutputServlet?series_id=CUUR0000SA0&years_option=all_years&periods_option=all_periods
Source: Bureau of Labor Statistics, CPI-U, All items, 1982-84=100, Series ID CUUR0000SA0
Series Id:   CUUR0000SA0

Exh. No. SPE-108
Docket No. IS09-437-000
Page 2 of 3

Exh. No. SPE-108
Docket No. IS09-437-000
Page 3 of 3

**Pipeline Cost of Equity Using the FERC DCF Cost of Equity Method**
**Six-month Period Ending March 2010**

| Line | Company | October 2009 High | Low | November 2009 High | Low | December 2009 High | Low | January 2010 High | Low | February 2010 High | Low | March 2010 High | Low | Average Price | Annual Distribution | Distribution Yield | I/B/E/S Growth | GDP Growth x 1/2 | Weighted Average Growth | Adjusted Yield | Cost of Equity |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Buckeye Partners, L.P. | 52.38 | 47.51 | 53.41 | 49.20 | 57.00 | 51.81 | 58.32 | 54.51 | 58.83 | 51.68 | 61.50 | 58.00 | 54.51 | 3.75 | 6.88% | 4.00% | 2.28% | 3.43% | 7.00% | 10.42% |
| 2 | Enbridge Energy Partners, L.P. | 49.00 | 44.05 | 49.68 | 45.03 | 54.44 | 49.12 | 55.74 | 51.50 | 53.97 | 46.77 | 53.00 | 48.60 | 50.08 | 3.96 | 7.91% | 3.00% | 2.28% | 2.76% | 8.02% | 10.78% |
| 3 | Enterprise Products Partners L.P. | 30.37 | 27.25 | 30.00 | 27.54 | 32.24 | 29.55 | 33.40 | 30.59 | 32.77 | 29.44 | 34.69 | 32.29 | 30.84 | 2.24 | 7.26% | 5.00% | 2.28% | 4.09% | 7.41% | 11.50% |
| 4 | Kinder Morgan Energy Partners, L.P. | 57.66 | 53.02 | 58.42 | 53.25 | 61.29 | 56.53 | 65.49 | 59.81 | 64.30 | 58.00 | 65.55 | 62.90 | 59.69 | 4.20 | 7.04% | 3.00% | 2.28% | 2.76% | 7.13% | 9.89% |
| 5 | Magellan Midstream Partners, L.P. | 40.20 | 36.55 | 41.21 | 37.81 | 43.70 | 40.11 | 44.63 | 41.81 | 45.32 | 39.81 | 47.65 | 44.36 | 41.93 | 2.84 | 6.77% | 4.60% | 2.28% | 3.83% | 6.90% | 10.73% |
| 6 | NuStar Energy L.P. | 55.56 | 50.54 | 54.99 | 51.61 | 57.34 | 51.53 | 59.75 | 55.29 | 57.99 | 51.49 | 60.79 | 57.15 | 55.34 | 4.26 | 7.70% | 4.50% | 2.28% | 3.76% | 7.84% | 11.60% |
| 7 | Plains All American Pipeline, L.P. | 51.19 | 45.45 | 51.14 | 47.07 | 53.37 | 50.12 | 57.11 | 52.30 | 55.49 | 49.82 | 57.06 | 54.39 | 52.04 | 3.71 | 7.13% | 5.00% | 2.28% | 4.09% | 7.27% | 11.37% |
| 8 | Sunoco Logistics Partners, L.P. | 62.11 | 57.27 | 62.45 | 57.00 | 69.87 | 61.69 | 72.32 | 67.05 | 71.05 | 62.20 | 69.23 | 66.85 | 64.92 | 4.36 | 6.72% | 5.50% | 2.28% | 4.43% | 6.86% | 11.29% |
| 9 | | | | | | | | | | | | | | | | | | | | | |
| 10 | Median | | | | | | | | | | | | | | | | | | | | 11.03% |
| 11 | Inflation through March 2010 | | | | | | | | | | | | | | | | | | | | 2.31% |
| 12 | Real Median | | | | | | | | | | | | | | | | | | | | 8.72% |
| 13 | | | | | | | | | | | | | | | | | | | | | |
| 14 | Sources: I/B/E/S Thomson Reuters March 2010 | | | | | | | | | | | | | | | | | | | | |
| 15 | GDP Growth Forecasts:EIA 2010, Global Insight March 2010, SSA 2009 Trustee's Report | | | | | | | | | | | | | | | | | | | | |
| 16 | Weighted average growth equals (2/3 x I/B/E/S growth) + (1/3 x GDP growth/.5). | | | | | | | | | | | | | | | | | | | | |

| | |
|---|---|
| Global Insight March 2010 | 4.29% |
| Energy Information Adminstration Early Release 20 | 4.77% |
| Social Security Administration 2009 OASDI Trustee | 4.62% |
| Average | 4.56% |
| 1/2 growth | 2.28% |
| Inflation Factor: | |
| http://data.bls.gov/PDQ/servlet/SurveyOutputServlet?series_id=CUUR0000SA0&years_option=all_years&periods_option=all_periods | |
| Source: Bureau of Labor Statistics, CPI-U, All items, 1982-84=100, Series ID CUUR0000SA0 | |
| Series Id:  CUUR0000SA0 | |

# ADDENDUM

**Sections of the Energy Policy Act of 1992, Pub. L. 102-486, 106 Stat. 2776 (1992), reprinted in 42 U.S.C. § 7172 Note**

§ 1801(a) ..................................................................................................1

**Sections of the Interstate Commerce Act, 49 U.S.C. app § 1, *et seq*. (1988)**

49 U.S.C. app. § 1 ....................................................................................2

49 U.S.C. app. § 15 ..................................................................................7

**Other Federal Statues**

5 U.S.C. 553 ............................................................................................13

28 U.S.C. § 2321(a) ................................................................................15

28 U.S.C. § 2342 ....................................................................................17

**Sections of the Code of Federal Regulations**

18 C.F.R. § 342.3(d) ..............................................................................19

18 C.F.R. § 346.2 ....................................................................................21

USCA Case #15-1101    EPAct § 1801    Filed: 09/04/2015    Page 62 of 83

tion by it on a matter referred to it pursuant to section 7174 of this title, shall be final agency action within the meaning of section 704 of title 5 and shall not be subject to further review by the Secretary or any officer or employee of the Department.

**(h) Rules, regulations, and statements of policy**

The Commission is authorized to prescribe rules, regulations, and statements of policy of general applicability with respect to any function under the jurisdiction of the Commission pursuant to this section.

(Pub. L. 95–91, title IV, § 402, Aug. 4, 1977, 91 Stat. 583; Pub. L. 103–272, § 7(b), July 5, 1994, 108 Stat. 1379.)

REFERENCES IN TEXT

The Federal Power Act, referred to in subsec. (a)(1)(A), (B), and (F), is act June 10, 1920, ch. 285, 41 Stat. 1063, as amended, which is classified generally to chapter 12 (§ 791a et seq.) of Title 16, Conservation. Parts I and II of the Federal Power Act are classified generally to subchapters I (§ 791a et seq.) and II (§ 824 et seq.), respectively, of chapter 12 of Title 16. For complete classification of this Act to the Code, see section 791a of Title 16 and Tables.

The Natural Gas Act, referred to in subsec. (a)(1)(E), (F), is act June 21, 1938, ch. 556, 52 Stat. 821, as amended, which is classified generally to chapter 15B (§ 717 et seq.) of Title 15, Commerce and Trade. For complete classification of this Act to the Code, see section 717w of Title 15 and Tables.

Sections 753, 757, and 760a of title 15, referred to in subsec. (c), were omitted from the Code pursuant to section 760g of Title 15, which provided for the expiration of the President's authority under those sections on Sept. 30, 1981.

Section 6214 of this title, referred to in subsec. (d), was repealed by Pub. L. 106–469, title I, § 103(3), Nov. 9, 2000, 114 Stat. 2029.

AMENDMENTS

1994—Subsec. (b). Pub. L. 103–272 struck out subsec. (b) which read as follows: "There are transferred to, and vested in, the Commission all functions and authority of the Interstate Commerce Commission or any officer or component of such Commission where the regulatory function establishes rates or charges for the transportation of oil by pipeline or establishes the valuation of any such pipeline." See section 60502 of Title 49, Transportation.

OIL PIPELINE REGULATORY REFORM

Pub. L. 102–486, title XVIII, Oct. 24, 1992, 106 Stat. 3010, provided that:

"SEC. 1801. OIL PIPELINE RATEMAKING METHODOLOGY.

"(a) ESTABLISHMENT.—Not later than 1 year after the date of the enactment of this Act [Oct. 24, 1992], the Federal Energy Regulatory Commission shall issue a final rule which establishes a simplified and generally applicable ratemaking methodology for oil pipelines in accordance with section 1(5) of part I of the Interstate Commerce Act [former 49 U.S.C. 1(5)].

"(b) EFFECTIVE DATE.—The final rule to be issued under subsection (a) may not take effect before the 365th day following the date of the issuance of the rule.

"SEC. 1802. STREAMLINING OF COMMISSION PROCEDURES.

"(a) RULEMAKING.—Not later than 18 months after the date of the enactment of this Act [Oct. 24, 1992], the Commission shall issue a final rule to streamline procedures of the Commission relating to oil pipeline rates in order to avoid unnecessary regulatory costs and delays.

"(b) SCOPE OF RULEMAKING.—Issues to be considered in the rulemaking proceeding to be conducted under subsection (a) shall include the following:

"(1) Identification of information to be filed with an oil pipeline tariff and the availability to the public of any analysis of such tariff filing performed by the Commission or its staff.

"(2) Qualification for standing (including definitions of economic interest) of parties who protest oil pipeline tariff filings or file complaints thereto.

"(3) The level of specificity required for a protest or complaint and guidelines for Commission action on the portion of the tariff or rate filing subject to protest or complaint.

"(4) An opportunity for the oil pipeline to file a response for the record to an initial protest or complaint.

"(5) Identification of specific circumstances under which Commission staff may initiate a protest.

"(c) ADDITIONAL PROCEDURAL CHANGES.—In conducting the rulemaking proceeding to carry out subsection (a), the Commission shall identify and transmit to Congress any other procedural changes relating to oil pipeline rates which the Commission determines are necessary to avoid unnecessary regulatory costs and delays and for which additional legislative authority may be necessary.

"(d) WITHDRAWAL OF TARIFFS AND COMPLAINTS.—

"(1) WITHDRAWAL OF TARIFFS.—If an oil pipeline tariff which is filed under part I of the Interstate Commerce Act [former 49 U.S.C. 1 et seq.] and which is subject to investigation is withdrawn—

"(A) any proceeding with respect to such tariff shall be terminated;

"(B) the previous tariff rate shall be reinstated; and

"(C) any amounts collected under the withdrawn tariff rate which are in excess of the previous tariff rate shall be refunded.

"(2) WITHDRAWAL OF COMPLAINTS.—If a complaint which is filed under section 13 of the Interstate Commerce Act [former 49 U.S.C. 13] with respect to an oil pipeline tariff is withdrawn, any proceeding with respect to such complaint shall be terminated.

"(e) ALTERNATIVE DISPUTE RESOLUTION.—To the maximum extent practicable, the Commission shall establish appropriate alternative dispute resolution procedures, including required negotiations and voluntary arbitration, early in an oil pipeline rate proceeding as a method preferable to adjudication in resolving disputes relating to the rate. Any proposed rates derived from implementation of such procedures shall be considered by the Commission on an expedited basis for approval.

"SEC. 1803. PROTECTION OF CERTAIN EXISTING RATES.

"(a) RATES DEEMED JUST AND REASONABLE.—Except as provided in subsection (b)—

"(1) any rate in effect for the 365-day period ending on the date of the enactment of this Act [Oct. 24, 1992] shall be deemed to be just and reasonable (within the meaning of section 1(5) of the Interstate Commerce Act [former 49 U.S.C. 1(5)]); and

"(2) any rate in effect on the 365th day preceding the date of such enactment shall be deemed to be just and reasonable (within the meaning of such section 1(5)) regardless of whether or not, with respect to such rate, a new rate has been filed with the Commission during such 365-day period;

if the rate in effect, as described in paragraph (1) or (2), has not been subject to protest, investigation, or complaint during such 365-day period.

"(b) CHANGED CIRCUMSTANCES.—No person may file a complaint under section 13 of the Interstate Commerce Act [former 49 U.S.C. 13] against a rate deemed to be just and reasonable under subsection (a) unless—

"(1) evidence is presented to the Commission which establishes that a substantial change has occurred after the date of the enactment of this Act [Oct. 24, 1992]—

# 49 U.S.C. app § 1

## TITLE 49, APPENDIX—TRANSPORTATION

*This Appendix consists of sections of former Title 49 that were not included in Title 49 as enacted by Pub. L. 95–473 and Pub. L. 97–449, and certain laws related to transportation that were enacted after Pub. L. 95–473. Sections from former Title 49 retain the same section numbers in this Appendix. For disposition of all sections of former Title 49, see Table at beginning of Title 49, Transportation.*

| Chap. | | Sec. |
|---|---|---|
| 1. | Interstate Commerce Act, Part I; General Provisions and Railroad and Pipe Line Carriers | 1 |
| 2. | Legislation Supplementary to "Interstate Commerce Act" [Repealed, Transferred, or Omitted] | 41 |
| 3. | Termination of Federal Control [Repealed or Transferred] | 71 |
| 4. | Bills of Lading | 81 |
| 5. | Inland Waterways Transportation | 141 |
| 6. | Air Commerce | 171 |
| 7. | Coordination of Interstate Railroad Transportation [Repealed] | 250 |
| 8. | Interstate Commerce Act, Part II; Motor Carriers [Repealed or Transferred] | 301 |
| 9. | Civil Aeronautics [Repealed, Omitted, or Transferred] | 401 |
| 10. | Training of Civil Aircraft Pilots [Omitted or Repealed] | 751 |
| 11. | Seizure and Forfeiture of Carriers Transporting, etc., Contraband Articles | 781 |
| 12. | Interstate Commerce Act, Part III; Water Carriers [Repealed] | 901 |
| 13. | Interstate Commerce Act, Part IV; Freight Forwarders [Repealed] | 1001 |
| 14. | Federal Aid for Public Airport Development [Repealed or Transferred] | 1101 |
| 15. | International Aviation Facilities | 1151 |
| 16. | Development of Commercial Aircraft [Omitted] | 1181 |
| 17. | Medals of Honor for Acts of Heroism | 1201 |
| 18. | Airways Modernization [Repealed] | 1211 |
| 19. | Interstate Commerce Act, Part V; Loan Guaranties [Repealed] | 1231 |
| 20. | Federal Aviation Program | 1301 |
| 21. | Urban Mass Transportation | 1601 |
| 22. | High-Speed Ground Transportation [Omitted or Repealed] | 1631 |
| 23. | Department of Transportation | 1651 |
| 24. | Natural Gas Pipeline Safety | 1671 |
| 25. | Aviation Facilities Expansion and Improvement | 1701 |
| 26. | Hazardous Materials Transportation Control [Repealed] | 1761 |
| 27. | Hazardous Materials Transportation | 1801 |
| 28. | National Transportation Safety Board | 1901 |
| 29. | Hazardous Liquid Pipeline Safety | 2001 |
| 30. | Abatement of Aviation Noise | 2101 |
| 31. | Airport and Airway Improvement | 2201 |
| 32. | Commercial Motor Vehicles | 2301 |
| 33. | Public Airports | 2401 |
| 34. | Motor Carrier Safety | 2501 |
| 35. | Commercial Space Launch | 2601 |
| 36. | Commercial Motor Vehicle Safety | 2701 |

## CHAPTER 1—INTERSTATE COMMERCE ACT, PART I; GENERAL PROVISIONS AND RAILROAD AND PIPE LINE CARRIERS

Sec.
1 to 23, 25. Repealed.
26.  Safety appliances, methods, and systems.
    (a) "Railroad" defined.
    (b) Order to install systems, etc.; modification; negligence of railroad.
    (c) Filing report on rules, standards, and instructions; time; modification.
    (d) Inspection by Secretary of Transportation; personnel.
    (e) Unlawful use of system, etc.
    (f) Report of failure of system, etc., and accidents.
    (g) Repealed.
    (h) Penalties; enforcement.
26a to 27. Repealed.

**§ 1. Repealed. Pub. L. 95–473, § 4(b), (c), Oct. 17, 1978, 92 Stat. 1466, 1470; Pub. L. 96–258, § 3(b), June 3, 1980, 94 Stat. 427**

Section repealed subject to an exception related to transportation of oil by pipeline. Section 402 of Pub. L. 95–607, which amended par. (14) of this section by adding subdiv. (b) and redesignating existing subdiv. (b) as (c) subsequent to the repeal of this section by Pub. L. 95–473, was repealed by Pub. L. 96–258. For disposition of this section in revised Title 49, Transportation, see Table at beginning of Title 49. See, also, notes following Table.

Prior to repeal, section read as follows:

**§ 1. Regulation in general; car service; alteration of line**

(1) **Carriers subject to regulation**

The provisions of this chapter shall apply to common carriers engaged in—

(a) The transportation of passengers or property wholly by railroad, or partly by railroad and partly by water when both are used under a common control, management, or arrangement for a continuous carriage or shipment; or

(b) The transportation of oil or other commodity, except water and except natural or artificial gas, by pipe line, or partly by pipe line and partly by railroad or by water; or

(c) Repealed. June 19, 1934, ch. 652, title VI, § 602(b), 48 Stat. 1102;

2

from one State or Territory of the United States, or the District of Columbia, to any other State or Territory of the United States, or the District of Columbia, or from one place in a Territory to another place in the same Territory, or from any place in the United States through a foreign country to any other place in the United States, or from or to any place in the United States to or from a foreign country, but only insofar as such transportation takes place within the United States.

**(2) Transportation subject to regulation**

The provisions of this chapter shall also apply to such transportation of passengers and property, but only insofar as such transportation takes place within the United States, but shall not apply—

(a) To the transportation of passengers or property, or to the receiving, delivering, storage, or handling of property, wholly within one State and not shipped to or from a foreign country from or to any place in the United States as aforesaid, except as otherwise provided in this chapter;

(b) Repealed. June 19, 1934, ch. 652, title VI, § 602(b), 48 Stat. 1102.

(c) To the transportation of passengers or property by a carrier by water where such transportation would not be subject to the provisions of this chapter except for the fact that such carrier absorbs, out of its port-to-port water rates or out of its proportional through rates, any switching, terminal, lighterage, car rental, trackage, handling, or other charges by a rail carrier for services within the switching, drayage, lighterage, or corporate limits of a port terminal or district.

**(3) Definitions**

(a) The term "common carrier" as used in this chapter shall include all pipe-line companies; express companies; sleeping-car companies; and all persons, natural or artificial, engaged in such transportation as aforesaid as common carriers for hire. Wherever the word "carrier" is used in this chapter it shall be held to mean "common carrier." The term "railroad" as used in this chapter shall include all bridges, car floats, lighters, and ferries used by or operated in connection with any railroad, and also all the road in use by any common carrier operating a railroad, whether owned or operated under a contract, agreement, or lease, and also all switches, spurs, tracks, terminals, and terminal facilities of every kind used or necessary in the transportation of the persons or property designated herein, including all freight depots, yards, and grounds, used or necessary in the transportation or delivery of any such property. The term "transportation" as used in this chapter shall include locomotives, cars, and other vehicles, vessels, and all instrumentalities and facilities of shipment or carriage, irrespective of ownership or of any contract, express or implied, for the use thereof, and all services in connection with the receipt, delivery, elevation, and transfer in transit, ventilation, refrigeration or icing, storage, and handling of property transported. The term "person" as used in this chapter includes an individual, firm, copartnership, corporation, company, association, or joint-stock association; and includes a trustee, receiver, assignee, or personal representative thereof.

(b) For the purposes of sections 5, 12(1), 20, 304(a)(7), 310, 320, 904(b), 910, and 913 of this Appendix, where reference is made to control (in referring to a relationship between any person or persons and another person or persons), such reference shall be construed to include actual as well as legal control, whether maintained or exercised through or by reason of the method of or circumstances surrounding organization or operation, through or by common directors, officers, or stockholders, a voting trust or trusts, a holding or investment company or companies, or through or by any other direct or indirect means; and to include the power to exercise control.

**(4) Duty to furnish transportation and establish through routes; division of joint rates**

It shall be the duty of every common carrier subject to this chapter to provide and furnish transportation upon reasonable request therefor, and to establish reasonable through routes with other such carriers, and just and reasonable rates, fares, charges, and classifications applicable thereto; and it shall be the duty of common carriers by railroad subject to this chapter to establish reasonable through routes with common carriers by water subject to chapter 12 of this Appendix, and just and reasonable rates, fares, charges, and classifications applicable thereto. It shall be the duty of every such common carrier establishing through routes to provide reasonable facilities for operating such routes and to make reasonable rules and regulations with respect to their operation, and providing for reasonable compensation to those entitled thereto; and in case of joint rates, fares, or charges, to establish just, reasonable, and equitable divisions thereof, which shall not unduly prefer or prejudice any of such participating carriers.

**(5) Just and reasonable charges; applicability; criteria for determination**

(a) All charges made for any service rendered or to be rendered in the transportation of passengers or property as aforesaid, or in connection therewith, shall be just and reasonable, and every unjust and unreasonable charge for such service or any part thereof is prohibited and declared to be unlawful. The provisions of this subdivision shall not apply to common carriers by railroad subject to this chapter.

(b) Each rate for any service rendered or to be rendered in the transportation of persons or property by any common carrier by railroad subject to this chapter shall be just and reasonable. A rate that is unjust or unreasonable is prohibited and unlawful. No rate which contributes or which would contribute to the going concern value of such a carrier shall be found to be unjust or unreasonable, or not shown to be just and reasonable, on the ground that such rate is below a just or reasonable minimum for the service rendered or to be rendered. A rate which equals or exceeds the variable costs (as determined through formulas prescribed by the Commission) of providing a service shall be presumed, unless such presumption is rebutted by clear and convincing evidence, to contribute to the going concern value of the carrier or carriers proposing such rate (hereafter in this paragraph referred to as the "proponent carrier"). In determining variable costs, the Commission shall, at the request of the carrier proposing the rate, determine only those costs of the carrier proposing the rate and only those costs of the specific service in question, except where such specific data and cost information is not available. The Commission shall not include in variable cost any expenses which do not vary directly with the level of service provided under the rate in question. Notwithstanding any other provision of this chapter, no rate shall be found to be unjust or unreasonable, or not shown to be just and reasonable, on the ground that such rate exceeds a just or reasonable maximum for the service rendered or to be rendered, unless the Commission has first found that the proponent carrier has market dominance over such service. A finding that a carrier has market dominance over a service shall not create a presumption that the rate or rates for such service exceed a just and reasonable maximum. Nothing in this paragraph shall prohibit a rate increase from a level which reduces the going concern value of the proponent carrier to a level which contributes to such going concern value and is otherwise just and reasonable. For the purposes of the preceding sentence, a rate increase which does not raise a rate above the incremental costs (as determined through formulas prescribed by the Commission) of rendering the service to which such rate applies shall be presumed to be just and reasonable.

3

application therefor in writing by any shipper or owner of such lateral, branch line railroad, such shipper or owner of such lateral branch line of railroad, may make complaint to the Commission, as provided in section 13 of this Appendix, and the Commission shall hear and investigate the same and shall determine as to the safety and practicability thereof and justification and reasonable compensation therefor, and the Commission may make an order, as provided in section 15 of this Appendix, directing the common carrier to comply with the provisions of this section in accordance with such order, and such order shall be enforced as hereinafter provided for the enforcement of all other orders by the Commission, other than orders for the payment of money.

**(10) "Car service" defined**

The term "car service" in this chapter shall include the use, control, supply, movement, distribution, exchange, interchange, and return of locomotives, cars, and other vehicles used in the transportation of property, including special types of equipment, and the supply of trains, by any carrier by railroad subject to this chapter.

**(11) Duty to furnish car service; rules and regulations**

It shall be the duty of every carrier by railroad subject to this chapter to furnish safe and adequate car service and to establish, observe, and enforce just and reasonable rules, regulations, and practices with respect to car service; and every unjust and unreasonable rule, regulation, and practice with respect to car service is prohibited and declared to be unlawful.

**(12) Distribution of coal cars; failure to prorate; penalty; applicability of unit-train and non-unit-train service; definition**

It shall also be the duty of every carrier by railroad to make just and reasonable distribution of cars for transportation of coal among the coal mines served by it, whether located upon its line or lines or customarily dependent upon it for car supply. During any period when the supply of cars available for such service does not equal the requirements of such mines it shall be the duty of the carrier to maintain and apply just and reasonable ratings of such mines and to count each and every car furnished to or used by any such mine for transportation of coal against the mine. Failure or refusal so to do shall be unlawful, and in respect of each car not so counted shall be deemed a separate offense, and the carrier, receiver, or operating trustee so failing or refusing shall forfeit to the United States the sum of $100 for each offense, which may be recovered in a civil action brought by the United States. In applying the provisions of this paragraph, unit-train service and non-unit-train service shall be considered separate and distinct classes of service, and a distinction shall be made between these two classes of service and between the cars used in each class of service; questions of the justness and reasonableness of, or discrimination or preference or prejudice or advantage or disadvantage in, the distribution of cars shall be determined within each such class and not between them, notwithstanding any other provision of section 1, 2, or 3 of this Appendix, and of section 41, 42, or 43 of this Appendix. Coal cars supplied by shippers or receivers shall not be considered a part of such carrier's fleet or otherwise counted in determining questions of distribution or car count under this paragraph or any provision of law referred to in this section. As used in this paragraph, the term "unit-train service", means the movement of a single shipment of coal of not less than 4,500 tons, tendered to one carrier, on one bill of lading, at one origin, on one day, and destined to one consignee, at one plant, at one destination, via one route.

**(13) Rules and regulations as to car service to be filed, etc.**

The Commission is authorized by general or special orders to require all carriers by railroad subject to this chapter, or any of them, to file with it from time to time their rules and regulations with respect to car service, and the Commission may, in its discretion, direct that such rules and regulations shall be incorporated in their schedules showing rates, fares, and charges for transportation, and be subject to any or all of the provisions of this chapter relating thereto.

**(14) Establishment by Commission of rules, etc., as to car service; procedures applicable**

(a) It is the intent of the Congress to encourage the purchase, acquisition, and efficient utilization of freight cars. In order to carry out such intent, the Commission may, upon complaint of an interested party or upon its own initiative without complaint, and after notice and an opportunity for a hearing, establish reasonable rules, regulations, and practices with respect to car service by common carriers by railroad subject to this chapter, including (i) the compensation to be paid for the use of any locomotive, freight car, or other vehicle, (ii) the other terms of any contract, agreement, or arrangement for the use of any locomotive or other vehicle not owned by the carrier by which it is used (and whether or not owned by another carrier, shipper, or third party), and (iii) the penalties or other sanctions for nonobservance of such rules, regulations, or practices. In determining the rates of compensation to be paid for each type of freight car, the Commission shall give consideration to the transportation use of each type of freight car, to the national level of ownership of each such type of freight car, and to other factors affecting the adequacy of the national freight car supply. Such compensation shall be fixed on the basis of the elements of ownership expense involved in owning and maintaining each such type of freight car, including a fair return on the cost of such type of freight car (giving due consideration to current costs of capital, repairs, materials, parts, and labor). Such compensation may be increased by any incentive element which will, in the judgment of the Commission, provide just and reasonable compensation to freight car owners, contribute to sound car service practices (including efficient utilization and distribution of cars), and encourage the acquisition and maintenance of a car supply adequate to meet the needs of commerce and the national defense. The Commission shall not make any incentive element applicable to any type of freight car if the Commission finds that the supply of such type of freight car is adequate. The Commission may exempt such incentive element from the compensation to be paid by any carrier or group of carriers if the Commission finds that such an exemption is in the national interest.

(b) If the Commission finds, upon the petition of an interested party and after notice and a hearing on the record, that a common carrier by railroad subject to this part has materially failed to furnish safe and adequate car service as required by paragraph (11) of this section, the Commission may require such carrier to provide itself with such facilities and equipment as may be reasonably necessary to furnish such service, if the evidence of record establishes, and the Commission affirmatively finds, that—

(i) the provision of such facilities or equipment will not materially and adversely affect the ability of such carrier to otherwise provide safe and adequate transportation services;

(ii) the expenditure required for such facilities or equipment, including a return which equals such carrier's current cost of capital, will be recovered; and

(iii) the provision of such facilities or equipment will not impair the ability of such carrier to attract adequate capital.

(c) It shall be unlawful for any common carrier by railroad or express company, subject to this chapter, to make or enter into any contract, agreement, or arrangement with any person for the furnishing to or on behalf of such carrier or express company of protective service against heat or cold to property transport-

**4**

ed or to be transported in interstate or foreign commerce, or for any such carrier or express company to continue after April 1, 1941, as a party to any such contract, agreement, or arrangement unless and until such contract, agreement, or arrangement has been submitted to and approved by the Commission as just, reasonable, and consistent with the public interest: *Provided,* That if the Commission is unable to make its determination with respect to any such contract, agreement, or arrangement prior to said date, it may extend it to not later than October 1, 1941.

**(15) Powers of Commission in case of emergency**

Whenever the Commission is of opinion that shortage of equipment, congestion of traffic, or other emergency requiring immediate action exists in any section of the country, the Commission shall have, and it is given, authority, either upon complaint or upon its own initiative without complaint, at once, if it so orders, without answer or other formal pleading by the interested carrier or carriers, and with or without notice, hearing, or the making or filing of a report, according as the Commission may determine: (a) to suspend the operation of any or all rules, regulations, or practices then established with respect to car service for such time as may be determined by the Commission; (b) to make such just and reasonable directions with respect to car service without regard to the ownership as between carriers of locomotives, cars, and other vehicles, during such emergency as in its opinion will best promote the service in the interest of the public and the commerce of the people, upon such terms of compensation as between the carriers as they may agree upon, or, in the event of their disagreement, as the Commission may after subsequent hearing find to be just and reasonable; (c) to require such joint or common use of terminals, including main-line track or tracks for a reasonable distance outside of such terminals, as in its opinion will best meet the emergency and serve the public interest, and upon such terms as between the carriers as they may agree upon, or, in the event of their disagreement, as the Commission may after subsequent hearing find to be just and reasonable; and (d) to give directions for preference or priority in transportation, embargoes, or movement of traffic under permits, at such time and for such periods as it may determine, and to modify, change, suspend, or annul them. In time of war or threatened war the President may certify to the Commission that it is essential to the national defense and security that certain traffic shall have preference or priority in transportation, and the Commission shall, under the power herein conferred, direct that such preference or priority be afforded.

**(16) Rerouting of traffic on failure of initial carrier to serve public**

(a) Whenever the Commission is of opinion that any carrier by railroad subject to this chapter is for any reason unable to transport the traffic offered it so as properly to serve the public, it may, upon the same procedure as provided in paragraph (15) of this section, make such just and reasonable directions with respect to the handling, routing, and movement of the traffic of such carrier and its distribution over other lines of roads, as in the opinion of the Commission will best promote the service in the interest of the public and the commerce of the people, and upon such terms as between the carriers as they may agree upon, or, in the event of their disagreement, as the Commission may after subsequent hearing find to be just and reasonable.

(b) Whenever any carrier by railroad is unable to transport the traffic offered it because—

(1) its cash position makes its continuing operation impossible;

(2) it has been ordered to discontinue any service by a court; or

(3) it has abandoned service without obtaining a certificate from the Commission pursuant to this section;

the Commission may, upon the same procedure as provided in paragraph (15) of this section, make such just and reasonable directions with respect to the handling, routing, and movement of the traffic available to such carrier and its distribution over such carrier's lines, as in the opinion of the Commission will best promote the service in the interest of the public and the commerce of the people subject to the following conditions:

(A) Such direction shall be effective for no longer than 60 days unless extended by the Commission for cause shown for an additional designated period not to exceed 180 days.

(B) No such directions shall be issued that would cause a carrier to operate in violation of the Federal Railroad Safety Act of 1970 [45 U.S.C. 431 et seq.] or that would substantially impair the ability of the carrier so directed to serve adequately its own patrons or to meet its outstanding common carrier obligations.

(C) The directed carrier shall not, by reason of such Commission direction, be deemed to have assumed or to become responsible for the debts of the other carrier.

(D) The directed carrier shall hire employees of the other carrier to the extent such employees had previously performed the directed service for the other carrier, and, as to such employees as shall be so hired, the directed carrier shall be deemed to have assumed all existing employment obligations and practices of the other carrier relating thereto, including, but not limited to, agreements governing rate of pay, rules and working conditions, and all employee protective conditions commencing with and for the duration of the direction.

(E) Any order of the Commission entered pursuant to this paragraph shall provide that if, for the period of its effectiveness, the cost, as hereinafter defined, of handling, routing, and moving the traffic of another carrier over the other carrier's lines of road shall exceed the direct revenues therefor, then upon request, payment shall be made to the directed carrier, in the manner hereinafter provided and within 90 days after expiration of such order, of a sum equal to the amount by which such cost has exceeded said revenues. The term "cost" shall mean those expenditures made or incurred in or attributable to the operations as directed, including the rental or lease of necessary equipment, plus an appropriate allocation of common expenses, overheads, and a reasonable profit. Such cost shall be then currently recorded by the carrier or carriers in such manner and on such forms as by general order may be prescribed by the Commission and shall be submitted to and subject to audit by the Commission. The Commission shall certify promptly to the Secretary of the Treasury the amount of payment to be made to said carrier or carriers under the provisions of this paragraph. Payments required to be made to a carrier under the provisions of this paragraph shall be made by the Secretary of the Treasury from funds hereby authorized to be appropriated in such amounts as may be necessary for the purpose of carrying out the provisions hereof.

**(17) Directions of Commission as to car service; disobedience; rights of States; bribery**

(a) The directions of the Commission as to car service and to the matters referred to in paragraphs (15) and (16) of this section may be made through and by such agents or agencies as the Commission shall designate and appoint for that purpose. It shall be the duty of all carriers by railroad subject to this chapter, and of their officers, agents, and employees, to obey strictly and conform promptly to such orders or directions of the Commission, and in case of failure or refusal on the part of any carrier, receiver, or operating trustee to comply with any such order or direction such carrier, receiver, or trustee shall be liable to a penalty of

**5**

not less than $100 nor more than $500 for each such offense and $50 for each and every day of the continuance of such offense, which shall accrue to the United States and may be recovered in a civil action brought by the United States: *Provided, however,* That nothing in this chapter shall impair or affect the right of a State, in the exercise of its police power, to require just and reasonable freight and passenger service for intrastate business, except insofar as such requirement is inconsistent with any lawful order of the Commission made under the provisions of this chapter and except as otherwise provided in this chapter.

(b) It shall be unlawful for any person to offer or give or cause or procure to be offered or given, directly or indirectly, any money, property, or thing of value, or bribe in any other form whatsoever, to any person acting for or employed by any carrier by railroad subject to this part with intent to influence his decision or action, or because of his decision or action, with respect to the supply, distribution, or movement of cars or other vehicles, or vessels, used in the transportation of property. It shall be unlawful for any person acting for or employed by any carrier by railroad subject to this chapter to solicit, accept, or receive, directly or indirectly, any money, property, or thing of value, or bribe in any other form whatsoever, with intent to be influenced thereby in his decision or action, or because of his decision or action, with respect to the supply, distribution, or movement of cars or other vehicles, or vessels, used in the transportation of property. Any person who violates the provisions of this subparagraph shall be deemed guilty of a misdemeanor and be subject for each offense to a fine of not more than $1,000, or imprisonment in the penitentiary for a term of not more than two years, or both such fine and imprisonment.

**(18) Extension or addition of lines; certificate required; procedures applicable to application for certificate; petition or initiative of Commission; agreements for ownership or use of spur, etc., tracks; limitations on authority of Commission; injunctions and penalty for violations**

(a) No carrier by railroad subject to this chapter shall—

(i) undertake the extension of any of its lines of railroad or the construction of any additional line of railroad;

(ii) acquire or operate any such extension or any such additional line; or

(iii) engage in transportation over, or by means of, any such extended or additional line of railroad,

unless such extension or additional line of railroad is described in and covered by a certificate which is issued by the Commission and which declares that the present or future public convenience and necessity require or will be enhanced by the construction and operation of such extended or additional line of railroad. Upon receipt of an application for such a certificate, the Commission shall (A) send a copy of the application to the chief executive officer of each State that would be directly affected by the construction or operation of such extended or additional line, (B) send an accurate and understandable summary of such application to a newspaper of general circulation in such affected area or areas with a request that such information be made available to the general public, (C) cause a copy of such summary to be published in the Federal Register, (D) take such other steps as it deems reasonable and effective to publicize such application, and (E) indicate in such transmissions and publications that each interested person is entitled to recommend to the Commission that it approve, disapprove, or take any other specified action with respect to such application.

(b) The Commission shall establish, and may from time to time amend, rules and regulations (as to hearings and other matters) to govern applications for, and the issuance of, any certificate required by subdivision (a). An application for such a certificate shall be submitted to the Commission in such form and manner

and with such documentation as the Commission shall prescribe. The Commission may—

(i) issue such a certificate in the form requested by the applicant;

(ii) issue such a certificate with modifications in such form and subject to such terms and conditions as are necessary in the public interest; or

(iii) refuse to issue such a certificate.

(c) Upon petition or upon its own initiative, the Commission may authorize any carrier by railroad subject to this chapter to extend any of its lines of railroad or to take any other action necessary for the provision of adequate, efficient, and safe facilities for the performance of such carrier's obligations under this chapter. No authorization shall be made unless the Commission finds that the expense thereof will not impair the ability of such carrier to perform its obligations to the public.

(d) Carriers by railroad subject to this chapter may, notwithstanding this paragraph and section 5 of this Appendix, and without the approval of the Commission, enter into contracts, agreements, or other arrangements for the joint [joint] ownership or joint use of spur, industrial, team, switching, or side tracks. The authority granted to the Commission under this paragraph shall not extend to the construction, acquisition, or operation of spur, industrial, team, switching, or side tracks if such tracks are located or intended to be located entirely within one State, and shall not apply to any street, suburban, or interurban electric railway which is not operated as part of a general system of rail transportation.

(e) Any construction or operation which is contrary to any provision of this paragraph, of any regulations promulgated under this paragraph, or of any terms and conditions of an applicable certificate, may be enjoined by an appropriate district court of the United States in a civil action commenced and maintained by the United States, the Commission, or the attorney general or the transportation regulatory body of an affected State or area. Such a court may impose a civil penalty of not to exceed $5,000 on each person who knowingly authorizes, consents to, or permits any violation of this paragraph or of the conditions of a certificate issued under this paragraph.

(Feb. 4, 1887, ch. 104, pt. I, § 1, 24 Stat. 379; June 29, 1906, ch. 3591, § 1, 34 Stat. 584; Apr. 13, 1908, ch. 143, 35 Stat. 60; June 18, 1910, ch. 309, § 7, 36 Stat. 544; May 29, 1917, ch. 23, 40 Stat. 101; Feb. 28, 1920, ch. 91, §§ 400–403, 41 Stat. 474–479; June 19, 1934, ch. 652, § 602(b), 48 Stat. 1102; Aug. 9, 1935, ch. 498, § 1, 49 Stat. 543; Sept. 18, 1940, ch. 722, title I, §§ 2, 3(a), (b), 4, 54 Stat. 899–901; June 24, 1948, ch. 622, 62 Stat. 472; Aug. 2, 1949, ch. 379, § 1, 63 Stat. 485; June 27, 1952, ch. 477, title IV, § 402(g), 66 Stat. 277; Aug. 12, 1958, Pub. L. 85–625, § 3, 72 Stat. 570; May 26, 1966, Pub. L. 89–430, § 1, 80 Stat. 168; Jan. 2, 1974, Pub. L. 93–236, title VI, § 601(e), 87 Stat. 1021; Feb. 5, 1976, Pub. L. 94–210, title II, §§ 202(a), (b), 211, 212(a), title III, § 310, title VIII, § 801, 90 Stat. 34, 35, 46, 60, 125; Nov. 8, 1978, Pub. L. 95–607, title IV, § 402, 92 Stat. 3067.)

**§ 1a. Repealed. Pub. L. 95–473, § 4(b), (c), Oct. 17, 1978, 92 Stat. 1466, 1470**

Section repealed subject to an exception related to transportation of oil by pipeline. For disposition of this section in revised Title 49, Transportation, see Table at beginning of Title 49. See, also, notes following Table.

Prior to repeal, section read as follows:

§ 13a. Discontinuance or change of the operation or service of trains or ferries; notice; investigation; hearing; determination

(1) A carrier or carriers subject to this chapter, if their rights with respect to the discontinuance or change, in whole or in part, of the operation or service of any train or ferry operating from a point in one State to a point in any other State or in the District of Columbia, or from a point in the District of Columbia to a point in any State, are subject to any provision of the constitution or statutes of any State or any regulation or order of (or are the subject of any proceeding pending before) any court or an administrative or regulatory agency of any State, may, but shall not be required to, file with the Commission, and upon such filing shall mail to the Governor of each State in which such train or ferry is operated, and post in every station, depot or other facility served thereby, notice at least thirty days in advance of any such proposed discontinuance or change. The carrier or carriers filing such notice may discontinue or change any such operation or service pursuant to such notice except as otherwise ordered by the Commission pursuant to this paragraph, the laws or constitution of any State, or the decision or order of, or the pendency of any proceeding before, any court or State authority to the contrary notwithstanding. Upon the filing of such notice the Commission shall have authority during said thirty days' notice period, either upon complaint or upon its own initiative without complaint, to enter upon an investigation of the proposed discontinuance or change. Upon the institution of such investigation, the Commission, by order served upon the carrier or carriers affected thereby at least ten days prior to the day on which such discontinuance or change would otherwise become effective, may require such train or ferry to be continued in operation or service, in whole or in part, pending hearing and decision in such investigation, but not for a longer period than four months beyond the date when such discontinuance or change would otherwise have become effective. If, after hearing in such investigation whether concluded before or after such discontinuance or change has become effective, the Commission finds that the operation or service of such train or ferry is required by public convenience and necessity and will not unduly burden interstate or foreign commerce, the Commission may by order require the continuance or restoration of operation or service of such train or ferry, in whole or in part, for a period not to exceed one year from the date of such order. The provisions of this paragraph shall not supersede the laws of any State or the orders or regulations of any administrative or regulatory body of any State applicable to such discontinuance or change unless notice as in this paragraph provided is filed with the Commission. On the expiration of an order by the Commission after such investigation requiring the continuance or restoration of operation or service, the jurisdiction of any State as to such discontinuance or change shall no longer be superseded unless the procedure provided by this paragraph shall again be invoked by the carrier or carriers.

(2) Where the discontinuance or change, in whole or in part, by a carrier or carriers subject to this chapter, of the operation or service of any train or ferry operated wholly within the boundaries of a single State is prohibited by the constitution or statutes of any State or where the State authority having jurisdiction thereof shall have denied an application or petition duly filed with it by said carrier or carriers for authority to discontinue or change, in whole or in part, the operation or service of any such train or ferry or shall not have acted finally on such an application or petition within one hundred and twenty days from the presentation thereof, such carrier or carriers may petition the Commission for authority to effect such discontinuance or change. The Commission may grant such authority only after full hearing and upon findings by it that (a) the present or future public convenience and necessity permit of such discontinuance or change, in whole or in part, of the operation or service of such train or ferry, and (b) the continued operation or service of such train or ferry without discontinuance or change, in whole or in part, will constitute an unjust and undue burden upon the interstate operations of such carrier or carriers or upon interstate commerce. When any petition shall be filed with the Commission under the provisions of this paragraph the Commission shall notify the Governor of the State in which such train or ferry is operated at least thirty days in advance of the hearing provided for in this paragraph, and such hearing shall be held by the Commission in the State in which such train or ferry is operated; and the Commission is authorized to avail itself of the cooperation, services, records and facilities of the authorities in such State in the performance of its functions under this paragraph.

(Feb. 4, 1887, ch. 104, pt. I, § 13a, as added Aug. 12, 1958, Pub. L. 85–625, § 5, 72 Stat. 571.)

## § 14. Repealed. Pub. L. 95–473, § 4(b), (c), Oct. 17, 1978, 92 Stat. 1466, 1470

Section repealed subject to an exception related to transportation of oil by pipeline. For disposition of this section in revised Title 49, Transportation, see Table at beginning of Title 49. See, also, notes following Table.

Prior to repeal, section read as follows:

§ 14. Reports and decisions of Commission

(1) Reports of investigations by Commission

Whenever an investigation shall be made by said Commission, it shall be its duty to make a report in writing in respect thereto, which shall state the conclusions of the Commission, together with its decision, order, or requirement in the premises; and in case damages are awarded, such report shall include the findings of fact on which the award is made.

(2) Record of reports; copies

All reports of investigations made by the Commission shall be entered of record, and a copy thereof shall be furnished to the party who may have complained, and to any common carrier that may have been complained of.

(3) Publication of reports and decisions; printing and distribution of annual reports

The Commission may provide for the publication of its reports and decisions in such form and manner as may be best adapted for public information and use, and such authorized publications shall be competent evidence of the reports and decisions of the Commission therein contained in all courts of the United States and of the several States without any further proof or authentication thereof. The Commission may also cause to be printed for early distribution its annual reports.

(Feb. 4, 1887, ch. 104, pt. I, § 14, 24 Stat. 384; Mar. 2, 1889, ch. 382, § 4, 25 Stat. 859; June 29, 1906, ch. 3591, § 3, 34 Stat. 589; Feb. 28, 1920, ch. 91, § 417, 41 Stat. 484; Aug. 9, 1935, ch. 408, § 1, 49 Stat. 543.)

## § 15. Repealed. Pub. L. 95–473, § 4(b), (c), Oct. 17, 1978, 92 Stat. 1466, 1470; Pub. L. 96–258. § 3(b). June 3, 1980, 94 Stat. 427

Section repealed subject to an exception related to transportation of oil by pipeline. Section 401 of Pub. L. 95–607, which amended par. (8)(c) and (d) of this section subsequent to the repeal of this section by Pub. L. 95–473, was repealed by Pub. L. 96–258, effective July 1, 1980, as provided by section 3(c) of Pub L. 96–258. For disposition of this section in revised Title 49, Transportation, see Table at beginning of Title 49. See, also, notes following Table.

Prior to repeal, section read as follows:

**§ 15. Determination of rates, routes, etc.; routing of traffic; disclosures, etc.**

**(1) Commission empowered to determine and prescribe rates, classifications, etc.**

Whenever, after full hearing, upon a complaint made as provided in section 13 of this Appendix, or after full hearing under an order for investigation and hearing made by the Commission on its own initiative, either in extension of any pending complaint or without any complaint whatever, the Commission shall be of opinion that any individual or joint rate, fare, or charge whatsoever demanded, charged, or collected by any common carrier or carriers subject to this chapter for the transportation of persons or property, as defined in section 1 of this Appendix, or that any individual or joint classification, regulation, or practice whatsoever of such carrier or carriers subject to the provisions of this chapter, is or will be unjust or unreasonable or unjustly discriminatory or unduly preferential or prejudicial, or otherwise in violation of any of the provisions of this chapter, the Commission is authorized and empowered to determine and prescribe what will be the just and reasonable individual or joint rate, fare, or charge, or rates, fares, or charges, to be thereafter observed in such case, or the maximum or minimum, or maximum and minimum, to be charged, and what individual or joint classification, regulation, or practice is or will be just, fair, and reasonable, to be thereafter followed, and to make an order that the carrier or carriers shall cease and desist from such violation to the extent to which the Commission finds that the same does or will exist, and shall not thereafter publish, demand, or collect any rate, fare, or charge for such transportation other than the rate, fare, or charge so prescribed, or in excess of the maximum or less than the minimum so prescribed, as the case may be, and shall adopt the classification and shall conform to and observe the regulation or practice so prescribed.

**(2) Orders of Commission**

Except as otherwise provided in this chapter, all orders of the Commission, other than orders for the payment of money, shall take effect within such reasonable time as the Commission may prescribe. Such orders shall continue in force until its further order, or for a specified period of time, according as shall be prescribed in the order, unless the same shall be suspended or modified or set aside by the Commission, or be suspended or set aside by a court of competent jurisdiction.

**(3) Establishment of through routes, joint classifications, joint rates, fares, etc.**

The Commission may, and it shall whenever deemed by it to be necessary or desirable in the public interest, after full hearing upon complaint or upon its own initiative without complaint, establish through routes, joint classifications, and joint rates, fares, or charges, applicable to the transportation of passengers or property by carriers subject to this chapter, or by carriers by railroad subject to this chapter and common carriers by water subject to chapter 12 of this Appendix, or the maxima or minima, or maxima and minima, to be charged, and the divisions of such rates, fares, or charges as hereinafter provided, and the terms and conditions under which such through routes shall be operated. The Commission shall not, however, establish any through route, classification, or practice, or any rate, fare, or charge, between street electric passenger railways not engaged in the general business of transporting freight in addition to their passenger and express business, and railroads of a different character. If any tariff or schedule canceling any through route or joint rate, fare, charge, or classification, without the consent of all carriers parties thereto or authorization by the Commission, is suspended by the Commission for investigation, the burden of proof shall be upon the carrier or carriers proposing such cancelation to show that it is consistent with the public interest, without regard to the provisions of paragraph (4) of this section. With respect to carriers by railroad, in determining whether any such cancellation or proposed cancellation involving any common carrier by railroad is consistent with the public interest, the Commission shall, to the extent applicable, (a) compare the distance traversed and the average transportation time and expense required using the through route, and the distance traversed and the average transportation time and expense required using alternative routes, between the points served by such through route, (b) consider any reduction in energy consumption which may result from such cancellation, and (c) take into account the overall impact of such cancellation on the shippers and carriers who are affected thereby.

**(4) Through routes to embrace entire length of railroad; temporary through routes**

In establishing any such through route the Commission shall not (except as provided in section 3 of this Appendix, and except where one of the carriers is a water line) require any carrier by railroad, without its consent, to embrace in such route substantially less than the entire length of its railroad and of any intermediate railroad operated in conjunction and under a common management or control therewith, which lies between the termini of such proposed through route, (a) unless such inclusion of lines would make the through route unreasonably long as compared with another practicable through route which could otherwise be established, or (b) unless the Commission finds that the through route proposed to be established is needed in order to provide adequate, and more efficient or more economic, transportation: *Provided, however,* That in prescribing through routes the Commission shall, so far as is consistent with the public interest, and subject to the foregoing limitations in clauses (a) and (b) of this paragraph, give reasonable preference to the carrier by railroad which originates the traffic. No through route and joint rates applicable thereto shall be established by the Commission for the purpose of assisting any carrier that would participate therein to meet its financial needs. In time of shortage of equipment, congestion of traffic, or other emergency declared by the Commission, it may (either upon complaint or upon its own initiative without complaint, at once, if it so orders, without answer or other formal pleadings by the interested carrier or carriers, and with or without notice, hearing, or the making or filing of a report, according as the Commission may determine) establish temporarily such through routes as in its opinion are necessary or desirable in the public interest.

**(5) Transportation of livestock in carload lots; services included**

Transportation wholly by railroad of ordinary livestock in carload lots destined to or received at public stockyards shall include all necessary service of unloading and reloading en route, delivery at public stockyards of inbound shipments into suitable pens, and receipt and loading at such yards of outbound shipments, without extra charge therefor to the shipper, consignee, or owner, except in cases where the unloading or reloading en route is at the request of the shipper, consignee, or owner, or to try an intermediate market, or to comply with quarantine regulations. The Commission may prescribe or approve just and reasonable rules governing each of such excepted services. Nothing in this paragraph shall be construed to affect the duties and liabilities of the carriers existing on February 28, 1920, by virtue of law respecting the transportation of other than ordinary livestock, or the duty of performing service as to shipments other than those to or from public stockyards.

(6) Commission to establishment just divisions of joint rates, fares, or charges; adjustments; procedures applicable

(a) Whenever, after full hearing upon complaint or upon its own initiative, the Commission is of opinion that the divisions of joint rates, fares, or charges, applicable to the transportation of passengers or property, are or will be unjust, unreasonable, inequitable, or unduly preferential or prejudicial as between the carriers parties thereto (whether agreed upon by such carriers, or any of them, or otherwise established), the Commission shall by order prescribe the just, reasonable, and equitable divisions thereof to be received by the several carriers, and in cases where the joint rate, fare, or charge was established pursuant to a finding or order of the Commission and the divisions thereof are found by it to have been unjust, unreasonable, or inequitable, or unduly preferential or prejudicial, the Commission may also by order determine what (for the period subsequent to the filing of the complaint or petition or the making of the order of investigation) would have been the just, reasonable and equitable divisions thereof to be received by the several carriers, and require adjustment to be made in accordance therewith. In so prescribing and determining the divisions of joint rates, fares, and charges, the Commission shall give due consideration, among other things, to the efficiency with which the carriers concerned are operated, the amount of revenue required to pay their respective operating expenses, taxes, and a fair return on their railway property held for and used in the service of transportation, and the importance to the public of the transportation services of such carriers; and also whether any particular participating carrier is an originating, intermediate, or delivering line, and any other fact or circumstance which would ordinarily, without regard to the mileage haul, entitle one carrier to a greater or less proportion than another carrier of the joint rate, fare, or charge.

(b) Notwithstanding any other provision of law, the Commission shall, within 180 days after February 5, 1976, establish, by rule, standards and procedures for the conduct of proceedings for the adjustment of divisions of joint rates or fares (whether prescribed by the Commission or otherwise) in accordance with the provisions of this paragraph. The Commission shall issue a final order in all such proceedings within 270 days after the submission to the Commission of a case. If the Commission is unable to issue such a final order within such time, it shall issue a report to the Congress setting forth the reasons for such inability.

(c) All evidentiary proceedings conducted pursuant to this paragraph shall be completed, in a case brought upon a complaint, within 1 year following the filing of the complaint, or, in a case brought upon the Commission's initiative, within 2 years following the commencement of such proceeding, unless the Commission finds that such a proceeding must be extended to permit a fair and expeditious completion of the proceeding. If the Commission is unable to meet any such time requirement, it shall issue a report to the Congress setting forth the reasons for such inability.

(d) Whenever a proceeding for the adjustment of divisions of joint rates or fares (whether prescribed by the Commission or otherwise established) is commenced by the filing of a complaint with the Commission, the complaining carrier or carriers shall (i) attach thereto all of the evidence in support of their position, and (ii) during the course of such proceeding, file only rebuttal or reply evidence unless otherwise directed by order of the Commission. Upon receipt of a notice of intent to file a complaint pursuant to this paragraph, the Commission shall accord, to the party filing such notice, the same right to discovery that would be accorded to a party filing a complaint pursuant to this paragraph.

(7) Commission to determine lawfulness of new rates; suspension; refunds; nonapplicability to common carriers by railroad subject to chapter

Whenever there shall be filed with the Commission any schedule stating a new individual or joint rate, fare, or charge, or any new individual or joint classification, or any new individual or joint regulation or practice affecting any rate, fare, or charge, the Commission shall have, and it is given, authority, either upon complaint or upon its own initiative without complaint, at once, and if it so orders without answer or other formal pleading by the interested carrier or carriers, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, fare, charge, classification, regulation, or practice; and pending such hearing and the decision thereon the Commission, upon filing with such schedule and delivering to the carrier or carriers affected thereby a statement in writing of its reasons for such suspension, may from time to time suspend the operation of such schedule and defer the use of such rate, fare, charge, classification, regulation, or practice, but not for a longer period than seven months beyond the time when it would otherwise go into effect; and after full hearing, whether completed before or after the rate, fare, charge, classification, regulation, or practice goes into effect, the Commission may make such order with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made within the period of suspension, the proposed change of rate, fare, charge, classification, regulation, or practice shall go into effect at the end of such period; but in case of a proposed increased rate or charge for or in respect to the transportation of property, the Commission may by order require the interested carrier or carriers to keep accurate account in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts are paid, and upon completion of the hearing and decision may by further order require the interested carrier or carriers to refund, with interest, to the persons in whose behalf such amounts were paid, such portion of such increased rates or charges as by its decision shall be found not justified. At any hearing involving a change in a rate, fare, charge, or classification, or in a rule, regulation, or practice, after September 18, 1940, the burden of proof shall be upon the carrier to show that the proposed changed rate, fare, charge, classification, rule, regulation, or practice is just and reasonable, and the Commission shall give to the hearing and decision of such questions preference over all other questions pending before it and decide the same as speedily as possible. This paragraph shall not apply to common carriers by railroad subject to this chapter.

(8) Commission to determine lawfulness of new rates; applicability to common carrier by railroad; suspensions; accounts; hearing and basis of decision

(a) Whenever a schedule is filed with the Commission by a common carrier by railroad stating a new individual or joint rate, fare, or charge, or a new individual or joint classification, regulation, or practice affecting a rate, fare, or charge, the Commission may, upon the complaint of an interested party or upon its own initiative, order a hearing concerning the lawfulness of such rate, fare, charge, classification, regulation, or practice. The hearing may be conducted without answer or other formal pleading, but reasonable notice shall be provided to interested parties. Such hearing shall be completed and a final decision rendered by the Commission not later than 7 months after such rate, fare, charge, classification, regulation, or practice was scheduled to become effective, unless, prior to the expiration of such 7-month period, the Commission reports in writing to the Congress that it is unable to render a decision within such period, together with a full explanation of the reason for the delay. If such a report is made to the Congress, the final decision shall be made not later than 10 months after the date of the filing of such schedule. If the final decision of the Commission is not made within the applicable time period, the rate, fare, charge, classification, regulation, or practice shall go into effect

**9**

immediately at the expiration of such time period, or shall remain in effect if it has already become effective. Such rate, fare, charge, classification, regulation, or practice may be set aside thereafter by the Commission if, upon complaint of an interested party, the Commission finds it to be unlawful.

(b) Pending a hearing pursuant to subdivision (a), the schedule may be suspended, pursuant to subdivision (d), for 7 months beyond the time when it would otherwise go into effect, or for 10 months if the Commission makes a report to the Congress pursuant to subdivision (a), except under the following conditions:

(i) in the case of a rate increase, a rate may not be suspended on the ground that it exceeds a just and reasonable level if the rate is within a limit specified in subdivision (c), except that such a rate change may be suspended under any provision of section 2, 3, or 4 of this Appendix or, following promulgation of standards and procedures under section 1(5)(d) of this Appendix, if the carrier is found to have market dominance, within the meaning of section 1(5)(c)(i) of this Appendix, over the service to which such rate increase applies; or

(ii) in the case of a rate decrease, a rate may not be suspended on the ground that it is below a just and reasonable level if the rate is within a limit specified in subdivision (c), except that such a rate change may be suspended under any provision of section 2, 3, or 4 of this Appendix, or for the purposes of investigating such rate change upon a complaint that such rate change constitutes a competitive practice which is unfair, destructive, predatory or otherwise undermines competition which is necessary in the public interest.

(c) The limitations upon the Commission's power to suspend rate changes set forth in subdivisions (b)(i) and (ii) apply only to rate changes which are not of general applicability to all or substantially all classes of traffic and only if—

(i) the rate increase or decrease is filed prior to July 1, 1980;

(ii) the common carrier by railroad notifies the Commission that it wishes to have the rate considered pursuant to this subdivision; and

(iii) the aggregate of increases or decreases in any rate filed pursuant to clause (i) or (ii) of this subdivision during any calendar year is not greater than 7 per centum of the rate in effect on January 1 of that year.

(d) The Commission may not suspend a rate under this paragraph unless it appears from specific facts shown by the verified complaint of any person that—

(i) without suspension the proposed rate change will cause substantial injury to the complainant or the party represented by such complainant; and

(ii) it is likely that such complainant will prevail on the merits.

The burden of proof shall be upon the complainant to establish the matters set forth in clauses (i) and (ii) of this subdivision. Nothing in this paragraph shall be construed as establishing a presumption that any rate increase or decrease in excess of the limits set forth in clause (iii) of subdivision (c) is unlawful or should be suspended.

(e) If a hearing is initiated under this paragraph with respect to a proposed increased rate, fare, or charge, and if the schedule is not suspended pending such hearing and the decision thereon, the Commission shall require the railroads involved to keep an account of all amounts received because of such increase from the date such rate, fare, or charge became effective until the Commission issues an order or until 7 months after such date, whichever first occurs, or, if the hearings are extended pursuant to subdivision (a), until an order issues or until 10 months elapse, whichever first occurs. The account shall specify by whom and on whose behalf the amounts are paid. In its final order, the Commission shall require the common carrier by railroad to refund to the person on whose behalf the amounts were paid that portion of such increased

rate, fare, or charge found to be not justified, plus interest at a rate which is equal to the average yield (on the date such schedule is filed) of marketable securities of the United States which have a duration of 90 days. With respect to any proposed decreased rate, fare, or charge which is suspended, if the decrease or any part thereof is ultimately found to be lawful, the common carrier by railroad may refund any part of the portion of such decreased rate, fare, or charge found justified if such carrier makes such a refund available on an equal basis to all shippers who participated in such rate, fare, or charge according to the relative amounts of traffic shipped at such rate, fare, or charge.

(f) In any hearing under this section, the burden of proof is on the common carrier by railroad to show that the proposed changed rate, fare, charge, classification, rule, regulation, or practice is just and reasonable. The Commission shall specifically consider, in any such hearing, proof that such proposed changed rate, fare, charge, classification, rule, regulation, or practice will have a significantly adverse effect (in violation of section 2 or 3 of this Appendix) on the competitive posture of shippers or consignees affected thereby. The Commission shall give such hearing and decision preference over all other matters relating to railroads pending before the Commission and shall make its decision at the earliest practicable time.

**(9) Commission to investigate lawfulness of rates with respect to market dominance of common carrier by railroad; conclusiveness of findings; suspensions**

Following promulgation of standards under section 1(5)(d) of this Appendix, whenever a rate of a common carrier by railroad subject to this chapter is challenged as being unreasonably high, the Commission shall, upon complaint or upon its own initiative and within 90 days after the commencement of a proceeding to investigate the lawfulness of such rate, determine whether the carrier proposing such rate has market dominance, within the meaning of section 1(5)(c)(i) of this Appendix, over the service to which such rate applies. If the Commission finds that such a carrier does not have such market dominance, such finding shall be determinative in all additional or other proceedings under this Act concerning such rate or service, unless (a) such finding is modified or set aside by the Commission, or (b) such finding is set aside by a court of competent jurisdiction. Nothing in this paragraph shall limit the Commission's power to suspend a rate pursuant to this section, except that if the Commission has found that a carrier does not have such market dominance over the service to which a rate applies, the Commission may not suspend any increase in such rate on the ground that such rate as increased exceeds a just or reasonable maximum for such service, unless the Commission specifically modifies or sets aside its prior determination concerning market dominance over the service to which such rate applies.

**(10) Shipper's choice of route to be observed**

In all cases where at the time of delivery of property to any railroad corporation being a common carrier for transportation subject to the provisions of this chapter to any point of destination, between which and the point of such delivery for shipment two or more through routes and through rates shall have been established as in this chapter provided to which through routes and through rates such carrier is a party, the person, firm, or corporation making such shipment, subject to such reasonable exceptions and regulations as the Interstate Commerce Commission shall from time to time prescribe, shall have the right to designate in writing by which of such through routes such property shall be transported to destination, and it shall thereupon be the duty of the initial carrier to route said property and issue a through bill of lading therefor as so directed, and to transport said property over its own line or lines and deliver the

same to a connecting line or lines according to such through route, and it shall be the duty of each of said connecting carriers to receive said property and transport it over the said line or lines and deliver the same to the next succeeding carrier or consignee according to the routing instructions in said bill of lading: *Provided, however,* That the shipper shall in all instances have the right to determine, where competing lines of railroad constitute portions of a through line or route, over which of said competing lines so constituting a portion of said through line or route his freight shall be transported.

#### (11) Liability of carriers where property is delivered contrary to routing instructions

Whenever property is diverted or delivered by one carrier to another carrier contrary to routing instructions in the bill of lading, unless such diversion or delivery is in compliance with a lawful order, rule, or regulation of the Commission, such carriers shall, in a suit or action in any court of competent jurisdiction, be jointly and severally liable to the carrier thus deprived of its right to participate in the haul of the property, for the total amount of the rate or charge it would have received had it participated in the haul of the property. The carrier to which the property is thus diverted shall not be liable in such suit or action if it can show, the burden of proof being upon it, that before carrying the property it had no notice, by bill of lading, waybill or otherwise, of the routing instructions. In any judgment which may be rendered the plaintiff shall be allowed to recover against the defendant a reasonable attorney's fee to be taxed in the case.

#### (12) Direction of unrouted traffic by Commission

With respect to traffic not routed by the shipper, the Commission may, whenever the public interest and a fair distribution of the traffic require, direct the route which such traffic shall take after it arrives at the terminus of one carrier or at a junction point with another carrier, and is to be there delivered to another carrier.

#### (13) Disclosure or solicitation of information concerning shipments unlawful; exceptions

It shall be unlawful for any common carrier subject to the provisions of this chapter, or any officer, agent, or employee of such common carrier, or for any other person or corporation lawfully authorized by such common carrier to receive information therefrom, knowingly to disclose to or permit to be acquired by any person or corporation other than the shipper or consignee, without the consent of such shipper or consignee, any information concerning the nature, kind, quantity, destination, consignee, or routing of any property tendered or delivered to such common carrier for interstate transportation, which information may be used to the detriment or prejudice of such shipper or consignee, or which may improperly disclose his business transactions to a competitor; and it shall also be unlawful for any person or corporation to solicit or knowingly receive any such information which may be so used: *Provided,* That nothing in this chapter shall be construed to prevent the giving of such information in response to any legal process issued under the authority of any State or Federal court, or to any officer or agent of the Government of the United States, or of any State or Territory, in the exercise of his powers, or to any officer or other duly authorized person seeking such information for the prosecution of persons charged with or suspected of crime; or information given by a common carrier to another carrier or its duly authorized agent, for the purpose of adjusting mutual traffic accounts in the ordinary course of business of such carriers.

#### (14) Penalty for violation of preceding provisions

Any person, corporation, or association violating any of the provisions of paragraph 13 of this section shall be deemed guilty of a misdemeanor, and for each offense, on conviction, shall pay to the United States a penalty of not more than $1,000.

#### (15) Allowance for service or facilities furnished by shipper

If the owner of property transported under this chapter directly or indirectly renders any service connected with such transportation, or furnishes any instrumentality used therein, the charge and allowance therefor shall be published in tariffs or schedules filed in the manner provided in this chapter and shall be no more than is just and reasonable, and the Commission may, after hearing on a complaint or on its own initiative, determine what is a reasonable charge as the maximum to be paid by the carrier or carriers for the services so rendered or for the use of the instrumentality so furnished, and fix the same by appropriate order, which order shall have the same force and effect and be enforced in like manner as the orders above provided for under this section.

#### (16) Other powers of Commission not excluded

The foregoing enumeration of powers shall not exclude any power which the Commission would otherwise have in the making of an order under the provisions of this chapter.

#### (17) Standards and expeditious procedures for establishment of rates based on seasonal, regional, or peak-period demand for rail services; annual report

Within 1 year after February 5, 1976, the Commission shall establish, by rule, standards and expeditious procedures for the establishment of railroad rates based on seasonal, regional, or peak-period demand for rail services. Such standards and procedures shall be designed to (a) provide sufficient incentive to shippers to reduce peak-period shipments, through rescheduling and advance planning; (b) generate additional revenues for the railroads; and (c) improve (i) the utilization of the national supply of freight cars, (ii) the movement of goods by rail, (iii) levels of employment by railroads, and (iv) the financial stability of markets served by railroads. Following the establishment of such standards and procedures, the Commission shall prepare and submit to the Congress annual reports on the implementation of such rates, including recommendations with respect to the need, if any, for additional legislation to facilitate the establishment of such demand-sensitive rates.

#### (18) Expeditious procedures for separate rates for distinct rail services

In order to encourage competition, to promote increased reinvestment by railroads, and to encourage and facilitate increased nonrailroad investment in the production of rail services, a carrier by railroad subject to this chapter may, upon its own initiative or upon the request of any shipper or receiver of freight, file separate rates for distinct rail services. Within 1 year after February 5, 1976, the Commission shall establish, by rule, expeditious procedures for permitting publication of separate rates for distinct rail services in order to (a) encourage the pricing of such services in accordance with the carrier's cash-outlays for such services and the demand therefor, and (b) enable shippers and receivers to evaluate all transportation and related charges and alternatives.

#### (19) Establishment of rate incentives for capital investment

Notwithstanding any other provision of law, a common carrier by railroad subject to this chapter may file with the Commission a notice of intention to file a schedule stating a new rate, fare, charge, classification, regulation, or practice whenever the implementation of the proposed schedule would require a total capital investment of $1,000,000 or more, individually or collectively, by such carrier, or by a shipper, receiver, or agent thereof, or an interested third party. The filing shall be accompanied by a sworn affidavit setting forth in detail the anticipated capital investment upon which such filing is based. Any interested person may request the Commission to investigate the sched-

ule proposed to be filed, and upon such request the Commission shall hold a hearing with respect to such schedule. Such hearing may be conducted without answer or other formal pleading, but reasonable notice shall be provided to interested parties. Unless, prior to the 180-day period following the filing of such notice of intention, the Commission determines, after a hearing, that the proposed schedule, or any part thereof, would be unlawful, such carrier may file the schedule at any time within 180 days thereafter to become effective after 30 days' notice. Such a schedule may not, for a period of 5 years after its effective date, be suspended or set aside as unlawful under section 1, 2, 3, or 4 of this Appendix, except that the Commission may at any time order such schedule to be revised to a level equaling the variable costs of providing the service, if the rate stated therein is found to reduce the going concern value of the carrier.

(Feb. 4, 1887, ch. 104, pt. I, § 15, 24 Stat. 384; June 29, 1906, ch. 3591, § 4, 34 Stat. 589; June 18, 1910, ch. 309, § 12, 36 Stat. 551; Feb. 28, 1920, ch. 91, §§ 418–421, 41 Stat. 484–488; Mar. 4, 1927, ch. 510, § 2, 44 Stat. 1447; June 19, 1934, ch. 652, § 602(b), 48 Stat. 1102; Aug. 9, 1935, ch. 498, § 1, 49 Stat. 543; Sept. 18, 1940, ch. 722, title I, § 10(a)–(d), 54 Stat. 911, 912; Feb. 5, 1976, Pub. L. 94–210, title II, §§ 201, 202(c)–(e), 203(a), 206, title III, § 302, 90 Stat. 34–37, 39, 41, 48; Oct. 19, 1976, Pub. L. 94–555, title II, § 220(m), 90 Stat. 2630; Nov. 8, 1978, Pub. L. 95–607, title IV, § 401, 92 Stat. 3067.)

## § 15a. Repealed. Pub. L. 95–473, § 4(b), (c), Oct. 17, 1978, 92 Stat. 1466, 1470

Section repealed subject to an exception related to transportation of oil by pipeline. For disposition of this section in revised Title 49, Transportation, see Table at beginning of Title 49. See, also, notes following Table.

Prior to repeal, section read as follows:

### § 15a. Fair return for carriers

#### (1) "Rates" defined

When used in this section, the term "rates" means rates, fares, and charges, and all classifications, regulations, and practices relating thereto.

#### (2) Ratemaking criteria; nonapplicability to common carriers by railroad subject to chapter

In the exercise of its power to prescribe just and reasonable rates the Commission shall give due consideration, among other factors, to the effect of rates on the movement of traffic by the carrier or carriers for which the rates are prescribed; to the need, in the public interest, of adequate and efficient railway transportation service at the lowest cost consistent with the furnishing of such service; and to the need of revenues sufficient to enable the carriers, under honest, economical, and efficient management to provide such service. This paragraph shall not apply to common carriers by railroad subject to this chapter.

#### (3) Competition between carriers of different modes of transportation; nonapplicability to common carriers by railroad subject to chapter

In a proceeding involving competition between carriers of different modes of transportation subject to this Act, the Commission, in determining whether a rate is lower than a reasonable minimum rate, shall consider the facts and circumstances attending the movement of the traffic by the carrier or carriers to which the rate is applicable. Rates of a carrier shall not be held up to a particular level to protect the traffic of any other mode of transportation, giving due consideration to the objectives of the national transportation policy declared in this Act. This paragraph shall not apply to common carriers by railroad subject to this chapter.

#### (4) Revenue levels of common carriers by railroad; standards and procedures for establishment

With respect to common carriers by railroad, the Commission shall, within 24 months after February 5, 1976, after notice and an opportunity for a hearing, develop and promulgate (and thereafter revise and maintain) reasonable standards and procedures for the establishment of revenue levels adequate under honest, economical, and efficient management to cover total operating expenses, including depreciation and obsolescence, plus a fair, reasonable, and economic profit or return (or both) on capital employed in the business. Such revenue levels should (a) provide a flow of net income plus depreciation adequate to support prudent capital outlays, assure the repayment of a reasonable level of debt, permit the raising of needed equity capital, and cover the effects of inflation and (b) insure retention and attraction of capital in amounts adequate to provide a sound transportation system in the United States. The Commission shall make an adequate and continuing effort to assist such carriers in attaining such revenue levels. No rate of a common carrier by railroad shall be held up to a particular level to protect the traffic of any other carrier or mode of transportation, unless the Commission finds that such rate reduces or would reduce the going concern value of the carrier charging the rate.

#### (5) Consideration of allegations of change in rate relationships between commodities, ports, etc., and effect on competitive position of shippers or consignees by proposed rate increase or decrease

The Commission shall, in any proceeding which involves a proposed increase or decrease in railroad rates, specifically consider allegations that such increase or decrease would change the rate relationships between commodities, ports, points, regions, territories, or other particular descriptions of traffic (whether or not such relationships were previously considered or approved by the Commission) and allegations that such increase or decrease would have a significantly adverse effect on the competitive position of shippers or consignees served by the railroad proposing such increase or decrease. If the Commission finds that such allegations as to change or effect are substantially supported on the record, it shall take such steps as are necessary, either before or after such proposed increase or decrease becomes effective and either within or outside such proceeding, to investigate the lawfulness of such change or effect.

#### (6) Adjustment of interstate rates

##### (a) Duty of Commission; petitions; requirements and considerations

The Commission shall by rule, on or before August 1, 1973, establish requirements for petitions for adjustment of interstate rates of common carriers subject to this chapter based upon increases in expenses of such carriers resulting from any increases in taxes under the Railroad Retirement Tax Act, as amended [26 U.S.C. 3201 et seq.], occurring on or before January 1, 1975, or as a result of the enactment of the Railroad Retirement Amendments of 1973. Such requirements, established pursuant to section 553 of title 5 (with time for comment limited so as to meet the required date for establishment and subject to future amendment or revocation), shall be designed to facilitate fair and expeditious action on any such petition as required in subparagraph (b) of this paragraph by disclosing such information as the amount needed in rate increases to offset such increases in expenses and the availability of means other than a rate increase by which the carrier might absorb or offset such increases in expenses.

##### (b) Interim rates; public notice requirement

Notwithstanding any other provision of law, the Commission shall, within thirty days of the filing of a verified petition in accordance with rules promulgated under subparagraph (a) of this paragraph, by any carrier or group of carriers subject to this chapter, permit the establishment of increases in the general level of the interstate rates of said carrier or carriers in an amount approximating that needed to offset increases

USCA Case #15-1101    Document #1574555    Filed: 09/04/2015    Page 74 of 83

(m) Nothing in this section authorizes any agency to withhold from any individual any record, including transcripts, recordings, or minutes required by this section, which is otherwise accessible to such individual under section 552a of this title.

(Added Pub. L. 94–409, §3(a), Sept. 13, 1976, 90 Stat. 1241; amended Pub. L. 104–66, title III, §3002, Dec. 21, 1995, 109 Stat. 734.)

REFERENCES IN TEXT

Section 552(e) of this title, referred to in subsec. (a)(1), was redesignated section 552(f) of this title by section 1802(b) of Pub. L. 99–570.

180 days after the date of enactment of this section, referred to in subsec. (g), means 180 days after the date of enactment of Pub. L. 94–409, which was approved Sept. 13, 1976.

AMENDMENTS

1995—Subsec. (j). Pub. L. 104–66 amended subsec. (j) generally. Prior to amendment, subsec. (j) read as follows: "Each agency subject to the requirements of this section shall annually report to Congress regarding its compliance with such requirements, including a tabulation of the total number of agency meetings open to the public, the total number of meetings closed to the public, the reasons for closing such meetings, and a description of any litigation brought against the agency under this section, including any costs assessed against the agency in such litigation (whether or not paid by the agency)."

EFFECTIVE DATE

Section 6 of Pub. L. 94–409 provided that:

"(a) Except as provided in subsection (b) of this section, the provisions of this Act [see Short Title note set out below] shall take effect 180 days after the date of its enactment [Sept. 13, 1976].

"(b) Subsection (g) of section 552b of title 5, United States Code, as added by section 3(a) of this Act, shall take effect upon enactment [Sept. 13, 1976]."

SHORT TITLE OF 1976 AMENDMENT

Section 1 of Pub. L. 94–409 provided: "That this Act [enacting this section, amending sections 551, 552, 556, and 557 of this title, section 10 of Pub. L. 92–463, set out in the Appendix to this title, and section 410 of Title 39, and enacting provisions set out as notes under this section] may be cited as the 'Government in the Sunshine Act'."

TERMINATION OF REPORTING REQUIREMENTS

For termination, effective May 15, 2000, of provisions of law requiring submittal to Congress of any annual, semiannual, or other regular periodic report listed in House Document No. 103–7 (in which the report required by subsec. (j) of this section is listed on page 151), see section 3003 of Pub. L. 104–66, as amended, set out as a note under section 1113 of Title 31, Money and Finance.

TERMINATION OF ADMINISTRATIVE CONFERENCE OF UNITED STATES

For termination of Administrative Conference of United States, see provision of title IV of Pub. L. 104–52, set out as a note preceding section 591 of this title.

DECLARATION OF POLICY AND STATEMENT OF PURPOSE

Section 2 of Pub. L. 94–409 provided that: "It is hereby declared to be the policy of the United States that the public is entitled to the fullest practicable information regarding the decisionmaking processes of the Federal Government. It is the purpose of this Act [see Short Title note set out above] to provide the public with such information while protecting the rights of individ-uals and the ability of the Government to carry out its responsibilities."

## § 553. Rule making

(a) This section applies, according to the provisions thereof, except to the extent that there is involved—

  (1) a military or foreign affairs function of the United States; or

  (2) a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts.

(b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include—

  (1) a statement of the time, place, and nature of public rule making proceedings;

  (2) reference to the legal authority under which the rule is proposed; and

  (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.

Except when notice or hearing is required by statute, this subsection does not apply—

  (A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or

  (B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

(c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. When rules are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this title apply instead of this subsection.

(d) The required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except—

  (1) a substantive rule which grants or recognizes an exemption or relieves a restriction;

  (2) interpretative rules and statements of policy; or

  (3) as otherwise provided by the agency for good cause found and published with the rule.

(e) Each agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 383.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ............... | 5 U.S.C. 1003. | June 11, 1946, ch. 324, §4, 60 Stat. 238. |

In subsection (a)(1), the words "or naval" are omitted as included in "military".

**13**

In subsection (b), the word "when" is substituted for "in any situation in which".

In subsection (c), the words "for oral presentation" are substituted for "to present the same orally in any manner". The words "sections 556 and 557 of this title apply instead of this subsection" are substituted for "the requirements of sections 1006 and 1007 of this title shall apply in place of the provisions of this subsection".

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

CODIFICATION

Section 553 of former Title 5, Executive Departments and Government Officers and Employees, was transferred to section 2245 of Title 7, Agriculture.

EXECUTIVE ORDER NO. 12044

Ex. Ord. No. 12044, Mar. 23, 1978, 43 F.R. 12661, as amended by Ex. Ord. No. 12221, June 27, 1980, 45 F.R. 44249, which related to the improvement of Federal regulations, was revoked by Ex. Ord. No. 12291, Feb. 17, 1981, 46 F.R. 13193, formerly set out as a note under section 601 of this title.

### § 554. Adjudications

(a) This section applies, according to the provisions thereof, in every case of adjudication required by statute to be determined on the record after opportunity for an agency hearing, except to the extent that there is involved—

(1) a matter subject to a subsequent trial of the law and the facts de novo in a court;

(2) the selection or tenure of an employee, except a[1] administrative law judge appointed under section 3105 of this title;

(3) proceedings in which decisions rest solely on inspections, tests, or elections;

(4) the conduct of military or foreign affairs functions;

(5) cases in which an agency is acting as an agent for a court; or

(6) the certification of worker representatives.

(b) Persons entitled to notice of an agency hearing shall be timely informed of—

(1) the time, place, and nature of the hearing;

(2) the legal authority and jurisdiction under which the hearing is to be held; and

(3) the matters of fact and law asserted.

When private persons are the moving parties, other parties to the proceeding shall give prompt notice of issues controverted in fact or law; and in other instances agencies may by rule require responsive pleading. In fixing the time and place for hearings, due regard shall be had for the convenience and necessity of the parties or their representatives.

(c) The agency shall give all interested parties opportunity for—

(1) the submission and consideration of facts, arguments, offers of settlement, or proposals of adjustment when time, the nature of the proceeding, and the public interest permit; and

(2) to the extent that the parties are unable so to determine a controversy by consent, hearing and decision on notice and in accordance with sections 556 and 557 of this title.

(d) The employee who presides at the reception of evidence pursuant to section 556 of this title shall make the recommended decision or initial decision required by section 557 of this title, unless he becomes unavailable to the agency. Except to the extent required for the disposition of ex parte matters as authorized by law, such an employee may not—

(1) consult a person or party on a fact in issue, unless on notice and opportunity for all parties to participate; or

(2) be responsible to or subject to the supervision or direction of an employee or agent engaged in the performance of investigative or prosecuting functions for an agency.

An employee or agent engaged in the performance of investigative or prosecuting functions for an agency in a case may not, in that or a factually related case, participate or advise in the decision, recommended decision, or agency review pursuant to section 557 of this title, except as witness or counsel in public proceedings. This subsection does not apply—

(A) in determining applications for initial licenses;

(B) to proceedings involving the validity or application of rates, facilities, or practices of public utilities or carriers; or

(C) to the agency or a member or members of the body comprising the agency.

(e) The agency, with like effect as in the case of other orders, and in its sound discretion, may issue a declaratory order to terminate a controversy or remove uncertainty.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 384; Pub. L. 95–251, § 2(a)(1), Mar. 27, 1978, 92 Stat. 183.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................. | 5 U.S.C. 1004. | June 11, 1946, ch. 324, § 5, 60 Stat. 239. |

In subsection (a)(2), the word "employee" is substituted for "officer or employee of the United States" in view of the definition of "employee" in section 2105.

In subsection (a)(4), the word "naval" is omitted as included in "military".

In subsection (a)(5), the word "or" is substituted for "and" since the exception is applicable if any one of the factors are involved.

In subsection (a)(6), the word "worker" is substituted for "employee", since the latter is defined in section 2105 as meaning Federal employees.

In subsection (b), the word "When" is substituted for "In instances in which".

In subsection (c)(2), the comma after the word "hearing" is omitted to correct an editorial error.

In subsection (d), the words "The employee" and "such an employee" are substituted in the first two sentences for "The same officers" and "such officers" in view of the definition of "employee" in section 2105. The word "officer" is omitted in the third and fourth sentences as included in "employee" as defined in section 2105. The prohibition in the third and fourth sentences is restated in positive form. In paragraph (C) of the last sentence, the words "in any manner" are omitted as surplusage.

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

[1] So in original.

# 28 U.S.C. § 2321

1162; Mar. 4, 1943, ch. 160, 37 Stat. 1013; Oct. 22, 1913, ch. 32, 38 Stat. 220; Feb. 13, 1925, ch. 229, §1, 43 Stat. 938; Aug. 24, 1937, ch. 754, §3, 50 Stat. 752; Apr. 6, 1942, ch. 210, §3, 56 Stat. 199).

Provisions of sections 47, 47a, 380, and 380a of title 28, U.S.C., 1940 ed., relating to the Supreme Court's jurisdiction of direct appeals appear in section 1253 of this title.

Provisions of sections 47, 380, and 380a of title 28, U.S.C., 1940 ed., requiring applications for injunctions restraining the enforcement, operation or execution of Federal or State statutes or orders of the Interstate Commerce Commission to be heard and determined by three-judge district courts appear in sections 2281, 2282, and 2325 of this title.

The provision for notice to the United States attorney for the district where the action is pending was added because of the necessity of the United States attorney's preparation for hearing as soon as possible, to expedite such a case.

Provisions of sections 47, 47a, 380, and 380a of title 28, U.S.C., 1940 ed., respecting time for direct appeal appear in section 2101 of this title.

This revised section represents an effort to provide a uniform method of convoking three-judge district courts, and for procedure therein. It follows recommendations of a committee appointed by the Judicial Conference of the United States, composed of Circuit Judges Evan A. Evans, Kimbrough Stone, Orie L. Phillips, and Albert B. Maris.

The committee pointed out that section 380a of title 28, U.S.C., 1940 ed., is the latest and "most carefully drawn expression by Congress on the subject." Consequently, this section follows closely such section 380a and eliminates the discrepancies between sections 47, 47a, 380, and 380a of such title.

This section governs only the composition and procedure of three-judge district courts. The requirement that applications for injunctions be heard and determined by such courts will appear in other sections of this and other titles of the United States Code as Congress may enact from time to time. For example, see sections 2281, 2282, and 2325 of this title, sections 1213, 1215, 1255 of title 11, U.S.C., 1940 ed., Bankruptcy, section 28 of title 15, U.S.C., 1940 ed., Commerce and Trade, and section 44 of title 49, U.S.C., 1940 ed., Transportation.

United States District Judge W. Calvin Chestnut, has referred to the provisions relating to enforcement or setting aside or orders of the Interstate Commerce Commission as unfortunately lengthy and prolix. He has urged revision to insure uniform procedure in the several classes of so-called three-judge cases.

The provision that such notice shall be given by the clerk by registered mail, and shall be complete on the mailing thereof follows, substantially, rules 4(d)(4) and 5(b) of the Federal Rules of Civil Procedure.

Changes were made in phraseology.

REFERENCES IN TEXT

The rules of civil procedure, referred to in subsec. (b)(3), are set out in the Appendix to this title.

AMENDMENTS

1984—Subsec. (b)(2). Pub. L. 98–620 struck out provision that the hearing had to be given precedence and held at the earliest practicable day.

1976—Pub. L. 94–381 substituted "Three-judge court; when required" for "Three-judge district court" in section catchline, and generally revised section to alter the method by which three-judge courts are composed, the procedure used by such courts, and to conform its requirements to the repeal of sections 2281 and 2282 of this title.

1960—Pub. L. 86–507 substituted "by registered mail or by certified mail by the clerk and" for "by registered mail by the clerk, and".

EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by Pub. L. 98–620 not applicable to cases pending on Nov. 8, 1984, see section 403 of Pub. L. 98–620,

set out as an Effective Date note under section 1657 of this title.

EFFECTIVE DATE OF 1976 AMENDMENT

Pub. L. 94–381, §7, Aug. 12, 1976, 90 Stat. 1120, provided that: "This Act [amending this section and section 2403 of this title and repealing sections 2281 and 2282 of this title] shall not apply to any action commenced on or before the date of enactment [Aug. 12, 1976]."

# CHAPTER 157—SURFACE TRANSPORTATION BOARD ORDERS; ENFORCEMENT AND REVIEW

| Sec. | |
|---|---|
| 2321. | Judicial review of Board's orders and decisions; procedure generally; process. |
| 2322. | United States as party. |
| 2323. | Duties of Attorney General; intervenors. |
| [2324, 2325. Repealed.] | |

AMENDMENTS

1995—Pub. L. 104–88, title III, §305(c)(1)(A), (E), Dec. 29, 1995, 109 Stat. 944, 945, substituted "SURFACE TRANSPORTATION BOARD" for "INTERSTATE COMMERCE COMMISSION" in chapter heading and "Board's" for "Commission's" in item 2321.

1975—Pub. L. 93–584, §8, Jan. 2, 1975, 88 Stat. 1918, substituted "Judicial Review of Commission's orders and decisions; procedure generally; process" for "Procedure generally; process" in item 2321 and struck out item 2324 "Stay of Commission's order" and item 2325 "Injunction; three-judge court required".

# § 2321. Judicial review of Board's orders and decisions; procedure generally; process

(a) Except as otherwise provided by an Act of Congress, a proceeding to enjoin or suspend, in whole or in part, a rule, regulation, or order of the Surface Transportation Board shall be brought in the court of appeals as provided by and in the manner prescribed in chapter 158 of this title.

(b) The procedure in the district courts in actions to enforce, in whole or in part, any order of the Surface Transportation Board other than for payment of money or the collection of fines, penalties, and forfeitures, shall be as provided in this chapter.

(c) The orders, writs, and process of the district courts may, in the cases specified in subsection (b) and in enforcement actions and actions to collect civil penalties under subtitle IV of title 49, run, be served and be returnable anywhere in the United States.

(June 25, 1948, ch. 646, 62 Stat. 969; May 24, 1949, ch. 139, §115, 63 Stat. 105; Pub. L. 93–584, §5, Jan. 2, 1975, 88 Stat. 1917; Pub. L. 95–473, §2(a)(3)(B), Oct. 17, 1978, 92 Stat. 1465; Pub. L. 104–88, title III, §305(c)(1)(B), (C), Dec. 29, 1995, 109 Stat. 945.)

HISTORICAL AND REVISION NOTES

1948 ACT

Based on title 28, U.S.C., 1940 ed., §44 (Oct. 22, 1913, ch. 32, 38 Stat. 220.)

Word "actions" was substituted for "cases," in view of rule 2 of the Federal Rules of Civil Procedure.

The exception as to procedure in the infliction of criminal punishment was omitted as unnecessary, as Title 18, U.S.C., Crimes and Criminal Procedure, and the Federal Rules of Criminal Procedure govern procedure in criminal matters.

Changes were made in phraseology.

1949 ACT

This section corrects, in section 2321 of title 28, U.S.C., the reference to certain sections in title 49,

**15**

U.S.C. The provisions which were formerly set out as section 49 of such title 49, are now set out as section 23 of such title.

### AMENDMENTS

1995—Pub. L. 104-88 substituted "Board's" for "Commission's" in section catchline and "Surface Transportation Board" for "Interstate Commerce Commission" in subsecs. (a) and (b).

1978—Subsec. (c). Pub. L. 95-473 substituted "enforcement actions and actions to collect civil penalties under subtitle IV of title 49" for "actions under section 20 of the Act of February 4, 1887, as amended (24 Stat. 386; 49 U.S.C. 20), section 23 of the Act of May 16, 1942, as amended (56 Stat. 301; 49 U.S.C. 23), and section 3 of the Act of February 19, 1903, as amended (32 Stat. 848; 49 U.S.C. 43)".

1975—Subsec. (a). Pub. L. 93-584 designated existing provisions as subsecs. (b) and (c) and added subsec. (a).

Subsec. (b). Pub. L. 93-584 designated existing first par. as subsec. (b) and substituted "in whole or in part, any order of the Interstate Commerce Commission other than for", for "suspend, enjoin, annual or set aside in whole or in part any order of the Interstate Commerce Commission other than for the".

Subsec. (c). Pub. L. 93-584 designated existing second par. as subsec. (c), substituted reference to subsec. (b) of this section for reference to this section, and inserted references to the dates of enactment, statute citations and code references of sections 20, 23 and 43 of Title 49.

1949—Act May 24, 1949, substituted "20, 23, and 43" for "20, 43, and 49" in second par.

### EFFECTIVE DATE OF 1995 AMENDMENT

Amendment by Pub. L. 104-88 effective Jan. 1, 1996, see section 2 of Pub. L. 104-88, set out as an Effective Date note under section 701 of Title 49, Transportation.

### EFFECTIVE DATE OF 1975 AMENDMENT

Pub. L. 93-584, §10, Jan. 2, 1975, 88 Stat. 1918, provided that: "This Act [amending this section, sections 1336, 1398, 2323, 2341, and 2342 of this title, and section 305 of former Title 49, Transportation, and repealing sections 2324 and 2325 of this title] shall not apply to any action commenced on or before the last day of the first month beginning after the date of enactment [Jan. 2, 1975]. However, actions to enjoin or suspend orders of the Interstate Commerce Commission which are pending when this Act becomes effective shall not be affected thereby, but shall proceed to final disposition under the law existing on the date they were commenced."

### § 2322. United States as party

All actions specified in section 2321 of this title shall be brought by or against the United States.

(June 25, 1948, ch. 646, 62 Stat. 969.)

### HISTORICAL AND REVISION NOTES

Based on title 28, U.S.C., 1940 ed., §48 (Mar. 3, 1911, ch. 231, §211, 36 Stat. 1150; Oct. 22, 1913, ch. 32, 38 Stat. 219).

Word "actions" was substituted for "cases and proceedings", in view of Rule 2 of the Federal Rules of Civil Procedure.

A provision authorizing intervention by the United States was omitted. The United States, under the provisions of this section, is a necessary and indispensable original party, and hence intervention is unnecessary. (See *Lambert Run Coal Co. v. Baltimore & O. R. Co.*, 1922, 42 S.Ct. 349, 258 U.S. 377, 66 L.Ed. 671.)

### § 2323. Duties of Attorney General; intervenors

The Attorney General shall represent the Government in the actions specified in section 2321 of this title and in enforcement actions and ac-

tions to collect civil penalties under subtitle IV of title 49.

The Surface Transportation Board and any party or parties in interest to the proceeding before the Board, in which an order or requirement is made, may appear as parties of their own motion and as of right, and be represented by their counsel, in any action involving the validity of such order or requirement or any part thereof, and the interest of such party.

Communities, associations, corporations, firms, and individuals interested in the controversy or question before the Board, or in any action commenced under the aforesaid sections may intervene in said action at any time after commencement thereof.

The Attorney General shall not dispose of or discontinue said action or proceeding over the objection of such party or intervenor, who may prosecute, defend, or continue said action or proceeding unaffected by the action or non-action of the Attorney General therein.

(June 25, 1948, ch. 646, 62 Stat. 970; May 24, 1949, ch. 139, §116, 63 Stat. 105; Pub. L. 93-584, §6, Jan. 2, 1975, 88 Stat. 1917; Pub. L. 95-473, §2(a)(3)(C), Oct. 17, 1978, 92 Stat. 1465; Pub. L. 104-88, title III, §305(c)(1)(C), (D), Dec. 29, 1995, 109 Stat. 945.)

### HISTORICAL AND REVISION NOTES

#### 1948 ACT

Based on title 28, U.S.C., 1940 ed., §45a (Mar. 3, 1911, ch. 231, §§212, 213, 36 Stat. 1150, 1151; Oct. 22, 1913, ch. 32, 38 Stat. 220).

The provision in the second sentence of section 45a of title 28, U.S.C., 1940 ed., authorizing the Attorney General to employ and compensate special attorneys was omitted as covered by sections 503 and 508 [now 543 and 548] of this title. The provision in the same sentence authorizing the court to make rules for the conduct and procedure of actions under this section were omitted as covered by the Federal Rules of Civil Procedure and section 2071 of this title relating to authority of district courts to promulgate local rules of procedure.

The last paragraph of section 45a of title 28, U.S.C., 1940 ed., was omitted as merely repetitive of the language immediately following the first proviso.

Word "action" was substituted for "suit" in conformity with Rule 2 of the Federal Rules of Civil Procedure.

Changes were made in phraseology.

#### 1949 ACT

This section corrects, in section 2323 of title 28, U.S.C., the reference to certain sections in title 49, U.S.C. The provisions which were formerly set out as section 49 of such title 49 are now set out as section 23 of such title.

### AMENDMENTS

1995—Pub. L. 104-88 substituted "Surface Transportation Board" for "Interstate Commerce Commission" and substituted "the Board" for "the Commission" in two places.

1978—Pub. L. 95-473 substituted "enforcement actions and actions to collect civil penalties under subtitle IV of title 49" for "actions under section 20 of the Act of February 4, 1887, as amended (24 Stat. 386; 49 U.S.C. 20), section 23 of the Act of May 16, 1942, as amended (56 Stat. 301; 49 U.S.C. 23), and section 3 of the Act of February 19, 1903, as amended (32 Stat. 848; 49 U.S.C. 43)" in first par.

1975—Pub. L. 93-584 struck out reference to the district courts and the Supreme Court of the United States upon appeal from the district courts as the courts in which the Attorney General can represent the United States in first par.

USCA Case #15-1101          Document #15552          Filed: 04/14/2015          Page 78 of 83

suspend orders of Interstate Commerce Commission which are pending when this amendment becomes effective shall not be affected thereby, but shall proceed to final disposition under the law existing on the date they were commenced, see section 10 of Pub. L. 93–584, set out as a note under section 2321 of this title.

TRANSFER OF FUNCTIONS

Atomic Energy Commission abolished and functions transferred by sections 5814 and 5841 of Title 42, The Public Health and Welfare. See, also, Transfer of Functions notes set out under those sections.

### § 2342. Jurisdiction of court of appeals

The court of appeals (other than the United States Court of Appeals for the Federal Circuit) has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of—

(1) all final orders of the Federal Communication Commission made reviewable by section 402(a) of title 47;

(2) all final orders of the Secretary of Agriculture made under chapters 9 and 20A of title 7, except orders issued under sections 210(e), 217a, and 499g(a) of title 7;

(3) all rules, regulations, or final orders of—

(A) the Secretary of Transportation issued pursuant to section 50501, 50502, 56101–56104, or 57109 of title 46 or pursuant to part B or C of subtitle IV, subchapter III of chapter 311, chapter 313, or chapter 315 of title 49; and

(B) the Federal Maritime Commission issued pursuant to section 305, 41304, 41308, or 41309 or chapter 421 or 441 of title 46;

(4) all final orders of the Atomic Energy Commission made reviewable by section 2239 of title 42;

(5) all rules, regulations, or final orders of the Surface Transportation Board made reviewable by section 2321 of this title;

(6) all final orders under section 812 of the Fair Housing Act; and

(7) all final agency actions described in section 20114(c) of title 49.

Jurisdiction is invoked by filing a petition as provided by section 2344 of this title.

(Added Pub. L. 89–554, §4(e), Sept. 6, 1966, 80 Stat. 622; amended Pub. L. 93–584, §4, Jan. 2, 1975, 88 Stat. 1917; Pub. L. 95–454, title II, §206, Oct. 13, 1978, 92 Stat. 1144; Pub. L. 96–454, §8(b)(2), Oct. 15, 1980, 94 Stat. 2021; Pub. L. 97–164, title I, §137, Apr. 2, 1982, 96 Stat. 41; Pub. L. 98–554, title II, §227(a)(4), Oct. 30, 1984, 98 Stat. 2852; Pub. L. 99–336, §5(a), June 19, 1986, 100 Stat. 638; Pub. L. 100–430, §11(a), Sept. 13, 1988, 102 Stat. 1635; Pub. L. 102–365, §5(c)(2), Sept. 3, 1992, 106 Stat. 975; Pub. L. 103–272, §5(h), July 5, 1994, 108 Stat. 1375; Pub. L. 104–88, title III, §305(d)(5)–(8), Dec. 29, 1995, 109 Stat. 945; Pub. L. 104–287, §6(f)(2), Oct. 11, 1996, 110 Stat. 3399; Pub. L. 109–59, title IV, §4125(a), Aug. 10, 2005, 119 Stat. 1738; Pub. L. 109–304, §17(f)(3), Oct. 6, 2006, 120 Stat. 1708.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .................. | 5 U.S.C. 1032. | Dec. 29, 1950, ch. 1189, §2, 64 Stat. 1129. Aug. 30, 1954, ch. 1073, §2(b), 68 Stat. 961. |

The words "have exclusive jurisdiction" are substituted for "shall have exclusive jurisdiction".

In paragraph (1), the word "by" is substituted for "in accordance with".

In paragraph (3), the word "now" is omitted as unnecessary. The word "under" is substituted for "pursuant to the provisions of". Reference to "Federal Maritime Commission" is substituted for "Federal Maritime Board" on authority of 1961 Reorg. Plan No. 7, eff. Aug. 12, 1961, 75 Stat. 840. Reference to the United States Maritime Commission is omitted because that Commission was abolished by 1950 Reorg. Plan No. 21, §306, eff. May 24, 1951, 64 Stat. 1277, and any existing rights are preserved by technical sections 7 and 8.

REFERENCES IN TEXT

Section 812 of the Fair Housing Act, referred to in par. (6), is classified to section 3612 of Title 42, The Public Health and Welfare.

AMENDMENTS

2006—Par. (3)(A). Pub. L. 109–304, §17(f)(3)(A), substituted "section 50501, 50502, 56101–56104, or 57109 of title 46" for "section 2, 9, 37, or 41 of the Shipping Act, 1916 (46 U.S.C. App. 802, 803, 808, 835, 839, and 841a)".

Par. (3)(B). Pub. L. 109–304, §17(f)(3)(B), added subpar. (B) and struck out former subpar. (B) which read as follows:

"(B) the Federal Maritime Commission issued pursuant to—

"(i) section 19 of the Merchant Marine Act, 1920 (46 U.S.C. App. 876);

"(ii) section 14 or 17 of the Shipping Act of 1984 (46 U.S.C. App. 1713 or 1716); or

"(iii) section 2(d) or 3(d) of the Act of November 6, 1966 (46 U.S.C. App. 817d(d) or 817e(d));".

2005—Par. (3)(A). Pub. L. 109–59 inserted ", subchapter III of chapter 311, chapter 313, or chapter 315" before "of title 49".

1996—Par. (3)(A). Pub. L. 104–287 amended Pub. L. 104–88, §305(d)(6). See 1995 Amendment note below.

1995—Par. (3)(A). Pub. L. 104–88, §305(d)(6), as amended by Pub. L. 104–287, inserted "or pursuant to part B or C of subtitle IV of title 49" before the semicolon.

Pub. L. 104–88, §305(d)(5), substituted "or 41" for "41, or 43".

Par. (3)(B). Pub. L. 104–88, §305(d)(7), redesignated cls. (ii), (iv), and (v) as (i), (ii), and (iii), respectively, and struck out former cls. (i) and (iii) which read as follows:

"(i) section 23, 25, or 43 of the Shipping Act, 1916 (46 U.S.C. App. 822, 824, or 841a);

"(iii) section 2, 3, 4, or 5 of the Intercoastal Shipping Act, 1933 (46 U.S.C. App. 844, 845, 845a, or 845b);".

Par. (5). Pub. L. 104–88, §305(d)(8), added par. (5) and struck out former par. (5) which read as follows: "all rules, regulations, or final orders of the Interstate Commerce Commission made reviewable by section 2321 of this title and all final orders of such Commission made reviewable under section 11901(j)(2) of title 49, United States Code;".

1994—Par. (7). Pub. L. 103–272 substituted "section 20114(c) of title 49" for "section 202(f) of the Federal Railroad Safety Act of 1970".

1992—Par. (7). Pub. L. 102–365, which directed the addition of par. (7) at end, was executed by adding par. (7) after par. (6) and before concluding provisions, to reflect the probable intent of Congress.

1988—Par. (6). Pub. L. 100–430 added par. (6).

1986—Par. (3). Pub. L. 99–336 amended par. (3) generally. Prior to amendment, par. (3) read as follows: "such final orders of the Federal Maritime Commission or the Maritime Administration entered under chapters 23 and 23A of title 46 as are subject to judicial review under section 830 of title 46;".

1984—Par. (5). Pub. L. 98–554 substituted "11901(j)(2)" for "11901(i)(2)".

1982—Pub. L. 97–164 inserted "(other than the United States Court of Appeals for the Federal Circuit)" after "court of appeals" in provisions preceding par. (1), and

struck out par. (6) which had given the court of appeals jurisdiction in cases involving all final orders of the Merit Systems Protection Board except as provided for in section 7703(b) of title 5. See section 1295(a)(9) of this title.

1980—Par. (5). Pub. L. 96–454 inserted "and all final orders of such Commission made reviewable under section 11901(i)(2) of title 49, United States Code" after "section 2321 of this title."

1978—Par. (6). Pub. L. 95–454 added par. (6).

1975—Par. (5). Pub. L. 93–584 added par. (5).

EFFECTIVE DATE OF 1996 AMENDMENT

Pub. L. 104–287, §6(f), Oct. 11, 1996, 110 Stat. 3399, provided that the amendment made by that section is effective Dec. 29, 1995.

EFFECTIVE DATE OF 1995 AMENDMENT

Amendment by Pub. L. 104–88 effective Jan. 1, 1996, see section 2 of Pub. L. 104–88, set out as an Effective Date note under section 701 of Title 49, Transportation.

EFFECTIVE DATE OF 1988 AMENDMENT

Amendment by Pub. L. 100–430 effective on 180th day beginning after Sept. 13, 1988, see section 13(a) of Pub. L. 100–430, set out as a note under section 3601 of Title 42, The Public Health and Welfare.

EFFECTIVE DATE OF 1986 AMENDMENT

Pub. L. 99–336, §5(b), June 19, 1986, 100 Stat. 638, provided that: "The amendment made by this section [amending this section] shall apply with respect to any rule, regulation, or final order described in such amendment which is issued on or after the date of the enactment of this Act [June 19, 1986]."

EFFECTIVE DATE OF 1982 AMENDMENT

Amendment by Pub. L. 97–164 effective Oct. 1, 1982, see section 402 of Pub. L. 97–164, set out as a note under section 171 of this title.

EFFECTIVE DATE OF 1978 AMENDMENT

Amendment by Pub. L. 95–454 effective 90 days after Oct. 13, 1978, see section 907 of Pub. L. 95–454, set out as a note under section 1101 of Title 5, Government Organization and Employees.

EFFECTIVE DATE OF 1975 AMENDMENT

Amendment by Pub. L. 93–584 not applicable to actions commenced on or before last day of first month beginning after Jan. 2, 1975, and actions to enjoin or suspend orders of Interstate Commerce Commission which are pending when this amendment becomes effective shall not be affected thereby, but shall proceed to final disposition under the law existing on the date they were commenced, see section 10 of Pub. L. 93–584, set out as a note under section 2321 of this title.

TRANSFER OF FUNCTIONS

Atomic Energy Commission abolished and functions transferred by sections 5814 and 5841 of Title 42, The Public Health and Welfare. See, also, Transfer of Functions notes set out under those sections.

§ 2343. Venue

The venue of a proceeding under this chapter is in the judicial circuit in which the petitioner resides or has its principal office, or in the United States Court of Appeals for the District of Columbia Circuit.

(Added Pub. L. 89–554, §4(e), Sept. 6, 1966, 80 Stat. 622.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ...................... | 5 U.S.C. 1033. | Dec. 29, 1950, ch. 1189, §3, 64 Stat. 1130. |

The section is reorganized for clarity and conciseness. The word "is" is substituted for "shall be". The word "petitioner" is substituted for "party or any of the parties filing the petition for review" in view of the definition of "petitioner" in section 2341 of this title.

§ 2344. Review of orders; time; notice; contents of petition; service

On the entry of a final order reviewable under this chapter, the agency shall promptly give notice thereof by service or publication in accordance with its rules. Any party aggrieved by the final order may, within 60 days after its entry, file a petition to review the order in the court of appeals wherein venue lies. The action shall be against the United States. The petition shall contain a concise statement of—

(1) the nature of the proceedings as to which review is sought;

(2) the facts on which venue is based;

(3) the grounds on which relief is sought; and

(4) the relief prayed.

The petitioner shall attach to the petition, as exhibits, copies of the order, report, or decision of the agency. The clerk shall serve a true copy of the petition on the agency and on the Attorney General by registered mail, with request for a return receipt.

(Added Pub. L. 89–554, §4(e), Sept. 6, 1966, 80 Stat. 622.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ...................... | 5 U.S.C. 1034. | Dec. 29, 1950, ch. 1189, §4, 64 Stat. 1130. |

The section is reorganized, with minor changes in phraseology. The words "as prescribed by section 1033 of this title" are omitted as surplusage. The words "of the United States" following "Attorney General" are omitted as unnecessary.

§ 2345. Prehearing conference

The court of appeals may hold a prehearing conference or direct a judge of the court to hold a prehearing conference.

(Added Pub. L. 89–554, §4(e), Sept. 6, 1966, 80 Stat. 622.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ...................... | 5 U.S.C. 1035. | Dec. 29, 1950, ch. 1189, §5, 64 Stat. 1130. |

§ 2346. Certification of record on review

Unless the proceeding has been terminated on a motion to dismiss the petition, the agency shall file in the office of the clerk the record on review as provided by section 2112 of this title.

(Added Pub. L. 89–554, §4(e), Sept. 6, 1966, 80 Stat. 623.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ...................... | 5 U.S.C. 1036. | Dec. 29, 1950, ch. 1189, §6, 64 Stat. 1130. |

# 18 C.F.R. § 342.3

indirectly to the Trans-Alaska Pipeline.

## § 342.1  General rule.

Each carrier subject to the jurisdiction of the Commission under the Interstate Commerce Act:

(a) Must establish its initial rates subject to such Act pursuant to § 342.2; and

(b) Must make any change in existing rates pursuant to § 342.3 or § 342.4, whichever is applicable, unless directed otherwise by the Commission.

## § 342.2  Establishing initial rates.

A carrier must justify an initial rate for new service by:

(a) Filing cost, revenue, and throughput data supporting such rate as required by part 346 of this chapter; or

(b) Filing a sworn affidavit that the rate is agreed to by at least one non-affiliated person who intends to use the service in question, *provided* that if a protest to the initial rate is filed, the carrier must comply with paragraph (a) of this section.

[Order 561, 58 FR 58779, Nov. 4, 1993, as amended at 59 FR 59146, Nov. 16, 1994]

## § 342.3  Indexing.

(a) *Rate changes.* A rate charged by a carrier may be changed, at any time, to a level which does not exceed the ceiling level established by paragraph (d) of this section, upon compliance with the applicable filing and notice requirements and with paragraph (b) of this section. A filing under this section proposing to change a rate that is under investigation and subject to refund, must take effect subject to refund.

(b) *Information required to be filed with rate changes.* The carrier must comply with Part 341 of this title. Carriers must specify in their letters of transmittal required in § 341.2(c) of this chapter the rate schedule to be changed, the proposed new rate, the prior rate, the prior ceiling level, and the applicable ceiling level for the movement. No other rate information is required to accompany the proposed rate change.

(c) *Index year.* The index year is the period from July 1 to June 30.

(d) *Derivation of the ceiling level.* (1) A carrier must compute the ceiling level for each index year by multiplying the previous index year's ceiling level by the most recent index published by the Commission. The index will be published by the Commission prior to June 1 of each year.

(2) The index published by the Commission will be based on the change in the final Producer Price Index for Finished Goods (PPI-FG), seasonally adjusted, as published by the U.S. Department of Labor, Bureau of Labor Statistics, for the two calendar years immediately preceding the index year. The index will be calculated by dividing the PPI-FG for the calendar year immediately preceding the index year, by the previous calendar year's PPI-FG.

(3) A carrier must compute the ceiling level each index year without regard to the actual rates filed pursuant to this section. All carriers must round their ceiling levels each index year to the nearest hundredth of a cent.

(4) For purposes of computing the ceiling level for the period January 1, 1995 through June 30, 1995, a carrier must use the rate in effect on December 31, 1994 as the previous index year's ceiling level in the computation in paragraph (d)(1) of this section. If the rate in effect on December 31, 1994 is subsequently lowered by Commission order pursuant to the Interstate Commerce Act, the ceiling level based on such rate must be recomputed, in accordance with paragraph (d)(1) of this section, using the rate established by such Commission order in lieu of the rate in effect on December 31, 1994.

(5) When an initial rate, or rate changed by a method other than indexing, takes effect during the index year, such rate will constitute the applicable ceiling level for that index year. If such rate is subsequently lowered by Commission order pursuant to the Interstate Commerce Act, the ceiling level based on such rate must be recomputed, in accordance with paragraph (d)(1) of this section, using the rate established by such Commission order as the ceiling level for the index year which includes the effective date of the rate established by such Commission order.

**Federal Energy Regulatory Commission**     **§ 343.2**

(e) *Rate decreases.* If the ceiling level computed pursuant to §342.3(d) is below the filed rate of a carrier, that rate must be reduced to bring it into compliance with the new ceiling level; provided, however, that a carrier is not required to reduce a rate below the level deemed just and reasonable under section 1803(a) of the Energy Policy Act of 1992, if such section applies to such rate or to any prior rate. The rate decrease must be accomplished by filing a revised tariff publication with the Commission to be effective July 1 of the index year to which the reduced ceiling level applies.

[Order 561, 58 FR 58779, Nov. 4, 1993, as amended by Order 561–A, 59 FR 40256, Aug. 8, 1994; 59 FR 59146, Nov. 16, 1994; Order 606, 64 FR 44405, Aug. 16, 1999; Order 650, 69 FR 53801, Sept. 3, 2004]

**§ 342.4 Other rate changing methodologies.**

(a) *Cost-of-service rates.* A carrier may change a rate pursuant to this section if it shows that there is a substantial divergence between the actual costs experienced by the carrier and the rate resulting from application of the index such that the rate at the ceiling level would preclude the carrier from being able to charge a just and reasonable rate within the meaning of the Interstate Commerce Act. A carrier must substantiate the costs incurred by filing the data required by part 346 of this chapter. A carrier that makes such a showing may change the rate in question, based upon the cost of providing the service covered by the rate, without regard to the applicable ceiling level under §342.3.

(b) *Market-based rates.* A carrier may attempt to show that it lacks significant market power in the market in which it proposes to charge market-based rates. Until the carrier establishes that it lacks market power, these rates will be subject to the applicable ceiling level under §342.3.

(c) *Settlement rates.* A carrier may change a rate without regard to the ceiling level under §342.3 if the proposed change has been agreed to, in writing, by each person who, on the day of the filing of the proposed rate change, is using the service covered by the rate. A filing pursuant to this section must contain a verified statement by the carrier that the proposed rate change has been agreed to by all current shippers.

[Order 561, 58 FR 58779, Nov. 4, 1993, as amended at 59 FR 59146, Nov. 16, 1994]

## PART 343—PROCEDURAL RULES APPLICABLE TO OIL PIPELINE PROCEEDINGS

Sec.
343.0  Applicability.
343.1  Definitions.
343.2  Requirements for filing interventions, protests and complaints.
343.3  Filing of protests and responses.
343.4  Procedure on complaints.
343.5  Required negotiations.

AUTHORITY: 5 U.S.C. 571–583; 42 U.S.C. 7101–7352; 49 U.S.C. 60502; 49 App. U.S.C. 1-85.

SOURCE: Order 561, 58 FR 58780, Nov. 4, 1993, unless otherwise noted.

**§ 343.0 Applicability.**

(a) *General rule.* The Commission's Rules of Practice and Procedure in part 385 of this chapter will govern procedural matters in oil pipeline proceedings under part 342 of this chapter and under the Interstate Commerce Act, except to the extent specified in this part.

**§ 343.1 Definitions.**

For purposes of this part, the following definitions apply:

(a) *Complaint* means a filing challenging an existing rate or practice under section 13(1) of the Interstate Commerce Act.

(b) *Protest* means a filing, under section 15(7) of the Interstate Commerce Act, challenging a tariff publication.

[Order 561, 58 FR 58780, Nov. 4, 1993, as amended by Order 578, 60 FR 19505, Apr. 19, 1995]

**§ 343.2 Requirements for filing interventions, protests and complaints.**

(a) *Interventions.* Section 385.214 of this chapter applies to oil pipeline proceedings.

(b) *Standing to file protest.* Only persons with a substantial economic interest in the tariff filing may file a protest to a tariff filing pursuant to the Interstate Commerce Act. Along with


# 18 C.F.R. § 346.2

**Federal Energy Regulatory Commission**                    **§ 346.2**

**§ 346.2  Material in support of initial rates or change in rates.**

A carrier that files for rates pursuant to § 342.2(a) or § 342.4(a) of this chapter, or a carrier described in § 342.0(b) that files to establish or change rates by filing cost, revenue, and throughput data supporting such rates, other than pursuant to a Commission-approved settlement, must file the following statements, schedules, and supporting workpapers. The statement, schedules, and workpapers must be based upon an appropriate test period.

(a) *Base and test periods defined.* (1) For a carrier which has been in operation for at least 12 months:

(i) A base period must consist of 12 consecutive months of actual experience. The 12 months of experience must be adjusted to eliminate nonrecurring items (except minor accounts). The filing carrier may include appropriate normalizing adjustments in lieu of nonrecurring items.

(ii) A test period must consist of a base period adjusted for changes in revenues and costs which are known and are measurable with reasonable accuracy at the time of filing and which will become effective within nine months after the last month of available actual experience utilized in the filing. For good cause shown, the Commission may allow reasonable deviation from the prescribed test period.

(2) For a carrier which has less than 12 months' experience, the test period may consist of 12 consecutive months ending not more than one year from the filing date. For good cause shown, the Commission may allow reasonable deviation from the prescribed test period.

(3) For a carrier which is establishing rates for new service, the test period will be based on a 12-month projection of costs and revenues.

(b) *Cost-of-service summary schedule.* This schedule must contain the following information:

(1) Total carrier cost of service for the test period.

(2) Throughput for the test period in both barrels and barrel-miles.

(3) For filings pursuant to § 342.4(a) of this chapter, the schedule must include the proposed rates, the rates which would be permitted under § 342.3 of this chapter, and the revenues to be realized from both sets of rates.

(c) *Content of statements.* Any cost-of-service rate filing must include supporting statements containing the following information for the test period.

(1) *Statement A—total cost of service.* This statement must summarize the total cost of service for a carrier (operating and maintenance expense, depreciation and amortization, return, and taxes) developed from Statements B through G described in paragraphs (c) (2) through (7) of this section.

(2) *Statement B—operation and maintenance expense.* This statement must set forth the operation, maintenance, administration and general, and depreciation expenses for the test period. Items used in the computations or derived on this statement must consist of operations, including salaries and wages, supplies and expenses, outside services, operating fuel and power, and oil losses and shortages; maintenance, including salaries and wages, supplies and expenses, outside services, and maintenance and materials; administrative and general, including salaries and wages, supplies and expenses, outside services, rentals, pensions and benefits, insurance, casualty and other losses, and pipeline taxes; and depreciation and amortization.

(3) *Statement C—overall return on rate base.* This statement must set forth the rate base for return purposes from Statement E in paragraph (c)(5) of this section and must also state the claimed rate of return and the application of the claimed rate of return to the overall rate base. The claimed rate of return must consist of a weighted cost of capital, combining the rate of return on debt capital and the real rate of return on equity capital. Items used in the computations or derived on this statement must include deferred earnings, equity ratio, debt ratio, weighted cost of capital, and costs of debt and equity.

(4) *Statement D—income taxes.* This statement must set forth the income tax computation. Items used in the computations or derived on this statement must show: return allowance, interest expense, equity return, annual

933

**21**

amortization of deferred earnings, depreciation on equity AFUDC, underfunded or overfunded ADIT amortization amount, taxable income, tax factor, and income tax allowance.

(5) *Statement E—rate base.* This statement must set forth the return rate base. Items used in the computations or derived on this statement must include beginning balances of the rate base at December 31, 1983, working capital (including materials and supplies, prepayments, and oil inventory), accrued depreciation on carrier plant, accrued depreciation on rights of way, and accumulated deferred income taxes; and adjustments and end balances for original cost of retirements, interest during construction, AFUDC adjustments, original cost of net additions and retirements from land, original cost of net additions and retirements from rights of way, original cost of plant additions, original cost accruals for depreciation, AFUDC accrued depreciation adjustment, original cost depreciation accruals added to rights of way, net charge for retirements from accrued depreciation, accumulated deferred income taxes, changes in working capital (including materials and supplies, prepayments, and oil inventory), accrued deferred earnings, annual amortization of accrued deferred earnings, and amortization of starting rate base write-up.

(6) *Statement F—allowance for funds used during construction.* This statement must set forth the computation of allowances for funds used during construction (AFUDC) including the AFUDC for each year commencing in 1984 and a summary of AFUDC and AFUDC depreciation for the years 1984 through the test year.

(7) *Statement G—revenues.* This statement must set forth the gross revenues for the actual 12 months of experience as computed under both the presently effective rates and the proposed rates. If the presently effective rates are not at the maximum ceiling rate established under § 342.3 of this chapter, then gross revenues must also be computed and set forth as if the ceiling rates were effective for the 12 month period.

[59 FR 59146, Nov. 16, 1994, as amended by Order 588, 61 FR 38569, July 25, 1996; Order 606, 64 FR 44405, Aug. 16, 1999]

### § 346.3  Asset retirement obligations.

(a) A carrier that files material in support of initial rates or change in rates under § 346.2 and has recorded asset retirement obligations on its books must provide a schedule, as part of the supporting workpapers, identifying all cost components related to the asset retirement obligations that are included in the book balances of all accounts reflected in the cost of service computation supporting the proposed rates. However, all cost components related to asset retirement obligations that would impact the calculation of rate base, such as carrier property and related accumulated depreciation and accumulated deferred income taxes, may not be reflected in rates and must be removed from the rate base calculation through a single adjustment.

(b) A carrier seeking to recover nonrate base costs related to asset retirement costs in rates must provide, with its filing under § 346.2 of this part, a detailed study supporting the amounts proposed to be collected in rates.

(c) A carrier who has recorded asset retirement obligations on its books but is not seeking recovery of the asset retirement costs in rates, must remove all asset retirement obligations related cost components from the cost of service supporting its proposed rates.

[Order 631, 68 FR 19625, Apr. 21, 2003]

## PART 347—OIL PIPELINE DEPRECIATION STUDIES

AUTHORITY: 42 U.S.C. 7101–7352; 49 U.S.C. 60502; 49 App. U.S.C. 1–85.

### § 347.1  Material to support request for newly established or changed property account depreciation studies.

(a) *Means of filing.* Filing of a request for new or changed property account depreciation rates must be made with the Secretary of the Commission.

(b) All filings under this Part must be made electronically pursuant to the requirements of §§ 341.1 and 341.2 of this chapter.

(c) *Transmittal letter.* Letters of transmittal must give a general description of the change in depreciation rates