**ORAL ARGUMENT NOT YET SCHEDULED**

# In the United States Court of Appeals
# for the District of Columbia Circuit

### Nos. 11-1479, *et al.* (consolidated)
————

UNITED AIRLINES, INC., *ET AL.*,
*Petitioners*,

v.

FEDERAL ENERGY REGULATORY COMMISSION
AND UNITED STATES OF AMERICA,
*Respondents*.
————

ON PETITIONS FOR REVIEW OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION
————

**BRIEF FOR RESPONDENTS
FEDERAL ENERGY REGULATORY COMMISSION
AND UNITED STATES OF AMERICA**
————

William J. Baer
Assistant Attorney General

James J. Fredricks
Robert J. Wiggers
Attorneys

For Respondent
United States of America
U.S. Department of Justice
Washington, D.C. 20530

November 17, 2015

Max Minzner
General Counsel

Robert H. Solomon
Solicitor

Beth G. Pacella
Deputy Solicitor

Elizabeth E. Rylander
Lisa B. Luftig
Attorneys

For Respondent
Federal Energy Regulatory Commission
Washington, D.C. 20426

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

## A.    Parties and Amici

All parties and intervenors appearing in this Court are identified in the Briefs of Petitioners.

## B.    Rulings Under Review

1.    *SFPP, L.P.*, Opinion 511, 134 FERC ¶ 61,121 (2011) (Opinion 511), R. 967, JA __;

2.    *SFPP, L.P.*, Opinion 511-A, 137 FERC ¶ 61,220 (2011) (Opinion 511-A), R. 1014, JA __; and

3.    *SFPP, L.P.*, Opinion 511-B, 150 FERC ¶ 61,096 (2015) (Opinion 511-B), R. 1044, JA __ (collectively, West Line Orders).

## C.    Related Cases

This case, which concerns Respondent Federal Energy Regulatory Commission's (FERC) approval of rates for transportation of petroleum products on Petitioner SFPP, L.P.'s West Line, has not previously been before this Court or any other Court.  But as noted in the Briefs of Petitioners, FERC is evaluating, in separate proceedings, rates for transportation of petroleum products on SFPP, L.P.'s East Line.  *See SFPP, L.P.*, Opinion 522, 140 FERC ¶ 61,220 (2012) (generally affirming Administrative Law Judge's findings concerning proposed East Line rates and requiring compliance filing), *on reh'g*, Opinion 522-A, 150

FERC ¶ 61,097 (2015), *reh'g pending* (collectively, East Line Orders).  Several

parties have filed petitions for review of the East Line Orders in *Southwest Airlines*

*Co. v. FERC*, Nos. 12-1455, *et al.*, and the Court has held the consolidated cases in

abeyance pending completion of agency proceedings.  Any eventual appellate

proceedings concerning the East Line Orders seem likely to involve similar parties

and similar issues to those presented in this case with regard to the West Line

Orders.

                                          */s/ Elizabeth E. Rylander*
                                          Elizabeth E. Rylander

November 17, 2015

# TABLE OF CONTENTS

**PAGE**

STATEMENT OF THE ISSUES.......................................................................... 1

COUNTER-STATEMENT OF JURISDICTION ............................................... 3

STATUTORY AND REGULATORY PROVISIONS ...................................... 4

STATEMENT OF FACTS ................................................................................ 4

     I.     Statutory And Regulatory Background ........................................... 4

          A.     The Interstate Commerce Act ............................................... 4

          B.     Cost-of-Service Ratemaking ................................................. 5

     II.    Factual Background......................................................................... 8

          A.     The *Lakehead* Policy And *BP West Coast*............................ 8

          B.     The Commission's Income Tax Policy Statement And The *BP West Coast* Remand Order............................. 11

          C.     *ExxonMobil* ......................................................................... 14

          D.     The Proceedings Under Review.......................................... 18

SUMMARY OF ARGUMENT ........................................................................ 19

ARGUMENT ................................................................................................... 22

     I.     The Shippers' Petitions Should Be Dismissed As Impermissible Collateral Attacks On Prior Commission Orders Affirmed By This Court ..................................................... 22

     II.    Standard of Review ....................................................................... 23

i

# TABLE OF CONTENTS

**PAGE**

III.   The Commission Reasonably Determined That The Pipeline
May Include An Income Tax Allowance In Its Cost of Service... 25

    A.   Granting An Income Tax Allowance Does Not Provide
Double Recovery Of Income Taxes.................................... 27

    B.   Double Corporate Income Taxation, Not Double
Income Tax Recovery, Provides Partnerships A
Financial Advantage Over Corporations ........................... 29

IV.   The Commission Reasonably Determined That It Would Be
Inappropriate To Use The Pipeline's Proposed 2009 Data To
Calculate The Rate of Return On Equity ...................................... 31

    A.   Determining The Rate Of Return On Equity Under The
Trended Original Cost Methodology ................................. 32

    B.   The Commission Reasonably Affirmed The
Administrative Law Judge's Determination To Use 2008
Data To Calculate The Rate Of Return On Equity ............. 33

    C.   The Pipeline's Arguments Are Without Merit .................. 38

V.   The Commission Reasonably Limited The Pipeline's
Index Increase For 2009 ................................................................ 42

    A.   The Commission's Indexing Procedures ........................... 43

    B.   The Commission Reasonably Denied The Pipeline
The Full Index Increase For 2009 ...................................... 44

## TABLE OF CONTENTS

**PAGE**

C.  The Pipeline's Challenges To The Commission's
    Determination Are Without Merit ..................................... 45

    1.  The Commission's Determination Is Fully
        Consistent With Its Regulations .............................. 45

    2.  The Commission's Determination Is Fully
        Consistent With Its Precedent.................................. 48

CONCLUSION…........................................................................ 53

# TABLE OF AUTHORITIES

**COURT CASES:**                                                      **PAGE**

\* *Ass'n of Oil Pipe Lines v. FERC*,
    83 F.3d 1424 (D.C. Cir. 1996).........................................6, 32-33, 43, 46-48

*Boston Edison Co. v. FERC*,
    885 F.2d 962 (1st Cir. 1989).................................................... 36

\* *BP West Coast Prods., LLC v. FERC*,
    374 F.3d 1263 (D.C. Cir. 2004).............................. 9-11, 13, 29-30, 32-33

*Cal. Pub. Utils. Comm'n v. FERC*,
    254 F.3d 250 (D.C. Cir. 2001)................................................. 42

*Cent. Vt. Pub. Serv. Corp. v. FERC*,
    214 F.3d 1366 (D.C. Cir. 2000)............................................... 25

*City of Charlottesville v. FERC*,
    774 F.2d 1205 (D.C. Cir. 1985)................................................ 5

\* *Constellation Energy Commodities Grp., Inc. v. FERC*,
    602 F. App'x. 536 (D.C. Cir. 2015) .................................... 3, 22

*Dynegy Midwest Generation, Inc. v. FERC*,
    633 F.3d 1122 (D.C. Cir. 2011)............................................... 23

*Elec. Consumers Res. Council v. FERC*,
    407 F.3d 1232 (D.C. Cir. 2005)............................................... 41

*Exxon Corp. v. FERC*,
    206 F.3d 47 (D.C. Cir. 2000).................................................. 24

---

\* Authorities upon which we chiefly rely are marked with asterisks.

## TABLE OF AUTHORITIES

**COURT CASES:**                                                    **PAGE**

*ExxonMobil Oil Corp. v. FERC*,
    363 F. App'x. 752 (D.C. Cir. 2010) ................................................... 51-52

\* *ExxonMobil Oil Corp. v. FERC*,
    487 F.3d 945 (D.C. Cir. 2007)....................2, 4, 5, 8, 10-19, 22-28, 38, 43

*Farmers Union Cent. Exch., Inc. v. FERC*,
    734 F.2d 1486 (D.C. Cir. 1984)................................................................ 33

*FPC v. Hope Nat. Gas Co.*,
    320 U.S. 591 (1944)............................................................................ 8, 17

*Frontier Pipeline Co. v. FERC*,
    452 F.3d 774 (D.C. Cir. 2006)................................................................... 5

*ICC v. Bhd. of Locomotive Eng'rs*,
    482 U.S. 270 (1987).................................................................................. 23

*Mobil Pipe Line Co. v. FERC*,
    676 F.3d 1098 (D.C. Cir. 2012).................................................................. 6

*Morgan Stanley Capital Grp. Inc. v. Pub. Util. Dist. No. 1*,
    554 U.S. 527 (2008).............................................................................. 6, 24

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*,
    463 U.S. 29 (1983).................................................................................... 24

*N. Border Pipeline Co. v. FERC*,
    129 F.3d 1315 (D.C. Cir. 1997)............................................................... 25

\* *Pac. Gas & Elec. Co. v. FERC*,
    533 F.3d 820 (D.C. Cir. 2008)........................................................... 4, 22

# TABLE OF AUTHORITIES

**COURT CASES:**                                                                                     **PAGE**

*Permian Basin Area Rate Cases*,
    390 U.S. 747 (1968)..................................................................... 24

\* *Sacramento Mun. Util. Dist. v. FERC*,
    428 F.3d 294 (D.C. Cir. 2005)........................................... 4, 22-23

*S. Cal. Edison Co. v. FERC*,
    443 F.3d 94 (D.C. Cir. 2006)................................................... 24

*S. Cal. Edison Co. v. FERC*,
    717 F.3d 177 (D.C. Cir. 2013)................................................. 39

*S. Co. Servs., Inc. v. FERC*,
    416 F.3d 39 (D.C. Cir. 2005)................................................... 23

*TC Ravenswood, LLC v. FERC*,
    705 F.3d 474 (D.C. Cir. 2013).............................................. 41

*United States v. L.A. Trucker Truck Lines, Inc.*,
    344 U.S. 33 (1952)................................................................... 39

*Williston Basin Interstate Pipeline Co. v. FERC*,
    165 F.3d 54 (D.C. Cir. 1999)....................................... 7, 24, 32

**ADMINISTRATIVE CASES:**

*BP West Coast Prods., LLC v. SFPP, L.P.*,
    118 FERC ¶ 61,261 (2007), *on reh'g*,
    121 FERC ¶ 61,195 (2007)..................................................... 51

*Cost-of-Service Reporting and Filing Requirements for Oil Pipelines*, Order 571,
    FERC Stats. & Regs. ¶ 31,006 (1994), *on reh'g*, Order 571-A,
    FERC Stats. & Regs. ¶ 31,012 (1995)................................... 44

# TABLE OF AUTHORITIES

**ADMINISTRATIVE CASES:**                                                  **PAGE**

*Lakehead Pipe Line Co.,* Opinion 397,
     71 FERC ¶ 61,338 (1995), *reh'g denied,* Opinion 397-A,
     75 FERC ¶ 61,181 (1996)....................................................................... 9-10

\* *Policy Statement on Income Tax Allowances*,
     111 FERC ¶ 61,139 (2005)..........................................4, 8, 11-13, 16-17, 25

*Portland Nat. Gas Transmission Sys.*, Opinion 510,
     134 FERC ¶ 61,129 (2011) ...................................................................... 36

*Revisions to Oil Pipeline Regulations Pursuant to the Energy Policy Act of 1992*,
     Order No. 561, FERC Stats. & Regs. ¶ 30,985 (1993), *on reh'g*,
     Order No. 561-A, FERC Stats. & Regs. ¶ 31,000 (1994) .......... 43, 44, 48

*Revisions to Oil Pipeline Regulations Pursuant to the Energy Policy Act of 1992*,
     127 FERC ¶ 61,184 (2009) ...................................................................... 44

*SFPP, L.P.*,
     63 FERC ¶ 61,014 (1993), *clarified*,
     63 FERC ¶ 61,275 (1993) ......................................................................... 8

*SFPP, L.P.*,
     80 FERC ¶ 63,014 (1997) ......................................................................... 9

*SFPP, L.P.,* Opinion 435,
     86 FERC ¶ 61,022 (1999), *reh'g denied in relevant part*, Opinion 435-A,
     91 FERC ¶ 61,135 (2000)...........................................................9-10, 48-50

*SFPP, L.P.*,
     111 FERC ¶ 61,334 (2005).............................................................. 4, 14-15

*SFPP, L.P.*,
     117 FERC ¶ 61,271 (2006), *reh'g denied*,
     120 FERC ¶ 61,245 (2007)................................................................ 50-51

# TABLE OF AUTHORITIES

**ADMINISTRATIVE CASES:**                                              **PAGE**

*SFPP, L.P.*,
    122 FERC ¶ 61,133 (2008).................................................................... 49

*SFPP, L.P.*,
    124 FERC ¶ 61,103 (2008).................................................................... 18

*SFPP, L.P.*,
    129 FERC ¶ 63,020 (2009)................................................ 6, 18, 31, 33-34

*SFPP, L.P.,* Opinion 511,
    134 FERC ¶ 61,121 (2011), *on reh'g,* Opinion 511-A,
    137 FERC ¶ 61,220 (2015), *on reh'g,* Opinion 511-B
    150 FERC ¶ 61,096 (2015)............................................ 1, 3, 8, 19, 22-23,
                                                    25-42, 44-50, 52-53

*Tesoro Refining & Mkting. Co. v. Calnev Pipe Line LLC*,
    134 FERC ¶ 61,214 (2011), *on reh'g,*
    136 FERC ¶ 61,083 (2011).................................................................... 49

*Trunkline Gas Co.*,
    90 FERC ¶ 61,017 (2000)...................................................................... 35

*Williams Pipe Line Co.*,
    21 FERC ¶ 61,260 (1982)...................................................................... 33

*Williams Pipe Line Co.*, Opinion 154-B,
    31 FERC ¶ 61,377 (1985)...................................................................... 32

**OTHER ADMINISTRATIVE MATERIAL:**

*Inquiry Regarding Income Tax Allowances*,
    69 Fed. Reg. 72,188 (Dec. 13, 2004)...................................................... 11

# TABLE OF AUTHORITIES

**STATUTES:** **PAGE**

Administrative Procedure Act

    5 U.S.C. § 706(2)(A) ................................................................. 23

Energy Policy Act of 1992, *reprinted in* 42 U.S.C. § 7172 note

    Section 1801(a) ................................................................ 43, 46

    Section 1802(a) ..................................................................... 43

Interstate Commerce Act

    49 U.S.C. app. § 1(5) ........................................................... 5, 43

    49 U.S.C. app. § 6(1) .............................................................. 4

    49 U.S.C. app. § 6(7) .............................................................. 4

    49 U.S.C.A. § 60502 ................................................................ 5

Internal Revenue Code

    26 U.S.C. § 7704 ................................................................... 30

Judicial Procedure

    28 U.S.C. § 2344 ................................................................... 23

# TABLE OF AUTHORITIES

**REGULATIONS:**                                                                **PAGE**

18 C.F.R. § 342.3......................................................................6, 43, 44-45

18 C.F.R. § 342.4........................................................................... 6

18 C.F.R. § 343.2(c) ...........................................................46-47, 49-50

18 C.F.R. § 346.2(a) ............................................................... 33

# GLOSSARY

| | |
|---|---|
| Administrative Judge Decision | *SFPP, L.P.*, 129 FERC ¶ 63,020 (2009), R. 938, JA ___ |
| *BP West Coast* Remand Order | *SFPP, L.P.*, 111 FERC ¶ 61,334 (2005) |
| Br. | Brief |
| Commission or FERC | Respondent Federal Energy Regulatory Commission |
| East Line Orders | *SFPP, L.P.*, Opinion 522, 140 FERC ¶ 61,220 (2012), *on reh'g*, Opinion 522-A, 150 FERC ¶ 61,097 (2015) |
| ICA or Act | Interstate Commerce Act, 49 U.S.C. App. § 1, *et seq.* |
| JA | Joint Appendix |
| P | Paragraph number within a FERC order |
| Pipeline | Petitioner SFPP, L.P. |
| Policy Statement | *Policy Statement on Income Tax Allowances*, 111 FERC ¶ 61,139 (2005) |
| R. | Record item number |
| Shippers | Petitioners United Airlines, Inc., Delta Air Lines, Inc., Southwest Airlines Co., US Airways, Inc., BP West Coast Products LLC, Chevron Products Co., ExxonMobil Oil Corp., Valero Marketing and Supply Co., and Tesoro Refining and Marketing Co. LLC |

## GLOSSARY

| | |
|---|---|
| West Line | A segment of pipeline, owned by the Pipeline, that runs from Watson Station, California, to Phoenix, Arizona |
| West Line Orders | *SFPP, L.P.*, Opinion 511, 134 FERC ¶ 61,121 (2011), R. 967, JA ___, *on reh'g, SFPP, L.P.*, Opinion 511-A, 137 FERC ¶ 61,220 (2011), R. 1014, JA ___, *on reh'g, SFPP, L.P.*, Opinion 511-B, 150 FERC ¶ 61,096 (2015), R. 1044, JA ___ |

# In the United States Court of Appeals
# for the District of Columbia Circuit

Nos. 11-1479, *et al.* (consolidated)

_____

UNITED AIRLINES, INC., *ET AL.*,
*Petitioners*,

*v.*

FEDERAL ENERGY REGULATORY COMMISSION
AND UNITED STATES OF AMERICA,
*Respondents*.

_____

ON PETITIONS FOR REVIEW OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION

_____

**BRIEF FOR RESPONDENTS
FEDERAL ENERGY REGULATORY COMMISSION
AND UNITED STATES OF AMERICA**

_____

## STATEMENT OF THE ISSUES

This case involves the Federal Energy Regulatory Commission's

(Commission or FERC) review, after a trial-type hearing, of oil pipeline

transportation rates proposed by Petitioner SFPP, L.P. (Pipeline) for its West Line,

which runs from Watson Station, California, to Phoenix, Arizona. *SFPP, L.P.*,

Opinion 511, 134 FERC ¶ 61,121, at P 2 (2011), R. 967, JA __, *on reh'g*, *SFPP,*

*L.P.*, Opinion 511-A, 137 FERC ¶ 61,220 (2011), R. 1014, JA __, *on reh'g*, *SFPP,*

*L.P.*, Opinion 511-B, 150 FERC ¶ 61,096 (2015), R. 1044, JA __.

1

The challenged orders addressed numerous contested issues.  On appeal, however, the two opposing sets of petitioners (the Pipeline and its Shippers) challenge the Commission's rulings on only three issues.  The Shippers (Petitioners United Airlines, Inc., Delta Air Lines, Inc., Southwest Airlines Co., US Airways, Inc., ExxonMobil Oil Corp., BP West Coast Products LLC, Chevron Products Co., Valero Marketing and Supply Co., and Tesoro Refining and Marketing Co. LLC), like the petitioners in *ExxonMobil Oil Corp. v. FERC*, 487 F.3d 945 (D.C. Cir. 2007), challenge the Commission's policy allowing pipelines to include an income tax allowance in their costs of service and, therefore, to recover income tax costs in their rates.  Shippers Br. at 10-52.

The Pipeline, on the other hand, challenges the Commission's determination that it would be inappropriate here to use the most recent financial data in the record to set the Pipeline's rate of return because that data reflected the recent stock market collapse and, therefore, was anomalous.  Pipeline Br. at 22-28.  The Pipeline also contends that the Commission should have approved its proposed full inflationary index adjustment of 7.6025 percent for 2009, notwithstanding that the Pipeline's cost-of-service rates largely already include the inflationary changes on which that index adjustment is based.  *Id.* at 28-36.

2

The issues presented for review are:

1.      Whether the Commission reasonably approved, consistent with its own policy and this Court's precedent, the Pipeline's proposal to include an income tax allowance in its cost of service;

2.      Whether the Commission reasonably affirmed the Administrative Law Judge's use of test period financial data to calculate the Pipeline's return on equity instead of the Pipeline's more recent financial data, which encompassed the stock market collapse beginning in late 2008, reflecting a unique period in American economics that had not existed since the Great Depression and was unlikely to exist for the foreseeable future; and

3.      Whether the Commission reasonably disallowed the Pipeline's request to use a full index adjustment for industry-wide cost increases in 2008, instead approving an adjustment equal to one-quarter of the full index amount, where the Pipeline's rates had already been adjusted for its own 2008 costs for the first three quarters of 2008.

## COUNTER-STATEMENT OF JURISDICTION

As further detailed below in Part I of the Argument, the Shippers' petitions for review should be dismissed because their claims are an impermissible collateral attack on judicially-affirmed Commission orders.  *See, e.g.*, *Constellation Energy Commodities Grp., Inc. v. FERC*, 602 F. App'x. 536, 538 (D.C. Cir. 2015);

3

*Pac. Gas & Elec. Co. v. FERC*, 533 F.3d 820, 825 (D.C. Cir. 2008); *Sacramento*

*Mun. Util. Dist. v. FERC*, 428 F.3d 294, 299 (D.C. Cir. 2005). Shippers' petitions

challenge the Commission's ratemaking policy that permits a pipeline to include an

income tax allowance in its cost of service, but that policy, its underlying rationale,

and its application to the Pipeline, were affirmed by this Court in *ExxonMobil*, 487

F.3d 945, *aff'g Policy Statement on Income Tax Allowances*, 111 FERC ¶ 61,139

(2005) (Policy Statement) (articulating income tax allowance policy) and *SFPP,*

*L.P.*, 111 FERC ¶ 61,334 (2005) (*BP West Coast* Remand Order) (applying policy

to the Pipeline). Consequently, the Court should dismiss the Shippers' petitions

for review.

## STATUTORY AND REGULATORY PROVISIONS

The pertinent statutes and regulations are reproduced in the Addendum.

## STATEMENT OF FACTS

### I.    Statutory And Regulatory Background

#### A.    The Interstate Commerce Act

In 1906, Congress extended the definition of common carrier under the

Interstate Commerce Act (ICA or Act) to oil pipelines and required that they file

their rates with the Interstate Commerce Commission. *See* 49 U.S.C. app. §§ 6(1),

6(7) (1988). In 1977, in conjunction with the formation of the Department of

Energy, regulatory authority over oil pipelines under the ICA was transferred from

4

the Interstate Commerce Commission to the newly-created FERC.  *See* 49 U.S.C.

§ 60502.  The traditional standards governing rate regulation under the ICA were

not modified.  *See Frontier Pipeline Co. v. FERC*, 452 F.3d 774, 776 (D.C. Cir.

2006) (explaining that "oil pipelines were to be regulated under the version of the

ICA that prevailed on October 1, 1977," and explaining citation of ICA provisions

to appendix to the 1988 edition of the United States Code).

ICA section 1(5)(a) requires that "[a]ll charges" for pipeline transportation,

or service in connection with transportation, be just and reasonable and declares all

"unjust and unreasonable charge[s] . . . to be unlawful."  49 U.S.C. app. § 1(5)(a).

This Court has "held that 'just and reasonable' rates are 'rates yielding sufficient

revenue to cover all proper costs, including federal income taxes, plus a specified

return on invested capital.'"  *ExxonMobil*, 487 F.3d at 951 (quoting *City of

Charlottesville v. FERC*, 774 F.2d 1205, 1207 (D.C. Cir. 1985)); *see also id.* at 953

("regulated entities are entitled to recover all 'proper' costs from their ratepayers")

(citing *City of Charlottesville*, 774 F.2d at 1207).  "Obviously, 'proper' is not a

self-defining term, and the Commission thus has broad discretion to determine

which costs may be recovered through a pipeline's rates."  *Id.* at 953.

### B.    Cost-Of-Service Ratemaking

Most of this case (Issue 1, addressed in Argument Section III, and Issue 2,

addressed in Argument Section IV) involves old-fashioned cost-of-service rates.

5

Over the past two decades, this type of case has become increasingly uncommon. The Commission, in response to legislative preferences and industry reforms, has restructured energy markets and has promoted market-oriented approaches to ratemaking, allowing for faster resolution and a closer relationship to competitive forces. *See, e.g., Morgan Stanley Capital Grp. Inc. v. Pub. Util. Dist. No. 1*, 554 U.S. 527, 535-38 (2008) (market-based rates for electric utilities); *Mobil Pipe Line Co. v. FERC*, 676 F.3d 1098 (D.C. Cir. 2012) (market-based rates for oil pipelines). This is especially true in the realm of oil pipeline rates, where the Commission has applied approaches that include indexing[1] and market-based rates to enable more timely resolution of disputes. *See Ass'n of Oil Pipe Lines v. FERC*, 83 F.3d 1424, 1428-31 (D.C. Cir. 1996) (approving indexed ratemaking method); 18 C.F.R. § 342.3-.4 (providing several ways oil pipelines may seek rate changes).

Still, oil pipelines may file for cost-of-service rates, and the Pipeline has been litigating its cost-of-service rates in phases before the Commission and this Court since 1992. *See generally SFPP, L.P.*, 129 FERC ¶ 63,020 at Att. A (2009) (Administrative Judge Decision) (summarizing rate proceedings), R. 938, JA ___-__. Most recently, in mid-2008, the Pipeline submitted the cost-based rate filing at

---

[1] Under indexing, pipelines are permitted to make annual filings to request to increase their rates up to a ceiling set by reference to an inflation index reflecting industry-wide cost changes. Issue 3 involves indexing, which is discussed more fully *infra* Argument section V.

issue here to increase its West Line rates.  *See* Opinion 511 at PP 1-2 (2008), JA

___.

Under the Commission's cost-of-service ratemaking methodology, the

operating and capital costs of a regulated pipeline are calculated to establish the

revenue required to cover the pipeline's costs including, as relevant here, a return

on equity (i.e., the rate of return an investor requires to invest in the pipeline) and

an income tax allowance (to ensure a pipeline has sufficient revenues to cover

income taxes).  Opinion 511 at P 263, JA __.  Ultimately the total revenue

requirement is divided by throughput in order to establish the pipeline's

transportation rate.  *See Williston Basin Interstate Pipeline Co. v. FERC*, 165 F.3d

54, 57 (D.C. Cir. 1999).

The Commission determines a pipeline's return on equity using a discounted

cash flow model.  Much as a real estate buyer might refer to the prices of

comparable properties to assess the market value of a potential new home, the

Commission determines a pipeline's rate of return on equity by examining the

returns on equity that the market requires for members of a "proxy group" – a set

of FERC-jurisdictional utilities with comparable risks and publicly-traded

securities.  Opinion 511 at P 242, JA ___; Opinion 511-A at P 292, JA ___.

The discounted cash flow model starts with the stock price of the securities

in the proxy group, and then calculates the percentage return, or yield, by dividing

7

the distribution or dividend of the security by the stock price. Opinion 511 at

P 243, JA ___. The dollar amount of the distribution in the first year, as increased

by a growth rate, is applied over the long-term growth horizon, and is discounted

back at the first year's percentage yield to produce the return on equity required to

attract capital to the firm. *Id.*

The Commission must ensure that a pipeline's return on equity is

commensurate with returns on equity of other enterprises facing comparable risks.

*FPC v. Hope Nat. Gas Co.*, 320 U.S. 591, 603 (1944); *ExxonMobil*, 487 F.3d at

953. The Commission compares the returns on equity of pipelines at the after-tax,

rather than at the before-tax, stage because most comparable securities trade on the

basis of an entity's after-tax return on its public utility income, and it would be

difficult to determine an appropriate pre-tax return based on traded equities alone.

Policy Statement, 111 FERC ¶ 61,139 at P 40.

## II.     Factual Background

### A.       The *Lakehead* Policy And *BP West Coast*

In 1992, in response to the Pipeline's filing to revise its tariffs, some

customers filed complaints challenging the Pipeline's rates and practices. *See*

*SFPP, L.P.*, 63 FERC ¶ 61,014 at 61,124 (1993), *clarified*, 63 FERC ¶ 61,275

(1993). After a trial-type hearing, an Administrative Law Judge found that the

complainants had not met their burden to show that the West Line rates were no

8

longer just and reasonable, but found that the East Line rates were not just and

reasonable and, therefore, needed to be revised.  *SFPP, L.P.*, 80 FERC ¶ 63,014

(1997).  The Commission affirmed the Administrative Law Judge's

determinations.  *SFPP, L.P.*, Opinion 435, 86 FERC ¶ 61,022 (1999), *reh'g denied*

*in relevant part*, Opinion 435-A, 91 FERC ¶ 61,135 (2000), *rev'd in relevant part*,

*BP West Coast Prods., LLC v. FERC*, 374 F.3d 1263 (D.C. Cir. 2004).

In doing so, the Commission addressed a number of issues, including the

Pipeline's income tax allowance.  The Commission applied its then-existing

"*Lakehead*" policy, which permitted a partnership pipeline to include an income

tax allowance for partnership units held by corporations, but not for those held by

individuals.  *See* Opinion 435, 86 FERC ¶ 61,022 at 61,102-04 (citing *Lakehead*

*Pipe Line Co.*, Opinion 397, 71 FERC ¶ 61,338 (1995), *reh'g denied*, Opinion 397-

A, 75 FERC ¶ 61,181 (1996)); Opinion 435-A, 91 FERC ¶ 61,135 at 61,508-09.

In instituting the *Lakehead* policy, the Commission reasoned that:

> When partnership interests are held by corporations, the
> partnership is entitled to a tax allowance in its cost-of-
> service for those corporate interests because the tax cost
> will be passed on to the corporate owners who must pay
> corporate income taxes on their allocated share of income
> directly on their tax returns.  The partnership is in
> essence a division of each of its corporate partners
> because the partnership functions as a conduit for income
> tax purposes.

*Lakehead*, 71 FERC ¶ 61,338 at 62,314-15.  By contrast, the Commission stated

that individual partners "do not pay a corporate income tax" and, therefore, "there

should be no corporate income tax allowance built into [a pipeline's] rates with

respect to income attributable to individual limited partners."  *Id.* at 62,315.  The

Commission believed that this "comport[ed] with the principle that there should

not be an element in the cost-of-service to cover costs that are not incurred."  *Id.*

*See also id.* ("with respect to [individual] partners, the corporate level of income

tax has been avoided and no tax allowance is needed to ensure that the partnership

has the opportunity to earn its allowed return on equity").

The Pipeline and a number of shippers appealed Opinions 435 and 435-A to

this Court.  While affirming many of the Commission's determinations, this Court

remanded those based on the *Lakehead* policy.  *BP West Coast*, 374 F.3d 1263.

The Court found that the Commission appeared to be granting income tax

allowances to entities that did not actually pay income taxes, and had not

reasonably explained why it treated individual and corporate partners differently

for tax allowance purposes.  *Id.* at 1290-91; *see also ExxonMobil*, 487 F.3d at 949

(discussing *BP West Coast*).  The Court specifically questioned the Commission's

statement that there should be no corporate income tax allowance for individual

partners because they do not pay a corporate income tax, pointing out that,

10

"[p]resumably, however, the individual owners pay individual income taxes." *BP West Coast*, 374 F.3d at 1289.

### B.    The Commission's Income Tax Policy Statement And The *BP West Coast* Remand Order

Following the *BP West Coast* remand, FERC issued a Notice of Inquiry requesting comments on "when, if ever, it is appropriate to provide an income tax allowance for partnerships or similar pass-through entities[2] that hold interests in a regulated public utility." *See ExxonMobil*, 487 F.3d at 950 (citing *Inquiry Regarding Income Tax Allowances*, 69 Fed. Reg. 72,188 (Dec. 13, 2004)).

After considering the public comments (including those by six of the nine Shippers petitioning here:  United Airlines, Inc., Delta Air Lines, Inc., Southwest Airlines Co., and US Airways, Inc. (collectively, as part of the Air Transport Association of America), Valero Marketing and Supply Company, and BP West Coast Products LLC, *see* Policy Statement, 111 FERC ¶ 61,139 at P 17 n.14), the Commission found that its *Lakehead* policy had "mistakenly focused on who pays the taxes rather than on the more fundamental cost allocation principle of what costs, including tax costs, are attributable to regulated service, and therefore properly includable in a regulated cost of service." *Id.* at P 33; *see also ExxonMobil*, 487 F.3d at 954 (same).  "While the pass-through entity [(i.e., the

---

[2] "Pass-through" entities pass their tax liability through to their owners.  Opinion 511 at n.426, JA ___.

partnership)] does not itself pay income taxes, the owners of a pass-through entity

[(i.e., the partners)] pay income taxes on the utility income generated by the assets

they own via the device of the pass-through entity.  Therefore, the taxes paid by the

owners of the pass-through entity are just as much a cost of acquiring and

operating the assets of that entity as if the utility assets were owned by a

corporation."  Policy Statement, 111 FERC ¶ 61,139 at P 33 (footnote omitted);

*see also ExxonMobil*, 487 F.3d at 952.

The Commission determined that, because a partnership's income (i.e., first-

tier, or pipeline-level, income) is attributed directly to its owners, and those owners

have an actual or potential income tax liability on that income, permitting a

partnership to have an income tax allowance does not create a phantom tax

liability.  Policy Statement, 111 FERC ¶ 61,139 at PP 33, 34, 37; *see also*

*ExxonMobil*, 487 F.3d at 952, 954-55 (same).  "[J]ust as a corporation has an

actual or potential income tax liability from the first tier public utility assets it

controls, so do the owners of a partnership or LLC on the first tier assets and

income they control by means of the pass-through entity."  Policy Statement, 111

FERC ¶ 61,139 at P 34; *see also id.* ("public utility income of pass-through entities

is attributed directly to the owners of such entities"); *ExxonMobil*, 487 F.3d at 952.

Providing a partnership an income tax allowance "recognize[s] in the rates the

actual or potential income tax liability ultimately attributable to regulated utility

12

income." Policy Statement, 111 FERC ¶ 61,139 at P 37; *see also id.* at P 40 (explaining that "both partners and . . . corporations pay income taxes on their first tier income"); *ExxonMobil*, 487 F.3d at 952 (noting that FERC concluded "income taxes paid by investors in a limited partnership are 'first-tier' taxes that may be allocated to the regulated entity's cost-of-service").

In addition, the Commission explained that its "failure to distinguish between first and second tier income . . . led to the double taxation rationale that the Commission incorrectly advanced in *Lakehead*." Policy Statement, 111 FERC ¶ 61,139 at P 38. "Dividends paid to the common stock investor and by the corporate investor in a pass-through entity are second tier income to such a common stock investor. As such, an income tax is paid by the investor in addition to the corporate tax that is due on the first tier [(i.e., pipeline-level)] income." *Id.* "In contrast, first tier income flows either to the corporation, a corporate partner, or individual partners (or LLC members) and is taxed at that level." *Id.* "To the extent *Lakehead* either concluded or assumed that dividend payments and income, and partnership distributions and income, have the same ownership[3] and income tax characteristic, this is simply incorrect as a matter of partnership and income tax law." *Id.* The Court in *BP West Coast*, 374 F.3d at 1289, "summarized this

---

[3] *See* Opinion 511-A at P 318, JA ___ (explaining that, because a partnership is a pass-through entity, a partner has a direct interest in the partnership's assets; in contrast, a shareholder's interest in a corporation's assets is indirect and the shareholder has no direct accounting interest in the corporation's assets).

situation succinctly when it stated that presumably both the corporate owners and individuals would pay taxes on public utility assets they control." *Id.* at P 38.

Furthermore, the Commission explained, denying an allowance would "act as a disincentive for the use of the partnership format," and create "strong incentives to shift to the taxable corporate ownership form," as corporations would be entitled to an income tax allowance. *Id.* at P 36 & n.33; *see also ExxonMobil*, 487 F.3d at 952-53.

Accordingly, the Commission determined that all partnership interests should be permitted an income tax allowance, provided the owners of those interests establish they have an actual or potential income tax liability on income earned through the interest. *Id.* at PP 1, 32.

The Commission applied the Policy Statement in its order on remand of *BP West Coast*, and approved the Pipeline's request for an income tax allowance, provided it could establish that its partners would incur an actual or potential income tax obligation from the Pipeline's regulated income. *BP West Coast Remand Order*, 111 FERC ¶ 61,334 at PP 21-27.

### C. *ExxonMobil*

Various shippers appealed the *BP West Coast* Remand Order (including Shippers petitioning here: ExxonMobil Oil Corp., BP West Coast Products LLC, Chevron Products Co., and Valero Marketing and Supply Co.), contending, as

14

pertinent here, that it was arbitrary and capricious and contrary to *BP West Coast*

to grant an income tax allowance to entities that do not actually pay income taxes.

*See ExxonMobil*, 487 F.3d at 948, 950. This Court rejected those claims, and

affirmed the Commission's conclusions and reasoning in the Policy Statement and

the *BP West Coast* Remand Order. *Id.* at 948-55.

      While the petitioners contended that partnerships do not pay entity-level

(first-tier) income taxes, and that providing them an income tax allowance creates a

phantom tax to pass through to the ratepayer, the Court found that, "as FERC

explained in the Policy Statement and the [*BP West Coast*] Remand Order, the

income taxes for which SFPP will receive an income tax allowance are real, albeit

indirect." *Id.* at 954; *see also id.* at 952 (noting that "[t]he Commission

acknowledged that 'the pass-through entity does not itself pay income taxes,' but

nonetheless granted the [income tax allowance] because 'the owners of a pass-

through entity pay income taxes on the utility income generated by the assets they

own via the device of the pass-through entity'") (quoting *BP West Coast* Remand

Order, 111 FERC ¶ 61,334 at P 23); *id.* (noting the Commission's reasoning that

"just as a corporation has an actual or potential income tax liability on income

from the public utility assets it controls, so do the owners of a partnership . . . on

the assets and income that they control by means of the pass-through entity")

(quoting *BP West Coast* Remand Order, 111 FERC ¶ 61,334 at P 25).

15

The Court determined that the Commission reasonably addressed

petitioners' argument that partnership income taxes "are ultimately paid by

individual investors – not the pipeline – and thus it was improper for FERC to

grant an [income tax allowance] to the regulated entity." *ExxonMobil*, 487 F.3d at

952. As FERC's Policy Statement explained, "'[b]ecause public utility income of

pass-through entities is attributed directly to the owners of such entities and the

owners have an actual or potential income tax liability on that income," the

Commission's "rationale here does not violate the court's concern that the

Commission has created a tax allowance to compensate for an income tax cost that

is not actually paid by the regulated utility.'" *Id.* (quoting Policy Statement, 111

FERC ¶ 61,139 at P 34); *id.* at 954-55 ("FERC has reasonably explained why its

new [income tax allowance] policy does not result in the creation of 'phantom' tax

liability for regulated pipelines that operate as limited partnerships."); *id.* at 954

("FERC has gone to great lengths to explain why the taxes in question are not

'phantom' and are properly attributable to the regulated entity.").

"Most importantly," the Court pointed out, "FERC determined that income

taxes paid by partners on their distributive share of the pipeline's income are 'just

as much a cost of acquiring and operating the assets of that entity as if the utility

assets were owned by a corporation.'" *ExxonMobil*, 487 F.3d at 952 (quoting

Policy Statement, 111 FERC ¶ 61,139 at P 33). "In other words, the Commission

16

found no good reason to limit the income tax allowance to corporations, given that 'both partners and Subchapter C corporations pay income taxes on their first tier income.'" *Id.* (quoting Policy Statement, 111 FERC ¶ 61,139 at P 40).  The Court found that "[t]he Commission reasonably determined that such taxes are 'attributable' to the regulated entity, given that partners must pay tax on their share of the partnership income regardless of whether they actually receive a cash distribution."  *Id.* at 955; *see also id.* at 953 (same); *id.* at 954 (the fact that "investors in a limited partnership are required to pay tax on their distributive shares of the partnership income, even if they do not receive a cash distribution . . . supports FERC's determination that taxes on the income received from a limited partnership should be allocated to the pipeline and included in the regulated entity's cost-of-service.  In this sense, petitioners' likening of partnership tax to shareholder dividend tax is inapposite because a shareholder of a corporation is generally taxed on the amount of the cash dividend actually received.").

Furthermore, the Court found that the Commission reasonably determined "that a full income tax allowance is necessary to ensure that corporations and partnerships of like risk will earn comparable after-tax returns," as required by *Hope Natural Gas*, 320 U.S. at 603.  *Id.* at 952-53, 955.  Otherwise, for example:

> if the corporate tax rate is 35%, then a pipeline that operates as a
> corporation is permitted to charge a rate of $154 in order to earn after-
> tax income of $100.  As several [Policy Statement] commenters
> pointed out, if an income tax allowance is not allowed the partnership,

17

> then the partners must pay a $35 income tax on $100 of utility
> income, leaving them with only an after-tax return of $65.

*Id.* at 953 (internal quotation marks omitted); *see also id.* (explaining that the court

"defer[s] to FERC's expert judgment about the best way to equalize after-tax

returns for partnerships and corporations"); *id.* at 955 ("Arguably, a fair return on

equity might have been afforded if FERC had chosen the fourth alternative of

computing return on pretax income and providing no tax allowance at all for the

pipeline owners.  This, however, is a policy decision rejected by FERC.  As we

noted above, policy decisions are for the Commission and not the court.").

### D.      The Proceedings Under Review

The instant case originated in 2008.  After the Pipeline completed an

expansion of its East Line in 2007, transportation volumes on that line increased,

volumes on the West Line fell, and the Pipeline filed to increase its West Line

rates.  West Line Tariff Filing, Transmittal Letter at 1-2 (June 30, 2008), R. 3, JA

__.  Parties protested the filing, and the Commission established a trial-type

hearing to address the issues they raised.  *SFPP, L.P.*, 124 FERC ¶ 61,103 at PP 5,

10 (2008).

After an 11-day evidentiary hearing, the Administrative Law Judge found, as

relevant here, that the Pipeline is entitled to an income tax allowance

(Administrative Judge Decision, 129 FERC ¶ 63,020 at PP 670, 677, JA __, __)

and that it would be inappropriate to use the most recent record data to update the

18

Pipeline's return on equity because that data represented extremely anomalous economic conditions (*id.* at P 650, JA ___).

The challenged orders affirmed these determinations. Opinion 511 at PP 204, 208-09, 218-313, JA ___, ___-___, ___-___; Opinion 511-A at PP 252, 255, 258, 266-340, JA ___, ___, ___, ___-___. In addition, the Commission rejected the Pipeline's proposal to apply the full indexed price increase to the Pipeline's rates in 2009, based upon industry-wide cost increases in 2008, because the Commission already had made numerous adjustments in this rate proceeding to the Pipeline's rates based upon the Pipeline's own cost changes for the first three quarters of 2008. Opinion 511-A at PP 405-411, JA ___-___; Opinion 511-B at PP 27-33, JA ___-___.

## SUMMARY OF ARGUMENT

**Shipper Claims**

The Shippers' challenge to Opinion Nos. 511 and 511-A should be dismissed as an untimely collateral attack. All of the Shippers' claims are premised on their contention that tax liability related to partnership income is investor-level liability. In *ExxonMobil*, 487 F.3d 945, however, this Court affirmed the Commission's determination in the Policy Statement and West Coast Remand Order that, for FERC ratemaking purposes, taxes on partnership income are pipeline-level taxes properly recovered as part of a pipeline's cost of service

19

through a tax allowance.  The Shippers' challenge to this judicially-affirmed finding is made well outside the 60-day time period to challenge a final Commission determination, and should be dismissed for lack of jurisdiction.

In any event, the Commission's approval of the proposed income tax allowance was reasonable and consistent with this Court's and its own precedent. As the Commission and this Court have found, income taxes are a real, albeit indirect, partnership cost.  Without an income tax allowance, the Pipeline would not be able to recover its cost of service, and its rates would not be just and reasonable.

The Pipeline will not double-recover income taxes if it is provided an income tax allowance.  The Shippers contend that income taxes related to partnership income are investor-level taxes and, therefore, purportedly already recovered in the Commission's discounted cash flow model.  The Commission explained, however, that, as affirmed in *ExxonMobil*, taxes on pipeline income are pipeline-level taxes.  The Shippers acknowledge pipeline-level taxes are not recovered in the Commission's discounted cash flow model.

## Pipeline Claims

For its part, the Pipeline argues that the Commission acted contrary to its precedent by not basing the Pipeline's rate of return on equity on the most recent financial data in the record.  The Commission reasonably explained that it departed

20

from its usual practice here because the most recent financial data in the record reflected the late-2008 collapse in the stock market, a unique period in American economics not seen since the Great Depression. Accordingly, the most recent data was not representative of the Pipeline's long-term equity cost of capital, and thus did not fairly represent costs the Pipeline was likely to incur over the period that the rates would be in effect. The Commission further reasonably affirmed the Administrative Law Judge's use of the financial data corresponding to the test period for the Pipeline's rates, as, based upon substantial evidence, the Commission found the real (inflation-adjusted) rate of return on equity for that period was more representative than the more recent data of the Pipeline's long-term equity cost of capital.

Likewise, the Commission reasonably disallowed the Pipeline's request for a full index adjustment to its rates for industry-wide cost increases in 2008. The Pipeline's rates in this rate case had already been adjusted for the Pipeline's own costs for the first three quarters of 2008. Accordingly, the Commission reasonably concluded that the Pipeline should be limited to an index adjustment based on industry-wide cost increases for the last quarter of 2008, i.e., one-quarter of the full index adjustment.

# ARGUMENT

## I. The Shippers' Petitions Should Be Dismissed As Impermissible Collateral Attacks on Prior Commission Orders Affirmed By This Court

All of the Shippers' challenges to Opinions 511 and 511-A are premised on the notion that partners' income tax liability is not considered a pipeline-level tax liability for FERC ratemaking purposes. *See*, *e.g.*, Shippers Br. at 26-27, 29, 31-33, 35, 38-50, 52. In Shippers' view, tax liability related to partnership income is investor-level (second-tier) tax liability analogous to that of corporate shareholders. In *ExxonMobil*, however, this Court affirmed the Commission's determination in the Policy Statement and the *BP West Coast* Remand Order that taxes on partnership income are, albeit indirectly, first tier, pipeline-level taxes, properly attributed to the partnership, not to the partner, for ratemaking/tax allowance purposes. *ExxonMobil*, 487 F.3d at 952-55; Policy Statement at PP 33-35, 37-38, 40; *BP West Coast* Remand Order at PP 17, 21-27. As noted *supra* at 14, four of the Shippers petitioning for review here were also parties to *ExxonMobil*.

The Shippers needed to raise any arguments related to that finding when it was made, not years later in the instant proceeding. *See, e.g.*, *Constellation*, 602 F. App'x at 538 (the Court "lacks jurisdiction to consider collateral attacks on earlier Commission orders") (citing *Pac. Gas & Elec.*, 533 F.3d at 25; *Sacramento*

22

*Mun. Util. Dist.*, 428 F.3d at 299).  Under 28 U.S.C. § 2344, parties have 60 days

in which to petition for review of FERC oil ratemaking orders.  *See* Shippers Br. at

1 (noting that 28 U.S.C. § 2344 governs whether the Court has jurisdiction to

review the challenged orders).  The 60-day clock starts running when "'the agency

has decided a question in a manner that reasonably puts aggrieved parties on notice

of the rule's content.'"  *Dynegy Midwest Generation, Inc. v. FERC*, 633 F.3d 1122,

1126 (D.C. Cir. 2011) (quoting *S. Co. Servs., Inc. v. FERC*, 416 F.3d 39, 44-45

(D.C. Cir. 2005)).  Moreover, "[a]s the Supreme Court has recognized, if the

challenged order 'revised' the prior order, then it can be reviewed; if it is a mere

'clarification,' then it cannot."  *S. Co. Servs.*, 416 F.3d at 44 (citing *ICC v. Bhd. of

Locomotive Eng'rs*, 482 U.S. 270, 286 (1987)).

Accordingly, as the Commission found (Opinion 511 at PP 241, 261, JA

___, ___; Opinion 511-A at P 286, JA ___), the Shippers' petitions raise

challenges that are an impermissible collateral attack on the Commission's prior,

judicially-affirmed, orders and, therefore, should be dismissed for lack of

jurisdiction.

## II.     Standard of Review

Assuming jurisdiction, the Court reviews FERC orders under the

Administrative Procedure Act's "arbitrary and capricious" standard.  5 U.S.C.

§ 706(2)(A); *see also, e.g.*, *ExxonMobil*, 487 F.3d at 951.  Under this standard, the

Commission's decisions will be upheld as long as the agency "has examined the relevant data and articulated a rational connection between the facts found and the choice made." *ExxonMobil*, 487 F.3d at 951 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)). This means that the Commission must "cogently explain why it has exercised its discretion in [the] given manner." *Id.* (quoting *Exxon Corp. v. FERC*, 206 F.3d 47, 54 (D.C. Cir. 2000) (alteration by court)).

The "statutory requirement that rates be 'just and reasonable' is obviously incapable of precise judicial definition, and [the Court] afford[s] great deference to the Commission in its rate decisions." *Morgan Stanley*, 554 U.S. at 532; *see also Permian Basin Area Rate Cases*, 390 U.S. 747, 790 (1968) (same); *ExxonMobil*, 487 F.3d at 951 (the Court is "particularly deferential to the Commission's expertise with respect to ratemaking issues"); *id.* at 953 (the Commission "has broad discretion to determine which costs may be recovered through a pipeline's rates"). Policy choices regarding ratemaking are the Commission's responsibility. *ExxonMobil*, 487 F.3d at 953. A reviewing court's role is "limited to ensuring that the Commission's decisionmaking is reasoned, principled, and based upon the record." *Id.* (quoting *So. Cal. Edison Co. v. FERC*, 443 F.3d 94, 98 (D.C. Cir. 2006) and *Williston Basin*, 165 F.3d at 60).

Likewise, courts "afford substantial deference to the Commission's interpretations of its own regulations, deferring to the agency unless its interpretation is plainly erroneous or inconsistent with the regulation[s] . . . ." *N. Border Pipeline Co. v. FERC*, 129 F.3d 1315, 1318 (D.C. Cir. 1997) (internal quotation marks and citation omitted); *accord Cent. Vt. Pub. Serv. Corp. v. FERC*, 214 F.3d 1366, 1369 (D.C. Cir. 2000).

## III. The Commission Reasonably Determined That The Pipeline May Include An Income Tax Allowance In Its Cost Of Service

The Pipeline's filing to increase its West Line rates explained that there was a substantial divergence between its existing rates and its actual costs, which would preclude it from charging just and reasonable rates. West Line Tariff Filing, Transmittal Letter at 2, JA ___. Along with other cost components, the Pipeline included an income tax allowance in its cost of service. *Id.*

The Commission appropriately approved the proposed income tax allowance as reasonable and consistent with this Court's and its own precedent. Opinion 511 at PP 218-313, JA ___-__; Opinion 511-A at PP 266-340, JA ___-__. As the Commission found, and this Court has affirmed, income taxes are a "real, albeit indirect" partnership cost for which an income tax allowance is appropriate. *ExxonMobil*, 487 F.3d at 954-55; Policy Statement, 111 FERC ¶ 61,139 at PP 33-37; *see also* Opinion 511 at PP 223, 225, 227, 228, 237, 240, 250, 259, 261, 265, JA ___, ___, ___, ___, ___, ___, ___, ___, ___, ___; Opinion 511-A at PP 340,

25

349, 353, JA ___, ___, ___.  Without an income tax allowance, the Pipeline would not be able to recover its cost of service.  Opinion 511 at PP 245, 259, 264, JA ___, ___, ___; Opinion 511-A at PP 269, 282, 284, 286, 296, 312, 318, 325, 327, 328, 333, 340, JA ___, ___, ___, ___, ___, ___, ___, ___, ___, ___, ___.

Shippers raise several arguments challenging the Commission's approval of the income tax allowance.  *See* Shippers Br. at 10-52.  Each of their arguments is premised on the notion that taxes on pipeline income are second-tier, or partner-level, taxes recovered in the pipeline's return on equity and, therefore, permitting an income tax allowance double recovers taxes on pipeline income.  *See*, *e.g.*, *id.* at 26-27, 29, 31-33, 35, 38-50, 52.

As already discussed *supra* at 14-18, however, *ExxonMobil* affirmed the Commission's determination that, for FERC ratemaking purposes, income taxes levied on partnership income are first-tier, pipeline-level taxes recoverable through an income tax allowance.  *ExxonMobil*, 487 F.3d at 952-55; *see also* Opinion 511 at PP 240, 250, JA ___, ___ (noting that petitioners' argument fails because it erroneously considers the taxes a partner pays on pipeline income to be investor-level, rather than pipeline-level, taxes as affirmed in *ExxonMobil*); *id.* at PP 237, 240, 261, JA ___, ___, ___ (under the Policy Statement and *ExxonMobil*, the comparison of relative returns was between the regulated entities – the partnership (including the imputed income tax liability) and the corporation (with its explicit

26

tax liability) – not between the partner and shareholder); Opinion 511-A at PP 319, 339, 340, JA ___, ___, ___ (*ExxonMobil* affirmed the Commission's determination to equalize after-tax returns at the entity level).

### A. Granting An Income Tax Allowance Does Not Provide Double Recovery Of Income Taxes

The Shippers assert that "[t]he only tax on income generated by partnership pipelines is paid by the partner/investors" and, therefore, "partnership pipelines incur no pipeline-level income taxes." Shippers Br. at 23; *see also id.* at 25-39, 42-45, 49 (same). They further assert that these "investor-level" income taxes are accounted for in the Commission's discounted cash flow model and, thus, granting a partnership an income tax allowance provides double recovery of income taxes. *Id.* at 23-48, 51-52. In Shippers' view, "FERC reads far too much into *ExxonMobil.*" *Id.* at 26. They argue that *ExxonMobil*'s finding that income taxes paid by partners are "reasonably 'attributable' to the pipeline," *id.* (citing *ExxonMobil*, 487 F.3d at 92), "simply means that the cost of income taxes borne by partners may be included in a partnership pipeline's cost of service" through the Commission's discounted cash flow model, *id.* at 25-26. The Shippers are mistaken.

*ExxonMobil* affirmed the Commission's determination that, for FERC ratemaking purposes, income taxes levied on partnership income are pipeline-level taxes recoverable through an income tax allowance. *ExxonMobil*, 487 F.3d at 952-

27

55; *see also supra* at 14-18 (discussing *ExxonMobil*).  The Shippers acknowledge that pipeline-level taxes are not recovered in the Commission's discounted cash flow model.  Shippers Br. at 27, 43.  Accordingly, as the Commission found, granting the Pipeline an income tax allowance will not lead to double recovery of taxes on pipeline income.  *See*, *e.g.*, Opinion 511 at PP 249-50, JA ___-___; Opinion 511-A at PP 280, 282, 284, 290, 295, 296, 315, 321-22, 340, JA ___, ___, ___, ___, ___, ___, ___, ___.

The Shippers' repeated references to Opinion 511 at P 244, JA ___, in support of its point that the Commission's discounted cash flow model "sets a pipeline's [return on equity] at a level that recovers the taxes borne by investors" (Shippers Br. at 41; *see also id.* at 38, 42, 44, 45 (same)), do not help them.  Again, income taxes levied on partnership income are pipeline-level taxes recovered through an income tax allowance.  And, as the Commission explained, partnership pipelines would not recover their cost of service without an income tax allowance.  Opinion 511 at PP 245, 259, 264, JA ___, ___, ___; Opinion 511-A at PP 269, 282, 286, 289-90, 296, 307-12, 318, 322, 325, 327, 328, 333, 340, JA ___, ___, ___, ___, ___, ___, ___, ___, ___, ___, ___, ___.

"In contrast to the way in which income taxes are grossed up outside the context of Commission regulation, the Commission does not gross up [i.e., increase] a jurisdictional entity's operating revenues or return to cover the income

28

taxes that must be paid to obtain its after-tax return." Opinion 511-A at P 280, JA

___; *see also id.* at PP 284, 290, 295, 322, 324, 327, 330, 335, 336, JA ___, ___,

___, ___, ___, ___, ___, ___, ___ (same). "Rather, the income taxes on the

jurisdictional entity's allowed equity return are covered through the income tax

allowance. Thus, there is no double recovery." Opinion 511-A at P 280, JA ___.

### B. Double Corporate Income Taxation, Not Double Income Tax Recovery, Provides Partnerships A Financial Advantage Over Corporations

The Shippers also contend that FERC cannot rely on the Internal Revenue

Code "to authorize a partnership pipeline to include a tax allowance in its cost of

service where doing so results in a double recovery of income tax costs and unjust

and unreasonable rates." Shippers Br. at 48 (capitalization in heading altered); *see

also id.* at 48-52 (same). As just discussed, however, approving the Pipeline's

request for a tax allowance for pipeline-level income taxes does not provide double

recovery of income tax costs.

While a partner may retain more after-tax cash than a corporate shareholder,

that is because, as the Shippers acknowledge (Br. at 11, 40), the Internal Revenue

Code taxes corporate pipeline income both at the pipeline level and on the

dividends received by the corporation's shareholders, but taxes partnership

pipeline income only once. Opinion 511 at PP 253-258, 261 (citing Policy

Statement, 111 FERC ¶ 61,139 at P 4 & n.6 (noting *BP West Coast*, 374 F.3d at

29

1290-91, explained that, while double taxation may affect the eventual return for the investor, that is a function of the tax consequences of the corporate structure)), JA ___-___, ___; *see also id.* at n.425, JA ___ (Internal Revenue Code section 7704, 26 U.S.C. § 7704, "treats certain publicly traded partnerships as corporations for income tax purposes, but exempts from taxation income from certain energy-related activities, including 'income and gains from transportation (including pipelines transporting gas, oil, or products thereof) . . . of any mineral resource . . . .'" (omissions by Commission)).  As a result, a partnership and its partners have a lower overall tax burden than a corporation and its shareholders, leaving partners with more after-tax cash than corporate shareholders.  Opinion 511-A at PP 306, 315-17, 319, 321, 325, 328, 330, 337-38, 350, JA ___, __-___, ___, ___, ___, ___, ___.  *See also* Opinion 511 at P 253, JA ___ (pipeline partnerships "were specifically designed as a tax advantaged form of investment compared to a corporation"); Opinion 511-A at P 315, JA ___ (pointing out that the Policy Statement recognized partnerships have financial advantages over corporations because partnership income is not subject to double taxation) (citing Policy Statement at PP 4, 9, 30, 33).

**IV.    The Commission Reasonably Determined That It Would Be Inappropriate To Use The Pipeline's Proposed 2009 Data To Calculate The Rate of Return On Equity**

In the challenged orders, the Commission affirmed the Administrative Law Judge's rejection of the Pipeline's 2009 data in calculating the return on equity, as that data – which encompassed the stock market collapse beginning in late 2008 – reflected a "unique period in American economics that has not existed since the Great Depression and is unlikely to exist for the foreseeable future." Administrative Judge Decision P 650, JA ___.  *See* Opinion 511 at PP 204, 208-09, JA___, ___-___.

Accordingly, the Commission reasonably concluded that the 2009 data was not representative of the Pipeline's long-term equity cost of capital, and thus did not fairly represent costs the Pipeline was likely to incur over the period that the rates would be in effect.  Opinion 511 at PP 208-09, JA ___-___; Opinion 511-A at P 258, JA ___.  Furthermore, the Commission reasonably affirmed the Administrative Law Judge's use of the financial data corresponding to the test period for the Pipeline's rates, as, based upon substantial evidence, the Commission found the real (inflation-adjusted) rate of return on equity for that period was more representative than the more recent data of the Pipeline's long-term equity cost of capital.  Opinion 511 at P 209, JA___; Opinion 511-A at

31

PP 252, 258, JA ___, ___.  The Pipeline's arguments that the Commission erred in these determinations are without merit.

### A.     Determining The Rate Of Return On Equity Under The Trended Original Cost Methodology

In calculating the rate base for oil pipelines, the Commission uses a "trended original cost" methodology.  *See BP West Coast*, 374 F.3d at 1283 (citing *Williams Pipe Line Co.*, Opinion 154-B, 31 FERC ¶ 61,377 at 61,833-35 (1985) (describing generic principles for setting cost-of-service rates for oil pipelines)) (Opinion 154-B).  This methodology requires the determination of a "nominal" (inflation-included) rate of return on equity that reflects the pipeline's cost of capital.  Opinion 154-B at 61,834.  The Commission uses the discounted cash flow analysis to determine the nominal return on equity.  *See Williston Basin*, 165 F.3d at 57 (the discounted cash flow analysis "projects investor growth expectations over the long term by adding average dividend yields to estimated constant growth in dividends over the indefinite future"); *see also supra* at 7-8 (discussing discounted cash flow method).

Once the nominal rate of return on equity is calculated, the inflation component of that rate of return is extracted, leaving a "real" rate of return.  Opinion 154-B at 61,834.  The pipeline recovers the real (inflation-adjusted) rate of return on equity in its current rates each year, but the inflation component of the nominal rate of return is added to the rate base and recovered over time.  *Ass'n of*

32

*Oil Pipe Lines*, 83 F.3d at 1429.[4]  Thus, this methodology keeps the rate base

aligned with the general price level by linking it to an inflation index, and gives a

real, inflation-free rate of return on the equity portion of the rate base.  *See*

*Farmers Union Cent. Exch., Inc. v. FERC*, 734 F.2d 1486, 1517 (D.C. Cir. 1984)

(citing *Williams Pipe Line Co*., 21 FERC ¶ 61,260 at 61,630 (1982)).

> **B.    The Commission Reasonably Affirmed The**
> **Administrative Law Judge's Determination To Use**
> **2008 Data To Calculate The Rate Of Return On Equity**

At hearing before the Administrative Law Judge, the Pipeline initially

proposed a rate of return on equity based upon financial data for the test period

extending through September 2008.[5]  *See* R. 410, Exhibit SFP-1, Prepared Direct

Testimony of J. Peter Williamson, at 3-22, JA ___-___.  For the six-month period

ending September 2008, the nominal rate of return on equity was 12.63 percent,

---

[4] The annual equity return in dollars is calculated by multiplying the real rate of
return by the equity portion of the pipeline's rate base.  Opinion 154-B at 61,834.
The inflation factor for the year in question is multiplied by the equity portion of
the rate base from that same year to produce the "equity rate base write-up" or
deferred return, which is then amortized over the life of the property.  *Id*.;
Administrative Judge Decision at PP 617-18, JA ___-___.

[5] The Commission uses a "test year" methodology to determine a pipeline's annual
cost of service.  *BP West Coast*, 374 F.3d at 1298.  "This approach looks to the
actual costs the carrier incurs in the 'test year' and then adjusts for any 'known and
measurable with reasonabl[e] accuracy' costs that 'will become effective within
nine months after the last month of the available actual experience utilized in the
filing.'"  *Id*. (quoting 18 C.F.R. § 346.2(a)).  Here, the test year is the year ending
December 31, 2007, and the subsequent nine-month adjustment period runs
through September 30, 2008.  Opinion 511 at P 8, JA ___.

and the real rate of return (after deducting the inflation component of 4.94 percent) was 7.69 percent. *See* Opinion 511-A at P 255, JA ___; Pipeline Br. at 8.

The Pipeline subsequently submitted two updates to Mr. Williamson's return on equity calculations, one using data for the six-month period ending January 2009 (R. 248, Exhibit SFP-76 at 1, JA ___), and one for the six-month period ending April 2009 (R. 569, Exhibit SFP-323 at 1, JA ___). In these latter calculations, the inflation rate dropped precipitously, thereby increasing the Pipeline's inflation-adjusted real rate of return on equity respectively to 14.30 percent and 14.83 percent. *See* Exhibit SFP-76 at 1, JA ___ (inflation rate of 0.03 percent) and Exhibit SFP-323 at 1, JA ___ (inflation rate of negative 0.74 percent).

The Administrative Law Judge rejected the Pipeline's updated financial data, finding such data anomalous as based on a temporary set of extreme conditions in the American economy. Administrative Judge Decision at P 650, JA ___; Opinion 511 at P 204, JA ___. The Commission upheld this determination, finding that the Pipeline's updated data was not representative of the Pipeline's long-term equity cost of capital. Opinion 511 at PP 208-09, JA ___-___.

The Pipeline argues that this determination runs afoul of the Commission's general policy of using the most recent financial data in the record for calculating a pipeline's return on equity. Pipeline Br. at 22-23. The Commission's policy, however, is based upon the fact that, generally, "later figures more accurately

reflect current investor needs.'"  Opinion 511 at P 208, JA ___-___ (quoting

*Trunkline Gas Co*., 90 FERC ¶ 61,017 at 61,117 (2000)).  Thus, "any updating of

the record is subject to the more fundamental principle of ratemaking that the cost

of service adopted in a rate proceeding be a reasonable forecast of the pipeline's

future cost of service; this is that the costs are representative of the costs that the

pipeline is likely to incur over the period that the rates at issue are in effect." *Id*.

*See also* Opinion 511-A at P 258, JA ___ ("in this proceeding, the Commission

justified its decision to depart from the general policy of using the most recent

financial data on the record in light of its overarching princip[le] that the cost of

service adopted in a rate proceeding should be representative of the costs that the

pipeline is likely to incur over the period that the rates at issue are in effect").

    Here, the Commission reasonably found that the Pipeline's updated financial

information was not representative of its long-term equity cost of capital.  Opinion

511 at P 209, JA ___.  The Pipeline's October 16, 2008 rate filing contained a real

equity rate of return of 7.20 percent for 2007, and 7.64 for September 2008.  *Id*.

(citing R. 414, Exhibit SFP-5 at 8-9, JA ___-___).  Using its proposed updated

data, the Pipeline increased the real equity rate of return in January 2009 to 14.30

percent, *id*. (citing Exhibit SFP-76, JA ___), and in April 2009 to 14.83 percent, *id*.

(citing Exhibit SFP-323 at 1, JA ___).  Use of updated data, therefore, resulted in a

6.66 point increase in the real rate of return on equity for the four month period of

October 2008 through January 2009, and a 7.79 point increase for the seven month period of October 2008 through April 2009.  *Id.*

These significant increases in the equity cost of capital reflected:  (1) the collapse of stock prices in late 2008 and early 2009, which increased the dividend yield used in the discounted cash flow analysis,[6] and (2) an inflation rate that was minimal (0.03 percent in January 2009) or negative (-0.74 percent in April 2009), which meant that virtually all of the nominal return on equity was also the real return on equity.  *Id.*

The Commission reasonably concluded that neither of these circumstances would continue for the indefinite future.  *Id.  See, e.g., Boston Edison Co. v. FERC*, 885 F.2d 962, 968 (1st Cir. 1989) (whether, and the extent to which, the Commission should adjust rates of return to reflect changes in the market "depends upon the extent of the change and its likely permanence").  As evidence of this, the Commission incorporated into the record of this proceeding the Pipeline's proposed equity rates of return from another proceeding, in which the Pipeline's proposed inflation-adjusted real return on equity based on data for the six-month period ending in February 2010 had already dropped to 9.09 percent, and for the

---

[6] The dividend yield component of the discounted cash flow analysis is the monthly dividend divided by the average stock price for the month.  When a financial crisis causes a sudden drop in stock prices, the immediate effect is to increase a proxy firm's dividend yield, which significantly increases the return on equity produced by the discounted cash flow analysis.  *See Portland Nat. Gas Transmission Sys.*, Opinion 510, 134 FERC ¶ 61,129 at P 246 (2011).

six-month period ending March 2010 to 8.72 percent.  Opinion 511 at P 209 &

n.339, JA ___; Pipeline Br. Exhibit A (attaching the return on equity calculations

incorporated into the record by the Commission).  This demonstrated that the

anomalous conditions in late 2008 and early 2009 – which produced inflation-

adjusted real returns on equity of 14.30 percent and 14.83 percent – did not in fact

continue into the future.  Opinion 511 at P 209, JA ___.

Thus, the Commission considered the following comparison of inflation-

adjusted real returns on equity, *see* Opinion 511-A at P 252, JA ___:

| Data Period | Real Return on Equity |
|---|---|
| September 2008 | 7.64 |
| January 2009 | 14.30 |
| April 2009 | 14.83 |
| February 2010 | 9.09 |
| March 2010 | 8.72 |

Based upon this comparison, the Commission reasonably determined that the 2008

data on which the Pipeline originally relied produced a real return on equity more

representative of the Pipeline's long-term equity cost of capital than the updated

2009 data.  Opinion 511 at P 209, JA ___; Opinion 511-A at PP 252, 258, JA ___,

___.

37

Accordingly, the Commission found it unreasonable to design a long-term rate for the West Line using a return on equity based on the updated financial information. Opinion 511 at P 209, JA ___; Opinion 511-A at PP 252, 258, JA ___, ___. The Commission was particularly concerned about embedding such a high real rate of return on equity in the Pipeline's rates because those rates may well continue indefinitely, since the Pipeline can obtain rate adjustments through indexing without filing a new rate case. Opinion 511 at P 209, JA ___; Opinion 511-A at PP 252, 258, JA ___, ___. Under the Commission's indexed rate cap system (discussed in Section V, *infra*), pipelines are permitted to make annual filings to request increases to their rates, up to a ceiling set by reference to an inflation index reflecting industry-wide cost changes. *See*, *e.g*., *ExxonMobil*, 487 F.3d at 964 n.3.

### C.    The Pipeline's Arguments Are Without Merit

The Pipeline contends that the Commission erred in relying upon the 2008 data because there were "economic troubles" beginning in 2007, Pipeline Br. at 25 (citing evidence), and the 2008 inflation factor of 4.94 percent was anomalously high. *Id*. at 25-26. The Pipeline failed to make its "economic troubles" argument regarding the 2008 data to the Commission, or to cite the evidence purportedly supporting that argument, and consequently the argument is waived. *See ExxonMobil*, 487 F.3d at 962 ("A party must first raise an issue with an agency

38

before seeking judicial review.") (citing *United States v. L.A. Trucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952)).  Rather, before the Commission, in response to the Commission's finding that the 2009 data reflected the stock market collapse, the Pipeline argued only that the nominal (inflation-included) return on equity in the 2009 time period was nevertheless in line with historical nominal returns.  *See* R. 973, April 11, 2011 Request for Rehearing of SFPP, L.P., at 9-10, JA ___-___.  Notably, the Pipeline also found the nominal 2008 return on equity consistent with historical nominal returns.  *See id.* at 11-12, JA ___-___  ("although the nominal rate of return on equity as of September 30, 2008 is consistent with historical periods (12.63 percent using the proxy rulings in Opinion No. 511), the real rate of return on equity is not").

Nor does the Pipeline's cited evidence support the contention that there were comparable "economic troubles" in 2007 and early 2008 to the stock market collapse in late 2008.  *See, e.g.*, R. 551, Exhibit SFP-220 at 5, JA ___ (cited in Pipeline Br. at 25) (noting that December 2007 "marked the peak of the last expansion" of the national economy, which "didn't begin to drop significantly until this August [of 2008]").  Indeed, this Court has recognized that the "critical economic changes" of the 2008 market collapse did not occur until the latter part of 2008.  *See S. Cal. Edison Co. v. FERC*, 717 F.3d 177, 188 (D.C. Cir. 2013) (finding that litigants could not have submitted evidence in May 2008 regarding

the effects of the late 2008 market collapse because the "critical economic

changes" occurred months later).

As for the allegedly anomalous inflation rate in the 2008 data, as discussed

in the preceding section, the Commission affirmed the use of the 2008 data based

upon its comparative analysis of the Pipeline's real returns on equity, which

exclude inflation.  *See* Opinion 511 at P 209, JA ___; Opinion 511-A at P 252, JA

___.

Further, before the Commission, the Pipeline argued that *both* the 2008 and

2009 rates of inflation were anomalous, and proposed as a "solution" to "calculate

the real rate of return on equity using an average inflation factor based on the

approximately two and a half year period during which the rates in this proceeding

have been in effect (August 2008 through February 2011), which is 1.11 percent."

April 11, 2011 Request for Rehearing of SFPP, L.P. at 10, JA ___.  *See also*

Pipeline Br. at 26 (same), 11 (chart demonstrating that, under Pipeline's proposal

for a 1.1 percent inflation rate, the real return on equity would have equaled 11.52

percent (the 2008 nominal return on equity of 12.63 percent minus the 1.1 percent

modified inflation rate)).

The Commission reasonably rejected the Pipeline's averaging proposal.

Opinion 511-A at P 259, JA ___.  The Commission found that it would be

incorrect to adjust one input into the ratemaking, the inflation factor, to account for

40

an anomalous economic time period, without making corresponding modifications to other inputs.  *Id*.  For example, the modified period the Pipeline seeks to use for the inflation factor would also have to be employed for the dividend yield average in the discounted cash flow analysis to reflect the change in stock prices.  *Id*.  If the Pipeline were permitted to use an average inflation factor that reflected a larger and later period (August 2008 through February 2011), the resulting return on equity would be artificially higher because there would not be any offsetting downward adjustments to other inputs to the discounted cash flow analysis that would arise out of using a later period.  *Id*.  *See, e.g., TC Ravenswood, LLC v. FERC*, 705 F.3d 474, 478 (D.C. Cir. 2013) (suggesting it would be an abuse of discretion to allow a rate increase based on changes to certain costs without considering whether there were offsetting changes to other costs).

For those reasons, the Commission reasonably explained its deviation from its general policy of using the most recent financial data in the discount cash flow analysis, and affirmed the Administrative Judge Decision's use of record data for the six months ended September 30, 2008.  Opinion 511 at P 209, JA ___.  Under the Court's deferential standard applied to the Commission's determinations here, the Commission orders should be affirmed.  *See Elec. Consumers Res. Council v. FERC*, 407 F.3d 1232, 1236 (D.C. Cir. 2005) (explaining "highly deferential" standard applicable to whether rate design is "just and reasonable" and that Court

41

defers to FERC resolution of factual disputes between expert witnesses); *Cal. Pub. Utils. Comm'n v. FERC*, 254 F.3d 250, 254 (D.C. Cir. 2001) ("issues of rate design are fairly technical and . . . involve policy judgments that lie at the core of the regulatory mission.").

## V.      The Commission Reasonably Limited The Pipeline's Index Increase For 2009

Under the Commission's rate cap indexing regime, pipelines are permitted to make annual filings to request increases to their rates, up to a ceiling set by reference to an inflation index that reflects prior year industry-wide cost increases. Opinion 511-A at P 398, JA ___.  Here, the Pipeline filed an indexed price increase for 2009, based upon industry-wide cost increases in 2008.  *Id.* at P 399, JA ___. Because the Commission had made numerous adjustments in this rate proceeding to the Pipeline's rates based upon the Pipeline's own cost changes for the first three quarters of 2008 (the adjustment period, *see supra* n.5), Opinion 511-A at P 409, JA ___, however, the Pipeline's cost of service rates already incorporated expense levels largely commensurate with its expenses for the first three quarters of 2008.  Under these circumstances, the Commission reasonably concluded that the Pipeline should receive the inflation-based increase only for the last quarter of 2008.  *See id.* at P 411, JA ___; Opinion 511-B at P 32, JA ___.

## A.     The Commission's Indexing Procedures

The Energy Policy Act of 1992[7] required FERC to establish "a simplified and generally applicable ratemaking methodology" for oil pipelines that was consistent with section 1(5) of the Interstate Commerce Act, 49 U.S.C. app. §1(5), which requires that oil pipeline rates be just and reasonable.  Energy Policy Act §§ 1801(a), 1802(a).  *See generally ExxonMobil*, 487 F.3d at 956-57 (summarizing background of Energy Policy Act of 1992 and Order 561).  Accordingly, in 1993, the Commission issued Order 561, in which it adopted a methodology for oil pipelines to adjust their rates using an index system that establishes industry-wide ceiling levels for such rates. *See Revisions to Oil Pipeline Regulations Pursuant to the Energy Policy Act of 1992*, Order 561, FERC Stats. & Regs. ¶ 30,985 at 30,940-41 (1993), *on reh'g*, Order 561-A, FERC Stats. & Regs. ¶ 31,000 (1994); *see also* 18 C.F.R. § 342.3 (methodologies and procedures for indexed rate changes).  *See generally Ass'n of Oil Pipe Lines*, 83 F.3d at 1430-31.  This allows rates to track inflation in the general economy, essentially preserving pipelines' existing rates in real economic terms.  Order 561 at 30,948-50.

Under the Commission's indexing procedures, the Commission publishes an index each year, effective for the following index year (from July 1 to June 30),

---

[7] Pub. L. No. 102-486, §§ 1801-1804, 106 Stat. 2776, 3010-12 (1992), *reprinted in* 42 U.S.C. § 7172 note.

based upon the change in the final Producer Price Index for Finished Goods for the preceding two calendar years. *See* Order 561 at 30,953-54; 18 C.F.R. § 342.3(c), (d); *Cost-of-Service Reporting and Filing Requirements for Oil Pipelines*, Order 571, FERC Stats. & Regs. ¶ 31,006, at 31,168 (1994), *on reh'g*, Order 571-A, FERC Stats. & Regs. ¶ 31,012, at 31,012 (1995). Each pipeline derives its rate ceiling level for each index year by multiplying its prior index year's ceiling level by the most recent index. 18 C.F.R. § 342.3(d).

### B. The Commission Reasonably Denied The Pipeline The Full Index Increase for 2009

In 2009, the industry-wide ceiling for the inflation-based increase was 7.6025 percent. *See* Opinion 511-A at P 398, JA ___. This figure is based upon industry-wide cost changes during 2008. Opinion 511-B at P 23, JA ___ (citing Notice of Annual Change in the Producer Price Index For Finished Goods, *Revisions to Oil Pipeline Regulations Pursuant to the Energy Policy Act of 1992*, 127 FERC ¶ 61,184 (2009)). In its Compliance Filing to implement the cost of service rates established in Opinion 511, the Pipeline sought to apply the full rate index adjustment of 7.6025 percent to its rates for the period July 2009 through June 2010. R. 976, Compliance Filing Implementing Opinion 511, Docket No. IS08-390-002 (Apr. 25, 2011), JA ___.

The Commission reasonably denied the Pipeline's proposal to apply the full index increase of 7.6025 percent reflecting industry-wide cost changes during

44

2008.  Opinion 511-A at PP 405-11, JA ___-___; *see also* Opinion 511-B at PP 27-

33, JA __-__.  The Pipeline's rates, effective August 2008, were established using

calendar year 2007 for the base test period and the first three quarters of 2008

(January 2008 through September 2008) as the adjustment period.  Pipeline Br. at

17; *see also* Opinion 511-A at P 409, JA ___.  As the Pipeline's costs were

adjusted for changes through the first three quarters of 2008, the Commission

reasonably concluded that the Pipeline was properly entitled to the index

adjustment attributable only to the last quarter of 2008.  Opinion 511-A at PP 405-

11, JA ___-___.

### C.  The Pipeline's Challenges To The Commission's Determination Are Without Merit

#### 1.  The Commission's Determination Is Fully Consistent With Its Regulations

As the Pipeline states, under the Commission's regulations, if a rate changed

by a method other than indexing is lowered, the lower rate becomes the ceiling

level for the index year including the effective date of the rate.  *See* Pipeline Br. at

33-34 (citing 18 C.F.R. § 342.3(d)(5)).  Here, the rates set in Opinion 511 became

effective in August 2008, during the July 2008 to June 2009 index year, and so the

new rates became the ceiling for that year.  *Id.*  Under section 342.3(d)(1), the

ceiling level for the next index year (i.e., the July 2009 to June 2010 index year) is

calculated by multiplying the previous year's ceiling level (i.e., the Opinion 511

45

rates) by the most recent index, which was 7.6025 percent. *Id*. at 34-35. The Pipeline asserts that, since it followed this mathematical process in calculating the proposed index increase in its Compliance Filing, the Commission's regulations compel the conclusion that the Pipeline is entitled to the full index increase. *Id*.

While the Commission recognized that its indexing regulations permitted the Pipeline to file a 7.6025 percent index rate increase for the July 2009-June 2010 index year, Opinion 511-A at P 406, JA ___, the Commission's regulations do not automatically make such increases reasonable, *id*. at P 407, JA ___. To the contrary, as this Court recognized in approving the Commission's indexing regulations, the Energy Policy Act required the Commission to adopt simplified procedures to assure just and reasonable rates. *See Ass'n of Oil Pipe Lines*, 83 F.3d at 1429 (discussing Energy Policy Act § 1801(a)). The Court ultimately affirmed the Commission's regulations after finding that they would adequately assure just and reasonable rates, both in the selection of an index that accurately tracks historical changes in the actual costs of the pipeline industry, *see id*. at 1430, 1437, and by adopting protest and complaint procedures that allow shippers to challenge unjust and unreasonable rates. *Id.* at 1437 (citing 18 C.F.R. § 343.2(c)(1)), 1445. As the Court noted, under 18 C.F.R. § 343.2(c)(1), "[e]ven though a pipeline's rate is within the rate ceiling, a shipper may file a protest or complaint if it can 'allege reasonable grounds for asserting that the rate increase is

46

so substantially in excess of the actual cost increases incurred by the carrier that

the rate is unjust and unreasonable.'" *Id*. at 1431 (quoting 18 C.F.R.

§ 343.2(c)(1)). *See* Opinion 511-A at P 405, JA ___; Opinion No. 511-B at P 28,

JA ___.

     Here, pursuant to section 343.2(c)(1), shippers protested the Pipeline's

application of the 2009 index because the index reflected industry-wide cost

increases during calendar year 2008, and the Commission had already awarded the

Pipeline a cost of service rate increase based on cost adjustments through

September 2008. *See* Opinion 511-A at PP 399-400, JA ___-___. The

Commission agreed that the 2009 index increase of 7.6025 percent was based upon

industry-wide cost changes during 2008, and that significant costs for the first three

quarters of 2008 had already been incorporated into the Pipeline's cost-of-service

rates. Opinion 511-B at P 28, JA ___. Thus, the Pipeline's cost-of-service rates

already incorporated expense levels largely commensurate with its January-

September 2008 expenses. *Id*. at P 29, JA ___. The Commission found that the

Pipeline should not be able to take advantage of cost-of-service adjustments from

the January-September 2008 adjustment period while simultaneously seeking an

index increase covering the same time frame. *Id*. at P 31, JA ___. "Given the

substantial presence of January 1-September 30 [2008] data in the Pipeline's cost

of service," *id*. at P 32, JA ___, the Commission properly denied the Pipeline the

full application of the July 1, 2009 index increase for industry-wide cost changes during 2008.  The Court affords substantial deference to the Commission's interpretation of its own regulations.  *See supra* at 25.

The Commission's consideration of the Pipeline's 2008 costs therefore did not "directly conflict with the principles underlying the establishment of the indexing methodology."  Pipeline Br. at 28.  To the contrary, the shippers' ability to challenge the Pipeline's proposed index increase based upon the Pipeline's actual costs is a foundation for this Court's conclusion that the Commission's stream-lined indexing procedures produce just and reasonable rates.  *Ass'n of Oil Pipe Lines*, 83 F.3d at 1431, 1437, 1445.  *See also, e.g.*, Order 561-A, FERC Stats. & Regs. ¶ 31,000, at 31,103 (to assure just and reasonable rates, the Commission allowed protests "to be brought against a rate increase that strays too far from the actual cost increases of the pipeline").

## 2.    The Commission's Determination Is Fully Consistent With Its Precedent

Likewise, the Pipeline has failed to demonstrate that the Commission's determination here is inconsistent with precedent.  *See* Pipeline Br. at 31-32.  The cases on which the Pipeline relies involve complaints challenging pipeline base rates – i.e., a full blown examination of a pipeline's underlying rate like that conducted in Opinion No. 511 – and the calculation of shipper reparations by "indexing forward" the newly revised base rate.  *See* Opinion 435-A, 91 FERC

48

¶ 61,135 at 61,516 (holding that the first step in determining reparations is to determine the proper base rate, after which the Commission's indexing methodology may be applied to the base rates so established); *Tesoro Refining & Mkting. Co. v. Calnev Pipe Line LLC*, 134 FERC ¶ 61,214 at P 73 (2011) (addressing 2009 complaints challenging the pipeline's base rate), *id.* at P 78 (finding that, if base rates are reduced pursuant to currently pending complaints challenging base rates for 2007, reparations may be made to the 2009 complainants based upon the difference in their 2009 rates and the just and reasonable 2007 rate indexed forward to 2009), *on reh'g*, 136 FERC ¶ 61,083 (2011); *SFPP, L.P.*, 122 FERC ¶ 61,133 at P 12 (2008) (calculating reparations for revised East Line base rates by indexing 1997 rates forward).

Thus, the cases the Pipeline relies on do not involve challenges to the index increase itself, but involve challenges to the base rate being indexed. By contrast, shippers here protested the index increase itself under 18 C.F.R. § 343.2(c), alleging that the index increase is "so substantially in excess of the actual cost increases incurred by the carrier that the rate is unjust and unreasonable." Opinion 511-A at P 407, JA ___.

The Pipeline points to a shipper challenge addressed in Opinion 435-A. Pipeline Br. at 32 (citing Opinion 435-A at 61,516). That challenge related to the Commission's determination in Opinion 435 to apply indexing to increase the

49

Pipeline's cost of service for each index year, allowing the Pipeline to restate its

cost of service retroactively without making a new rate filing. *See id*.; Opinion 435

at 61,113 (permitting the Pipeline to establish a new cost of service for each index

year). On rehearing in Opinion 435-A, the Commission "appl[ied] the indexing

method to the rate, and not SFPP's cost of service as was done in the prior order,"

and thus, did "not permit[] SFPP to restate its cost of service retrospectively."

Opinion 435-A at 61,516.

     In contrast, the Commission demonstrated that its decision here was fully

consistent with Commission precedent. The Commission pointed to its prior

decision applying 18 C.F.R. § 343.2(c) to deny the Pipeline an index increase to its

East Line rates under similar circumstances. *See* Opinion 511-A at PP 408-09, JA

___ (citing *SFPP, L.P.*, 117 FERC ¶ 61,271 (2006), *reh'g denied*, 120 FERC

¶ 61,245 (2007)); *see also* Opinion 511-B at P 28 & n.31, JA ___. In that case, the

Pipeline sought an indexed rate increase on its East Line for the July 2006-June

2007 index year, which was based upon industry-wide cost increases in 2005.

Shippers protested the filing because the Pipeline had filed new rates in May 2006,

which were based on the Pipeline's actual 2005 costs. *See SFPP*, 120 FERC

¶ 61,245 at PP 2-3. The Commission noted that, under its regulations, the Pipeline

had correctly applied the index factor representing calendar year 2005 industry-

wide cost increases to the newly-approved rates and had correctly proposed an

50

effective date of July 1, 2006 for the indexed-increased rates. *Id.* at P 2.

Nevertheless, the Commission denied the index increase of 6.15 percent because it

would result in an over-recovery of the Pipeline's actual costs as reflected in its

June 2006 rates. *Id.* at P 4.

The Pipeline argued there – as it does here, *see* Pipeline Br. at 35-36 – that

this effectively rewrites the Commission's regulations because any new rate filed

during the index year would always be denied the next index increase, as the rates

would in whole or in part reflect a pipeline's actual costs during the same time

period covered by the industry-wide inflation increase. *See SFPP*, 120 FERC

¶ 61,245 at P 6.  The Commission reasonably rejected this argument. *See id.* at PP

7-10.  In particular, the Commission noted that it had denied shipper protests raised

in similar circumstances on the Pipeline's North Line, where the Pipeline sought an

index increase in July 2005 to new rates that were effective in June 2005. *See id.*

at P 9 (citing *BP West Coast Prods., LLC v. SFPP, L.P.*, 118 FERC ¶ 61,261

(2007), *on reh'g*, 121 FERC ¶ 61,195 (2007)).  In that case – as affirmed by this

Court in *ExxonMobil Oil Corp. v. FERC*, 363 F. App'x 752 (D.C. Cir. 2010) – the

Commission found that, notwithstanding the rate increase, the Pipeline continued

to under-recover its cost of service, and therefore the 2005 index-based increase

did not result in an unjust and unreasonable rate. *See id.* at 753.  This Court

rejected the argument that the Commission had departed from its precedent in

51

*SFPP*, 120 FERC ¶ 61,245, in denying the shippers' protests, because "in this case the pipeline continued to under-recover its cost of service" whereas in *SFPP* the proposed index rate increase "would have resulted in an over-recovery." *ExxonMobil*, 363 F. App'x at 753.

The Commission also observed in *SFPP* that it would be possible to obtain a proportional index increase where the facts suggest that would be an appropriate solution.  *See SFPP*, 120 FERC ¶ 61,245 at P 9.  The Commission reasonably found such a proportional increase appropriate here, given that the Pipeline's rates encompassed cost of service adjustments for the first three quarters of 2008. Opinion 511-A at PP 408-09, JA ___-___.

Thus, as demonstrated, the Commission does not, in response to shipper protests, categorically reject an indexed rate increase in the index year following a new rate filing.  Rather, the Commission engages in a case-specific inquiry to determine whether the indexed increase will result in unjust and unreasonable rates.  The Commission's decision here to permit one-fourth of the requested July 2009 index increase was "based upon a fact-specific examination of the conclusions in Opinion No. 511 and a fully developed record following a hearing." Opinion 511-A at P 411 n.687, JA ___.  "The evaluation of this data is straightforward.  Given the substantial presence of January 1-September 30, 2008 data in SFPP's cost of service, Opinion No. 511-A properly denied SFPP the full

application of the July 1, 2009 index increase for industry-wide cost changes during 2008."  Opinion No. 511-B at P 32, JA ___.

## CONCLUSION

For the foregoing reasons, the petitions for review, to the extent not dismissed as an improper collateral attack on earlier, final orders, should be denied.

Respectfully submitted,

| | |
|---|---|
| William J. Baer | Max Minzner |
| Assistant Attorney General | General Counsel |
| | |
| James J. Fredricks | Robert H. Solomon |
| Robert J. Wiggers | Solicitor |
| Attorneys | |
| | Beth G. Pacella |
| U.S. Department of Justice | Deputy Solicitor |
| Washington, D.C. 20530 | |
| (202) 514-2460 | */s/ Elizabeth E. Rylander* |
| | Elizabeth E. Rylander |
| | Lisa B. Luftig |
| | Attorneys |
| | |
| November 17, 2015 | Federal Energy Regulatory Commission |
| | Washington, D.C.  20426 |
| | (202) 502-8466 |
| | elizabeth.rylander@ferc.gov |

## <u>CERTIFICATE OF COMPLIANCE</u>

In accordance with Fed. R. App. P. 32(a)(7)(C), I certify that this brief is prepared in 14-point Times New Roman typeface, and that it contains 12,535 words, not including the tables of contents and authorities, the glossary, the certificates of counsel, and the addendum.

<u>/s/ Elizabeth E. Rylander</u>
Elizabeth E. Rylander
Attorney

Federal Energy Regulatory Commission
Washington, D.C. 20426
Tel.:  (202) 502-8466
Fax:  (202) 273-0901
E-mail:  elizabeth.rylander@ferc.gov

November 17, 2015

# ADDENDUM
# STATUTES AND REGULATIONS

# TABLE OF CONTENTS

**PAGE**

**STATUTES:**

Administrative Procedure Act
    5 U.S.C. § 706(2)(A) ............................................................... A-1

Energy Policy Act of 1992, *reprinted in* 42 U.S.C. § 7172 note
    Section 1801(a) ...................................................................... A-3

    Section 1802(a) ...................................................................... A-3

Interstate Commerce Act
    49 U.S.C. app § 1(5) ............................................................. A-4

    49 U.S.C. app § 6(1) ............................................................. A-6

    49 U.S.C. app § 6(7) ............................................................. A-6

    49 U.S.C.A. § 60502 ............................................................. A-8

Internal Revenue Code
    26 U.S.C. § 7704 .................................................................... A-9

Judicial Procedure
    28 U.S.C. § 2344 .................................................................. A-12

**REGULATIONS:**
    18 C.F.R. § 342.3 .................................................................. A-13

    18 C.F.R. § 342.4 .................................................................. A-14

    18 C.F.R. § 343.2(c) .............................................................. A-15

    18 C.F.R. § 346.2(a) .............................................................. A-17

injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392; Pub. L. 94–574, §1, Oct. 21, 1976, 90 Stat. 2721.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................ | 5 U.S.C. 1009(a). | June 11, 1946, ch. 324, §10(a), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

AMENDMENTS

1976—Pub. L. 94–574 removed the defense of sovereign immunity as a bar to judicial review of Federal administrative action otherwise subject to judicial review.

§ 703. Form and venue of proceeding

The form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction. If no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer. Except to the extent that prior, adequate, and exclusive opportunity for judicial review is provided by law, agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392; Pub. L. 94–574, §1, Oct. 21, 1976, 90 Stat. 2721.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................ | 5 U.S.C. 1009(b). | June 11, 1946, ch. 324, §10(b), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

AMENDMENTS

1976—Pub. L. 94–574 provided that if no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer as defendant.

§ 704. Actions reviewable

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................ | 5 U.S.C. 1009(c). | June 11, 1946, ch. 324, §10(c), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

§ 705. Relief pending review

When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................ | 5 U.S.C. 1009(d). | June 11, 1946, ch. 324, §10(d), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

§ 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................. | 5 U.S.C. 1009(e). | June 11, 1946, ch. 324, § 10(e), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

ABBREVIATION OF RECORD

Pub. L. 85–791, Aug. 28, 1958, 72 Stat. 941, which authorized abbreviation of record on review or enforcement of orders of administrative agencies and review on the original papers, provided, in section 35 thereof, that: ''This Act [see Tables for classification] shall not be construed to repeal or modify any provision of the Administrative Procedure Act [see Short Title note set out preceding section 551 of this title].''

## CHAPTER 8—CONGRESSIONAL REVIEW OF AGENCY RULEMAKING

Sec.
801.    Congressional review.
802.    Congressional disapproval procedure.
803.    Special rule on statutory, regulatory, and judicial deadlines.
804.    Definitions.
805.    Judicial review.
806.    Applicability; severability.
807.    Exemption for monetary policy.
808.    Effective date of certain rules.

### § 801. Congressional review

(a)(1)(A) Before a rule can take effect, the Federal agency promulgating such rule shall submit to each House of the Congress and to the Comptroller General a report containing—

(i) a copy of the rule;

(ii) a concise general statement relating to the rule, including whether it is a major rule; and

(iii) the proposed effective date of the rule.

(B) On the date of the submission of the report under subparagraph (A), the Federal agency promulgating the rule shall submit to the Comptroller General and make available to each House of Congress—

(i) a complete copy of the cost-benefit analysis of the rule, if any;

(ii) the agency's actions relevant to sections 603, 604, 605, 607, and 609;

(iii) the agency's actions relevant to sections 202, 203, 204, and 205 of the Unfunded Mandates Reform Act of 1995; and

(iv) any other relevant information or requirements under any other Act and any relevant Executive orders.

(C) Upon receipt of a report submitted under subparagraph (A), each House shall provide copies of the report to the chairman and ranking member of each standing committee with jurisdiction under the rules of the House of Representatives or the Senate to report a bill to amend the provision of law under which the rule is issued.

(2)(A) The Comptroller General shall provide a report on each major rule to the committees of jurisdiction in each House of the Congress by the end of 15 calendar days after the submission or publication date as provided in section 802(b)(2). The report of the Comptroller General shall include an assessment of the agency's compliance with procedural steps required by paragraph (1)(B).

(B) Federal agencies shall cooperate with the Comptroller General by providing information relevant to the Comptroller General's report under subparagraph (A).

(3) A major rule relating to a report submitted under paragraph (1) shall take effect on the latest of—

(A) the later of the date occurring 60 days after the date on which—

(i) the Congress receives the report submitted under paragraph (1); or

(ii) the rule is published in the Federal Register, if so published;

(B) if the Congress passes a joint resolution of disapproval described in section 802 relating to the rule, and the President signs a veto of such resolution, the earlier date—

(i) on which either House of Congress votes and fails to override the veto of the President; or

(ii) occurring 30 session days after the date on which the Congress received the veto and objections of the President; or

(C) the date the rule would have otherwise taken effect, if not for this section (unless a joint resolution of disapproval under section 802 is enacted).

(4) Except for a major rule, a rule shall take effect as otherwise provided by law after submission to Congress under paragraph (1).

(5) Notwithstanding paragraph (3), the effective date of a rule shall not be delayed by operation of this chapter beyond the date on which either House of Congress votes to reject a joint resolution of disapproval under section 802.

(b)(1) A rule shall not take effect (or continue), if the Congress enacts a joint resolution of disapproval, described under section 802, of the rule.

(2) A rule that does not take effect (or does not continue) under paragraph (1) may not be reissued in substantially the same form, and a new rule that is substantially the same as such a rule may not be issued, unless the reissued or new rule is specifically authorized by a law enacted after the date of the joint resolution disapproving the original rule.

(c)(1) Notwithstanding any other provision of this section (except subject to paragraph (3)), a rule that would not take effect by reason of subsection (a)(3) may take effect, if the President makes a determination under paragraph (2) and submits written notice of such determination to the Congress.

Regulatory Commission, upon the request of the licensee of FERC project numbered 4656 (and after reasonable notice) is authorized, in accordance with the good faith, due diligence, and public interest requirements of section 13 and the Commission's procedures under such section, to extend until March 26, 1999, the time required for the licensee to acquire the required real property and commence the construction of project numbered 4656.

(5) The authorization for issuing extensions under paragraphs (1) through (4) shall terminate 3 years after the date of enactment of this section. To facilitate requests under such subsections, the Commission may consolidate the requests. The Commission shall provide at the beginning of each Congress a report on the status of all extensions granted by Congress regarding the requirements of section 13 of the Federal Power Act, including information about any delays by the Commission on the licensee and the reasons for such delays.

(d) EMINENT DOMAIN- Section 21 of the Federal Power Act is amended by striking the period at the end thereof and adding the following: `*Provided further,* That no licensee may use the right of eminent domain under this section to acquire any lands or other property that, prior to the date of enactment of the Energy Policy Act of 1992, were owned by a State or political subdivision thereof and were part of or included within any public park, recreation area or wildlife refuge established under State or local law. In the case of lands or other property that are owned by a State or political subdivision and are part of or included within a public park, recreation area or wildlife refuge established under State or local law on or after the date of enactment of such Act, no licensee may use the right of eminent domain under this section to acquire such lands or property unless there has been a public hearing held in the affected community and a finding by the Commission, after due consideration of expressed public views and the recommendations of the State or political subdivision that owns the lands or property, that the license will not interfere or be inconsistent with the purposes for which such lands or property are owned.'.

## TITLE XVIII--OIL PIPELINE REGULATORY REFORM

## SEC. 1801. OIL PIPELINE RATEMAKING METHODOLOGY.

(a) ESTABLISHMENT- Not later than 1 year after the date of the enactment of this Act, the Federal Energy Regulatory Commission shall issue a final rule which establishes a simplified and generally applicable ratemaking methodology for oil pipelines in accordance with section 1(5) of part I of the Interstate Commerce Act.

(b) EFFECTIVE DATE- The final rule to be issued under subsection (a) may not take effect before the 365th day following the date of the issuance of the rule.

## SEC. 1802. STREAMLINING OF COMMISSION PROCEDURES.

(a) RULEMAKING- Not later than 18 months after the date of the enactment of this Act, the Commission shall issue a final rule to streamline procedures of the Commission relating to oil pipeline rates in order to avoid unnecessary regulatory costs and delays.

(b) SCOPE OF RULEMAKING- Issues to be considered in the rulemaking proceeding to be conducted under subsection (a) shall include the following:

(1) Identification of information to be filed with an oil pipeline tariff and the availability to the public of any analysis of such tariff filing performed by the Commission or its staff.

A-3

from one State or Territory of the United States, or the District of Columbia, to any other State or Territory of the United States, or the District of Columbia, or from one place in a Territory to another place in the same Territory, or from any place in the United States through a foreign country to any other place in the United States, or from or to any place in the United States to or from a foreign country, but only insofar as such transportation takes place within the United States.

### (2) Transportation subject to regulation

The provisions of this chapter shall also apply to such transportation of passengers and property, but only insofar as such transportation takes place within the United States, but shall not apply—

(a) To the transportation of passengers or property, or to the receiving, delivering, storage, or handling of property, wholly within one State and not shipped to or from a foreign country from or to any place in the United States as aforesaid, except as otherwise provided in this chapter;

(b) Repealed. June 19, 1934, ch. 652, title VI, § 602(b), 48 Stat. 1102.

(c) To the transportation of passengers or property by a carrier by water where such transportation would not be subject to the provisions of this chapter except for the fact that such carrier absorbs, out of its port-to-port water rates or out of its proportional through rates, any switching, terminal, lighterage, car rental, trackage, handling, or other charges by a rail carrier for services within the switching, drayage, lighterage, or corporate limits of a port terminal or district.

### (3) Definitions

(a) The term "common carrier" as used in this chapter shall include all pipe-line companies; express companies; sleeping-car companies; and all persons, natural or artificial, engaged in such transportation as aforesaid as common carriers for hire. Wherever the word "carrier" is used in this chapter it shall be held to mean "common carrier." The term "railroad" as used in this chapter shall include all bridges, car floats, lighters, and ferries used by or operated in connection with any railroad, and also all the road in use by any common carrier operating a railroad, whether owned or operated under a contract, agreement, or lease, and also all switches, spurs, tracks, terminals, and terminal facilities of every kind used or necessary in the transportation of the persons or property designated herein, including all freight depots, yards, and grounds, used or necessary in the transportation or delivery of any such property. The term "transportation" as used in this chapter shall include locomotives, cars, and other vehicles, vessels, and all instrumentalities and facilities of shipment or carriage, irrespective of ownership or of any contract, express or implied, for the use thereof, and all services in connection with the receipt, delivery, elevation, and transfer in transit, ventilation, refrigeration or icing, storage, and handling of property transported. The term "person" as used in this chapter includes an individual, firm, copartnership, corporation, company, association, or joint-stock association; and includes a trustee, receiver, assignee, or personal representative thereof.

(b) For the purposes of sections 5, 12(1), 20, 304(a)(7), 310, 320, 904(b), 910, and 913 of this Appendix, where reference is made to control (in referring to a relationship between any person or persons and another person or persons), such reference shall be construed to include actual as well as legal control, whether maintained or exercised through or by reason of the method of or circumstances surrounding organization or operation, through or by common directors, officers, or stockholders, a voting trust or trusts, a holding or investment company or companies, or through or by any other direct or indirect means; and to include the power to exercise control.

### (4) Duty to furnish transportation and establish through routes; division of joint rates

It shall be the duty of every common carrier subject to this chapter to provide and furnish transportation upon reasonable request therefor, and to establish reasonable through routes with other such carriers, and just and reasonable rates, fares, charges, and classifications applicable thereto; and it shall be the duty of common carriers by railroad subject to this chapter to establish reasonable through routes with common carriers by water subject to chapter 12 of this Appendix, and just and reasonable rates, fares, charges, and classifications applicable thereto. It shall be the duty of every such common carrier establishing through routes to provide reasonable facilities for operating such routes and to make reasonable rules and regulations with respect to their operation, and providing for reasonable compensation to those entitled thereto; and in case of joint rates, fares, or charges, to establish just, reasonable, and equitable divisions thereof, which shall not unduly prefer or prejudice any of such participating carriers.

### (5) Just and reasonable charges; applicability; criteria for determination

(a) All charges made for any service rendered or to be rendered in the transportation of passengers or property as aforesaid, or in connection therewith, shall be just and reasonable, and every unjust and unreasonable charge for such service or any part thereof is prohibited and declared to be unlawful. The provisions of this subdivision shall not apply to common carriers by railroad subject to this chapter.

(b) Each rate for any service rendered or to be rendered in the transportation of persons or property by any common carrier by railroad subject to this chapter shall be just and reasonable. A rate that is unjust or unreasonable is prohibited and unlawful. No rate which contributes or which would contribute to the going concern value of such a carrier shall be found to be unjust or unreasonable, or not shown to be just and reasonable, on the ground that such rate is below a just or reasonable minimum for the service rendered or to be rendered. A rate which equals or exceeds the variable costs (as determined through formulas prescribed by the Commission) of providing a service shall be presumed, unless such presumption is rebutted by clear and convincing evidence, to contribute to the going concern value of the carrier or carriers proposing such rate (hereafter in this paragraph referred to as the "proponent carrier"). In determining variable costs, the Commission shall, at the request of the carrier proposing the rate, determine only those costs of the carrier proposing the rate and only those costs of the specific service in question, except where such specific data and cost information is not available. The Commission shall not include in variable cost any expenses which do not vary directly with the level of service provided under the rate in question. Notwithstanding any other provision of this chapter, no rate shall be found to be unjust or unreasonable, or not shown to be just and reasonable, on the ground that such rate exceeds a just or reasonable maximum for the service rendered or to be rendered, unless the Commission has first found that the proponent carrier has market dominance over such service. A finding that a carrier has market dominance over a service shall not create a presumption that the rate or rates for such service exceed a just and reasonable maximum. Nothing in this paragraph shall prohibit a rate increase from a level which reduces the going concern value of the proponent carrier to a level which contributes to such going concern value and is otherwise just and reasonable. For the purposes of the preceding sentence, a rate increase which does not raise a rate above the incremental costs (as determined through formulas prescribed by the Commission) of rendering the service to which such rate applies shall be presumed to be just and reasonable.

(c) As used in this chapter, the terms—

(i) "market dominance" refers to an absence of effective competition from other carriers or modes of transportation, for the traffic or movement to which a rate applies; and

(ii) "rate" means any rate or charge for the transportation of persons or property.

(d) Within 240 days after February 5, 1976, the Commission shall establish, by rule, standards and procedures for determining, in accordance with section 15(9) of this Appendix, whether and when a carrier possesses market dominance over a service rendered or to be rendered at a particular rate or rates. Such rules shall be designed to provide for a practical determination without administrative delay. The Commission shall solicit and consider the recommendations of the Attorney General and of the Federal Trade Commission in the course of establishing such rules.

### (5½) Exchange of services

Nothing in this Act shall be construed to prevent any common carrier subject to this Act from entering into or operating under any contract with any telephone, telegraph, or cable company, for the exchange of their services.

### (6) Classification of property for transportation; regulations and practices; demurrage charges

It is made the duty of all common carriers subject to the provisions of this chapter to establish, observe, and enforce just and reasonable classifications of property for transportation, with reference to which rates, tariffs, regulations, or practices are or may be made or prescribed, and just and reasonable regulations and practices affecting classifications, rates, or tariffs, the issuance, form, and substance of tickets, receipts, and bills of lading, the manner and method of presenting, marking, packing, and delivering property for transportation, the facilities for transportation, the carrying of personal, sample, and excess baggage, and all other matters relating to or connected with the receiving, handling, transporting, storing, and delivery of property subject to the provisions of this chapter which may be necessary or proper to secure the safe and prompt receipt, handling, transportation, and delivery of property subject to the provisions of this chapter upon just and reasonable terms, and every unjust and unreasonable classification, regulation, and practice is prohibited and declared to be unlawful. Demurrage charges shall be computed, and rules and regulations relating to such charges shall be established, in such a manner as to fulfill the national needs with respect to (a) freight car utilization and distribution, and (b) maintenance of an adequate freight car supply available for transportation of property.

### (7) Free transportation for passengers prohibited; exceptions; penalty

No common carrier subject to the provisions of this chapter, shall, directly or indirectly, issue or give any interstate free ticket, free pass, or free transportation for passengers, except to its employees, its officers, time inspectors, surgeons, physicians, and attorneys at law, and the families of any of the foregoing; to the executive officers, general chairmen, and counsel of employees' organizations when such organizations are authorized and designated to represent employees in accordance with the provisions of the Railway Labor Act [45 U.S.C. 151 et. seq.]; to ministers of religion, traveling secretaries of railroad Young Men's Christian Associations, inmates of hospitals and charitable and eleemosynary institutions, and persons exclusively engaged in charitable and eleemosynary work; to indigent, destitute and homeless persons, and to such persons when transported by charitable societies or hospitals, and the necessary agents employed in such transportation; to inmates of the National Homes or State Homes for Disabled Volunteer Soldiers, and of Soldiers' and Sailors' Homes, including those about to enter and those returning home after discharge; to necessary caretakers of livestock, poultry, milk, and fruit; to employees on sleeping cars, express cars, and to linemen of telegraph and telephone companies; to railway mail-service employees and persons in charge of the mails when on duty and traveling to and from duty, and all duly accredited agents and officers of the United States Postal Service and the Railway Mail Service and post-office inspectors while traveling on official business, upon the exhibition of their credentials; to customs inspectors, and immigration officers; to newsboys on trains, baggage agents, witnesses attending any legal investigation in which the common carrier is interested, persons injured in wrecks and physicians and nurses attending such persons: Provided, That this provision shall not be construed to prohibit the interchange of passes for the officers, agents, and employees of common carriers, and their families; nor to prohibit any common carrier from carrying passengers free with the object of providing relief in cases of general epidemic, pestilence, or other calamitous visitation: And provided further, That this provision shall not be construed to prohibit the privilege of passes or franks, or the exchange thereof with each other, for the officers, agents, employees, and their families of such telegraph, telephone, and cable lines, and the officers, agents, employees and their families of other common carriers subject to the provisions of this chapter: Provided further, That the term "employees" as used in this paragraph shall include furloughed, pensioned, and superannuated employees, persons who have become disabled or infirm in the service of any such common carrier, and the remains of a person killed in the employment of a carrier and exemployees traveling for the purpose of entering the service of any such common carrier; and the term "families" as used in this paragraph shall include the families of those persons named in this proviso, also the families of persons killed, and the widows during widowhood and minor children during minority of persons who died, while in the service of any such common carrier. Any common carrier violating this provision shall be deemed guilty of a misdemeanor and for each offense, on conviction, shall pay to the United States a penalty of not less than $100 nor more than $2,000, and any person, other than the persons excepted in this provision, who uses any such interstate free ticket, free pass, or free transportation shall be subject to a like penalty. Jurisdiction of offenses under this provision shall be the same as that provided for offenses in sections 41 to 43 of this Appendix.

### (8) Transportation of commodity manufactured or produced by railroad forbidden

It shall be unlawful for any railroad company to transport from any State, Territory, or the District of Columbia, to any other State, Territory, or the District of Columbia, or to any foreign country, any article or commodity, other than timber and the manufactured products thereof, manufactured, mined, or produced by it, or under its authority, or which it may own in whole or in part, or in which it may have any interest, direct or indirect, except such articles or commodities as may be necessary and intended for its use in the conduct of its business as a common carrier.

### (9) Switch connections and tracks

Any common carrier subject to the provisions of this chapter, upon application of any lateral, branch line of railroad, or of any shipper tendering interstate traffic for transportation, shall construct, maintain, and operate upon reasonable terms a switch connection with any such lateral, branch line of railroad, or private side track which may be constructed to connect with its railroad, where such connection is reasonably practicable and can be put in with safety and will furnish sufficient business to justify the construction and maintenance of the same; and shall furnish cars for the movement of such traffic to the best of its ability without discrimination in favor of or against any such shipper. If any common carrier shall fail to install and operate any such switch or connection as aforesaid, on

rate, or charge docketed with such organization within 120 days after such proposal is docketed.

(Feb. 4, 1887, ch. 104, part I, § 5b, as added Feb. 5, 1976, Pub. L. 94–210, title II, § 208(b), 90 Stat. 42, and amended Oct. 19, 1976, Pub. L. 94–555, title II, § 220(k), 90 Stat. 2630.)

### § 6. Repealed. Pub. L. 95–473, § 4(b), (c), Oct. 17, 1978, 92 Stat. 1466, 1470

Section repealed subject to an exception related to transportation of oil by pipeline. For disposition of this section in revised Title 49, Transportation, see Table at beginning of Title 49. See, also, notes following Table.

Prior to repeal, section read as follows:

### § 6. Schedules and statements of rates, etc., joint rail and water transportation

**(1) Schedule of rates, fares, and charges; filing and posting**

Every common carrier subject to the provisions of this chapter shall file with the Commission created by this chapter and print and keep open to public inspection schedules showing all the rates, fares, and charges for transportation between different points on its own route and between points on its own route and points on the route of any other carrier by railroad, by pipe line, or by water when a through route and joint rate have been established. If no joint rate over the through route has been established, the several carriers in such through route shall file, print, and keep open to public inspection, as aforesaid, the separately established rates, fares, and charges applied to the through transportation. The schedules printed as aforesaid by any such common carrier shall plainly state the places between which property and passengers will be carried, and shall contain the classification of freight in force, and shall also state separately all terminal charges, storage charges, icing charges, and all other charges which the Commission may require, all privileges or facilities granted or allowed, and any rules or regulations which in any wise change, affect, or determine any part or the aggregate of such aforesaid rates, fares, and charges, or the value of the service rendered to the passenger, shipper, or consignee. Such schedules shall be plainly printed in large type, and copies for the use of the public shall be kept posted in two public and conspicuous places in every depot, station, or office of such carrier where passengers or freight, respectively, are received for transportation, in such form that they shall be accessible to the public and can be conveniently inspected. The provisions of this section shall apply to all traffic, transportation, and facilities defined in this chapter.

**(2) Schedule of rates through foreign country**

Any common carrier subject to the provisions of this chapter receiving freight in the United States to be carried through a foreign country to any place in the United States shall also in like manner print and keep open to public inspection, at every depot or office where such freight is received for shipment, schedules showing the through rates established and charged by such common carrier to all points in the United States beyond the foreign country to which it accepts freight for shipment; and any freight shipped from the United States through a foreign country into the United States the through rate on which shall not have been made public, as required by this chapter, shall, before it is admitted into the United States from said foreign country, be subject to customs duties as if said freight were of foreign production.

**(3) Change in rates, fares, etc.; notice required; simplification of schedules**

No change shall be made in the rates, fares, and charges or joint rates, fares, and charges which have been filed and published by any common carrier in compliance with the requirements of this section, except after thirty days' notice to the Commission and

to the public published as aforesaid, which shall plainly state the changes proposed to be made in the schedule then in force and the time when the changed rates, fares, or charges will go into effect; and the proposed changes shall be shown by printing new schedules, or shall be indicated upon the schedules in force at the time and kept open to public inspection: *Provided,* That the Commission may, in its discretion and for good cause shown, allow changes upon less than the notice herein specified, or modify the requirements of this section in respect to publishing, posting, and filing of tariffs, either in particular instances or by a general order applicable to special or peculiar circumstances or conditions: *Provided further,* That the Commission is authorized to make suitable rules and regulations for the simplification of schedules of rates, fares, charges, and classifications and to permit in such rules and regulations the filing of an amendment of or change in any rate, fare, charge, or classification without filing complete schedules covering rates, fares, charges, or classifications not changed if, in its judgment, not inconsistent with the public interest.

**(4) Joint tariffs**

The names of the several carriers which are parties to any joint tariff shall be specified therein, and each of the parties thereto, other than the one filing the same, shall file with the Commission such evidence of concurrence therein or acceptance thereof as may be required or approved by the Commission, and where such evidence of concurrence or acceptance is filed it shall not be necessary for the carriers filing the same to also file copies of the tariffs in which they are named as parties.

**(5) Copies of traffic contracts to be filed**

Every common carrier subject to this chapter shall also file with said Commission copies of all contracts, agreements, or arrangements, with other common carriers in relation to any traffic affected by the provisions of this chapter to which it may be a party: *Provided, however,* That the Commission, by regulations, may provide for exceptions from the requirements of this paragraph in the case of any class or classes of contracts, agreements, or arrangements, the filing of which, in its opinion, is not necessary in the public interest.

**(6) Form and manner of publishing, filing, and posting schedules; incorporation of rates into individual tariffs; time for incorporation; rejection of schedules; unlawful use**

The schedules required by this section to be filed shall be published, filed, and posted in such form and manner as the Commission by regulation shall prescribe. The Commission shall, beginning 2 years after February 5, 1976, require (a) that all rates shall be incorporated into the individual tariffs of each common carrier by railroad subject to this chapter or rail ratemaking association within 2 years after the initial publication of the rate, or within 2 years after a change in any rate is approved by the Commission, whichever is later, and (b) that any rate shall be null and void with respect to any such carrier or association which does not so incorporate such rate into its individual tariff. The Commission may, upon good cause shown, extend such period of time. Notice of any such extension and a statement of the reasons therefor shall be promptly transmitted to the Congress. The Commission is authorized to reject any schedule filed with it which is not in accordance with this section and with such regulations. Any schedule so rejected by the Commission shall be void and its use shall be unlawful.

**(7) Transportation without filing and publishing rates forbidden; rebates; privileges**

No carrier, unless otherwise provided by this chapter, shall engage or participate in the transportation of passengers or property, as defined in this chapter,

USCA Case #11-1479     Document #1584003     Filed: 11/17/2015     Page 78 of 90

unless the rates, fares, and charges upon which the same are transported by said carrier have been filed and published in accordance with the provisions of this chapter; nor shall any carrier charge or demand or collect or receive a greater or less or different compensation for such transportation of passengers or property, or for any service in connection therewith, between the points named in such tariffs than the rates, fares, and charges which are specified in the tariff filed and in effect at the time; nor shall any carrier refund or remit in any manner or by any device any portion of the rates, fares, and charges so specified, nor extend to any shipper or person any privileges or facilities in the transportation of passengers or property, except such as are specified in such tariffs.

**(8) Preference to shipments for United States**

In time of war or threatened war preference and precedence shall, upon demand of the President of the United States, be given, over all other traffic, for the transportation of troops and material of war, and carriers shall adopt every means within their control to facilitate and expedite the military traffic. And in time of peace shipments consigned to agents of the United States for its use shall be delivered by the carriers as promptly as possible and without regard to any embargo that may have been declared, and no such embargo shall apply to shipments so consigned.

**(9) Schedule lacking notice of effective date**

The Commission may reject and refuse to file any schedule that is tendered for filing which does not provide and give lawful notice of its effective date, and any schedule so rejected by the Commission shall be void and its use shall be unlawful.

**(10) Penalty for failure to comply with regulations**

In case of failure or refusal on the part of any carrier, receiver, or trustee to comply with the terms of any regulation adopted and promulgated or any order made by the Commission under the provisions of this section, such carrier, receiver, or trustee shall be liable to a penalty of $500 for each such offense, and $25 for each and every day of the continuance of such offense, which shall accrue to the United States and may be recovered in a civil action brought by the United States.

**(11) Jurisdiction of Commission over transportation by rail and water**

When property may be or is transported from point to point in the United States by rail and water through the Panama Canal or otherwise, the transportation being by a common carrier or carriers, and not entirely within the limits of a single State, the Interstate Commerce Commission shall have jurisdiction of such transportation and of the carriers, both by rail and by water, which may or do engage in the same, in the following particulars, in addition to the jurisdiction otherwise given by this chapter:

**(a)** To establish physical connection between the lines of the rail carrier and the dock at which interchange of passengers or property is to be made by directing the rail carrier to make suitable connection between its line and a track or tracks which have been constructed from the dock to the limits of the railroad right-of-way, or by directing either or both the rail and water carrier, individually or in connection with one another to construct and connect with the lines of the rail carrier a track or tracks to the dock. The Commission shall have full authority to determine and prescribe the terms and conditions upon which these connecting tracks shall be operated, and it may, either in the construction or the operation of such tracks, determine what sum shall be paid to or by either carrier: *Provided*, That construction required by the Commission under the provisions of this paragraph shall be subject to the same restrictions as to findings of public convenience and necessity and other matters as is construction required under section 1 of this Appendix.

**(b)** To establish proportional rates or maximum, or minimum, or maximum and minimum proportional rates, by rail to and from the ports to which the traffic is brought, or from which it is taken by the water carrier, and to determine to what traffic and in connection with what vessels and upon what terms and conditions such rates shall apply. By proportional rates are meant those which differ from the corresponding local rates to and from the port and which apply only to traffic which has been brought to the port or is carried from the port by a common carrier by water.

**(12) Jurisdiction of Commission over carriers contracting with water carriers operating to foreign ports**

If any common carrier subject to this Act enters into arrangements with any water carrier operating from a port in the United States to a foreign country, through the Panama Canal or otherwise, for the handling of through business between interior points of the United States and such foreign country, the Commission may by order require such common carrier to enter into similar arrangements with any or all other lines of steamships operating from said port to the same foreign country.

(Feb. 4, 1887, ch. 104, pt. I, § 6, 24 Stat. 380; Mar. 2, 1889, ch. 382, § 1, 25 Stat. 855; June 29, 1906, ch. 3591, § 2, 34 Stat. 586; June 18, 1910, ch. 309, § 9, 36 Stat. 548; Aug. 24, 1912, ch. 390, § 11, 37 Stat. 568; Aug. 29, 1916, ch. 417, 39 Stat. 604; Feb. 28, 1920, ch. 91, §§ 409–413, 41 Stat. 483; Aug. 9, 1935, ch. 498, § 1, 49 Stat. 543; Sept. 18, 1940, ch. 722, title I, § 8, 54 Stat. 910; Aug. 2, 1949, ch. 379, § 5, 63 Stat. 486; Feb. 5, 1976, Pub. L. 94–210, title II, § 209, 90 Stat. 45.)

**§ 7. Repealed. Pub. L. 95–473, § 4(b), (c), Oct. 17, 1978, 92 Stat. 1466, 1470**

Section repealed subject to an exception related to transportation of oil by pipeline. For disposition of this section in revised Title 49, Transportation, see Table at beginning of Title 49. See, also, notes following Table.

Prior to repeal, section read as follows:

**§ 7. Combinations to prevent continuous carriage of freight prohibited**

It shall be unlawful for any common carrier subject to the provisions of this chapter to enter into any combination, contract, or agreement, expressed or implied, to prevent, by change of time schedule, carriage in different cars, or by other means or devices, the carriage of freights from being continuous from the place of shipment to the place of destination; and no break of bulk, stoppage, or interruption made by such common carrier shall prevent the carriage of freights from being and being treated as one continuous carriage from the place of shipment to the place of destination, unless such break, stoppage, or interruption was made in good faith for some necessary purpose, and without any intent to avoid or unnecessarily interrupt such continuous carriage or to evade any of the provisions of this chapter.

(Feb. 4, 1887, ch. 104, pt. I, § 7, 24 Stat. 382; Aug. 9, 1935, ch. 498, § 1, 49 Stat. 543.)

**§ 8. Repealed. Pub. L. 95–473, § 4(b), (c), Oct. 17, 1978, 92 Stat. 1466, 1470**

Section repealed subject to an exception related to transportation of oil by pipeline. For disposition of this section in revised Title 49, Transportation, see Table at beginning of Title 49. See, also, notes following Table.

Prior to repeal, section read as follows:

measure of the resources used by the Department of Transportation in the regulation of pipeline transportation; or

"(2) another basis of assessment would be a more appropriate measure of those resources.

"(b) CONSIDERATIONS.—In making the report, the Secretary shall consider a wide range of assessment factors and suggestions and comments from the public."

## CHAPTER 605—INTERSTATE COMMERCE REGULATION

Sec.
60501. Secretary of Energy.
60502. Federal Energy Regulatory Commission.
60503. Effect of enactment.

## § 60501. Secretary of Energy

Except as provided in section 60502 of this title, the Secretary of Energy has the duties and powers related to the transportation of oil by pipeline that were vested on October 1, 1977, in the Interstate Commerce Commission or the chairman or a member of the Commission.

(Pub. L. 103–272, § 1(e), July 5, 1994, 108 Stat. 1329.)

HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 60501 .......... | 42:7155. 49:101 (note prec.). | Aug. 4, 1977, Pub. L. 95–91, § 306, 91 Stat. 581. Oct. 17, 1978, Pub. L. 95–473, § 4(c)(1)(A), (2) (related to § 306 of Department of Energy Organization Act), 92 Stat. 1470. |

The words "duties and powers . . . that were vested . . . in" are coextensive with, and substituted for, "transferred . . . such functions set forth in the Interstate Commerce Act and vested by law in" for clarity and to eliminate unnecessary words. The words "on October 1, 1977" are added to reflect the effective date of the transfer of the duties and powers to the Secretary of Energy.

ABOLITION OF INTERSTATE COMMERCE COMMISSION AND TRANSFER OF FUNCTIONS

Interstate Commerce Commission abolished and functions of Commission transferred, except as otherwise provided in Pub. L. 104–88, to Surface Transportation Board effective Jan. 1, 1996, by section 702 of this title, and section 101 of Pub. L. 104–88, set out as a note under section 701 of this title. References to Interstate Commerce Commission deemed to refer to Surface Transportation Board, a member or employee of the Board, or Secretary of Transportation, as appropriate, see section 205 of Pub. L. 104–88, set out as a note under section 701 of this title.

## § 60502. Federal Energy Regulatory Commission

The Federal Energy Regulatory Commission has the duties and powers related to the establishment of a rate or charge for the transportation of oil by pipeline or the valuation of that pipeline that were vested on October 1, 1977, in the Interstate Commerce Commission or an officer or component of the Interstate Commerce Commission.

(Pub. L. 103–272, § 1(e), July 5, 1994, 108 Stat. 1329.)

HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 60502 .......... | 42:7172(b). 49:101 (note prec.). | Aug. 4, 1977, Pub. L. 95–91, § 402(b), 91 Stat. 584. Oct. 17, 1978, Pub. L. 95–473, § 4(c)(1)(B), (2) (related to § 402(b) of Department of Energy Organization Act), 92 Stat. 1470. |

The words "duties and powers . . . that were vested . . . in" are coextensive with, and substituted for, "transferred to, and vested in . . . all functions and authority of" for clarity and to eliminate unnecessary words. The word "regulatory" is omitted as surplus. The words "on October 1, 1977" are added to reflect the effective date of the transfer of the duties and powers to the Federal Energy Regulatory Commission.

ABOLITION OF INTERSTATE COMMERCE COMMISSION AND TRANSFER OF FUNCTIONS

Interstate Commerce Commission abolished and functions of Commission transferred, except as otherwise provided in Pub. L. 104–88, to Surface Transportation Board effective Jan. 1, 1996, by section 702 of this title, and section 101 of Pub. L. 104–88, set out as a note under section 701 of this title. References to Interstate Commerce Commission deemed to refer to Surface Transportation Board, a member or employee of the Board, or Secretary of Transportation, as appropriate, see section 205 of Pub. L. 104–88, set out as a note under section 701 of this title.

## § 60503. Effect of enactment

The enactment of the Act of October 17, 1978 (Public Law 95–473, 92 Stat. 1337), the Act of January 12, 1983 (Public Law 97–449, 96 Stat. 2413), and the Act enacting this section does not repeal, and has no substantive effect on, any right, obligation, liability, or remedy of an oil pipeline, including a right, obligation, liability, or remedy arising under the Interstate Commerce Act or the Act of August 29, 1916 (known as the Pomerene Bills of Lading Act), before any department, agency, or instrumentality of the United States Government, an officer or employee of the Government, or a court of competent jurisdiction.

(Pub. L. 103–272, § 1(e), July 5, 1994, 108 Stat. 1329.)

HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 60503 .......... | 49:101 (note prec.). | Oct. 31, 1988, Pub. L. 100–561, § 308, 102 Stat. 2817. |

The words "the Act of January 12, 1983 (Public Law 97–449, 96 Stat. 2413), and the Act enacting this section" are added for clarity. The words "department, agency, or instrumentality of the United States Government" are substituted for "Federal department or agency", and the words "officer or employee" are substituted for "official", for consistency in the revised title and with other titles of the United States Code.

REFERENCES IN TEXT

Act of October 17, 1978, referred to in text, is Pub. L. 95–473, Oct. 17, 1978, 92 Stat. 1337, the first section of which enacted subtitle IV of this title. For complete classification of this Act to the Code, see Tables.

Act of January 12, 1983, referred to in text, is Pub. L. 97–449, Jan. 12, 1983, 96 Stat. 2413, the first section of which enacted subtitles I and II of this title. For complete classification of this Act to the Code, see Tables.

EFFECTIVE DATE

Section applicable to bonds issued after Aug. 15, 1986, except as otherwise provided, see sections 1311 to 1318 of Pub. L. 99–514, set out as an Effective Date; Transitional Rules note under section 141 of this title.

## § 7704. Certain publicly traded partnerships treated as corporations

**(a) General rule**

For purposes of this title, except as provided in subsection (c), a publicly traded partnership shall be treated as a corporation.

**(b) Publicly traded partnership**

For purposes of this section, the term "publicly traded partnership" means any partnership if—

(1) interests in such partnership are traded on an established securities market, or

(2) interests in such partnership are readily tradable on a secondary market (or the substantial equivalent thereof).

**(c) Exception for partnerships with passive-type income**

**(1) In general**

Subsection (a) shall not apply to any publicly traded partnership for any taxable year if such partnership met the gross income requirements of paragraph (2) for such taxable year and each preceding taxable year beginning after December 31, 1987, during which the partnership (or any predecessor) was in existence. For purposes of the preceding sentence, a partnership shall not be treated as being in existence during any period before the 1st taxable year in which such partnership (or a predecessor) was a publicly traded partnership.

**(2) Gross income requirements**

A partnership meets the gross income requirements of this paragraph for any taxable year if 90 percent or more of the gross income of such partnership for such taxable year consists of qualifying income.

**(3) Exception not to apply to certain partnerships which could qualify as regulated investment companies**

This subsection shall not apply to any partnership which would be described in section 851(a) if such partnership were a domestic corporation. To the extent provided in regulations, the preceding sentence shall not apply to any partnership a principal activity of which is the buying and selling of commodities (not described in section 1221(a)(1)), or options, futures, or forwards with respect to commodities.

**(d) Qualifying income**

For purposes of this section—

**(1) In general**

Except as otherwise provided in this subsection, the term "qualifying income" means—

(A) interest,
(B) dividends,
(C) real property rents,
(D) gain from the sale or other disposition of real property (including property described in section 1221(a)(1)),

(E) income and gains derived from the exploration, development, mining or production, processing, refining, transportation (including pipelines transporting gas, oil, or products thereof), or the marketing of any mineral or natural resource (including fertilizer, geothermal energy, and timber), industrial source carbon dioxide, or the transportation or storage of any fuel described in subsection (b), (c), (d), or (e) of section 6426, or any alcohol fuel defined in section 6426(b)(4)(A) or any biodiesel fuel as defined in section 40A(d)(1),

(F) any gain from the sale or disposition of a capital asset (or property described in section 1231(b)) held for the production of income described in any of the foregoing subparagraphs of this paragraph, and

(G) in the case of a partnership described in the second sentence of subsection (c)(3), income and gains from commodities (not described in section 1221(a)(1)) or futures, forwards, and options with respect to commodities.

For purposes of subparagraph (E), the term "mineral or natural resource" means any product of a character with respect to which a deduction for depletion is allowable under section 611; except that such term shall not include any product described in subparagraph (A) or (B) of section 613(b)(7).

**(2) Certain interest not qualified**

Interest shall not be treated as qualifying income if—

(A) such interest is derived in the conduct of a financial or insurance business, or

(B) such interest would be excluded from the term "interest" under section 856(f).

**(3) Real property rent**

The term "real property rent" means amounts which would qualify as rent from real property under section 856(d) if—

(A) such section were applied without regard to paragraph (2)(C) thereof (relating to independent contractor requirements), and

(B) stock owned, directly or indirectly, by or for a partner would not be considered as owned under section 318(a)(3)(A) by the partnership unless 5 percent or more (by value) of the interests in such partnership are owned, directly or indirectly, by or for such partner.

**(4) Certain income qualifying under regulated investment company or real estate trust provisions**

The term "qualifying income" also includes any income which would qualify under section 851(b)(2)(A) or 856(c)(2).

**(5) Special rule for determining gross income from certain real property sales**

In the case of the sale or other disposition of real property described in section 1221(a)(1), gross income shall not be reduced by inventory costs.

**(e) Inadvertent terminations**

If—

(1) a partnership fails to meet the gross income requirements of subsection (c)(2),

(2) the Secretary determines that such failure was inadvertent,

(3) no later than a reasonable time after the discovery of such failure, steps are taken so that such partnership once more meets such gross income requirements, and

(4) such partnership agrees to make such adjustments (including adjustments with respect to the partners) or to pay such amounts as may be required by the Secretary with respect to such period,

then, notwithstanding such failure, such entity shall be treated as continuing to meet such gross income requirements for such period.

**(f) Effect of becoming corporation**

As of the 1st day that a partnership is treated as a corporation under this section, for purposes of this title, such partnership shall be treated as—

(1) transferring all of its assets (subject to its liabilities) to a newly formed corporation in exchange for the stock of the corporation, and

(2) distributing such stock to its partners in liquidation of their interests in the partnership.

**(g) Exception for electing 1987 partnerships**

**(1) In general**

Subsection (a) shall not apply to an electing 1987 partnership.

**(2) Electing 1987 partnership**

For purposes of this subsection, the term ''electing 1987 partnership'' means any publicly traded partnership if—

(A) such partnership is an existing partnership (as defined in section 10211(c)(2) of the Revenue Reconciliation Act of 1987),

(B) subsection (a) has not applied (and without regard to subsection (c)(1) would not have applied) to such partnership for all prior taxable years beginning after December 31, 1987, and before January 1, 1998, and

(C) such partnership elects the application of this subsection, and consents to the application of the tax imposed by paragraph (3), for its first taxable year beginning after December 31, 1997.

A partnership which, but for this sentence, would be treated as an electing 1987 partnership shall cease to be so treated (and the election under subparagraph (C) shall cease to be in effect) as of the 1st day after December 31, 1997, on which there has been an addition of a substantial new line of business with respect to such partnership.

**(3) Additional tax on electing partnerships**

**(A) Imposition of tax**

There is hereby imposed for each taxable year on the income of each electing 1987 partnership a tax equal to 3.5 percent of such partnership's gross income for the taxable year from the active conduct of trades and businesses by the partnership.

**(B) Adjustments in the case of tiered partnerships**

For purposes of this paragraph, in the case of a partnership which is a partner in an-

other partnership, the gross income referred to in subparagraph (A) shall include the partnership's distributive share of the gross income of such other partnership from the active conduct of trades and businesses of such other partnership. A similar rule shall apply in the case of lower-tiered partnerships.

**(C) Treatment of tax**

For purposes of this title, the tax imposed by this paragraph shall be treated as imposed by chapter 1 other than for purposes of determining the amount of any credit allowable under chapter 1 and shall be paid by the partnership. Section 6655 shall be applied to such partnership with respect to such tax in the same manner as if the partnership were a corporation, such tax were imposed by section 11, and references in such section to taxable income were references to the gross income referred to in subparagraph (A).

**(4) Election**

An election and consent under this subsection shall apply to the taxable year for which made and all subsequent taxable years unless revoked by the partnership. Such revocation may be made without the consent of the Secretary, but, once so revoked, may not be reinstated.

(Added Pub. L. 100–203, title X, § 10211(a), Dec. 22, 1987, 101 Stat. 1330–403; amended Pub. L. 100–647, title II, § 2004(f)(1), (3)–(5), Nov. 10, 1988, 102 Stat. 3602, 3603; Pub. L. 105–34, title IX, § 964(a), Aug. 5, 1997, 111 Stat. 892; Pub. L. 105–206, title VI, § 6009(b)(1), July 22, 1998, 112 Stat. 812; Pub. L. 106–170, title V, § 532(c)(2)(V)–(Y), Dec. 17, 1999, 113 Stat. 1931; Pub. L. 108–357, title III, § 331(e), Oct. 22, 2004, 118 Stat. 1476; Pub. L. 110–343, div. B, title I, § 116(a), title II, § 208(a), Oct. 3, 2008, 122 Stat. 3831, 3840.)

REFERENCES IN TEXT

Section 10211(c)(2) of the Revenue Reconciliation Act of 1987, referred to in subsec. (g)(2)(A), probably means section 10211(c)(2) of the Revenue Act of 1987, title X of Pub. L. 100–203, which is set out as a note below.

AMENDMENTS

2008—Subsec. (d)(1)(E). Pub. L. 110–343, § 208(a), substituted '', industrial source carbon dioxide, or the transportation or storage of any fuel described in subsection (b), (c), (d), or (e) of section 6426, or any alcohol fuel defined in section 6426(b)(4)(A) or any biodiesel fuel as defined in section 40A(d)(1)'' for ''or industrial source carbon dioxide''.

Pub. L. 110–343, § 116(a), inserted ''or industrial source carbon dioxide'' before comma at end.

2004—Subsec. (d)(4). Pub. L. 108–357 substituted ''section 851(b)(2)(A)'' for ''section 851(b)(2)''.

1999—Subsecs. (c)(3), (d)(1)(D), (G), (5). Pub. L. 106–170 substituted ''section 1221(a)(1)'' for ''section 1221(1)''.

1998—Subsec. (g)(3)(C). Pub. L. 105–206 inserted at end ''and shall be paid by the partnership. Section 6655 shall be applied to such partnership with respect to such tax in the same manner as if the partnership were a corporation, such tax were imposed by section 11, and references in such section to taxable income were references to the gross income referred to in subparagraph (A)''.

1997—Subsec. (g). Pub. L. 105–34 added subsec. (g).

1988—Subsec. (c)(1). Pub. L. 100–647, § 2004(f)(3), inserted at end ''For purposes of the preceding sentence,

A-10

a partnership shall not be treated as being in existence during any period before the 1st taxable year in which such partnership (or a predecessor) was a publicly traded partnership.''

Subsec. (d)(1). Pub. L. 100–647, §2004(f)(4), inserted at end ''For purposes of subparagraph (E), the term 'mineral or natural resource' means any product of a character with respect to which a deduction for depletion is allowable under section 611; except that such term shall not include any product described in subparagraph (A) or (B) of section 613(b)(7).''

Subsec. (d)(3). Pub. L. 100–647, §2004(f)(5), amended par. (3) generally. Prior to amendment, par. (3) read as follows: ''The term 'real property rent' means amounts which would qualify as rent from real property under section 856(d) if such section were applied without regard to paragraph (2)(C) thereof (relating to independent contractor requirements).''

Subsec. (e)(4). Pub. L. 100–647, §2004(f)(1), inserted ''or to pay such amounts'' before ''as may be required''.

EFFECTIVE DATE OF 2008 AMENDMENT

Pub. L. 110–343, div. B, title I, §116(b), Oct. 3, 2008, 122 Stat. 3831, provided that: ''The amendment made by this section [amending this section] shall take effect on the date of the enactment of this Act [Oct. 3, 2008], in taxable years ending after such date.''

Pub. L. 110–343, div. B, title II, §208(b), Oct. 3, 2008, 122 Stat. 3840, provided that: ''The amendment made by this section [amending this section] shall take effect on the date of the enactment of this Act [Oct. 3, 2008], in taxable years ending after such date.''

EFFECTIVE DATE OF 2004 AMENDMENT

Amendment by Pub. L. 108–357 applicable to taxable years beginning after Oct. 22, 2004, see section 331(h) of Pub. L. 108–357, set out as a note under section 469 of this title.

EFFECTIVE DATE OF 1999 AMENDMENT

Amendment by Pub. L. 106–170 applicable to any instrument held, acquired, or entered into, any transaction entered into, and supplies held or acquired on or after Dec. 17, 1999, see section 532(d) of Pub. L. 106–170, set out as a note under section 170 of this title.

EFFECTIVE DATE OF 1998 AMENDMENT

Pub. L. 105–206, title VI, §6009(b)(2), July 22, 1998, 112 Stat. 812, provided that: ''The second sentence of section 7704(g)(3)(C) of the 1986 Code (as added by paragraph (1)) shall apply to taxable years beginning after the date of the enactment of this Act [July 22, 1998].''

EFFECTIVE DATE OF 1997 AMENDMENT

Section 964(b) of Pub. L. 105–34 provided that: ''The amendment made by this section [amending this section] shall apply to taxable years beginning after December 31, 1997.''

EFFECTIVE DATE OF 1988 AMENDMENT

Amendment by Pub. L. 100–647 effective, except as otherwise provided, as if included in the provisions of the Revenue Act of 1987, Pub. L. 100–203, title X, to which such amendment relates, see section 2004(u) of Pub. L. 100–647, set out as a note under section 56 of this title.

EFFECTIVE DATE

Section 10211(c) of Pub. L. 100–203, as amended by Pub. L. 100–647, title II, §2004(f)(2), Nov. 10, 1988, 102 Stat. 3602, provided that:

''(1) IN GENERAL.—The amendments made by this section [enacting this section] shall apply—

''(A) except as provided in subparagraph (B), to taxable years beginning after December 31, 1987, or

''(B) in the case of an existing partnership, to taxable years beginning after December 31, 1997.

''(2) EXISTING PARTNERSHIP.—For purposes of this subsection—

''(A) IN GENERAL.—The term 'existing partnership' means any partnership if—

''(i) such partnership was a publicly traded partnership on December 17, 1987,

''(ii) a registration statement indicating that such partnership was to be a publicly traded partnership was filed with the Securities and Exchange Commission with respect to such partnership on or before such date, or

''(iii) with respect to such partnership, an application was filed with a State regulatory commission on or before such date seeking permission to restructure a portion of a corporation as a publicly traded partnership.

''(B) SPECIAL RULE WHERE SUBSTANTIAL NEW LINE OF BUSINESS ADDED AFTER DECEMBER 17, 1987.—A partnership which, but for this subparagraph, would be treated as an existing partnership shall cease to be treated as an existing partnership as of the 1st day after December 17, 1987, on which there has been an addition of a substantial new line of business with respect to such partnership.

''(C) COORDINATION WITH PASSIVE-TYPE INCOME REQUIREMENTS.—In the case of an existing partnership, paragraph (1) of section 7704(c) of the Internal Revenue Code of 1986 (as added by this section) shall be applied by substituting for 'December 31, 1987' the earlier of—

''(i) December 31, 1997, or

''(ii) the day (if any) as of which such partnership ceases to be treated as an existing partnership by reason of subparagraph (B).''

## CHAPTER 80—GENERAL RULES

| Subchapter | | Sec.[1] |
| --- | --- | --- |
| A. | Application of internal revenue laws .... | 7801 |
| B. | Effective date and related provisions .... | 7851 |
| C. | Provisions affecting more than one subtitle ................................................ | 7871 |

### Subchapter A—Application of Internal Revenue Laws

| Sec. | |
| --- | --- |
| 7801. | Authority of Department of the Treasury. |
| 7802. | Internal Revenue Service Oversight Board. |
| 7803. | Commissioner of Internal Revenue; other officials. |
| 7804. | Other personnel. |
| 7805. | Rules and regulations. |
| 7806. | Construction of title. |
| 7807. | Rules in effect upon enactment of this title. |
| 7808. | Depositaries for collections. |
| 7809. | Deposit of collections. |
| 7810. | Revolving fund for redemption of real property. |
| 7811. | Taxpayer Assistance Orders. |

AMENDMENTS

1998—Pub. L. 105–206, title I, §§1101(c)(2), 1102(e)(1), 1104(b)(2), July 22, 1998, 112 Stat. 697, 704, 710, added items 7802 to 7804 and struck out former items 7802 ''Commissioner of Internal Revenue; Assistant Commissioners; Taxpayer Advocate'', 7803 ''Other personnel'', and 7804 ''Effect of reorganization plans''.

1996—Pub. L. 104–168, title I, §101(b)(3), July 30, 1996, 110 Stat. 1456, added item 7802 and struck out former item 7802 ''Commissioner of Internal Revenue; Assistant Commissioner (Employee Plans and Exempt Organizations)''.

1988—Pub. L. 100–647, title VI, §6230(b), Nov. 10, 1988, 102 Stat. 3734, added item 7811.

1983—Pub. L. 97–473, title II, §202(c), Jan. 14, 1983, 96 Stat. 2610, added item for subchapter C.

1974—Pub. L. 93–406, title II, §1051(c), Sept. 2, 1974, 88 Stat. 951, substituted ''Commissioner of Internal Revenue; Assistant Commissioner (Employee Plans and Ex-

---

[1] Section numbers editorially supplied.

struck out par. (6) which had given the court of appeals jurisdiction in cases involving all final orders of the Merit Systems Protection Board except as provided for in section 7703(b) of title 5. See section 1295(a)(9) of this title.

1980—Par. (5). Pub. L. 96–454 inserted "and all final orders of such Commission made reviewable under section 11901(i)(2) of title 49, United States Code" after "section 2321 of this title".

1978—Par. (6). Pub. L. 95–454 added par. (6).

1975—Par. (5). Pub. L. 93–584 added par. (5).

EFFECTIVE DATE OF 1996 AMENDMENT

Section 6(f) of Pub. L. 104–287 provided that the amendment made by that section is effective Dec. 29, 1995.

EFFECTIVE DATE OF 1995 AMENDMENT

Amendment by Pub. L. 104–88 effective Jan. 1, 1996, see section 2 of Pub. L. 104–88, set out as an Effective Date note under section 701 of Title 49, Transportation.

EFFECTIVE DATE OF 1988 AMENDMENT

Amendment by Pub. L. 100–430 effective on 180th day beginning after Sept. 13, 1988, see section 13(a) of Pub. L. 100–430, set out as a note under section 3601 of Title 42, The Public Health and Welfare.

EFFECTIVE DATE OF 1986 AMENDMENT

Section 5(b) of Pub. L. 99–336 provided that: "The amendment made by this section [amending this section] shall apply with respect to any rule, regulation, or final order described in such amendment which is issued on or after the date of the enactment of this Act [June 19, 1986]."

EFFECTIVE DATE OF 1982 AMENDMENT

Amendment by Pub. L. 97–164 effective Oct. 1, 1982, see section 402 of Pub. L. 97–164, set out as a note under section 171 of this title.

EFFECTIVE DATE OF 1978 AMENDMENT

Amendment by Pub. L. 95–454 effective 90 days after Oct. 13, 1978, see section 907 of Pub. L. 95–454, set out as a note under section 1101 of Title 5, Government Organization and Employees.

EFFECTIVE DATE OF 1975 AMENDMENT

Amendment by Pub. L. 93–584 not applicable to actions commenced on or before last day of first month beginning after Jan. 2, 1975, and actions to enjoin or suspend orders of Interstate Commerce Commission which are pending when this amendment becomes effective shall not be affected thereby, but shall proceed to final disposition under the law existing on the date they were commenced, see section 10 of Pub. L. 93–584, set out as a note under section 2321 of this title.

TRANSFER OF FUNCTIONS

Atomic Energy Commission abolished and functions transferred by sections 5814 and 5841 of Title 42, The Public Health and Welfare. See, also, Transfer of Functions notes set out under those sections.

§ 2343. Venue

The venue of a proceeding under this chapter is in the judicial circuit in which the petitioner resides or has its principal office, or in the United States Court of Appeals for the District of Columbia Circuit.

(Added Pub. L. 89–554, § 4(e), Sept. 6, 1966, 80 Stat. 622.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ..................... | 5 U.S.C. 1033. | Dec. 29, 1950, ch. 1189, § 3, 64 Stat. 1130. |

The section is reorganized for clarity and conciseness. The word "is" is substituted for "shall be". The word "petitioner" is substituted for "party or any of the parties filing the petition for review" in view of the definition of "petitioner" in section 2341 of this title.

§ 2344. Review of orders; time; notice; contents of petition; service

On the entry of a final order reviewable under this chapter, the agency shall promptly give notice thereof by service or publication in accordance with its rules. Any party aggrieved by the final order may, within 60 days after its entry, file a petition to review the order in the court of appeals wherein venue lies. The action shall be against the United States. The petition shall contain a concise statement of—

(1) the nature of the proceedings as to which review is sought;

(2) the facts on which venue is based;

(3) the grounds on which relief is sought; and

(4) the relief prayed.

The petitioner shall attach to the petition, as exhibits, copies of the order, report, or decision of the agency. The clerk shall serve a true copy of the petition on the agency and on the Attorney General by registered mail, with request for a return receipt.

(Added Pub. L. 89–554, § 4(e), Sept. 6, 1966, 80 Stat. 622.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ..................... | 5 U.S.C. 1034. | Dec. 29, 1950, ch. 1189, § 4, 64 Stat. 1130. |

The section is reorganized, with minor changes in phraseology. The words "as prescribed by section 1033 of this title" are omitted as surplusage. The words "of the United States" following "Attorney General" are omitted as unnecessary.

§ 2345. Prehearing conference

The court of appeals may hold a prehearing conference or direct a judge of the court to hold a prehearing conference.

(Added Pub. L. 89–554, § 4(e), Sept. 6, 1966, 80 Stat. 622.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ..................... | 5 U.S.C. 1035. | Dec. 29, 1950, ch. 1189, § 5, 64 Stat. 1130. |

§ 2346. Certification of record on review

Unless the proceeding has been terminated on a motion to dismiss the petition, the agency shall file in the office of the clerk the record on review as provided by section 2112 of this title.

(Added Pub. L. 89–554, § 4(e), Sept. 6, 1966, 80 Stat. 623.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ..................... | 5 U.S.C. 1036. | Dec. 29, 1950, ch. 1189, § 6, 64 Stat. 1130. |

§342.1                                    18 CFR Ch. I (4–1–10 Edition)

indirectly to the Trans-Alaska Pipeline.

§342.1  General rule.

Each carrier subject to the jurisdiction of the Commission under the Interstate Commerce Act:

(a) Must establish its initial rates subject to such Act pursuant to §342.2; and

(b) Must make any change in existing rates pursuant to §342.3 or §342.4, whichever is applicable, unless directed otherwise by the Commission.

§342.2  Establishing initial rates.

A carrier must justify an initial rate for new service by:

(a) Filing cost, revenue, and throughput data supporting such rate as required by part 346 of this chapter; or

(b) Filing a sworn affidavit that the rate is agreed to by at least one non-affiliated person who intends to use the service in question, *provided* that if a protest to the initial rate is filed, the carrier must comply with paragraph (a) of this section.

[Order 561, 58 FR 58779, Nov. 4, 1993, as amended at 59 FR 59146, Nov. 16, 1994]

§342.3  Indexing.

(a) *Rate changes.* A rate charged by a carrier may be changed, at any time, to a level which does not exceed the ceiling level established by paragraph (d) of this section, upon compliance with the applicable filing and notice requirements and with paragraph (b) of this section. A filing under this section proposing to change a rate that is under investigation and subject to refund, must take effect subject to refund.

(b) *Information required to be filed with rate changes.* The carrier must comply with Part 341 of this title. Carriers must specify in their letters of transmittal required in §341.2(c) of this chapter the rate schedule to be changed, the proposed new rate, the prior rate, the prior ceiling level, and the applicable ceiling level for the movement. No other rate information is required to accompany the proposed rate change.

(c) *Index year.* The index year is the period from July 1 to June 30.

(d) *Derivation of the ceiling level.* (1) A carrier must compute the ceiling level for each index year by multiplying the previous index year's ceiling level by the most recent index published by the Commission. The index will be published by the Commission prior to June 1 of each year.

(2) The index published by the Commission will be based on the change in the final Producer Price Index for Finished Goods (PPI-FG), seasonally adjusted, as published by the U.S. Department of Labor, Bureau of Labor Statistics, for the two calendar years immediately preceding the index year. The index will be calculated by dividing the PPI-FG for the calendar year immediately preceding the index year, by the previous calendar year's PPI-FG.

(3) A carrier must compute the ceiling level each index year without regard to the actual rates filed pursuant to this section. All carriers must round their ceiling levels each index year to the nearest hundredth of a cent.

(4) For purposes of computing the ceiling level for the period January 1, 1995 through June 30, 1995, a carrier must use the rate in effect on December 31, 1994 as the previous index year's ceiling level in the computation in paragraph (d)(1) of this section. If the rate in effect on December 31, 1994 is subsequently lowered by Commission order pursuant to the Interstate Commerce Act, the ceiling level based on such rate must be recomputed, in accordance with paragraph (d)(1) of this section, using the rate established by such Commission order in lieu of the rate in effect on December 31, 1994.

(5) When an initial rate, or rate changed by a method other than indexing, takes effect during the index year, such rate will constitute the applicable ceiling level for that index year. If such rate is subsequently lowered by Commission order pursuant to the Interstate Commerce Act, the ceiling level based on such rate must be recomputed, in accordance with paragraph (d)(1) of this section, using the rate established by such Commission order as the ceiling level for the index year which includes the effective date of the rate established by such Commission order.

936

**Federal Energy Regulatory Commission**                                    **§ 343.2**

(e) *Rate decreases.* If the ceiling level computed pursuant to §342.3(d) is below the filed rate of a carrier, that rate must be reduced to bring it into compliance with the new ceiling level; provided, however, that a carrier is not required to reduce a rate below the level deemed just and reasonable under section 1803(a) of the Energy Policy Act of 1992, if such section applies to such rate or to any prior rate. The rate decrease must be accomplished by filing a revised tariff publication with the Commission to be effective July 1 of the index year to which the reduced ceiling level applies.

[Order 561, 58 FR 58779, Nov. 4, 1993, as amended by Order 561–A, 59 FR 40256, Aug. 8, 1994; 59 FR 59146, Nov. 16, 1994; Order 606, 64 FR 44405, Aug. 16, 1999; Order 650, 69 FR 53801, Sept. 3, 2004]

**§ 342.4  Other rate changing methodologies.**

(a) *Cost-of-service rates.* A carrier may change a rate pursuant to this section if it shows that there is a substantial divergence between the actual costs experienced by the carrier and the rate resulting from application of the index such that the rate at the ceiling level would preclude the carrier from being able to charge a just and reasonable rate within the meaning of the Interstate Commerce Act. A carrier must substantiate the costs incurred by filing the data required by part 346 of this chapter. A carrier that makes such a showing may change the rate in question, based upon the cost of providing the service covered by the rate, without regard to the applicable ceiling level under §342.3.

(b) *Market-based rates.* A carrier may attempt to show that it lacks significant market power in the market in which it proposes to charge market-based rates. Until the carrier establishes that it lacks market power, these rates will be subject to the applicable ceiling level under §342.3.

(c) *Settlement rates.* A carrier may change a rate without regard to the ceiling level under §342.3 if the proposed change has been agreed to, in writing, by each person who, on the day of the filing of the proposed rate change, is using the service covered by the rate. A filing pursuant to this section must contain a verified statement by the carrier that the proposed rate change has been agreed to by all current shippers.

[Order 561, 58 FR 58779, Nov. 4, 1993, as amended at 59 FR 59146, Nov. 16, 1994]

# PART 343—PROCEDURAL RULES APPLICABLE TO OIL PIPELINE PROCEEDINGS

Sec.
343.0   Applicability.
343.1   Definitions.
343.2   Requirements for filing interventions, protests and complaints.
343.3   Filing of protests and responses.
343.4   Procedure on complaints.
343.5   Required negotiations.

AUTHORITY: 5 U.S.C. 571–583; 42 U.S.C. 7101–7352; 49 U.S.C. 60502; 49 App. U.S.C. 1-85.

SOURCE: Order 561, 58 FR 58780, Nov. 4, 1993, unless otherwise noted.

**§ 343.0  Applicability.**

(a) *General rule.* The Commission's Rules of Practice and Procedure in part 385 of this chapter will govern procedural matters in oil pipeline proceedings under part 342 of this chapter and under the Interstate Commerce Act, except to the extent specified in this part.

**§ 343.1  Definitions.**

For purposes of this part, the following definitions apply:

(a) *Complaint* means a filing challenging an existing rate or practice under section 13(1) of the Interstate Commerce Act.

(b) *Protest* means a filing, under section 15(7) of the Interstate Commerce Act, challenging a tariff publication.

[Order 561, 58 FR 58780, Nov. 4, 1993, as amended by Order 578, 60 FR 19505, Apr. 19, 1995]

**§ 343.2  Requirements for filing interventions, protests and complaints.**

(a) *Interventions.* Section 385.214 of this chapter applies to oil pipeline proceedings.

(b) *Standing to file protest.* Only persons with a substantial economic interest in the tariff filing may file a protest to a tariff filing pursuant to the Interstate Commerce Act. Along with

937

**Federal Energy Regulatory Commission**                                         **§ 343.2**

(e) *Rate decreases.* If the ceiling level computed pursuant to §342.3(d) is below the filed rate of a carrier, that rate must be reduced to bring it into compliance with the new ceiling level; provided, however, that a carrier is not required to reduce a rate below the level deemed just and reasonable under section 1803(a) of the Energy Policy Act of 1992, if such section applies to such rate or to any prior rate. The rate decrease must be accomplished by filing a revised tariff publication with the Commission to be effective July 1 of the index year to which the reduced ceiling level applies.

[Order 561, 58 FR 58779, Nov. 4, 1993, as amended by Order 561–A, 59 FR 40256, Aug. 8, 1994; 59 FR 59146, Nov. 16, 1994; Order 606, 64 FR 44405, Aug. 16, 1999; Order 650, 69 FR 53801, Sept. 3, 2004]

**§ 342.4  Other rate changing methodologies.**

(a) *Cost-of-service rates.* A carrier may change a rate pursuant to this section if it shows that there is a substantial divergence between the actual costs experienced by the carrier and the rate resulting from application of the index such that the rate at the ceiling level would preclude the carrier from being able to charge a just and reasonable rate within the meaning of the Interstate Commerce Act. A carrier must substantiate the costs incurred by filing the data required by part 346 of this chapter. A carrier that makes such a showing may change the rate in question, based upon the cost of providing the service covered by the rate, without regard to the applicable ceiling level under § 342.3.

(b) *Market-based rates.* A carrier may attempt to show that it lacks significant market power in the market in which it proposes to charge market-based rates. Until the carrier establishes that it lacks market power, these rates will be subject to the applicable ceiling level under § 342.3.

(c) *Settlement rates.* A carrier may change a rate without regard to the ceiling level under § 342.3 if the proposed change has been agreed to, in writing, by each person who, on the day of the filing of the proposed rate change, is using the service covered by the rate. A filing pursuant to this section must contain a verified statement by the carrier that the proposed rate change has been agreed to by all current shippers.

[Order 561, 58 FR 58779, Nov. 4, 1993, as amended at 59 FR 59146, Nov. 16, 1994]

## PART 343—PROCEDURAL RULES APPLICABLE TO OIL PIPELINE PROCEEDINGS

Sec.
343.0  Applicability.
343.1  Definitions.
343.2  Requirements for filing interventions, protests and complaints.
343.3  Filing of protests and responses.
343.4  Procedure on complaints.
343.5  Required negotiations.

AUTHORITY: 5 U.S.C. 571–583; 42 U.S.C. 7101–7352; 49 U.S.C. 60502; 49 App. U.S.C. 1-85.

SOURCE: Order 561, 58 FR 58780, Nov. 4, 1993, unless otherwise noted.

**§ 343.0  Applicability.**

(a) *General rule.* The Commission's Rules of Practice and Procedure in part 385 of this chapter will govern procedural matters in oil pipeline proceedings under part 342 of this chapter and under the Interstate Commerce Act, except to the extent specified in this part.

**§ 343.1  Definitions.**

For purposes of this part, the following definitions apply:

(a) *Complaint* means a filing challenging an existing rate or practice under section 13(1) of the Interstate Commerce Act.

(b) *Protest* means a filing, under section 15(7) of the Interstate Commerce Act, challenging a tariff publication.

[Order 561, 58 FR 58780, Nov. 4, 1993, as amended by Order 578, 60 FR 19505, Apr. 19, 1995]

**§ 343.2  Requirements for filing interventions, protests and complaints.**

(a) *Interventions.* Section 385.214 of this chapter applies to oil pipeline proceedings.

(b) *Standing to file protest.* Only persons with a substantial economic interest in the tariff filing may file a protest to a tariff filing pursuant to the Interstate Commerce Act. Along with

937

the protest, a verified statement that the protestor has a substantial economic interest in the tariff filing in question must be filed.

(c) *Other requirements for filing protests or complaints*—(1) *Rates established under § 342.3 of this chapter.* A protest or complaint filed against a rate proposed or established pursuant to § 342.3 of this chapter must allege reasonable grounds for asserting that the rate violates the applicable ceiling level, or that the rate increase is so substantially in excess of the actual cost increases incurred by the carrier that the rate is unjust and unreasonable, or that the rate decrease is so substantially less than the actual cost decrease incurred by the carrier that the rate is unjust and unreasonable. In addition to meeting the requirements of the section, a complaint must also comply with all the requirements of § 385.206, except § 385.206(b)(1) and (2).

(2) *Rates established under § 342.4(c) of this chapter.* A protest or complaint filed against a rate proposed or established under § 342.4(c) of this chapter must allege reasonable grounds for asserting that the rate is so substantially in excess of the actual cost increases incurred by the carrier that the rate is unjust and unreasonable. In addition to meeting the requirements of the section, a complaint must also comply with all the requirements of § 385.206, except § 385.206(b)(1) and (2).

(3) *Non-rate matters.* A protest or complaint filed against a carrier's operations or practices, other than rates, must allege reasonable grounds for asserting that the operations or practices violate a provision of the Interstate Commerce Act, or of the Commission's regulations. In addition to meeting the requirements of this section, a complaint must also comply with the requirements of § 385.206.

(4) A protest or complaint that does not meet the requirements of paragraphs (c)(1), (c)(2), or (c)(3) of this section, whichever is applicable, will be dismissed.

[Order 561, 58 FR 58780, Nov. 4, 1993, as amended by Order 602, 64 FR 17097, Apr. 8, 1999; Order 606, 64 FR 44405, Aug. 16, 1999]

§ 343.3  **Filing of protests and responses.**

(a) *Protests.* Any protest pursuant to section 15(7) of the Interstate Commerce Act must be filed not later than 15 days after the filing of a tariff publication. If the carrier submits a separate letter with the filing, providing a telefax number and contact person, and requesting all protests to be telefaxed to the carrier by a protestant, any protest must be so telefaxed to the pipeline at the time the protest is filed with the Commission. Only persons with a substantial economic interest in the tariff filing may file a protest to a tariff filing pursuant to the Interstate Commerce Act. Along with the protest, the protestant must file a verified statement which must contain a reasonably detailed description of the nature and substance of the protestant's substantial economic interest in the tariff filing.

(b) *Responses.* The carrier may file a response to a protest no later than 5 days from the filing of the protest.

(c) *Commission action.* Commission action, including any hearings or other proceedings, on a protest will be limited to the issues raised in such protest. If a filing is protested, before the effective date of the tariff publication or within 30 days of the tariff filing, whichever is later, the Commission will determine whether to suspend the tariff and initiate a formal investigation.

(d) *Termination of investigation.* Withdrawal of the protest, or protests, that caused the initiation of an investigation automatically terminates the investigation.

[Order 561, 58 FR 58780, Nov. 4, 1993, as amended by Order 561–A, 59 FR 40256, Aug. 8, 1994]

§ 343.4  **Procedure on complaints.**

(a) *Responses.* The carrier must file an answer to a complaint filed pursuant to section 13(1) of the Interstate Commerce Act within 20 days after the filing of the complaint in accordance with Rule 206.

(b) *Commission action.* Commission action, including any hearings or other proceedings, on a complaint will be

**Federal Energy Regulatory Commission** §346.2

### §346.2 Material in support of initial rates or change in rates.

A carrier that files for rates pursuant to §342.2(a) or §342.4(a) of this chapter, or a carrier described in §342.0(b) that files to establish or change rates by filing cost, revenue, and throughput data supporting such rates, other than pursuant to a Commission-approved settlement, must file the following statements, schedules, and supporting workpapers. The statement, schedules, and workpapers must be based upon an appropriate test period.

(a) *Base and test periods defined.* (1) For a carrier which has been in operation for at least 12 months:

(i) A base period must consist of 12 consecutive months of actual experience. The 12 months of experience must be adjusted to eliminate nonrecurring items (except minor accounts). The filing carrier may include appropriate normalizing adjustments in lieu of nonrecurring items.

(ii) A test period must consist of a base period adjusted for changes in revenues and costs which are known and are measurable with reasonable accuracy at the time of filing and which will become effective within nine months after the last month of available actual experience utilized in the filing. For good cause shown, the Commission may allow reasonable deviation from the prescribed test period.

(2) For a carrier which has less than 12 months' experience, the test period may consist of 12 consecutive months ending not more than one year from the filing date. For good cause shown, the Commission may allow reasonable deviation from the prescribed test period.

(3) For a carrier which is establishing rates for new service, the test period will be based on a 12-month projection of costs and revenues.

(b) *Cost-of-service summary schedule.* This schedule must contain the following information:

(1) Total carrier cost of service for the test period.

(2) Throughput for the test period in both barrels and barrel-miles.

(3) For filings pursuant to §342.4(a) of this chapter, the schedule must include the proposed rates, the rates which would be permitted under §342.3 of this chapter, and the revenues to be realized from both sets of rates.

(c) *Content of statements.* Any cost-of-service rate filing must include supporting statements containing the following information for the test period.

(1) *Statement A—total cost of service.* This statement must summarize the total cost of service for a carrier (operating and maintenance expense, depreciation and amortization, return, and taxes) developed from Statements B through G described in paragraphs (c)(2) through (7) of this section.

(2) *Statement B—operation and maintenance expense.* This statement must set forth the operation, maintenance, administration and general, and depreciation expenses for the test period. Items used in the computations or derived on this statement must consist of operations, including salaries and wages, supplies and expenses, outside services, operating fuel and power, and oil losses and shortages; maintenance, including salaries and wages, supplies and expenses, outside services, and maintenance and materials; administrative and general, including salaries and wages, supplies and expenses, outside services, rentals, pensions and benefits, insurance, casualty and other losses, and pipeline taxes; and depreciation and amortization.

(3) *Statement C—overall return on rate base.* This statement must set forth the rate base for return purposes from Statement E in paragraph (c)(5) of this section and must also state the claimed rate of return and the application of the claimed rate of return to the overall rate base. The claimed rate of return must consist of a weighted cost of capital, combining the rate of return on debt capital and the real rate of return on equity capital. Items used in the computations or derived on this statement must include deferred earnings, equity ratio, debt ratio, weighted cost of capital, and costs of debt and equity.

(4) *Statement D—income taxes.* This statement must set forth the income tax computation. Items used in the computations or derived on this statement must show: return allowance, interest expense, equity return, annual

933

***United Airlines, Inc., et al. v. FERC***          **Docket No. IS08-390**
**D.C. Cir. No. 11-1479,** *et al.*

## CERTIFICATE OF SERVICE

In accordance with Fed. R. App. P. 25(d), and the Court's Administrative

Order Regarding Electronic Case Filing, I hereby certify that I have, this 17th day

of November 2015, served the foregoing upon the counsel listed in the Service

Preference Report via email through the Court's CM/ECF system as indicated

below:

Steven Andrew Adducci                    EMAIL
Richard E. Powers Jr.
Venable LLP
575 7th St., NW
Washington, DC  20004

Charles F. Caldwell                      EMAIL
Elizabeth Barnidge Kohlhausen
Dean Hyrum Lefler
Deborah Renee Repman
Caldwell Boudreaux Lefler, PLLC
Suite 1680
1800 West Loop South
Houston, TX  77027

Melvin Goldstein                         EMAIL
Goldstein & Associates
1757 P Street, NW
Washington, DC  20036

Thomas James Eastment                              EMAIL
Gregory S. Wagner
Baker Botts LLP
The Warner, Suite 1300 West
1299 Pennsylvania Ave., NW
Washington, DC  20004-2400

James Joseph Fredricks                              EMAIL
Robert J. Wiggers
U.S. Department of Justice
(DOJ) Antitrust Division, Appellate
  Section
Room 3224
950 Pennsylvania Ave., NW
Washington, DC  20530-0001

Frederick George Jauss                              EMAIL
Marcus William Sisk Jr.
Dorsey & Whitney LLP
Suite 750
1801 K Street, NW
Washington, DC  20006

Daniel Watson Sanborn                              EMAIL
Vinson & Elkins LLP
First City Tower Suite 2300
1001 Fannin Street, Suite 2500
Houston, TX 77002

*/s/ Elizabeth E. Rylander*
Elizabeth E. Rylander
Attorney

Federal Energy Regulatory
  Commission
Washington, DC  20426
Tel:  (202) 502-8466
Fax:  (202) 273-0901
Email:  elizabeth.rylander@ferc.gov