<u>ORAL ARGUMENT HAS BEEN SCHEDULED FOR<br>MARCH 22, 2016</u>

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**Nos. 11-1479, 12-1069, 12-1070, 12-1073, 12-1086,<br>15-1101, 15-1105, and 15-1107<br>(Consolidated)**
_____

**UNITED AIRLINES, INC.,** *et al.*,
*Petitioners,*

**v.**

**FEDERAL ENERGY REGULATORY COMMISSION AND<br>UNITED STATES OF AMERICA,**
*Respondents*

_____

**ON PETITION FOR REVIEW OF ORDERS OF<br>THE FEDERAL ENERGY REGULATORY COMMISSION**
_____

**JOINT INITIAL BRIEF OF SHIPPER PETITIONERS**

Richard E. Powers, Jr.
Venable LLP
575 7th Street, N.W.
Washington, D.C.  20004
202-344-4360

Counsel for United Airlines, Inc., Delta
Air Lines, Inc., Southwest Airlines Co.,
and US Airways, Inc.

September 4, 2015
February 5, 2016 (Final Brief)

Thomas J. Eastment
Gregory S. Wagner
Baker Botts L.L.P.
1299 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2400
202-639-7700

Counsel for ExxonMobil Oil
Corporation and BP West Coast
Products LLC

Steven A. Adducci
Venable LLP
575 7th Street, N.W.
Washington, D.C.  20004
202-344-4361

Melvin Goldstein
Goldstein & Associates, P.C.
1757 P Street, N.W.
Washington, D.C.  20036
202-872-8740

Counsel for Chevron Products Company
and Valero Marketing and Supply
Company

Counsel for Tesoro Refining and
Marketing Company LLC

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**Nos. 11-1479, 12-1069, 12-1070, 12-1073, 12-1086,
15-1101, 15-1105, and 15-1107
(Consolidated)**

_____

**UNITED AIRLINES, INC., *et al.*,**
*Petitioners,*

**v.**

**FEDERAL ENERGY REGULATORY COMMISSION AND
UNITED STATES OF AMERICA**
*Respondents*

_____

**CERTIFICATE AS TO
PARTIES, RULINGS AND RELATED CASES**

_____

Petitioners United Airlines, Inc., Delta Air Lines, Inc., Southwest Airlines Co., US Airways, Inc., BP West Coast Products LLC, Chevron Products Co., ExxonMobil Oil Corporation, Valero Marketing and Supply Company, and Tesoro Refining and Marketing Company LLC ("Shippers") hereby submit their Certificate as to Parties, Rulings and Related Cases.

**Parties and Amici**.

Parties to this Petition for Review.

Petitions for review were brought by Shippers against the Federal Energy Regulatory Commission ("FERC") and the United States of America in

i

Case Nos. 11-1479, 12-1069, 12-1070, 12-1073, 12-1086, 15-1101, 15-1105, and

15-1107, all of which are now consolidated by order of the Court.  The Parties in

these proceedings are:

    BP West Coast Products LLC
    ExxonMobil Oil Corporation
    Chevron Products Company
    United Airlines, Inc.
    Delta Air Lines, Inc.
    Southwest Airlines Co.
    US Airways, Inc.
    Valero Marketing and Supply Company
    Tesoro Refining and Marketing Company LLC
    Phillips 66 Company
    SFPP, L.P.
    Federal Energy Regulatory Commission
    United States of America

    Parties to the Proceeding Below

        All parties appearing before FERC in Docket No. IS08-390, *et al*. are:

    BP West Coast Products LLC
    ExxonMobil Oil Corporation
    Chevron Products Company
    United Airlines, Inc.
    Delta Air Lines, Inc.
    Southwest Airlines Co.
    US Airways, Inc.
    Valero Marketing and Supply Company
    Ultramar, Inc.
    Tesoro Refining and Marketing Company LLC
    Phillips 66 Company
    SFPP, L.P.

**Rule 26.1 Disclosure Statements**.

Pursuant to Rule 26.1 of the D.C. Circuit Rules and Rule 28(a)(1) of the Federal Rules of Appellate Procedure, Counsel states that:

**BP West Coast Products LLC** ("BP WCP") is a limited liability corporation organized and existing under the laws of Delaware with principal offices located at 4519 Grandview Road in Blaine, Washington 98230. BP WCP is a refiner and marketer of petroleum products and ships products over the common carrier oil pipeline that is regulated by FERC and subject to the FERC orders on review in this proceeding. BP WCP is a subsidiary of BP Products North America Inc., a Maryland corporation, which is a subsidiary of BP America Inc., a Delaware corporation with its principal place of business in Warrenville, Illinois. BP America Inc. is a subsidiary of BP p.l.c., the only publicly traded entity in this chain of ownership and whose principal place of business is London, England.

**ExxonMobil Oil Corporation** ("ExxonMobil") is a corporation organized and existing under the laws of New York and has its principal office located at 5959 Las Colinas Boulevard, Irving, Texas. ExxonMobil is a refiner and marketer of petroleum products and ships products over the common carrier oil pipeline that is regulated by FERC and subject to the FERC orders on review in this proceeding. ExxonMobil, formerly known as Mobil Oil Corporation, is a wholly-owned subsidiary of Mobil Corporation, a Delaware Corporation, and

which has its principal office located at 5959 Las Colinas Boulevard, Irving, Texas. Mobil Corporation is a wholly-owned subsidiary of Exxon Mobil Corporation (formerly known as Exxon Corporation), the only publicly traded entity in this chain of ownership and a New Jersey corporation with its principal office located at 5959 Las Colinas Boulevard, Irving, Texas.

**Chevron Products Company** ("Chevron Products") is engaged in the purchase, marketing, and transportation of various hydrocarbon products, including refined petroleum products that are shipped over the common carrier oil pipeline that is regulated by FERC and subject to the FERC orders on review in this proceeding. Chevron Products is a division of Chevron U.S.A. Inc. Chevron U.S.A. Inc. is an indirect wholly-owned subsidiary of Chevron Corporation, a publicly-traded corporation that is organized under the laws of Delaware with its principal place of business and corporate offices located in San Ramon, California. No publicly traded entity owns more than 10% of the stock of Chevron Corporation.

**United Airlines, Inc.** ("United") is a Delaware corporation with its corporate headquarters located at 233 South Wacker Drive, Chicago, Illinois. United's predecessor entity, Continental Airlines, Inc. ("Continental") shipped refined petroleum products (jet fuel) over the common carrier oil pipeline that is regulated by FERC and subject to the FERC orders on review in this proceeding. United is the successor in

interest to all the rights, claims, and interests of Continental, an intervenor, protestor and party of record in the FERC orders on review in this proceeding. After the FERC proceedings were initiated, United Airlines, Inc. was merged into Continental and the name of the surviving entity, Continental, was contemporaneously changed to United Airlines, Inc. United is a wholly-owned subsidiary of United Continental Holdings, Inc. ("United Continental"), a publicly-traded company whose shares are traded on the New York Stock Exchange. United Continental is a Delaware corporation with its corporate headquarters located at 233 South Wacker Drive, Chicago, Illinois. No publicly traded entity owns more than 10% of United Continental stock. United Continental, through its subsidiaries and affiliates, is primarily engaged in providing airline service in the United States and abroad.

**Delta Air Lines, Inc.** ("Delta") is a Delaware corporation with its principal offices located at 1030 Delta Boulevard, Atlanta, Georgia. Delta's predecessor entity, Northwest Airlines, Inc. ("Northwest") shipped refined petroleum products (jet fuel) over the common carrier oil pipeline that is regulated by FERC and subject to the FERC orders on review in this proceeding. Delta is the successor in interest to the rights, claims, and interests of Northwest, an intervenor, protestor, and party of record in the FERC orders on review in this proceeding. After the underlying FERC proceedings were initiated, Northwest merged with Delta and no longer exists as a separate entity. Delta is a publicly-traded company whose share are traded on the New York Stock Exchange. No publicly traded entity owns more than 10% of Delta stock. Delta is a major passenger

and cargo airline that provides scheduled transportation in the United States and around the world.

    **Southwest Airlines Co.** ("Southwest") is a Texas corporation with its corporate headquarters at 2702 Dallas Love Field Drive, Dallas, Texas.  Southwest ships refined petroleum products (jet fuel) over the common carrier oil pipeline that is regulated by FERC and subject to the FERC orders on review in this proceeding.  Southwest is a publicly-traded company whose shares are traded on the New York Stock Exchange.  Based solely on Schedule 13Gs filed to date with the Securities and Exchange Commission ("SEC"), PRIMECAP Management Company ("PRIMECAP"), an investment management company, owns 11.6% of Southwest stock.  Based solely on Schedule 13Gs filed to date with the SEC, other than PRIMECAP, no publicly traded entity owns more than 10% of Southwest stock.  Southwest is a major passenger airline that provides scheduled transportation in the United States and internationally.

    **US Airways, Inc.** ("US Airways") is a Delaware corporation with its corporate headquarters located at 111 West Rio Salado Parkway, Tempe, Arizona. US Airways ships refined petroleum products (jet fuel) over the common carrier oil pipeline that is regulated by FERC and subject to the FERC orders on review in this proceeding.  US Airways is a wholly-owned subsidiary of US Airways Group, Inc. which in turn is a wholly-owned subsidiary of American Airlines Group Inc.

("American"), a publicly-traded company whose shares are traded on the NASDAQ Stock Market. American is a Delaware corporation with its corporate headquarters located at 4333 Amon Carter Boulevard, Fort Worth, Texas. Based solely on Schedule 13Gs filed to date with the SEC, T. Rowe Price Group ("T. Rowe Price"), an investment management firm, owns 12.5% of American stock. Based solely on Schedule 13Gs filed to date with the SEC, other than T. Rowe Price, no publicly traded entity owns more than 10% of American stock. American, through its wholly-owned subsidiaries, is a major passenger airline that provides scheduled transportation in the United States and around the world.

**Valero Marketing and Supply Company** ("VMSC") is engaged in the purchase, marketing, and transportation of various hydrocarbon products, including refined petroleum products, that are shipped over the common carrier oil pipeline that is regulated by FERC and subject to the FERC orders on review in this proceeding. VMSC is a wholly-owned, indirect subsidiary of Valero Energy Corporation ("Valero") which is a publicly-traded holding company whose shares are traded on the New York Stock Exchange. Valero is the only publicly traded entity that owns 10% or more of VMSC. VMSC's and Valero's principle offices are located at One Valero Way, San Antonio, Texas.

**Tesoro Refining and Marketing Company LLC ("Tesoro")** is a limited liability corporation organized and existing under the laws of the State of

Delaware with its principal location located at 19100 Ridgewood Parkway in San Antonio, Texas 78259. Tesoro is a refiner and marketer of refined petroleum products and ships over the common carrier oil pipeline that is regulated by FERC and subject to the FERC orders on review in this proceeding. Tesoro is a subsidiary of Tesoro Corporation, which is incorporated in the state of Delaware, with its principal place of business in San Antonio, Texas and is traded publicly on the New York Stock Exchange.  Tesoro Corporation is the only publicly traded entity in this chain of ownership.

**Orders Under Review**.

Petitioners seek review of three orders issued by FERC in Docket Nos. IS08-390, *et al*.:

1.      "Opinion and Order on Initial Decision," Opinion No. 511, *SFPP, L.P.*, Docket No. IS08-390-002, 134 FERC ¶ 61,121 (Feb. 17, 2011).

2.      "Order on Rehearing and Compliance Filing," Opinion No. 511-A, *SFPP, L.P.*, Docket Nos. IS08-390-004, *et al.*, 137 FERC ¶ 61,220 (Dec. 16, 2011).

3.      "Order on Rehearing and Compliance Filing," Opinion No. 511-B, *SFPP, L.P.*, Docket Nos. IS08-390-004, *et al.*, 150 FERC ¶ 61,096 (Feb. 19, 2015).

**Related Cases**.

This case has not previously been before this Court or any other Court.  While Petitioners are not aware of any other case currently addressing the rates at issue in these consolidated cases before this or any other court, similar issues may arise in a case currently pending before the Court and held in abeyance

for further FERC proceedings. *Chevron Products Company, et al. v. Federal Energy Regulatory Commission and United States of America*, Case Nos. 12-1455, 12-1458, 15-1103, 15-1104, and 15-1106 (consolidated) involves challenges to FERC decisions that, like the decisions challenged here, deal with, among other things, the application of FERC's income tax allowance policy to partnership pipelines. Both the cases at issue here and Case Nos. 12-1455, *et al.*, pertain to pipelines operated by SFPP, L.P. This case addresses rates on SFPP's West Line, and Case Nos. 12-1455, *et al.*, address the rates on SFPP's East Line.

Respectfully submitted,

Richard E. Powers, Jr.
Venable LLP
575 7th Street, N.W.
Washington, D.C.  20004
202-344-4360

Counsel for United Airlines, Inc., Delta Air Lines, Inc., Southwest Airlines Co., and US Airways, Inc.


Steven A. Adducci
Venable LLP
575 7th Street, N.W.
Washington, D.C.  20004
202-344-4361

Counsel for Chevron Products Company and Valero Marketing and Supply Company

*/s/ Thomas J. Eastment*
Thomas J. Eastment
Gregory S. Wagner
Baker Botts L.L.P.
1299 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2400
202-639-7700

Counsel for ExxonMobil Oil Corporation and BP West Coast Products LLC


Melvin Goldstein
Goldstein & Associates, P.C.
1757 P Street, N.W.
Washington, D.C.  20036
202-872-8740

Counsel for Tesoro Refining and Marketing Company LLC


September 4, 2015
February 5, 2016 (Final Brief)

x

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................... xiii

GLOSSARY ...................................................................................... xiv

I.    STATEMENT OF JURISDICTION AND STANDING ............................... 1

II.   ISSUE PRESENTED FOR REVIEW ...................................................... 1

III.  STATEMENT OF THE CASE ................................................................ 2

IV.   STATUTORY PROVISIONS .................................................................. 3

V.    SUMMARY OF ARGUMENT ................................................................ 4

VI.   ARGUMENT ......................................................................................... 9

      A.    Standard Of Review ................................................................ 9

      B.    This Court's Prior Decision Upholding FERC's Tax Allowance
            Policy Does Not Support FERC's Orders On Review ...................... 10

      C.    FERC's DCF Method Sets A Pipeline's ROE At A Before-
            Investor-Tax Level Sufficient To Recover Investor-Level Taxes
            And Provide An After-Investor-Tax Return Sufficient To
            Attract Investment. ................................................................ 14

            1.    The DCF Method Calculates The ROE Required By
                  Investors To Provide Capital To The Pipeline. ...................... 15

            2.    The DCF Method Sets A Before-Investor-Tax ROE,
                  Which Allows Recovery Of Investor Income Tax
                  Liability And The Investors' Required After-Investor-
                  Tax Return ................................................................ 18

      D.    Granting Partnership Pipelines A Tax Allowance Is Unjust And
            Unreasonable Because It Results In A Double Recovery Of
            Partner/Investors' Income Tax Liability. ............................................. 21

            1.    Double Recovery Of A Cost Item Is Unjust And
                  Unreasonable .......................................................... 21

2.      Granting A Partnership Pipeline A Tax Allowance In
        Addition To Its DCF-ROE Is Unjust And Unreasonable
        Because It Results In A Double Recovery Of
        Partner/Investor Taxes. ............................................................23

E.      FERC's Denial Of Double Recovery Is Unsupported By
        Reasoned Analysis Or Substantial Evidence Because It Is
        Premised On The Factually Erroneous Assumption That The
        Tax Borne By Partner/Investors Is Instead Borne By The
        Partnership Pipeline..................................................................25

        1.      FERC's Denial Of Double Recovery Is Unfounded
                Because It Is Based On A Factually Erroneous
                Assumption. ...................................................................25

        2.      Correcting The Erroneous Assumption Underlying
                FERC's Analysis Demonstrates The Double Recovery. ..........28

        3.      The Schink Exhibits Appended To Opinion 511
                Illustrate, Rather Than Refute, The Double Recovery. ............36

        4.      FERC's Abandonment Of The Schink Analysis In
                Opinion 511-A Is Based On A Contrived Gross-Up
                Concept That Has No Foundation In The Record. ...................41

F.      FERC Has No Statutory Authority To Authorize A Partnership
        Pipeline To Include A Tax Allowance In Its Cost of Service
        Where Doing So Results In A Double Recovery Of Income Tax
        Costs And Unjust And Unreasonable Rates.......................................48

VII.  CONCLUSION.............................................................................52

## TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Aeronautical Radio, Inc. v. FCC*, 928 F.2d 428 (D.C. Cir. 1991)..........................10

*Ass'n of Oil Pipe Lines v. FERC*, 83 F.3d 1424 (D.C. Cir. 1996)..........................22

*AT&T Corp. v. FCC*, 86 F.3d 242 (D.C. Cir. 1996) ...............................................10

*Bechtel v. FCC*, 957 F.2d 873 (D.C. Cir. 1992) ....................................................10

*Bluefield Waterworks & Improvement Co. v. Pub. Serv. Comm'n of W. Va.*,
   262 U.S. 679 (1923)...........................................................................................15

*BP West Coast Products LLC v. FERC*,
   374 F.3d 1263 (D.C. Cir. 2004) .................................................11, 23, 24, 36, 51

*Branch v. Smith*, 538 U.S. 254 (2003) ....................................................................50

*Canadian Ass'n of Petroleum Producers v. FERC*,
   254 F.3d 289 (D.C. Cir. 2001)......................................................................16, 17

*City of Charlottesville v. FERC*, 774 F.2d (D.C. Cir. 1985) .............................21, 24

*ExxonMobil Oil Corp v. FERC*, 487 F.3d 945 (D.C. Cir. 2007).....7, 12, 13, 14, 25,
   .............................................................................. 26, 29, 31, 35, 36, 39, 48, 51

*Farmers Union Cent. Exch., Inc. v. FERC*, 734 F.2d 1486 (D.C. Cir. 1984) ..........9

*Flagstaff Broad. Found. v. FCC*, 979 F.2d 1566 (D.C. Cir. 1992) ..........................9

*Flint Hills Resources Alaska LLC v. FERC*, 627 F.3d 881 (D.C. Cir. 2010)..........22

*FPC v. Hope Natural Gas Co.*, 320 U.S. 591 (1944) .............................4, 6, 15, 31

*Int'l Bhd. of Elec. Workers v. NLRB*, 814 F.2d 697 (D.C. Cir. 1987)....................50

_____

[*]Authorities upon which we chiefly rely are marked with asterisks.

*Johnson v. Office of Thrift Supervision,* 81 F.3d 195 (D.C. Cir. 1996)..................10

*Morton v. Mancari*, 417 U.S. 535 (1974) ........................................................50, 51

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)..................................................................................9

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007)........51

*Posadas v. Nat'l City Bank*, 296 U.S. 497 (1936) ...................................................51

*Pub. Serv. Comm'n of N.M. v. FERC*, 653 F.2d 681 (D.C. Cir. 1981) ..................21

*United States v. Amer. Coll. of Physicians*, 475 U.S. 834 (1986) ..........................50

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) .......................................10

*Universal Interpretive Shuttle Corp. v. Wash. Metro. Area Transit Comm'n*,
    393 U.S. 186 (1968)..............................................................................51

*W. Mich. Broad. Co. v. FCC*, 735 F.2d 601 (D.C. Cir. 1984)................................10

## Statutes & Regulations

5 U.S.C. § 706(2)(C)..................................................................................................9

28 U.S.C. §§ 2321, 2342, 2344.................................................................................1

I.R.C. § 701 .............................................................................................................23

I.R.C. §§ 7704, 7704(a), 7704(c)(2), 7704(d)(1)(E)............................48, 49, 50, 51

*49 U.S.C. App. § 1(5), 6(3), 15(1), 15(7) (1988) ...................................... 8, 21, 49

49 U.S.C. App. § 17 ................................................................................................ 1

## Administrative Decisions

*BP Pipelines (Alaska) Inc.*, Opinion No. 502, 123 FERC ¶ 61,287 (2008) ...........21

*Composition of Proxy Groups for Determining Gas and Oil Pipeline Return
    on Equity*, 123 FERC ¶ 61,048 (2008) .................................................16, 17, 18

*Dynegy Midwest Generation, Inc.*, Opinion 498,
121 FERC ¶ 61,025 (2007), *on reh'g*, 125 FERC ¶ 61,280 ..............................22

*Entergy Services Inc.*,102 FERC ¶ 63,016, *aff'd on reh'g*, 105 FERC ¶
61,319 (2003), *aff'd on reh'g*, 109 FERC ¶ 61,095 (2004)................................22

*Kern River Transmission Co.,* Opinion No. 486-B,
126 FERC ¶ 61,034 (2009) ...................................................................................18

*Northwestern Corp.*, 129 FERC ¶ 61,116 (2009)....................................................22

Policy Statement on Income Tax Allowances,
111 FERC ¶ 61,139 (2005)...................................... 12, 13, 23, 25, 28, 29, 30, 49

*Preventing Undue Discrimination and Preference in Transmission Service,*
Order No. 890, FERC Stats. & Regs. ¶ 31,241 (2007)..............................21, 22

*Pub. Serv. Co. of Indiana, Inc.*, 7 FERC ¶ 61,319 (1979) .......................................15

*Trailblazer Pipeline Co.¸* 80 FERC ¶ 61,141, *on reh'g*, 81 FERC ¶ 61,032
(1997)...................................................................................................................22

# GLOSSARY

| | |
|---|---|
| ALJ | Administrative Law Judge |
| After-investor-tax return | The return investors receive after they pay taxes on their investment income |
| Before-investor-tax return | The return investors receive before they pay taxes on their investment income |
| Cost of Service | The cost of providing pipeline service, including a reasonable rate of return |
| DCF Method | The discounted cash flow method the Commission uses to set a regulated interstate pipeline's rate of return on equity |
| East Line | SFPP, L.P.'s refined petroleum products pipeline facilities extending from El Paso, Texas to Arizona |
| FERC or Commission | Federal Energy Regulatory Commission |
| ICA | Interstate Commerce Act, 49 U.S.C. § 1, *et seq.*[*] |
| Investor-level taxes | Income taxes incurred and paid by investors on their investment income |
| KMEP | Kinder Morgan Energy Partners, L.P. |

---

[*] In 1978 the ICA was partially repealed and recodified. However, Public Law No. 95-473, § 4(c) (92 Stat. 1466-70 (1978)) provides that those portions of the ICA that were repealed and recodified in 1978 nevertheless remain in effect as they existed on October 1, 1977, to the extent that these laws relate to the movement of oil by pipeline and the rates and charges related thereto. Subsequently, the ICA relating to oil pipeline regulation was published as an appendix to Title 49 of the United States Code and cited as 49 App. U.S.C. § 1, *et seq.* (1988).  However, the ICA relating to oil pipelines no longer is published as an appendix in the current versions of the U.S. Code.  The pertinent sections of the ICA are appended in Attachment 1 hereto.

| | |
|---|---|
| MLP | Master Limited Partnership, which is a publicly traded partnership |
| Pipeline-level taxes | Income taxes incurred and paid by a pipeline entity on its income |
| ROE | Return on Equity |
| Shareholders | Owners of shares in a corporation |
| Tax Allowance | An allowance included in a pipeline's cost of service to reimburse the pipeline for its income tax expense |
| Units | The ownership shares in a Master Limited Partnership |
| Unitholders | The partners, which own units in a Master Limited Partnership |
| West Line | SFPP, L.P.'s refined petroleum products pipeline facilities extending from California to Arizona |

Petitioners United Airlines, Inc., Delta Air Lines, Inc., Southwest Airlines Co., US Airways, Inc., BP West Coast Products LLC, Chevron Products Co., ExxonMobil Oil Corporation, Valero Marketing and Supply Company, and Tesoro Refining and Marketing Company LLC (collectively "Shippers") hereby file their Initial Brief.

## I.     STATEMENT OF JURISDICTION AND STANDING

Shippers challenge orders of the Federal Energy Regulatory Commission ("Commission" or "FERC") issued under the authority of the Interstate Commerce Act ("ICA"), 49 U.S.C. App. § 1, *et seq*. (1988), which governs the rates charged by interstate pipelines for the transportation of refined petroleum products.  This Court has jurisdiction to review the orders at issue under Section 17 of the ICA and under 28 U.S.C. §§ 2321, 2342, and 2344.

Shippers have standing to petition for review of the challenged FERC orders because the orders set the rates for oil pipeline transportation services SFPP, L.P. ("SFPP") provides to each of the Shippers.

## II.     ISSUE PRESENTED FOR REVIEW

Did the Commission err by permitting a pipeline, organized as a partnership, to include in its cost of service an allowance for income taxes borne by its partner/investors, given that the cost of service also includes a return on equity

("ROE") component designed to recover the partner/investors' income tax liability and to provide an after-investor-tax return sufficient to attract their investment?

## III.    STATEMENT OF THE CASE

On June 30, 2008, SFPP filed at FERC to increase transportation rates on its West Line.  SFPP is a limited partnership essentially entirely owned by Kinder Morgan Energy Partners, L.P. ("KMEP"), a Master Limited Partnership ("MLP") whose limited partnership units are publicly traded.[1]

On July 29, 2008, FERC accepted and suspended SFPP's proposed rates subject to refund and conditions,[2] and set the case for hearing before an administrative law judge ("ALJ").  On December 2, 2009, the ALJ issued his Initial Decision.[3]  The ALJ determined that SFPP was entitled to an allowance to recover the income taxes borne by its partner/investors, including the partner/investors in its parent, KMEP.[4]

---

[1] *SFPP, L.P.*, Opinion 511, 134 FERC ¶ 61,121 at P 74 (2011) ("Opinion 511"), R.967 (J.A.0421-22) (citing Exhibit SFP-194, R.138 (J.A.0017)).  "R." references are to the Certified Record Item Nos.  "J.A." references are to the Joint Appendix.

[2] *SFPP, L.P.,* 124 FERC ¶ 61,103 (2008), R.12 (J.A.0003).

[3] *SFPP, L.P.,* 129 FERC ¶ 63,020 (2009), R.938 (J.A.0157).

[4] *Id.* at PP 670-82 (J.A.0327-30).

2

FERC affirmed the Initial Decision on the income tax allowance ("Tax Allowance") issue in Opinion 511.[5]  Shippers sought rehearing of the Tax Allowance issue,[6] which the Commission denied in Opinion 511-A.[7]  SFPP requested rehearing of Opinion 511-A on other matters, which the Commission resolved on February 19, 2015.[8]

Certain Shippers petitioned this Court for review of Opinions 511 and 511-A, and on February 21, 2012, the Court consolidated the Shippers' petitions.[9] Subsequently, the Court consolidated these petitions with the later filed petitions of SFPP and certain Shippers of Opinions 511, 511-A, and 511-B.[10]

IV.    STATUTORY PROVISIONS

Relevant statutory provisions are reproduced in Attachment 1 hereto.

---

[5] Opinion 511 at P 1 (J.A.0388).

[6] R.971, 972, and 975 (J.A.0552, 0553, and 0633).

[7] *SFPP, L.P.*, Opinion 511-A, 137 FERC ¶ 61,220 at P 340 (2011) ("Opinion 511-A"), R.1014 (J.A.0896-97).

[8] *SFPP, L.P.*, Opinion 511-B, 150 FERC ¶ 61,096 (2015) ("Opinion 511-B"), R.1044 (J.A.0964).

[9] Order, *Continental Airlines, Inc., et al. v. FERC*, Case Nos. 11-1479, *et al.* (D.C. Cir. Feb. 21, 2012).

[10] Order, *Continental Airlines, Inc., et al. v. FERC*, Case Nos. 11-1479, *et al.* (D.C. Cir. April 22, 2015).

V.     SUMMARY OF ARGUMENT

In the orders on review, FERC reconsidered and reaffirmed its policy of granting a Tax Allowance to pipelines organized as partnerships.  The Court should invalidate FERC's orders because the record demonstrates that FERC's policy results in a double recovery of partner/investors' income tax liability and, therefore, in unjust and unreasonable rates.

FERC grants pipelines organized as partnerships a Tax Allowance for the purpose of recovering the cost of the tax liability borne by the pipelines' partner/investors on their shares of the pipelines' income.  This Court has previously ruled that the partners/investors' tax liability is recoverable in a pipeline's cost of service and Shippers do not seek to disturb that prior ruling.  The issue here arises from the fact that FERC's policy overcompensates partnership pipelines by allowing them to charge Shippers twice for the income tax liability of the pipelines' partner/investors thereby resulting in unjust and unreasonable rates.  This issue was not addressed in this Court's prior decisions.

All FERC-regulated corporate and partnership pipelines charging cost-based rates recover the income tax costs of the pipelines' investors in the ROE component of those rates.  FERC sets the ROE at a level sufficient to attract equity investment from investors, as the Supreme Court required in *FPC v. Hope Natural Gas Co.*, 320 U.S. 591 (1944) ("*Hope*").  To accomplish this, FERC uses a

4

discounted cash flow ("DCF") method, which bases the ROE on the actual cash distribution yields[11] provided to investors (the corporate shareholders or partnership partner/investors) in the market by a proxy group of comparable entities. Because investors are subject to taxes on income they receive from these pipelines, the return the pipelines provide to the investors must be high enough to cover those taxes and provide the after-tax ROE that the investors require to attract their investment. Thus, the actual market yield data used in FERC's DCF method sets a before-investor-tax return that covers both the return required by the partner/investors and the taxes assessed on that return.

The only reason to grant a Tax Allowance on top of a DCF-ROE is to compensate for taxes incurred by the pipeline entity itself. Therein lies the difference between pipelines owned by partnerships and those owned by corporations. Partnerships are not themselves subject to income taxes, while corporations are. A corporate pipeline's ROE is designed to recover the income tax liability of its shareholder/investors and to provide the required after-tax return, but FERC provides a Tax Allowance in addition to the DCF-ROE to ensure that the corporate pipeline also recovers pipeline-level taxes. If a corporate pipeline did not receive an allowance to cover pipeline-level taxes, the pipeline would be left

---

[11] The cash distribution yield for partnerships is equal to the cash distributions paid to investors divided by the unit price. For corporations, it is equal to the dividends divided by the share price.

with less than its allowed DCF-ROE to pass on to investors, which would fail to attract investment as required by *Hope*.  In contrast, a partnership pipeline does not require a Tax Allowance because the partnership itself incurs no income taxes — the only tax on partnership income is borne by the partner/investors and this tax is recovered through the DCF-ROE.

FERC explicitly agreed in Opinion 511 that the DCF method places in a pipeline's cost of service the ROE required by investors in the market *before* they pay income taxes on that return.  Opinion 511 at P 244 (J.A.0506).  FERC illustrated that if investors require a rate of return of 6 percent after paying their taxes, and if their tax rate is assumed to be 25 percent, the DCF method will set the before-investor-tax ROE to be placed in the cost of service at 8 percent in order to cover the 25 percent tax and still provide the required after-investor-tax ROE of 6 percent.  FERC's example aptly illustrates that the DCF method necessarily provides for recovery of investors' tax liability.  As a result, granting a partnership pipeline a Tax Allowance to recover partner/investors' tax costs, along with a DCF-ROE, causes a double recovery of investor tax liability and thus unjust and unreasonable rates.

Notwithstanding FERC's illustration that the DCF method ensures recovery of investors' income taxes, FERC created a labyrinth of discussion, tables, and appendices to attempt to prove that providing partnership pipelines with

both a Tax Allowance and a DCF-ROE does not result in a double recovery. FERC's denial of the double recovery, and its multiple supporting illustrations, are founded on a single factually incorrect assumption, rooted in FERC's misreading of this Court's decision in *ExxonMobil Oil Corp v. FERC*, 487 F.3d 945 (D.C. Cir. 2007) ("*ExxonMobil*").

*ExxonMobil* upheld FERC's policy decision to attribute investor taxes to the pipeline so as to permit inclusion of those taxes in its cost of service. But FERC goes too far and interprets *ExxonMobil* as authorizing FERC to assume that the taxes borne by partner/investors are *actually* borne by the partnership itself and, therefore, are not investor taxes recovered in the DCF-ROE. FERC's assumption is contrary to fact. There is no taxation of partnership pipeline income at the partnership level; the only tax on this income is borne by the partner/investors. Simply because *ExxonMobil* permitted FERC to attribute those taxes to the partnership for purposes of including them in a partnership pipeline's cost of service, does not make it permissible to pretend that the taxes are actually incurred by the partnership when analyzing the question of double recovery. This false premise permeates FERC's entire opinion, and provides the sole basis for FERC's rejection of Shippers' demonstration that the tax policy results in double recovery.

The identity of the parties actually responsible for taxes levied on partnership income is central to answering the double recovery question correctly.

7

The only tax on partnership income is paid by the partner/investors, not the pipeline, and the DCF method uses actual market data to embed these tax costs in the pipeline's ROE. These facts cannot be assumed away. By assuming that the taxes are borne by the pipeline rather than the partner/investors, FERC assumes its own conclusions that the taxes are not investor-level taxes recovered in the DCF-ROE and that granting a Tax Allowance to partnership pipelines in addition to the DCF-ROE does not result in a double recovery. Accordingly, FERC's denial that there is a double recovery lacks a reasoned basis and any evidentiary support.

Finally, FERC's argument that the tax code provisions setting the income tax methodology applicable to partnerships authorize FERC's Tax Allowance policy is also without merit. These provisions, and their legislative history, make no mention of FERC's ratemaking authority let alone authorize FERC to approve the double recovery of partner/investor income tax costs. The ICA obligates FERC to ensure that oil pipeline rates are just and reasonable, and the tax code leaves this obligation undisturbed.[12]

For these reasons, FERC's grant of a Tax Allowance to a partnership pipeline, in addition to a DCF-ROE, cannot be sustained because it permits the pipeline to recover such taxes twice: once through the ROE and a second time through the Tax Allowance. This double recovery is unjust and unreasonable.

---

[12] *See* 49 U.S.C. App. § 1(5).

8

VI.    ARGUMENT

A.    Standard Of Review

Under the Administrative Procedure Act, a court is required to set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(C).  In determining whether agency action is arbitrary and capricious or an abuse of discretion, a reviewing court must determine whether the agency has engaged in reasoned decision-making.  *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  In doing so, the reviewing court must:

> conduct a "searching and careful" inquiry into the record in order to assure itself that the agency has examined the relevant data and articulated a reasoned explanation for its action including a "rational connection between the facts found and the choice made."[13]

It is "axiomatic . . . that an agency's action will be set aside by a reviewing court whenever the agency fails to provide a reasoned basis for its decision . . . .  This principle applies to all agency action, regardless of whether it involves established policy or the application of brand-new rules of interpretation." *Flagstaff Broad. Found. v. FCC*, 979 F.2d 1566, 1569 (D.C. Cir. 1992).  "The Commission's duty is even more pressing when the policy is embodied not in a binding regulation issued after public notice and comment but in a general

_____

[13] *Farmers Union Cent. Exch., Inc. v. FERC*, 734 F.2d 1486, 1499 (D.C. Cir. 1984) (citations and footnote omitted).

statement of policy . . . ." *Bechtel v. FCC*, 957 F.2d 873, 881 (D.C. Cir. 1992).

Although an agency has applied a policy in prior cases, it still must justify the

policy in response to a proper challenge. *W. Mich. Broad. Co. v. FCC*, 735 F.2d

601, 604-07 (D.C. Cir. 1984).    Where an agency's "predictions about the

effectiveness of [a previously court-approved policy] prove erroneous," the agency

must reconsider its decisions "in accordance with its continuing obligation to

practice reasoned decisionmaking."  *Aeronautical Radio, Inc. v. FCC*, 928 F.2d

428, 445 (D.C. Cir. 1991).

        Moreover, the Commission's decision must be based on "substantial

evidence," and take "into account whatever in the record fairly detracts from its

weight."   *See AT&T Corp. v. FCC*, 86 F.3d 242, 247 (D.C. Cir. 1996) (citing

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).  When an agency's

decision is not supported by substantial evidence, the decision must be set aside.

*See Johnson v. Office of Thrift Supervision,* 81 F.3d 195, 205 (D.C. Cir. 1996).

    B.    This Court's Prior Decision Upholding FERC's Tax Allowance Policy
          Does Not Support FERC's Orders On Review.

        This Court has reviewed FERC's Tax Allowance policy as applied to

partnership pipelines before, but it has not ruled on the double recovery issue

presented here.    Specifically, while this Court's precedent holds that the

Commission may allow a partnership pipeline to include in its cost of service the

income tax costs borne by partner/investors, the Court has not ruled on whether

10

FERC may permit a partnership pipeline to include such costs twice in its cost of service.[14]   Accordingly, the Court's earlier decisions do not dictate the outcome of the issue presented here.

In *BP West Coast Products LLC v. FERC*, 374 F.3d 1263 (D.C. Cir. 2004) ("*BP West*"), the Court recognized the fundamental difference in the income taxes paid on corporate pipeline income and partnership pipeline income.  For corporate pipelines, income is taxed both at the pipeline level and on the dividends received by the shareholder/investors.   In contrast, for partnership pipelines, income is not taxed at the pipeline level, but only on the partner/investor level.  *Id.* at 1286.  In *BP West,* the Court rejected the Commission's *Lakehead* policy, under which FERC had permitted a Tax Allowance on income attributable to partnership units owned by corporations but not to those owned by individuals or other non-corporate entities.  *Id.* at 1287-88.  The Court concluded that FERC's distinction between corporate and non-corporate owners of a partnership pipeline lacked a reasoned basis and that FERC had not justified permitting partnership pipelines to collect a Tax Allowance because such pipelines incurred no taxes.  *Id.* at 1288-90.

---

[14] See Request for Rehearing of Chevron Products, *et al.*, Docket No. IS08-390-002 ("ACV Rehearing Request") at 10 n.1 (Apr. 11, 2011), R.975 (J.A.0652-53) and Request for Rehearing of ExxonMobil, *et al*., Docket No. IS08-390-002 ("ExxonMobil/BP Rehearing Request") at 8-11 (Apr. 11, 2011), R.972 (J.A.0565-68).

On remand from *BP West,* FERC issued a Policy Statement on Income Tax Allowances, 111 FERC ¶ 61,139 (2005) ("Tax Allowance Policy Statement"), finding that partners pay taxes on partnership pipelines' income, even though the partnership pipelines themselves do not. *Id.* at P 33 & n.29. FERC held that it was reasonable to permit such pipelines to include the partner/investors' tax cost in the pipelines' cost of service because the cost is attributable to regulated service. *Id.* at PP 33-34. It also concluded that without a Tax Allowance, partnership pipelines would be at a competitive *disadvantage* in comparison to corporate pipelines, which are entitled to a Tax Allowance on taxes paid by the pipelines. *Id.* at PP 25-27, 36.

In *ExxonMobil*, the Court upheld orders applying the Tax Allowance Policy Statement and permitted a partnership pipeline to include a Tax Allowance in its cost of service. The Court found it reasonable for FERC to approve the allowance to ensure that partnership pipelines would not be at a *disadvantage* in comparison to corporate pipelines, *i.e.*, that corporate and partnership pipelines of like risk would earn comparable after-tax returns. *ExxonMobil* at 955; *see also id.* at 953 ("we defer to FERC's expert judgment about the best way to equalize after-tax returns for partnerships and corporations"). The Court concluded that FERC may view the taxes paid by partners on partnership income as attributable to the

12

regulated utility and, therefore, could permit partnership pipelines to include these income tax costs in their cost of service. *Id.* at 952.

Neither FERC's Tax Allowance Policy Statement nor *ExxonMobil* addressed the recovery of partner/investor taxes in the DCF-ROE, or the double recovery of such taxes if partnership pipelines were permitted to recover a Tax Allowance and a DCF-ROE. Shippers do not here dispute that, under *ExxonMobil*, a partnership pipeline's cost of service may include partner/investors' income tax liability arising from their investment in the pipeline. Instead, Shippers dispute that the Commission may permit a partnership pipeline to recover partner/investors' taxes twice. The *ExxonMobil* Court held that "FERC has reasonably explained why income taxes paid on partnership income are properly allocated to the regulated entity for ratemaking purposes, and the shipper petitioners have offered no compelling reason to second-guess the agency's policy choices." *Id.* at 953. By contrast, the record of double recovery developed in this case provides a compelling basis to require the Commission to change its Tax Allowance policy to ensure that the income tax costs of partner/investors are recovered only once.

Further, the *ExxonMobil* Court expressly based its approval of a Tax Allowance for partnership pipelines on FERC's assertion that it was necessary to assure that partnership pipelines would not be at a *disadvantage vis-a-vis* corporate

pipelines.  But in the orders below, FERC conceded that corporate and partnership

pipeline investors will receive the same after-tax return on their investment if the

corporate pipelines get a Tax Allowance but the partnership pipelines do not.  *See*

Opinion 511 at P 249 (J.A.0508-09).    In light of this concession, FERC now

defends the Tax Allowance on grounds that it is needed to ensure an *advantage* for

partnership pipelines.  *Id.* at P 239 (J.A.0503-04).  Accordingly, *ExxonMobil* is

based on reasoning that FERC has abandoned, and it cannot dictate the result here.

> C.    FERC's DCF Method Sets A Pipeline's ROE At A Before-Investor-Tax Level Sufficient To Recover Investor-Level Taxes And Provide An After-Investor-Tax Return Sufficient To Attract Investment.

FERC's goal in setting a pipeline's allowed ROE is to ensure that the

pipeline offers a sufficient return to potential investors to attract their investment.

Potential investors determine whether their investment is justified by evaluating

the return they receive after taxes on the investment income are paid, *i.e.*, the after-

investor-tax return.  Therefore, the pipeline must pay a return that covers investor

taxes and leaves enough income to attract capital.  FERC accomplishes this by

examining the returns paid by other pipeline companies in the market.  Because

these returns are paid to investors before taxes are levied on investment income,

the returns necessarily are high enough to cover investor taxes and satisfy

investors' after-tax return requirements.  Accordingly, investor tax expenses are

intrinsically included in the ROE set by FERC, and there is no need for an additional Tax Allowance to cover investors' tax liability.

1.     The DCF Method Calculates The ROE Required By Investors To Provide Capital To The Pipeline.

Setting a pipeline's ROE is a central step in setting just and reasonable rates.  The objective is to set the ROE at the level sufficient to attract capital.  *Hope* held that "the return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks. That return, moreover, should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital."  *Hope*, 320 U.S. at 603; *see also Bluefield Waterworks & Improvement Co. v. Pub. Serv. Comm'n of W. Va.*, 262 U.S. 679, 693 (1923).

To allow a pipeline to attract investment, FERC must ensure the pipeline's allowed return is competitive with the returns received by investors in entities of comparable risk.  The Commission explained that "[t]he objective of the Commission's DCF model is to determine the return that must be earned by the regulated entity for the entity to obtain equity capital from *investors*."  Opinion 511 at P 242 (emphasis added) (J.A.0505); *see also Pub. Serv. Co. of Indiana, Inc.*, 7 FERC ¶ 61,319, at 61,709 (1979) ("If a company offers investors a return commensurate with what they could expect from alternative investments of comparable risk, then it stands to reason that the company will be able to attract

15

capital. Conversely, it logically follows that a company which is able to attract capital must be offering investors an opportunity to earn a commensurate return.").

To this end, FERC sets a pipeline's ROE by using the DCF method, which is the same for both corporate and partnership pipelines except for certain long-term growth rate assumptions.[15]  The DCF method finds the investors' required return based on the returns the market actually provides to investors in members of a proxy group.[16]  The proxy group comprises other pipelines of comparable risk, and the median return of the group is typically deemed sufficient to attract investors.  Opinion 511 at P 242 (J.A.0505).

The formula used for determining the market-established ROE is derived from the formula originally used to estimate the value of stocks.  As FERC has explained, the stock valuation formula

> is based on the premise that "a stock's price is equal to the present value of the infinite stream of expected dividends discounted at a market rate commensurate with

---

[15] *See Composition of Proxy Groups for Determining Gas and Oil Pipeline Return on Equity* ("Proxy Group Policy Statement"), 123 FERC ¶ 61,048 at PP 88-106 (2008).

[16] Opinion 511 at P 242 (J.A.0505).  The returns of each proxy group member is determined by the actual cash distribution yields provided to investors (the corporate shareholders or the partner/investor unitholders) in the market. *Canadian Ass'n of Petroleum Producers v. FERC*, 254 F.3d 289, 293 (D.C. Cir. 2001) ("To calculate the rate of return necessary to attract [investors], the Commission measures the return enjoyed by the company's equity investors by the [DCF] model. . .");  Proxy Group Policy Statement at P 5.

16

the stock's risk." With simplifying assumptions, the DCF model results in the investor using the following formula to determine share price:

P = D/(r-g)

where P is the price of the stock at the relevant time, D is the current dividend, r is the discount rate or rate of return, and g is the expected constant growth in dividend income to be reflected in capital appreciation.[17]

FERC has adapted this formula to determine the ROE actually required by investors in the market to invest in a regulated pipeline. It does so by solving the formula above for the ROE (r) for each member of the proxy group. "Under the resulting DCF formula, ROE equals current dividend yield (dividends divided by share price) plus the projected future growth rate of dividends: r = D/P + g."[18] Because the corporate dividends, or partnership distributions, and the stock prices are figures taken from actual market data, the resulting r is the ROE actually demanded by investors in the market to attract their capital.[19] Put another way, potential investors in the market know the level of dividends or distributions paid

---

[17] Proxy Group Policy Statement at P 4 (citing *Canadian Ass'n of Petroleum Producers,* 254 F.3d at 293).

[18] *Id.* at PP 5, 60 ("the Commission solves the DCF formula for the return required by the investor" based on "market-determined" stock or unit price and dividend or distribution figures).

[19] *Id.* at P 48. The yield for a corporate proxy group member is based on the corporation's dividends, and the yield for a partnership proxy group member is based on the partnership's cash distributions. *Id.* at PP 57-60.

by an enterprise, and based on that knowledge, they buy and sell the security, thereby setting the enterprise's security market price. The resulting yield reveals the investors' required return.

FERC then uses the investors' required return (r) for the proxy group companies to "determine[] the dollar amount of the ROE component of the cost-of-service of the pipeline filing the rate case by multiplying (1) the percentage return on equity required by the market by (2) the actual rate base of the pipeline in question."[20] As a result, the ROE component of the pipeline's cost of service directly reflects the actual market-established ROE that investors require to invest in the pipeline. As explained in the next section, this is the ROE required by investors before they pay income taxes.

2.    The DCF Method Sets A Before-Investor-Tax ROE, Which Allows Recovery Of Investor Income Tax Liability And The Investors' Required After-Investor-Tax Return.

Investors judge the attractiveness of an investment by measuring its expected return after paying taxes on investment income. *Kern River Transmission Co.,* Opinion 486-B, 126 FERC ¶ 61,034 at P 114 (2009) ("investors invest on the basis of after-tax returns and price an instrument accordingly"). Accordingly, the only proper way to determine the return required by investors is

---

[20] *Id.* at P 62.

18

to measure whether it allows *investors* to earn their required *after-investor-tax* return.

In Opinion 511, FERC explained this principle by using a hypothetical example:

> The investor desires a 6 percent after-tax return and has a 25 percent marginal tax rate. Thus, the security must have an ROE of 8 percent to achieve an after-tax yield of 6 percent. Assume that the distribution or dividend is $8. The investor will price the security at $100. Conversely, if the security price is $100 and the yield is $8, the Commission determines that the required return is 8 percent. If the dollar distribution increases to $10, the investor will price the security at $125 because $10 is 8 percent of $125. The Commission would note that the security price is $125 and that the yield is $10, or a return of 8 percent. If the distribution is $6, the security price will drop to $75, a return of 8 percent. The Commission would observe a $75 dollar security price, a $6 yield, and a return of 8 percent. In all cases the ROE is 8 percent and the after-tax return is 6 percent based on the market-established return.[21]

FERC's example illustrates that where a pipeline's investors require an after-investor-tax return of 6 percent, FERC's DCF formula will set the ROE to be included in the pipeline's cost of service at 8 percent. In this way, the pipeline will charge rates based on a cost of service that enables it to pass through to investors a return of 8 percent, which allows the investors to pay their taxes (25%

---

[21] Opinion 511 at P 244 (J.A.0506).

19

of 8%) and retain the desired after-tax return of 6 percent.  Thus, the DCF formula yields a "before-investor-tax" ROE.

Shipper witness, Dr. Horst, described FERC's DCF-ROE as including a "built in" tax allowance.  Exhibits XOM-1 at 17:4 to 21:7, 46 (Chart 3), R.305 (J.A.0041-45, 0047); XOM-41, R.343 (J.A.0048); Tr. 2503:7 to 2506:6 (Horst) R.1047 (J.A.0984-87).  Dr. Horst noted that the built-in tax allowance is illustrated in the market by the differential in yields provided to investors by tax-exempt state and municipal bonds and taxable corporate bonds of comparable risk.  The market sets the yields on the taxable bonds higher than the yields on non-taxable bonds, reflecting the higher yield investors require to cover income taxes and still recover their required after-tax return.

Because the Commission uses actual dividend and distribution data and share or unit prices for each proxy group member, the resulting ROE is established by the market and reflects the before-investor-tax ROE investors require, in order to cover their income taxes and the after-tax return they require to invest.  For these reasons, the DCF-ROE methodology ensures that pipelines, whether organized as corporations or as partnerships, recover investors' income taxes via the DCF-ROE.

D.    Granting Partnership Pipelines A Tax Allowance Is Unjust And Unreasonable Because It Results In A Double Recovery Of Partner/Investors' Income Tax Liability.

1.    Double Recovery Of A Cost Item Is Unjust And Unreasonable.

The bedrock principle of cost-based ratemaking is that a pipeline should be permitted to recover its cost of service plus a reasonable return on investment.  *See, e.g.*, *City of Charlottesville v. FERC*, 774 F.2d at 1205, 1207 (D.C. Cir. 1985) ("cost-of-service ratemaking principles" require "rates yielding sufficient revenue to cover all proper costs, including federal income taxes, plus a specified return on invested capital"); *Pub. Serv. Comm'n of N.M. v. FERC*, 653 F.2d 681, 683 (D.C. Cir. 1981).

A corollary to this rule is the prohibition against over-recovery of costs, one obvious form of which is double recovery of an expense item. Recovering an element of an oil pipeline's costs twice in rates is "an unjust and unreasonable double recovery."  *BP Pipelines (Alaska) Inc.*, Opinion 502, 123 FERC ¶ 61,287 at P 83 (2008).  Accordingly, double recovery of a cost item is prohibited by the ICA.[22]

This principle is universal across each of FERC's regulatory spheres. For example, FERC has required electric utilities to "demonstrate that . . . charges do not allow for double recovery of . . . . costs." *Preventing Undue Discrimination*

---

[22] *See* 49 U.S.C. App. §§  1(5), 6(3), 15(1), and 15(7) (1988).

21

*and Preference in Transmission Service*, Order No. 890, FERC Stats. & Regs. ¶ 31,241 at P 690 (2007)); *see also Northwestern Corp.*, 129 FERC ¶ 61,116 at P 26 n.23 (2009).   Similarly, the Commission has held that it is unjust and unreasonable to recover a cost that already is recovered in another component of rates. *Dynegy Midwest Generation, Inc.*, Opinion 498, 121 FERC ¶ 61,025, P 73 (2007), *on reh'g*, 125 FERC ¶ 61,280 at P 29; *Entergy Services Inc.*, 102 FERC ¶ 63,016 at P 98, *aff'd on reh'g*, 105 FERC ¶ 61,319 at P 4 n.12 (2003), *aff'd on reh'g*, 109 FERC ¶ 61,095 at P 55 (2004).

FERC has taken the same view in regulating natural gas pipelines.[23] When a gas pipeline assessed an exit fee for capacity that it later remarketed, the Commission asserted "[t]here is no question that a credit must be made to cost of service." *Trailblazer Pipeline Co.*, 80 FERC ¶ 61,141, at 61,518 (1997).   On rehearing, the Commission reinforced its opposition to double recovery, holding that failure to make a credit would give the pipeline "a windfall" and leave the pipeline's customers paying unjust and unreasonable rates "that cover costs [the pipeline] has already recovered." *Trailblazer Pipeline Co.*, 81 FERC ¶ 61,032, at 61,172 (1997).

---

[23] Natural Gas Act cases are presumptively applicable to oil pipeline proceedings. *Flint Hills Resources Alaska LLC v. FERC*, 627 F.3d 881, 887 (D.C. Cir. 2010) (citing *Ass'n of Oil Pipe Lines v. FERC*, 83 F.3d 1424, 1440–41 (D.C. Cir. 1996)).

Accordingly, it is well-established that double recovery of costs is unjust and unreasonable.

2. Granting A Partnership Pipeline A Tax Allowance In Addition To Its DCF-ROE Is Unjust And Unreasonable Because It Results In A Double Recovery Of Partner/Investor Taxes.

Investor-level income taxes are accounted for in the DCF-ROE for both partnership and corporate pipelines.  The only tax on income generated by partnership pipelines is paid by the partner/investors, because partnership pipelines incur no pipeline-level income taxes.[24]  Accordingly, there is no basis to add a Tax Allowance on top of a partnership pipeline's DCF-ROE.

Unlike partnership pipelines, corporate pipelines generate two levels of income taxes on their income: one at the corporate level and another at the investor/shareholder level.  The DCF-ROE recovers the income taxes borne by shareholders for corporate pipelines.  But a Tax Allowance is needed to cover the pipeline-level taxes.  The Tax Allowance allows a corporate pipeline to recover the cost of its own income tax liability and to pass through its full allowed DCF-ROE to investors.  *See BP West,* 374 F.3d at 1286.  The DCF-ROE, in turn, is sufficient

---

[24] Opinion 511 at P 223 (J.A.0493-94); Tax Allowance Policy Statement, 111 FERC ¶ 61,139 at P 33.  The partners bear the legal liability for income taxes in their own capacity.  The partnership entity itself has no liability for those taxes. I.R.C. § 701 ("A partnership as such shall not be subject to the income tax imposed by this chapter. Persons carrying on business as partners shall be liable for income tax only in their separate or individual capacities.").

to compensate investors for their own taxes and to provide them with their required after-investor-tax return. If a corporate pipeline does not receive a Tax Allowance, the pipeline would have to pay its own taxes without reimbursement from ratepayers, leaving it with insufficient revenue to pass on the full allowed ROE to investors.

A partnership pipeline, like a corporate pipeline, needs sufficient income to pass through enough cash to allow investors to pay their own taxes and earn their required after-investor-tax return. But a partnership pipeline does not need a Tax Allowance to pay pipeline-level taxes because there are none.

If a partnership pipeline is permitted to include a Tax Allowance in a cost of service that already includes a full DCF-ROE, the pipeline necessarily double-recovers its partner/investors' tax costs. Granting a partnership pipeline a double recovery through the Tax Allowance yields unjust and unreasonable rates. Income taxes are no different from any other element of the cost of service. *BP West*, 374 F.3d at 1291; *City of Charlottesville v. FERC*, 774 F.2d at 1207. And, there is no reasoned basis to permit a partnership pipeline to recover such costs twice.

E.   FERC's Denial Of Double Recovery Is Unsupported By Reasoned Analysis Or Substantial Evidence Because It Is Premised On The Factually Erroneous Assumption That The Tax Borne By Partner/Investors Is Instead Borne By The Partnership Pipeline.

1.   FERC's Denial Of Double Recovery Is Unfounded Because It Is Based On A Factually Erroneous Assumption.

FERC denies that granting partnership pipelines a Tax Allowance results in a double recovery.   According to FERC, Shippers "erroneously consider[] the taxes that the MLP partner pays on the MLP pipeline income to be 'investor level' taxes rather than taxes that are imputed to the entity under *ExxonMobil . . . .*"  Opinion 511 at P 250 (J.A.0509); *see also id.* at P 240 (J.A.0504).  This criticism exposes FERC's error.  It is undisputed that the only tax on partnership pipeline income is imposed on the partner/investors.[25]  Shippers' analysis is based on this uncontradicted fact, and it is absurd for FERC to claim that Shippers err because their analysis is based on fact.

FERC's false contention that the tax imposed on partner/investors must be treated as a pipeline-level tax infects FERC's calculations, tables and analysis throughout Opinions 511 and 511-A, and ultimately leads it to the erroneous conclusion that granting partnership pipelines a Tax Allowance does not result in a double recovery.  The reason that FERC's premise is fatal to its analysis is that erroneously treating the investor-level tax as a pipeline-level tax leads

---

[25] Opinion 511 at P 223 (J.A.0493-94); Tax Allowance Policy Statement, 111 FERC ¶ 61,139 at P 33.

FERC to the incorrect conclusion that the tax is not recovered in the DCF-ROE, which as explained above recovers investor-level taxes.

FERC bases its position on its Tax Allowance Policy Statement and *ExxonMobil*, noting that the *ExxonMobil* Court upheld FERC's conclusion that partnership pipelines should be permitted to recover in their cost of service the cost of the taxes borne by partner/investors because the income taxes are "attributable" to the partnership pipeline.  Opinion 511 at PP 240, 250 (J.A.0504, 0509).  From this, FERC insists that the question of double recovery must be analyzed under the premise that the taxes borne by partner/investors are instead borne by the partnership pipeline itself.

FERC reads far too much into *ExxonMobil*.  It is correct that *ExxonMobil* held that it was reasonable for the Commission to include in a partnership pipeline's cost of service the cost of taxes borne by the partner/investors because the taxes "must be paid regardless of whether the partners actually receive a cash distribution" and therefore are reasonably "attributable" to the pipeline.  *ExxonMobil*, 487 F.3d at 952.  But attributing the taxes to the pipeline simply means that the cost of income taxes borne by partners may be included in a partnership pipeline's cost of service.  It does not change the fundamental fact that it is the partner/investors who actually bear the income tax, or the fact that taxes borne by partner/investors are recovered in FERC's DCF-

ROE.  These facts cannot be rationally assumed away when analyzing whether the grant of a Tax Allowance results in a double recovery.

The identity of the taxpayer is critical to determining whether there is a double recovery because taxes borne by partner/investors are accounted for in the DCF-ROE, but taxes borne by the pipeline are not.  If the tax on partnership income were borne by the pipeline, in the sense that it is payable by the pipeline itself, then it would follow, as FERC asserts, that the tax is not recovered in the DCF-ROE and that the award of a Tax Allowance does not give rise to a double recovery.  But the tax on partnership income is borne by the partner/investors, not the pipelines, and FERC must account for the fact that the taxes paid by the partner/investors are recovered in the DCF-ROE when addressing the double recovery question.

FERC's assumption that the partner/investor taxes are paid by the partnership pipeline allows FERC, without any evidence or justification, to sidestep the fact that the partner/investor taxes are recovered in the DCF-ROE.  By pretending that the partnership, rather than the partner/investors, pay taxes, FERC assumes away the possibility of double recovery.  Unsurprisingly, this leads FERC to erroneously conclude that there is, in fact, no double recovery.  FERC's conclusion is no more valid than the faulty assumption on which it rests.

27

The uncontradicted record demonstrates that the only tax on partnership income is borne by the partner/investors and, as such, it is already accounted for in the DCF-ROE. It follows that recovery of such taxes in a Tax Allowance, in addition to collection of a DCF-ROE, necessarily results in a double recovery.

> 2. Correcting The Erroneous Assumption Underlying FERC's Analysis Demonstrates The Double Recovery.

In an attempt to support its denial of double recovery, FERC reprises in Opinion 511 the illustration it put forth in its Tax Allowance Policy Statement. Opinion 511 at P 245 (J.A.0506-07); *compare* Tax Allowance Policy Statement at PP 25-27, 36. And in Opinion 511-A, FERC repeats the illustration a third time, with multiple iterations varying only as to the assumed tax rate on corporate shareholders on their dividend income. Opinion 511-A at P 308 and Tables 3-6. (J.A.0873, 0876-79). Table 6 in Opinion 511-A sets forth the example using the same tax rate assumptions as those underlying FERC's earlier illustration, and, therefore, the discussion below tracks the iteration of FERC's example set forth in Table 6, which is attached for reference as Attachment 2 hereto.

FERC asserts that its illustration shows that Shippers' double recovery argument is "mathematically incorrect." Opinion 511-A at P 321 (J.A.0883). The Commission claims to have demonstrated with the illustration that partnership

28

pipelines must be awarded a Tax Allowance in order to recover their required cost of capital, Opinion 511-A at P 312 (J.A.0874).

But FERC's oft-repeated illustration provides no answer to Shippers' double recovery argument because it is based on the erroneous assumption that the tax on partnership income is borne by the pipeline, rather than the partner/investors. Once that error is corrected, the illustration clearly shows that awarding a Tax Allowance to a partnership pipeline, in addition to the DCF-ROE, is not only unnecessary to equalize the after-tax returns for partnerships and corporations, but in fact provides partnership pipelines with an unjust and unreasonable double recovery and destroys the parity required by the *ExxonMobil* Court. 487 F.3d at 952-53.

FERC's example assumes that $100 in "after-tax return" is required to attract capital for both a corporate pipeline and a partnership pipeline. Tax Allowance Policy Statement, 111 FERC ¶ 61,139 at P 25; Opinion 511 at P 245 (J.A.0506-07); Opinion 511-A at PP 307-14 and Table 6 (Attachment 2 hereto) (J.A.0872-75, 0879). It also assumes that a corporate pipeline is subject to a 35% tax rate and is granted a Tax Allowance at that rate, allowing it to collect revenues of $154, which is sufficient to yield what the Commission terms an "after-tax return" of $100. Tax Allowance Policy Statement, 111 FERC ¶ 61,139 at P 25. And finally the Commission assumes that the corporate shareholders are also taxed

at the 35% rate.  *Id.*  The Commission compares this scenario to partnership

pipelines, whose partners are subject to a 35% tax rate, and alternatively are either

granted a Tax Allowance at the 35% rate or denied an allowance.  *Id.*

FERC's illustrative example is summarized in the chart below:

|  | Corporation (with Tax Allowance) | Partnership (with Tax Allowance) | Partnership (without Tax Allowance) |
|---|---|---|---|
| Assumed Required DCF Equity Return in Cost of Service | $100 | $100 | $100 |
| Tax Allowance | $ 54 | $ 54 | 0 |
| Revenues | $154 | $154 | $100 |
| Pipeline-Level Tax at 35% Rate | ($54) | ($54) | ($35) |
| After-Pipeline-Level-Tax Return | $100 | $100 | $ 65 |

Under FERC's flawed analysis, if the partnership pipeline is denied a

Tax Allowance, the pipeline passes through $100 to partner/investors, who must

pay 35% in taxes, leaving them only $65 in "after-tax return."  Tax Allowance

Policy Statement at P 26.  According to FERC, this is a disincentive to using the

partnership form because the "corporate investor" receives from the pipeline a

return of $100, while the "partnership investor" receives only $65.  *Id.* at PP 27,

36.  If partnerships are denied a Tax Allowance, then "for a Form 1040 individual

investor who has the option of investing either in a corporation or a partnership, the

30

partnership is not competitive if, all other things being equal, there is no partnership tax allowance." *Id.* at P 28. Opinion 511 and 511-A reiterate the Commission's reliance on this analysis. Opinion 511 at P 245 (J.A.0506-07); Opinion 511-A at P 314 and Table 6 (Attachment 2 hereto) (J.A.0875, 0879).

The *ExxonMobil* Court relied on this same example, as initially put forward in the Tax Allowance Policy Statement, to conclude that it was reasonable to grant partnership pipelines a Tax Allowance in order to place them in parity with corporate pipelines. The Court explained:

> [T]he Commission determined that pipelines operating as limited partnerships should receive a full income tax allowance in order to maintain parity with pipelines that operate as corporations. This conclusion was not unreasonable, and we defer to FERC's expert judgment about the best way to equalize after-tax return for partnerships and corporations.

*ExxonMobil,* 487 F.3d at 953. The basis of the Court's reasoning was the fundamental precept in *Hope* that "'the return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks.'" *Id.* (citing *Hope*, 320 U.S. at 603).

The main problem with FERC's example, as well as with the multiple variations reflecting different tax rate assumptions in Opinion 511-A, Tables 3-7, is that it erroneously treats the tax on partner/investors as a pipeline-level tax paid by the pipeline, and therefore fails to account for the fact that as a tax borne by the partner/investors it is recovered in the DCF-ROE. This can be seen from the fact

31

that in the illustration the partnership's DCF-ROE, which as previously discussed is a before-investor tax return, is the same $100 as the assumed "after-tax" return. This is plainly inconsistent with the assumed tax rate on investors of 35%. Because FERC assumes that the DCF-ROE included in the pipeline's cost of service is $100, the $100 must be — as all DCF returns are — a before-investor-tax return. Thus, the after-investor-tax return (assuming a 35% tax rate) required by investors must be $65. *See* Opinion 511 at P 244 (J.A.0506). This is the same as the after-investor-tax return for the corporation in FERC's example, which properly shows that if the pipeline's before-investor-tax return is assumed to be $100, the after-investor-tax return must be $65.

Table 6 in Opinion 511-A (Attachment 2 hereto) illustrates this point. The heading states that the assumed "required after-tax return" is 10%, and the assumed tax on partners/investors and corporate shareholders is 35%. Example 1 in Table 6 purports to show that a partnership without a Tax Allowance will not get its required 10% after-tax return, but rather is left with only a 6.5% after-tax return. But the example is actually premised on a 10% DCF ROE, as reflected in the $100 of equity return on the assumed $1000 equity rate base. Since, as FERC agrees, the DCF-ROE is the required before-investor-tax ROE, the required after-investor-tax ROE (assuming the 35% tax rate) must be 6.5%. Thus, Example 1 in Table 6 shows that the investors have a required before-investor-tax ROE of 10% and get

32

the required after-investor tax return of 6.5%, even though in Example 1 there is no Tax Allowance.

In summary, FERC's use of the term "after-tax returns" in Table 6 of Opinion 511-A is inherently ambiguous. There is a fundamental difference between after-pipeline-tax returns and after-investor-tax returns, and FERC's failure to distinguish between them obscures the central error in its analysis. FERC has improperly treated the tax on the partner/investors as a pipeline-level tax like the 35% tax on the corporate pipeline. In this way, FERC's example simply assumes away the double recovery by failing to treat the tax as borne by partner/investors, which is recovered in the DCF-ROE.

The correct analysis treats the tax on partner/investors as what it factually is — an investor-level tax — and recognizes that the DCF ROE is a before-investor-tax ROE, as reflected in the comparative illustration below:

|  | Corporation (with Tax Allowance) | Partnership (with Tax Allowance) | Partnership (without Tax Allowance) |
|---|---|---|---|
| Assumed Required DCF Equity Return (Before-Investor-Tax DCF-based Return) in Cost of Service | $100 | $100 | $100 |
| Tax Allowance | $54 | $54 | 0 |
| Revenues | $154 | $154 | $100 |
| Tax on Pipeline at Assumed 35% rate | ($54) | 0 | 0 |
| Return Available to Investors (Before-Investor-Tax) | $100 | $154 | $100 |
| Tax on Investor Shareholder or Partner at 35% | ($35) | ($54) | ($35) |
| After-Investor-Tax Return to Investors | $65 | $100 | $65 |

When the tax on partnership income is correctly treated as a tax on partner/investors, it can be seen that the partnership pipeline without a Tax Allowance provides the same required after-investor-tax return of $65 to partner/investors as a corporation with a Tax Allowance provides to shareholders. The partnership pipeline with a Tax Allowance on the other hand actually provides to the investors $100 of after-investor-tax return, which exceeds the required after-investor-tax return of $65 because there is a double-recovery of the

34

partner/investor taxes.  When a partnership pipeline is given a Tax Allowance, it effectively receives an additional $54 of return, which drives up the unit market price.  This inflated return reflects the double recovery of partner/investor taxes.

Based on this analysis, the only way that equity owners of partnership pipelines and equity owners of corporate pipelines can receive returns in parity, as the *ExxonMobil* Court found is required, 487 F.3d at 952-53, is to deny the partnership pipeline a Tax Allowance.  This parity is illustrated in Opinion 511-A, Table 6.  Note that in Example 4, relating to a corporate pipeline with a Tax Allowance, the required ROE of 10% is correctly treated as a before-investor-tax ROE.  This is the DCF-ROE used to compute the equity return of $100 on the equity rate base of $1000.  The corporate pipeline-level tax of 35% is recovered in a Tax Allowance, ensuring the pipeline can pass through to equity investors the full required before-investor-tax return of $100.  After the investors pay their taxes of $35, they receive their required after-investor-tax return of $65, or the required after-tax return of 6.5%.  This is in exact parity with the partnership pipeline receiving no Tax Allowance in Table 6, Example 1.

For these reasons, the Commission's erroneous premise that the tax on partnership income is a pipeline-level tax fatally undermines its denial of double recovery.  When the tax is correctly treated as an investor-level tax, FERC's examples illustrate that granting partnership pipelines a Tax Allowance results in a

35

double recovery and an after-investor-tax return exceeding that of a comparable corporate pipeline. In contrast, denying partnership pipelines a Tax Allowance eliminates the double recovery and provides partnership and corporate pipelines the same after-investor-tax returns.

> 3.   The Schink Exhibits Appended To Opinion 511 Illustrate, Rather Than Refute, The Double Recovery.

FERC adopted SFPP's Exhibits SFP-98 and SFP-99, prepared by SFPP's witness Dr. Schink, as the centerpiece of its analysis in Opinion 511, agreeing with Dr. Schink's claim that an award of a Tax Allowance to partnership pipelines does not result in a double recovery of the taxes paid by partner/investors.[26]   FERC stated: "the analysis in Exhs. SFP-98 and SFP-99 demonstrates that it is simply not true that the income taxes of the MLP partnership are recovered twice because in fact they are paid only once and compensated only once." Opinion 511 at P 249 (J.A.0508-09); *see also id.* at P 250 (J.A.0509)

---

[26] FERC also claims that Exhibits SFP-98 and SFP-99 somehow show that Shippers' opposition to awarding a Tax Allowance to partnership pipelines effectively seeks a return to the *Lakehead* approach under which a Tax Allowance is only granted "on those partnership interests owned by a corporation. . . ." Opinion 511 at P 249 (J.A. 0508-09). This claim is incorrect. Shippers argue that partnership pipelines should not be given a Tax Allowance for any of their ownership interests, whether owned by a corporation, individual or other entity. This is the same position Shippers took in *BP West,* 374 F.3d at 1287-91 and in *ExxonMobil*, 487 F.3d at 948-53.  *See also* ACV Rehearing Request at 30-31 & n.8, R.975 (J.A.0672-73) and ExxonMobil/BP Rehearing Request at 49-51 & n.19, R.972 (J.A.0606-08).

(asserting that the double recovery argument is "mathematically incorrect"). FERC's statement is wrong. The original Schink Exhibits, which are set forth in Appendices B and C to Opinion 511 (J.A.0549-50), as well as the revised Exhibits discussed in Opinion 511,[27] conclusively illustrate that granting a Tax Allowance to partnership pipelines results in a double recovery of partner/investor income taxes.

The revised Schink Exhibits, SFP-98 and SFP-99 (Attachment 3 hereto), show the recovery of investor-level taxes by both the corporate and partnership pipelines in their DCF-ROE on Lines 1-3. Line 1 shows the required after-investor-tax ROE, Line 2 shows the assumed investor tax rate, and Line 3 shows the required before-investor-tax DCF-ROE, which is also identified on line 27. The DCF-ROE is 13.54% (Line 3), which (given the assumed tax rate on investors of 32% (Line 2)) yields the investors' required after-investor-tax ROE of 9.207% (Line 1). The DCF-ROE of 13.54% is multiplied by the rate base to determine the equity return in Line 13, illustrating that the cost of service of both the partnership and corporate pipelines includes a return to investors that is

---

[27] SFPP's Exhibit SFP-201, R.533 (J.A.0083), included revised versions of Exhibits SFP-98 and SFP-99. FERC discussed the revised versions in Opinion 511, PP 247 and 248 (J.A.0507-08) but attached the original versions of the Exhibits. The differences between the versions are not material, but to avoid confusion Shippers refer to the revised versions and append them hereto as Attachment 3 for reference.

sufficient to cover the investors' taxes and the investors' required after-tax ROE of 9.207%.   This is consistent with the Commission's own acknowledgment in Paragraph 244 of Opinion 511 that the DCF-ROE sets a before-investor-tax ROE that ensures sufficient return to provide investors with their required after-tax return.

        In addition, in both Exhibits, the corporate pipeline receives a Tax Allowance to recover the cost of the pipeline-level taxes.  *See* revised Exhibits SFP-98 and 99, Line 14 (Attachment 3 hereto).  As shown on lines 14, 20 and 28, the corporate income tax reimburses the corporate pipeline for corporate pipeline-level taxes of $3,645,305.  Corporate investors also incurred their own income tax liability of $2,166,353, as shown on line 29.  The corporate pipeline recovers this investor-level tax as part of its DCF-ROE.  Specifically, the embedded investor-level tax recovery is equal to the difference between the DCF-ROE (13.54%) and the required after-investor-tax ROE (9.207%) multiplied by the equity portion (50%) of the rate base of $100,000,000.  This works out to the tax on investors of $2,166,353 stated on line 29.[28]

        Since a partnership pipeline does not incur pipeline-level income taxes, revised Exhibit SFP-99 shows that it does not require a Tax Allowance to

---

[28] (13.54% - 9.207%) x $50,000,000 = $2,166,500. The difference between this figure and $2,166,353 appears attributable to rounding.

recover pipeline-level income taxes. *See* revised Exhibit SFP-99, lines 14 and 20 (Attachment 3 hereto). But the tax on partner/investors is covered by the DCF-ROE as it is for corporate pipelines. *See id.* at lines 1-3, 13 and 29. Therefore, the DCF-ROE ensures that the income tax borne by the partner/investors is included in the cost of service. Without the Tax Allowance, the partnership pipeline provides the same return to investors as the corporate pipeline receiving a Tax Allowance, thereby ensuring parity as required by *ExxonMobil*. *See id.* at lines 21-27.

Revised Exhibit SFP-98 shows what happens when partnership pipelines get a Tax Allowance on top of the full DCF-ROE. Contrary to FERC's claims, the pipeline is compensated twice for partner/investor income taxes (once in the DCF-ROE and a second time in the Tax Allowance), resulting in a cost of service that is higher by $3,185,813 than it would be without the Tax Allowance.[29] The extra revenue from the double recovery drives up the market value of the partnership units from $68 to $100. Compare revised Exhibits SFP-98 and SFP-99, line 25 (Attachment 3 hereto).[30] As the Commission acknowledges,

---

[29] *See* revised Exhibit SFP-98, Line 14 and also compare revised Exhibit SFP-98, Line 17 with revised Exhibit SFP-99, Line 17 (Attachment 3 hereto). When a partnership receives a Tax Allowance, its income increases by the amount of the Tax Allowance because it is pure additional profit as there are no associated costs. Investors' taxes therefore also increase. Compare revised Exhibits SFP-98 and 99, line 29.

[30] *See also* Lines 2 and 12 (showing the tax liability of the partnership and corporate entities and their investors, and illustrating that the partnership pipeline

"*granting an income tax allowance* to MLPs results in an adjustment in the relative investment price of an MLP's and a corporation's securities to the former's advantage." Opinion 511 at P 261 (emphasis added) (J.A.0515).

The Commission claims the superior return of a partnership receiving a Tax Allowance is "the result of the double taxation of corporate income." Opinion 511 at P 239 (J.A.0503-04). But that is merely the other side of the double-recovery coin. Corporations and their investors incur both levels of taxes, and are reasonably permitted to charge rates that cover two levels of taxes. Partnership pipelines and their partner/investors incur one level of taxes, but awarding the pipelines a Tax Allowance permits them to collect two levels of taxes as if they were subject to the double taxation applying to corporate income. This windfall return generated by the Tax Allowance for partnership pipelines is the cause of the increase in the partnership unit price (*i.e.*, the greater the cash flow, the higher the unit price).[31]

Such partnerships outperform corporations in the Schink Exhibits because the Commission grants partnerships an advantage by allowing them to double-recover their tax costs. The Commission cannot blame this disparity on the

---

has only one level of income taxes but, with a Tax Allowance, recovers such taxes twice).

[31] *See* Tr. at 538-40 (June 4, 2009) (SFPP witness Schink confirming MLP unit price increase is a result of the Tax Allowance). R.1048 (J.A.0998-1000).

tax code.  The tax code merely imposes lower costs on partnership pipelines; it is FERC's Tax Allowance policy that permits partnership pipelines to unreasonably recover partner/investors' tax twice.

> ### 4.    FERC's Abandonment Of The Schink Analysis In Opinion 511-A Is Based On A Contrived Gross-Up Concept That Has No Foundation In The Record.

Recognizing that Dr. Schink's analysis demonstrated ─ rather than refuted ─ double recovery, FERC abandoned Dr. Schink as its champion in Opinion 511-A by claiming that his analysis contained a methodological error. Opinion 511-A at P 280 (J.A.0848-49).  To jettison Dr. Schink, FERC contrived a "gross up" theory that appears nowhere in the testimony of any witness.  It is demonstrably false and contrary to the record.

According to FERC, the supposed error in Dr. Schink's Exhibits is their illustration that a partnership pipeline's DCF-ROE is a before-investor-tax ROE that recovers income taxes imposed on the partner/investors' income from their investment in the partnership.   Opinion 511-A at P 327 (J.A.0888-89). Nowhere does FERC explain how Dr. Schink's Exhibits are in error, nor could it, because they precisely reflect the Commission's own acknowledgement in Paragraph 244 of Opinion 511 that the DCF-ROE sets a pipeline's ROE at a level that recovers the taxes borne by investors so that they can receive an after-investor-tax return sufficient to attract investment.

Instead, FERC ignores Paragraph 244 of Opinion 511, and "corrects" Dr. Schink's calculations by reducing his DCF-ROE by backing out the portion of the ROE that recovers the taxes borne by investors.  Opinion 511-A at P 280 and Appendix D (J.A.0848-49, 0939-41).  FERC's elimination of what it now calls the erroneous "gross-up" cannot be reconciled with the DCF-ROE methodology.  In effect, if FERC's "correction" were applied to its own example in Paragraph 244 of Opinion 511, the DCF-ROE in that example would be reduced to 6%.  But this means that the pipeline can only provide investors with a before-investor-tax of 6%, resulting in a 4.5% after-investor-tax return (based on the example's assumed 25% tax rate), which is less than the example's assumed required after-investor-tax ROE of 6%.

FERC's gross-up argument is based on the same error that permeates its analysis throughout Opinions 511 and 511-A.  As explained in Section C above, FERC is pretending the income tax borne by partner/investors is a pipeline-level tax.  On this false premise, FERC asserts that such tax is not recovered in the DCF-ROE because investor-level taxes, not pipeline-level taxes, are included in the DCF-ROE.  *Id*.  This leads FERC to its erroneous "gross-up" correction of backing out of the partnership's ROE in Dr. Schink's Exhibits the taxes borne by the partner/investors.

FERC claims that, "the Commission does not gross up a jurisdictional entity's operating revenues or return to cover the income taxes that must be paid to obtain *its* after-tax return. Rather the income taxes on the jurisdictional entity's allowed equity return are recovered through the income tax allowance." Opinion 511-A at P 280 (J.A.0848-49) (emphasis added). FERC's explanation blurs the critical difference between taxes incurred by a pipeline and those incurred by investors. It is true that the DCF-ROE is not grossed up to recover a jurisdictional pipeline's own taxes; a corporation, which does bear income tax liability, gets a Tax Allowance for the taxes it pays on its equity return. But it is uncontroverted that a partnership pipeline pays no income taxes at the entity level, so the only taxes that must be recovered by a partnership pipeline are the taxes borne by the partner/investors. Dr. Schink's Exhibits did not gross-up for taxes borne by the jurisdictional partnership pipeline. Instead, Dr. Schink's Exhibits correctly reflected the fact that there is no gross-up to account for taxes on partner/investors as those taxes are inherently recovered in the DCF-ROE, regardless of whether the pipeline is owned by a corporation or a partnership. Thus, there is no rational basis to back out a purported gross-up of the DCF-ROE as FERC has done in its attempt to correct Dr. Schink's Exhibits.

Thus, the central flaw in FERC's gross-up argument is the same as that underlying its various charts, tables and examples put forward to support

43

awarding a Tax Allowance to partnership pipelines. It is based on the factually incorrect premise that the income tax borne by partner/investors is a pipeline-level tax, rather than an investor-level tax. On this basis, its "correction" backs out the portion of the DCF-ROE in Dr. Schink's Exhibits that is attributable to the tax paid by the partner/investors. In "correcting" Dr. Schink's Exhibits, FERC merely relabels investor-level taxes as pipeline-level taxes and thereby assumes away the recovery of partner/investor income taxes in the DCF-ROE that FERC itself recognized in Paragraph 244 of Opinion 511. The problem is that FERC's relabeling does not change the fact that partnership pipelines pay no pipeline-level income tax and that the operation of the DCF methodology builds in recovery of investor-level taxes in the ROE.

In Appendix D to Opinion 511-A (J.A.0939-41), which is attached hereto as Attachment 4, FERC illustrates its gross-up argument, and in doing so plainly demonstrates its error.[32] Display A correctly shows Dr. Schink's analysis that the Equity Return is calculated based on the before-investor-tax ROE of 13.8%, which, consistent with Paragraph 244 of Opinion 511, results in an after-investor-tax return of 9.384%.

---

[32] Unfortunately, in Appendix D, FERC switches gears from Opinion 511, in which it discusses Dr. Schink's revised Exhibit Nos. SFP-98 and SFP-99, by setting out the numbers in his original Exhibits SFP-98 and SFP-99. The switch does not affect the substance of the argument.

In FERC's analysis of Display A of Appendix D, it asserts that the partnership and corporation's cost of service on Line 17 should be the same, but it does not explain why Dr. Schink is "fundamentally incorrect." Dr. Schink's analysis simply reflects the fact that a partnership pipeline bears no pipeline-level taxes, so its costs are lower than those of a corporate pipeline.

In Display B, FERC purports to "correct" the error by eliminating what it considers to be an improper "gross-up" of the pipeline ROE. But this "correction" mistakenly calculates the ROE on Line 13 based on an ROE of 9.384%, which is Dr. Schink's assumed *after*-investor-tax return, not the *before*-investor-tax ROE of 13.8%. Accordingly, the resulting Equity Return figure of $4,692,000 in Display B should be $6,900,000 as calculated in Display A using the before-investor-tax ROE of 13.8%. This before-investor-tax ROE is sufficient to cover investor taxes and still yield the required after-investor-tax ROE of 9.384%.

By calculating the equity return using 9.384% in Display B, FERC is just changing the assumption underlying Dr. Schink's example rather than correcting his analysis. As explained in Opinion 511, Paragraph 244, the DCF-ROE is the required before-investor-tax ROE, so Display B simply assumes that the DCF-ROE is 9.384% rather than 13.8% as Dr. Schink assumed. FERC's revised assumption means that the required after-investor-tax return would be 6.38%, as is confirmed for the corporate pipeline on line FERC 23 of Display B

45

(the after-investor-tax return of $3,190,560 divided by the equity rate base of $50,000,000 equals 6.38%).

Recognizing that Display B has done nothing more than change the assumed before-investor-tax DCF-ROE from 13.8% to 9.384%, Display B actually illustrates the double recovery of partner/investor taxes in the MLP (partnership) column. As noted in the prior paragraph, if 9.384% is the assumed required before-investor-tax DCF-ROE and the assumed tax rate on investors is 32% (Display B, line FERC 22), then the required after-investor-tax return would be 6.38%. But Display B shows that giving a partnership pipeline a Tax Allowance actually results in an after-investor-tax return of 9.384% ($4,692,000 divided by $50,000,000 equity rate base equals 9.384%). It is nonsensical for FERC to claim that the before-investor-tax DCF-ROE used to compute the return on line 13 is 9.384% and the after-investor-tax return should be the same 9.384%. Thus, Display B actually shows that providing a Tax Allowance to a partnership pipeline provides a duplicative recovery of investor-level income taxes and thereby more than the required after-investor-tax return of 6.38%.

Accordingly, Display B debunks FERC's straw man gross-up theory. Employing circular logic, FERC attempts to demonstrate the absence of an embedded amount in the DCF-ROE to cover income taxes paid by investors simply by removing it from the DCF-ROE. But FERC cannot assume away the

46

fact that the DCF-ROE used to calculate the pipeline cost of service is a before-investor-tax ROE.  In Dr. Schink's example this is 13.8%, not 9.384% as FERC claims in Display B.  Thus, at bottom, the gross-up argument assumes its own erroneous conclusion by asserting that the DCF-ROE is an after-investor-tax return of 9.384%.

FERC's gross-up fiction carries over to Display C.  Display C again assumes a before-investor-tax DCF-ROE of 9.384%, rather than the 13.8% assumed by Dr. Schink.  With this changed assumption, Display C results in the same after-investor-tax return of 6.38% for both the partnership and the corporate pipeline.  Without that error ─ and provided that the obvious subtraction error is also corrected (in Display C subtracting line FERC 22 from Line 21 in the MLP column should yield the same $3,190,560 on line FERC 23 as is found in the Corporation column) ─ the after-investor-tax return for both the corporate and partnership pipelines is 6.38% (again $3,190,560 divided by the $50 million equity rate base equals 6.38%).  Thus, Display C does not, as FERC claims in its "Analysis" paragraph in Display C, result in a lower after-tax return to partnership partner/investors than corporate shareholders.  Instead, Display C shows that if a Tax Allowance is given to a corporate pipeline, but not a partnership pipeline, the resulting after-investor-tax return to partner/investors and corporate shareholders is the same.  This shows that FERC's claim, in the Tax Allowance Policy Statement,

that partnership pipelines must get a Tax Allowance to ensure parity in the returns available to corporate pipelines with a Tax Allowance ─ which claim *ExxonMobil* relied on to affirm FERC ─ is demonstrably false.

> F.     FERC Has No Statutory Authority To Authorize A Partnership Pipeline To Include A Tax Allowance In Its Cost of Service Where Doing So Results In A Double Recovery Of Income Tax Costs And Unjust And Unreasonable Rates.

FERC claims that Congress, by enacting Section 7704 of the Internal Revenue Code, which excepts certain publicly-traded partnerships from being treated as corporations for income tax purposes, intended that a partnership pipeline should be permitted to include a Tax Allowance in its cost of service. Opinion 511 at P 258 (J.A.0513-14) ("The Commission therefore concludes that Congress did not preclude granting MLPs [a Tax Allowance] and in fact intended the contrary.")  FERC cites no statutory language or legislative history that even references FERC or its regulatory authority, let alone authorizes FERC to grant a Tax Allowance to partnership pipelines.   Instead, FERC implies from this Congressional "silence," *id.* at P 257 (J.A.0513), that "there is no evidence on this record that Congress expressly intended to deny FERC-jurisdictional MLPs a regulatory income tax allowance."  Opinion 511-A at P 345 (J.A.0898-99).

Sections 7704(a), (c)(2), and (d)(1)(E) exempt from direct taxation partnerships that derive 90 percent or more of their income from "the exploration, development, mining or production, processing, refining, transportation (including

48

pipelines transporting gas, oil, or products thereof) or the marketing of any mineral

or natural resource . . . ."  I.R.C. § 7704(d)(1)(E).  The taxation on exempted

pipeline income is instead borne by partner/investors.  Tax Allowance Policy

Statement at P 33.  Further, the statute provides that the partners are not subject to

taxation on cash distributions when received, but rather such taxation is deferred

until the time of sale of partnership units.  *Id.* at P 37 n.35.  Deferral is

accomplished because the cash distributions reduce the unitholder's basis in the

partnership units, and the tax is thereby recaptured by taxing at the time of sale the

reduction in basis attributable to the cash distributions at ordinary tax rates.  *Id.*

FERC's reliance on Section 7704 is misplaced because it is premised

on its erroneous position that granting a Tax Allowance to partnership pipelines

does not result in a double recovery of partner/investors' income tax liability.

Opinion 511-A at PP 343-44, 351 (J.A.0898, 0902-03).  FERC thereby attempts to

sidestep its statutory duty under the ICA to ensure just and reasonable rates.  *See*

49 U.S.C. App. §§ 1(5), 6(3), 15(1) and 15(7) (1988).  FERC does not argue that

Section 7704 amended or repealed the ICA so as to authorize FERC to approve

rates that recover partner/investors' tax costs twice.  Instead, as previously

explained, FERC assumes away the double recovery by treating the taxes actually

borne by partner/investors as being pipeline-level costs.  On this factually incorrect

basis, FERC concludes that granting a Tax Allowance to partnership pipelines

"does not result in a rate that is unjust and unreasonable" and, therefore, "all arguments that the Commission improperly amended the ICA by silence are irrelevant." *Id.* at P 344 (J.A.0898).

If FERC's policy simply allowed a partnership pipeline to recover a single time the income taxes borne by partner/investors, as FERC claims, there would be no need to resort to Section 7704, or its legislative history, to justify that policy. The problem is that the policy results in an excessive return to partner/investors through the double recovery of tax costs and unjust and unreasonable rates. Nothing in the statutory language or the legislative history of Section 7704 even mentions FERC, let alone authorizes FERC to depart from the ICA's just and reasonable standards to approve the double recovery of income taxes. The Commission cannot infer from Congressional silence a radical alteration in its core responsibilities under the ICA.[33]

Repeal or modification of an existing statute cannot be implied from a subsequent statute without "a clearly expressed congressional intention." *Branch v. Smith*, 538 U.S. 254, 273 (2003) (quoting *Morton v. Mancari*, 417 U.S. 535, 551

---

[33] FERC scours the legislative history for support but, like the statute, the history FERC cites does not even mention FERC or Tax Allowances. Opinion 511 at PP 253-56 (J.A.0511-13). Where a statute is silent on an issue, as it is here, the Commission may not manufacture its authority from legislative history alone. *Int'l Bhd. of Elec. Workers v. NLRB*, 814 F.2d 697, 712 (D.C. Cir. 1987) (emphasis in original) (citing *United States v. Amer. Coll. of Physicians*, 475 U.S. 834, 846-47 (1986)).

(1974)). "'[R]epeals by implication are not favored' . . . [and] will only be found where provisions in two statutes are in 'irreconcilable conflict,' or where the latter Act covers the whole subject of the earlier one and 'is clearly intended as a substitute.'"  *Branch*, 538 U.S. at 273 (quoting *Universal Interpretive Shuttle Corp. v. Wash. Metro. Area Transit Comm'n*, 393 U.S. 186, 193 (1968) and *Posadas v. Nat'l City Bank*, 296 U.S. 497, 503 (1936)).  "[I]mplied amendments are no more favored than implied repeals."  *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 664 n.8 (2007).  Section 7704 plainly does not irreconcilably conflict with the ICA, nor does it establish a substitute for the just and reasonable standard.  Accordingly, Section 7704 did not repeal or modify the ICA by implication.

As this Court observed in *BP West Coast*, the statutory mandate on taxation of partnership pipeline income did not give FERC a "'roving commission'" to alter its ratemaking principles and obligations.  374 F.3d at 1293 (citation omitted).  Instead "the mandate of Congress on the tax amendment was exhausted when the pipeline limited partnership was exempted from corporate taxation.  It did not empower FERC to do anything, let alone to create an allowance for fictitious taxes."  *Id.*

While *ExxonMobil* held that the tax borne by partner/investors on partnership pipeline income was real and could be included in the pipeline's cost of

service, the tax is borne just once. There is no basis in statute or the evidentiary record to support the duplicative recovery of such tax on the fiction that the taxes are borne by the pipeline and must be recovered in a Tax Allowance when the facts demonstrate that the taxes are borne by the partner/investors and are therefore already recovered in the partnership pipelines' DCF-ROE.

VII.   CONCLUSION

For the foregoing reasons, Shippers hereby request that the Court reverse the Commission's orders on review to the extent they approve SFPP's inclusion of a Tax Allowance in its rates.

Respectfully submitted,

/s/ Richard E. Powers, Jr.

Richard E. Powers, Jr.
Venable LLP
575 7th Street, N.W.
Washington, D.C.  20004
202-344-4360

Counsel for United Airlines, Inc.,
Delta Air Lines, Inc., Southwest
Airlines Co., and US Airways, Inc.

/s/ Thomas J. Eastment

Thomas J. Eastment
Gregory S. Wagner
Baker Botts L.L.P.
1299 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2400
202-639-7700

Counsel for ExxonMobil Oil Corporation
and BP West Coast Products LLC

/s/ Steven A. Adducci

Steven A. Adducci
Venable LLP
575 7th Street, N.W.
Washington, D.C.  20004
202-344-4361

Counsel for Chevron Products
Company and Valero Marketing
and Supply Company

/s/ Melvin Goldstein

Melvin Goldstein
Goldstein & Associates, P.C.
1757 P Street, N.W.
Washington, D.C.  20036
202-872-8740

Counsel for Tesoro Refining and
Marketing Company LLC

Dated:  September 4, 2015
            February 5, 2016 (Final Brief)

# ATTACHMENT 1

*Pertinent Statutes*

I.R.C. § 701

I.R.C. §§  7704(a), 7704(c)(2), 7704(d)(1)(E)

49 U.S.C. App. § 1(5)

49 U.S.C. App. § 6(3)

49 U.S.C. App. § 15(1)

49 U.S.C. App. § 15(7)

credit or refund of any overpayment of tax resulting from the amendments made by this subsection shall not expire before the date 1 year after the date of the enactment of this Act [July 18, 1984]."

Section 1(b) of Pub. L. 98–259 as amended by Pub. L. 98–369, div. A, title VII, § 722(g)(1), July 18, 1984, 98 Stat. 974; Pub. L. 99–514, § 2, Oct. 22, 1986, 100 Stat. 2095, provided that:

"(1) IN GENERAL.—The amendment made by subsection (a) [amending this section] shall apply with respect to all taxable years (whether beginning before, on, or after the date of enactment of this Act [Apr. 10, 1984]) of individuals dying after November 17, 1978, as a result of wounds or injuries incurred after such date.

"(2) STATUTE OF LIMITATIONS WAIVED.—Notwithstanding section 6511 of the Internal Revenue Code of 1986 [formerly I.R.C. 1954], the time for filing a claim for credit or refund of any overpayment of tax resulting from the amendment made by subsection (a) shall not expire before the date 1 year after the date of the enactment of this Act."

EFFECTIVE DATE OF 1976 AMENDMENT

Amendment by Pub. L. 94–455 effective for taxable years beginning after Dec. 31, 1976, see section 1901(d) of Pub. L. 94–455, set out as a note under section 2 of this title.

EFFECTIVE DATE OF 1975 AMENDMENT

Section 4(b) of Pub. L. 93–597 provided that: "The amendments made by subsection (a) [amending this section] shall apply to taxable years ending on or after February 28, 1961."

REFUNDS AND CREDITS OF OVERPAYMENTS FOR TAXABLE YEARS ENDING ON OR AFTER FEBRUARY 28, 1961, RESULTING FROM APPLICATION OF PROVISIONS

Section 4(c) of Pub. L. 93–597, as amended by Pub. L. 99–514, § 2, Oct. 22, 1986, 100 Stat. 2095, provided that: "If the refund or credit of any overpayment for any taxable year ending on or after February 28, 1961, resulting from the application of section 692 of the Internal Revenue Code of 1986 [formerly I.R.C. 1954] (as amended by subsection (a) of this section) is prevented at any time before the expiration of one year after the date of the enactment of this Act [Jan. 2, 1975] by the operation of any law or rule of law, but would not have been so prevented if claim for refund or credit therefor were made on the due date for the return for the taxable year of his death (or any later year), refund or credit of such overpayment may, nevertheless, be made or allowed if claim therefor is filed before the expiration of such one-year period."

TREATMENT OF DIRECTOR GENERAL OF MULTINATIONAL FORCE IN SINAI

Section 722(g)(4) of Pub. L. 98–369, as amended by Pub. L. 99–514, § 2, Oct. 22, 1986, 100 Stat. 2095, provided that: "For purposes of section 692(c) of the Internal Revenue Code of 1986 [formerly I.R.C. 1954], the Director General of the Multinational Force and Observers in the Sinai who died on February 15, 1984, shall be treated as if he were a civilian employee of the United States while he served as such Director General."

## Subchapter K—Partners and Partnerships

Part
I.    Determination of tax liability.
II.   Contributions, distributions, and transfers.
III.  Definitions.
IV.   Special rules for electing large partnerships.

AMENDMENTS

1997—Pub. L. 105–34, title XII, § 1221(b), Aug. 5, 1997, 111 Stat. 1008, added item for part IV.

## PART I—DETERMINATION OF TAX LIABILITY

Sec.
701.    Partners, not partnership, subject to tax.
702.    Income and credits of partner.
703.    Partnership computations.
704.    Partner's distributive share.
705.    Determination of basis of partner's interest.
706.    Taxable years of partner and partnership.
707.    Transactions between partner and partnership.
708.    Continuation of partnership.
709.    Treatment of organization and syndication fees.

AMENDMENTS

1976—Pub. L. 94–455, title II, § 213(b)(2), title XIX, § 1901(b)(23), Oct. 4, 1976, 90 Stat. 1547, 1798, struck out part IV "Effective date for subchapter" in table of parts of subchapter K of chapter 1 and added item 709.

### § 701. Partners, not partnership, subject to tax

A partnership as such shall not be subject to the income tax imposed by this chapter. Persons carrying on business as partners shall be liable for income tax only in their separate or individual capacities.

(Aug. 16, 1954, ch. 736, 68A Stat. 239.)

### § 702. Income and credits of partner

**(a) General rule**

In determining his income tax, each partner shall take into account separately his distributive share of the partnership's—

(1) gains and losses from sales or exchanges of capital assets held for not more than 1 year,

(2) gains and losses from sales or exchanges of capital assets held for more than 1 year,

(3) gains and losses from sales or exchanges of property described in section 1231 (relating to certain property used in a trade or business and involuntary conversions),

(4) charitable contributions (as defined in section 170(c)),

(5) dividends with respect to which section 1(h)(11) or part VIII of subchapter B applies,

(6) taxes, described in section 901, paid or accrued to foreign countries and to possessions of the United States,

(7) other items of income, gain, loss, deduction, or credit, to the extent provided by regulations prescribed by the Secretary, and

(8) taxable income or loss, exclusive of items requiring separate computation under other paragraphs of this subsection.

**(b) Character of items constituting distributive share**

The character of any item of income, gain, loss, deduction, or credit included in a partner's distributive share under paragraphs (1) through (7) of subsection (a) shall be determined as if such item were realized directly from the source from which realized by the partnership, or incurred in the same manner as incurred by the partnership.

**(c) Gross income of a partner**

In any case where it is necessary to determine the gross income of a partner for purposes of this title, such amount shall include his distributive share of the gross income of the partnership.

**(d) Cross reference**

For rules relating to procedures for determining the tax treatment of partnership items see subchapter C of chapter 63 (section 6221 and following).

EFFECTIVE DATE

Section applicable to bonds issued after Aug. 15, 1986, except as otherwise provided, see sections 1311 to 1318 of Pub. L. 99–514, set out as an Effective Date; Transitional Rules note under section 141 of this title.

## § 7704. Certain publicly traded partnerships treated as corporations

### (a) General rule

For purposes of this title, except as provided in subsection (c), a publicly traded partnership shall be treated as a corporation.

### (b) Publicly traded partnership

For purposes of this section, the term "publicly traded partnership" means any partnership if—

(1) interests in such partnership are traded on an established securities market, or

(2) interests in such partnership are readily tradable on a secondary market (or the substantial equivalent thereof).

### (c) Exception for partnerships with passive-type income

#### (1) In general

Subsection (a) shall not apply to any publicly traded partnership for any taxable year if such partnership met the gross income requirements of paragraph (2) for such taxable year and each preceding taxable year beginning after December 31, 1987, during which the partnership (or any predecessor) was in existence. For purposes of the preceding sentence, a partnership shall not be treated as being in existence during any period before the 1st taxable year in which such partnership (or a predecessor) was a publicly traded partnership.

#### (2) Gross income requirements

A partnership meets the gross income requirements of this paragraph for any taxable year if 90 percent or more of the gross income of such partnership for such taxable year consists of qualifying income.

#### (3) Exception not to apply to certain partnerships which could qualify as regulated investment companies

This subsection shall not apply to any partnership which would be described in section 851(a) if such partnership were a domestic corporation. To the extent provided in regulations, the preceding sentence shall not apply to any partnership a principal activity of which is the buying and selling of commodities (not described in section 1221(a)(1)), or options, futures, or forwards with respect to commodities.

### (d) Qualifying income

For purposes of this section—

#### (1) In general

Except as otherwise provided in this subsection, the term "qualifying income" means—

(A) interest,
(B) dividends,
(C) real property rents,
(D) gain from the sale or other disposition of real property (including property described in section 1221(a)(1)),

(E) income and gains derived from the exploration, development, mining or production, processing, refining, transportation (including pipelines transporting gas, oil, or products thereof), or the marketing of any mineral or natural resource (including fertilizer, geothermal energy, and timber), industrial source carbon dioxide, or the transportation or storage of any fuel described in subsection (b), (c), (d), or (e) of section 6426, or any alcohol fuel defined in section 6426(b)(4)(A) or any biodiesel fuel as defined in section 40A(d)(1),

(F) any gain from the sale or disposition of a capital asset (or property described in section 1231(b)) held for the production of income described in any of the foregoing subparagraphs of this paragraph, and

(G) in the case of a partnership described in the second sentence of subsection (c)(3), income and gains from commodities (not described in section 1221(a)(1)) or futures, forwards, and options with respect to commodities.

For purposes of subparagraph (E), the term "mineral or natural resource" means any product of a character with respect to which a deduction for depletion is allowable under section 611; except that such term shall not include any product described in subparagraph (A) or (B) of section 613(b)(7).

#### (2) Certain interest not qualified

Interest shall not be treated as qualifying income if—

(A) such interest is derived in the conduct of a financial or insurance business, or

(B) such interest would be excluded from the term "interest" under section 856(f).

#### (3) Real property rent

The term "real property rent" means amounts which would qualify as rent from real property under section 856(d) if—

(A) such section were applied without regard to paragraph (2)(C) thereof (relating to independent contractor requirements), and

(B) stock owned, directly or indirectly, by or for a partner would not be considered as owned under section 318(a)(3)(A) by the partnership unless 5 percent or more (by value) of the interests in such partnership are owned, directly or indirectly, by or for such partner.

#### (4) Certain income qualifying under regulated investment company or real estate trust provisions

The term "qualifying income" also includes any income which would qualify under section 851(b)(2)(A) or 856(c)(2).

#### (5) Special rule for determining gross income from certain real property sales

In the case of the sale or other disposition of real property described in section 1221(a)(1), gross income shall not be reduced by inventory costs.

### (e) Inadvertent terminations

If—

(1) a partnership fails to meet the gross income requirements of subsection (c)(2),

USCA Case #11-1479     Document #1597530          Filed: 02/05/2016     Page 76 of 94

from one State or Territory of the United States, or the District of Columbia, to any other State or Territory of the United States, or the District of Columbia, or from one place in a Territory to another place in the same Territory, or from any place in the United States through a foreign country to any other place in the United States, or from or to any place in the United States to or from a foreign country, but only insofar as such transportation takes place within the United States.

**(2) Transportation subject to regulation**

The provisions of this chapter shall also apply to such transportation of passengers and property, but only insofar as such transportation takes place within the United States, but shall not apply—

(a) To the transportation of passengers or property, or to the receiving, delivering, storage, or handling of property, wholly within one State and not shipped to or from a foreign country from or to any place in the United States as aforesaid, except as otherwise provided in this chapter;

(b) Repealed. June 19, 1934, ch. 652, title VI, § 602(b), 48 Stat. 1102.

(c) To the transportation of passengers or property by a carrier by water where such transportation would not be subject to the provisions of this chapter except for the fact that such carrier absorbs, out of its port-to-port water rates or out of its proportional through rates, any switching, terminal, lighterage, car rental, trackage, handling, or other charges by a rail carrier for services within the switching, drayage, lighterage, or corporate limits of a port terminal or district.

**(3) Definitions**

(a) The term "common carrier" as used in this chapter shall include all pipe-line companies; express companies; sleeping-car companies; and all persons, natural or artificial, engaged in such transportation as aforesaid as common carriers for hire. Wherever the word "carrier" is used in this chapter it shall be held to mean "common carrier." The term "railroad" as used in this chapter shall include all bridges, car floats, lighters, and ferries used by or operated in connection with any railroad, and also all the road in use by any common carrier operating a railroad, whether owned or operated under a contract, agreement, or lease, and also all switches, spurs, tracks, terminals, and terminal facilities of every kind used or necessary in the transportation of the persons or property designated herein, including all freight depots, yards, and grounds, used or necessary in the transportation or delivery of any such property. The term "transportation" as used in this chapter shall include locomotives, cars, and other vehicles, vessels, and all instrumentalities and facilities of shipment or carriage, irrespective of ownership or of any contract, express or implied, for the use thereof, and all services in connection with the receipt, delivery, elevation, and transfer in transit, ventilation, refrigeration or icing, storage, and handling of property transported. The term "person" as used in this chapter includes an individual, firm, copartnership, corporation, company, association, or joint-stock association; and includes a trustee, receiver, assignee, or personal representative thereof.

(b) For the purposes of sections 5, 12(1), 20, 304(a)(7), 310, 320, 904(b), 910, and 913 of this Appendix, where reference is made to control (in referring to a relationship between any person or persons and another person or persons), such reference shall be construed to include actual as well as legal control, whether maintained or exercised through or by reason of the method of or circumstances surrounding organization or operation, through or by common directors, officers, or stockholders, a voting trust or trusts, a holding or investment company or companies, or through or by any other direct or indirect means; and to include the power to exercise control.

**(4) Duty to furnish transportation and establish through routes; division of joint rates**

It shall be the duty of every common carrier subject to this chapter to provide and furnish transportation upon reasonable request therefor, and to establish reasonable through routes with other such carriers, and just and reasonable rates, fares, charges, and classifications applicable thereto; and it shall be the duty of common carriers by railroad subject to this chapter to establish reasonable through routes with common carriers by water subject to chapter 12 of this Appendix, and just and reasonable rates, fares, charges, and classifications applicable thereto. It shall be the duty of every such common carrier establishing through routes to provide reasonable facilities for operating such routes and to make reasonable rules and regulations with respect to their operation, and providing for reasonable compensation to those entitled thereto; and in case of joint rates, fares, or charges, to establish just, reasonable, and equitable divisions thereof, which shall not unduly prefer or prejudice any of such participating carriers.

**(5) Just and reasonable charges; applicability; criteria for determination**

(a) All charges made for any service rendered or to be rendered in the transportation of passengers or property as aforesaid, or in connection therewith, shall be just and reasonable, and every unjust and unreasonable charge for such service or any part thereof is prohibited and declared to be unlawful. The provisions of this subdivision shall not apply to common carriers by railroad subject to this chapter.

(b) Each rate for any service rendered or to be rendered in the transportation of persons or property by any common carrier by railroad subject to this chapter shall be just and reasonable. A rate that is unjust or unreasonable is prohibited and unlawful. No rate which contributes or which would contribute to the going concern value of such a carrier shall be found to be unjust or unreasonable, or not shown to be just and reasonable, on the ground that such rate is below a just or reasonable minimum for the service rendered or to be rendered. A rate which equals or exceeds the variable costs (as determined through formulas prescribed by the Commission) of providing a service shall be presumed, unless such presumption is rebutted by clear and convincing evidence, to contribute to the going concern value of the carrier or carriers proposing such rate (hereafter in this paragraph referred to as the "proponent carrier"). In determining variable costs, the Commission shall, at the request of the carrier proposing the rate, determine only those costs of the carrier proposing the rate and only those costs of the specific service in question, except where such specific data and cost information is not available. The Commission shall not include in variable cost any expenses which do not vary directly with the level of service provided under the rate in question. Notwithstanding any other provision of this chapter, no rate shall be found to be unjust or unreasonable, or not shown to be just and reasonable, on the ground that such rate exceeds a just or reasonable maximum for the service rendered or to be rendered, unless the Commission has first found that the proponent carrier has market dominance over such service. A finding that a carrier has market dominance over a service shall not create a presumption that the rate or rates for such service exceed a just and reasonable maximum. Nothing in this paragraph shall prohibit a rate increase from a level which reduces the going concern value of the proponent carrier to a level which contributes to such going concern value and is otherwise just and reasonable. For the purposes of the preceding sentence, a rate increase which does not raise a rate above the incremental costs (as determined through formulas prescribed by the Commission) of rendering the service to which such rate applies shall be presumed to be just and reasonable.

(c) As used in this chapter, the terms—

(i) "market dominance" refers to an absence of effective competition from other carriers or modes of transportation, for the traffic or movement to which a rate applies; and

(ii) "rate" means any rate or charge for the transportation of persons or property.

(d) Within 240 days after February 5, 1976, the Commission shall establish, by rule, standards and procedures for determining, in accordance with section 15(9) of this Appendix, whether and when a carrier possesses market dominance over a service rendered or to be rendered at a particular rate or rates. Such rules shall be designed to provide for a practical determination without administrative delay. The Commission shall solicit and consider the recommendations of the Attorney General and of the Federal Trade Commission in the course of establishing such rules.

**(5½) Exchange of services**

Nothing in this Act shall be construed to prevent any common carrier subject to this Act from entering into or operating under any contract with any telephone, telegraph, or cable company, for the exchange of their services.

**(6) Classification of property for transportation; regulations and practices; demurrage charges**

It is made the duty of all common carriers subject to the provisions of this chapter to establish, observe, and enforce just and reasonable classifications of property for transportation, with reference to which rates, tariffs, regulations, or practices are or may be made or prescribed, and just and reasonable regulations and practices affecting classifications, rates, or tariffs, the issuance, form, and substance of tickets, receipts, and bills of lading, the manner and method of presenting, marking, packing, and delivering property for transportation, the facilities for transportation, the carrying of personal, sample, and excess baggage, and all other matters relating to or connected with the receiving, handling, transporting, storing, and delivery of property subject to the provisions of this chapter which may be necessary or proper to secure the safe and prompt receipt, handling, transportation, and delivery of property subject to the provisions of this chapter upon just and reasonable terms, and every unjust and unreasonable classification, regulation, and practice is prohibited and declared to be unlawful. Demurrage charges shall be computed, and rules and regulations relating to such charges shall be established, in such a manner as to fulfill the national needs with respect to (a) freight car utilization and distribution, and (b) maintenance of an adequate freight car supply available for transportation of property.

**(7) Free transportation for passengers prohibited; exceptions; penalty**

No common carrier subject to the provisions of this chapter, shall, directly or indirectly, issue or give any interstate free ticket, free pass, or free transportation for passengers, except to its employees, its officers, time inspectors, surgeons, physicians, and attorneys at law, and the families of any of the foregoing; to the executive officers, general chairmen, and counsel of employees' organizations when such organizations are authorized and designated to represent employees in accordance with the provisions of the Railway Labor Act [45 U.S.C. 151 et seq.]; to ministers of religion, traveling secretaries of railroad Young Men's Christian Associations, inmates of hospitals and charitable and eleemosynary institutions, and persons exclusively engaged in charitable and eleemosynary work; to indigent, destitute and homeless persons, and to such persons when transported by charitable societies or hospitals, and the necessary agents employed in such transportation; to inmates of the National Homes or State Homes for Disabled Volunteer Soldiers, and of Soldiers' and Sailors' Homes, including those about to enter and those returning home after discharge; to necessary caretakers of livestock, poultry, milk, and

fruit; to employees on sleeping cars, express cars, and to linemen of telegraph and telephone companies; to railway mail-service employees and persons in charge of the mails when on duty and traveling to and from duty, and all duly accredited agents and officers of the United States Postal Service and the Railway Mail Service and post-office inspectors while traveling on official business, upon the exhibition of their credentials; to customs inspectors, and immigration officers; to newsboys on trains, baggage agents, witnesses attending any legal investigation in which the common carrier is interested, persons injured in wrecks and physicians and nurses attending such persons: *Provided*, That this provision shall not be construed to prohibit the interchange of passes for the officers, agents, and employees of common carriers, and their families; nor to prohibit any common carrier from carrying passengers free with the object of providing relief in cases of general epidemic, pestilence, or other calamitous visitation: *And provided further,* That this provision shall not be construed to prohibit the privilege of passes or franks, or the exchange thereof with each other, for the officers, agents, employees, and their families of such telegraph, telephone, and cable lines, and the officers, agents, employees and their families of other common carriers subject to the provisions of this chapter: *Provided further,* That the term "employees" as used in this paragraph shall include furloughed, pensioned, and superannuated employees, persons who have become disabled or infirm in the service of any such common carrier, and the remains of a person killed in the employment of a carrier and exemployees traveling for the purpose of entering the service of any such common carrier; and the term "families" as used in this paragraph shall include the families of those persons named in this proviso, also the families of persons killed, and the widows during widowhood and minor children during minority of persons who died, while in the service of any such common carrier. Any common carrier violating this provision shall be deemed guilty of a misdemeanor and for each offense, on conviction, shall pay to the United States a penalty of not less than $100 nor more than $2,000, and any person, other than the persons excepted in this provision, who uses any such interstate free ticket, free pass, or free transportation shall be subject to a like penalty. Jurisdiction of offenses under this provision shall be the same as that provided for offenses in sections 41 to 43 of this chapter.

**(8) Transportation of commodity manufactured or produced by railroad forbidden**

It shall be unlawful for any railroad company to transport from any State, Territory, or the District of Columbia, to any other State, Territory, or the District of Columbia, or to any foreign country, any article or commodity, other than timber and the manufactured products thereof, manufactured, mined, or produced by it, or under its authority, or which it may own in whole or in part, or in which it may have any interest, direct or indirect, except such articles or commodities as may be necessary and intended for its use in the conduct of its business as a common carrier.

**(9) Switch connections and tracks**

Any common carrier subject to the provisions of this chapter, upon application of any lateral, branch line of railroad, or of any shipper tendering interstate traffic for transportation, shall construct, maintain, and operate upon reasonable terms a switch connection with any such lateral, branch line of railroad, or private side track which may be constructed to connect with its railroad, where such connection is reasonably practicable and can be put in with safety and will furnish sufficient business to justify the construction and maintenance of the same; and shall furnish cars for the movement of such traffic to the best of its ability without discrimination in favor of or against any such shipper. If any common carrier shall fail to install and operate any such switch or connection as aforesaid, on

§ 6                    TITLE 49, APPENDIX—TRANSPORTATION                    Page 538

rate, or charge docketed with such organization within 120 days after such proposal is docketed.

(Feb. 4, 1887, ch. 104, part I, § 5b, as added Feb. 5, 1976, Pub. L. 94–210, title II, § 208(b), 90 Stat. 42, and amended Oct. 19, 1976, Pub. L. 94–555, title II, § 220(k), 90 Stat. 2630.)

## § 6. Repealed. Pub. L. 95–473, § 4(b), (c), Oct. 17, 1978, 92 Stat. 1466, 1470

Section repealed subject to an exception related to transportation of oil by pipeline. For disposition of this section in revised Title 49, Transportation, see Table at beginning of Title 49. See, also, notes following Table.

Prior to repeal, section read as follows:

### § 6. Schedules and statements of rates, etc., joint rail and water transportation

**(1) Schedule of rates, fares, and charges; filing and posting**

Every common carrier subject to the provisions of this chapter shall file with the Commission created by this chapter and print and keep open to public inspection schedules showing all the rates, fares, and charges for transportation between different points on its own route and between points on its own route and points on the route of any other carrier by railroad, by pipe line, or by water when a through route and joint rate have been established. If no joint rate over the through route has been established, the several carriers in such through route shall file, print, and keep open to public inspection, as aforesaid, the separately established rates, fares, and charges applied to the through transportation. The schedules printed as aforesaid by any such common carrier shall plainly state the places between which property and passengers will be carried, and shall contain the classification of freight in force, and shall also state separately all terminal charges, storage charges, icing charges, and all other charges which the Commission may require, all privileges or facilities granted or allowed, and any rules or regulations which in any wise change, affect, or determine any part or the aggregate of such aforesaid rates, fares, and charges, or the value of the service rendered to the passenger, shipper, or consignee. Such schedules shall be plainly printed in large type, and copies for the use of the public shall be kept posted in two public and conspicuous places in every depot, station, or office of such carrier where passengers or freight, respectively, are received for transportation, in such form that they shall be accessible to the public and can be conveniently inspected. The provisions of this section shall apply to all traffic, transportation, and facilities defined in this chapter.

**(2) Schedule of rates through foreign country**

Any common carrier subject to the provisions of this chapter receiving freight in the United States to be carried through a foreign country to any place in the United States shall also in like manner print and keep open to public inspection, at every depot or office where such freight is received for shipment, schedules showing the through rates established and charged by such common carrier to all points in the United States beyond the foreign country to which it accepts freight for shipment; and any freight shipped from the United States through a foreign country into the United States the through rate on which shall not have been made public, as required by this chapter, shall, before it is admitted into the United States from said foreign country, be subject to customs duties as if said freight were of foreign production.

**(3) Change in rates, fares, etc.; notice required; simplification of schedules**

No change shall be made in the rates, fares, and charges or joint rates, fares, and charges which have been filed and published by any common carrier in compliance with the requirements of this section, except after thirty days' notice to the Commission and to the public published as aforesaid, which shall plainly state the changes proposed to be made in the schedule then in force and the time when the changed rates, fares, or charges will go into effect; and the proposed changes shall be shown by printing new schedules, or shall be plainly indicated upon the schedules in force at the time and kept open to public inspection: *Provided,* That the Commission may, in its discretion and for good cause shown, allow changes upon less than the notice herein specified, or modify the requirements of this section in respect to publishing, posting, and filing of tariffs, either in particular instances or by a general order applicable to special or peculiar circumstances or conditions: *Provided further,* That the Commission is authorized to make suitable rules and regulations for the simplification of schedules of rates, fares, charges, and classifications and to permit in such rules and regulations the filing of an amendment of or change in any rate, fare, charge, or classification without filing complete schedules covering rates, fares, charges, or classifications not changed if, in its judgment, not inconsistent with the public interest.

**(4) Joint tariffs**

The names of the several carriers which are parties to any joint tariff shall be specified therein, and each of the parties thereto, other than the one filing the same, shall file with the Commission such evidence of concurrence therein or acceptance thereof as may be required or approved by the Commission, and where such evidence of concurrence or acceptance is filed it shall not be necessary for the carriers filing the same to also file copies of the tariffs in which they are named as parties.

**(5) Copies of traffic contracts to be filed**

Every common carrier subject to this chapter shall also file with said Commission copies of all contracts, agreements, or arrangements, with other common carriers in relation to any traffic affected by the provisions of this chapter to which it may be a party: *Provided, however,* That the Commission, by regulations, may provide for exceptions from the requirements of this paragraph in the case of any class or classes of contracts, agreements, or arrangements, the filing of which, in its opinion, is not necessary in the public interest.

**(6) Form and manner of publishing, filing, and posting schedules; incorporation of rates into individual tariffs; time for incorporation; rejection of schedules; unlawful use**

The schedules required by this section to be filed shall be published, filed, and posted in such form and manner as the Commission by regulation shall prescribe. The Commission shall, beginning 2 years after February 5, 1976, require (a) that all rates shall be incorporated into the individual tariffs of each common carrier by railroad subject to this chapter or rail ratemaking association within 2 years after the initial publication of the rate, or within 2 years after a change in any rate is approved by the Commission, whichever is later, and (b) that any rate shall be null and void with respect to any such carrier or association which does not so incorporate such rate into its individual tariff. The Commission may, upon good cause shown, extend such period of time. Notice of any such extension and a statement of the reasons therefor shall be promptly transmitted to the Congress. The Commission is authorized to reject any schedule filed with it which is not in accordance with this section and with such regulations. Any schedule so rejected by the Commission shall be void and its use shall be unlawful.

**(7) Transportation without filing and publishing rates forbidden; rebates; privileges**

No carrier, unless otherwise provided by this chapter, shall engage or participate in the transportation of passengers or property, as defined in this chapter,

§ 15. Determination of rates, routes, etc.; routing of traffic; disclosures, etc.

(1) Commission empowered to determine and prescribe rates, classifications, etc.

Whenever, after full hearing, upon a complaint made as provided in section 13 of this Appendix, or after full hearing under an order for investigation and hearing made by the Commission on its own initiative, either in extension of any pending complaint or without any complaint whatever, the Commission shall be of opinion that any individual or joint rate, fare, or charge whatsoever demanded, charged, or collected by any common carrier or carriers subject to this chapter for the transportation of persons or property, as defined in section 1 of this Appendix, or that any individual or joint classification, regulation, or practice whatsoever of such carrier or carriers subject to the provisions of this chapter, is or will be unjust or unreasonable or unjustly discriminatory or unduly preferential or prejudicial, or otherwise in violation of any of the provisions of this chapter, the Commission is authorized and empowered to determine and prescribe what will be the just and reasonable individual or joint rate, fare, or charge, or rates, fares, or charges, to be thereafter observed in such case, or the maximum or minimum, or maximum and minimum, to be charged, and what individual or joint classification, regulation, or practice is or will be just, fair, and reasonable, to be thereafter followed, and to make an order that the carrier or carriers shall cease and desist from such violation to the extent to which the Commission finds that the same does or will exist, and shall not thereafter publish, demand, or collect any rate, fare, or charge for such transportation other than the rate, fare, or charge so prescribed, or in excess of the maximum or less than the minimum so prescribed, as the case may be, and shall adopt the classification and shall conform to and observe the regulation or practice so prescribed.

(2) Orders of Commission

Except as otherwise provided in this chapter, all orders of the Commission, other than orders for the payment of money, shall take effect within such reasonable time as the Commission may prescribe. Such orders shall continue in force until its further order, or for a specified period of time, according as shall be prescribed in the order, unless the same shall be suspended or modified or set aside by the Commission, or be suspended or set aside by a court of competent jurisdiction.

(3) Establishment of through routes, joint classifications, joint rates, fares, etc.

The Commission may, and it shall whenever deemed by it to be necessary or desirable in the public interest, after full hearing upon complaint or upon its own initiative without complaint, establish through routes, joint classifications, and joint rates, fares, or charges, applicable to the transportation of passengers or property by carriers subject to this chapter, or by carriers by railroad subject to this chapter and common carriers by water subject to chapter 12 of this Appendix, or the maxima or minima, or maxima and minima, to be charged, and the divisions of such rates, fares, or charges as hereinafter provided, and the terms and conditions under which such through routes shall be operated. The Commission shall not, however, establish any through route, classification, or practice, or any rate, fare, or charge, between street electric passenger railways not engaged in the general business of transporting freight in addition to their passenger and express business, and railroads of a different character. If any tariff or schedule canceling any through route or joint rate, fare, charge, or classification, without the consent of all carriers parties thereto or authorization by the Commission, is suspended by the Commission for investigation, the burden of proof shall be upon the carrier or carriers proposing such cancelation to show that it is consistent with the

public interest, without regard to the provisions of paragraph (4) of this section. With respect to carriers by railroad, in determining whether any such cancellation or proposed cancellation involving any common carrier by railroad is consistent with the public interest, the Commission shall, to the extent applicable, (a) compare the distance traversed and the average transportation time and expense required using the through route, and the distance traversed and the average transportation time and expense required using alternative routes, between the points served by such through route, (b) consider any reduction in energy consumption which may result from such cancellation, and (c) take into account the overall impact of such cancellation on the shippers and carriers who are affected thereby.

(4) Through routes to embrace entire length of railroad; temporary through routes

In establishing any such through route the Commission shall not (except as provided in section 3 of this Appendix, and except where one of the carriers is a water line) require any carrier by railroad, without its consent, to embrace in such route substantially less than the entire length of its railroad and of any intermediate railroad operated in conjunction and under a common management or control therewith, which lies between the termini of such proposed through route, (a) unless such inclusion of lines would make the through route unreasonably long as compared with another practicable through route which could otherwise be established, or (b) unless the Commission finds that the through route proposed to be established is needed in order to provide adequate, and more efficient or more economic, transportation: *Provided, however,* That in prescribing through routes the Commission shall, so far as is consistent with the public interest, and subject to the foregoing limitations in clauses (a) and (b) of this paragraph, give reasonable preference to the carrier by railroad which originates the traffic. No through route and joint rates applicable thereto shall be established by the Commission for the purpose of assisting any carrier that would participate therein to meet its financial needs. In time of shortage of equipment, congestion of traffic, or other emergency declared by the Commission, it may (either upon complaint or upon its own initiative without complaint, at once, if it so orders, without answer or other formal pleadings by the interested carrier or carriers, and with or without notice, hearing, or the making or filing of a report, according as the Commission may determine) establish temporarily such through routes as in its opinion are necessary or desirable in the public interest.

(5) Transportation of livestock in carload lots; services included

Transportation wholly by railroad of ordinary livestock in carload lots destined to or received at public stockyards shall include all necessary service of unloading and reloading en route, delivery at public stockyards of inbound shipments into suitable pens, and receipt and loading at such yards of outbound shipments, without extra charge therefor to the shipper, consignee, or owner, except in cases where the unloading or reloading en route is at the request of the shipper, consignee, or owner, or to try an intermediate market, or to comply with quarantine regulations. The Commission may prescribe or approve just and reasonable rules governing each of such excepted services. Nothing in this paragraph shall be construed to affect the duties and liabilities of the carriers existing on February 28, 1920, by virtue of law respecting the transportation of other than ordinary livestock, or the duty of performing service as to shipments other than those to or from public stockyards.

USCA Case #11-1479     Document #1597530     Filed: 02/05/2016     Page 80 of 94

(6) Commission to establishment just divisions of joint rates, fares, or charges; adjustments; procedures applicable

(a) Whenever, after full hearing upon complaint or upon its own initiative, the Commission is of opinion that the divisions of joint rates, fares, or charges, applicable to the transportation of passengers or property, are or will be unjust, unreasonable, inequitable, or unduly preferential or prejudicial as between the carriers parties thereto (whether agreed upon by such carriers, or any of them, or otherwise established), the Commission shall by order prescribe the just, reasonable, and equitable divisions thereof to be received by the several carriers, and in cases where the joint rate, fare, or charge was established pursuant to a finding or order of the Commission and the divisions thereof are found by it to have been unjust, unreasonable, or inequitable, or unduly preferential or prejudicial, the Commission may also by order determine what (for the period subsequent to the filing of the complaint or petition or the making of the order of investigation) would have been the just, reasonable and equitable divisions thereof to be received by the several carriers, and require adjustment to be made in accordance therewith. In so prescribing and determining the divisions of joint rates, fares, and charges, the Commission shall give due consideration, among other things, to the efficiency with which the carriers concerned are operated, the amount of revenue required to pay their respective operating expenses, taxes, and a fair return on their railway property held for and used in the service of transportation, and the importance to the public of the transportation services of such carriers; and also whether any particular participating carrier is an originating, intermediate, or delivering line, and any other fact or circumstance which would ordinarily, without regard to the mileage haul, entitle one carrier to a greater or less proportion than another carrier of the joint rate, fare, or charge.

(b) Notwithstanding any other provision of law, the Commission shall, within 180 days after February 5, 1976, establish, by rule, standards and procedures for the conduct of proceedings for the adjustment of divisions of joint rates or fares (whether prescribed by the Commission or otherwise) in accordance with the provisions of this paragraph. The Commission shall issue a final order in all such proceedings within 270 days after the submission to the Commission of a case. If the Commission is unable to issue such a final order within such time, it shall issue a report to the Congress setting forth the reasons for such inability.

(c) All evidentiary proceedings conducted pursuant to this paragraph shall be completed, in a case brought upon a complaint, within 1 year following the filing of the complaint, or, in a case brought upon the Commission's initiative, within 2 years following the commencement of such proceeding, unless the Commission finds that such a proceeding must be extended to permit a fair and expeditious completion of the proceeding. If the Commission is unable to meet any such time requirement, it shall issue a report to the Congress setting forth the reasons for such inability.

(d) Whenever a proceeding for the adjustment of divisions of joint rates or fares (whether prescribed by the Commission or otherwise established) is commenced by the filing of a complaint with the Commission, the complaining carrier or carriers shall (i) attach thereto all of the evidence in support of their position, and (ii) during the course of such proceeding, file only rebuttal or reply evidence unless otherwise directed by order of the Commission. Upon receipt of a notice of intent to file a complaint pursuant to this paragraph, the Commission shall accord, to the party filing such notice, the same right to discovery that would be accorded to a party filing a complaint pursuant to this paragraph.

(7) Commission to determine lawfulness of new rates; suspension; refunds; nonapplicability to common carriers by railroad subject to chapter

Whenever there shall be filed with the Commission any schedule stating a new individual or joint rate, fare, or charge, or any new individual or joint classification, or any new individual or joint regulation or practice affecting any rate, fare, or charge, the Commission shall have, and it is given, authority, either upon complaint or upon its own initiative without complaint, at once, and if it so orders without answer or other formal pleading by the interested carrier or carriers, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, fare, charge, classification, regulation, or practice; and pending such hearing and the decision thereon the Commission, upon filing with such schedule and delivering to the carrier or carriers affected thereby a statement in writing of its reasons for such suspension, may from time to time suspend the operation of such schedule and defer the use of such rate, fare, charge, classification, regulation, or practice, but not for a longer period than seven months beyond the time when it would otherwise go into effect; and after full hearing, whether completed before or after the rate, fare, charge, classification, regulation, or practice goes into effect, the Commission may make such order with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made within the period of suspension, the proposed change of rate, fare, charge, classification, regulation, or practice shall go into effect at the end of such period; but in case of a proposed increased rate or charge for or in respect to the transportation of property, the Commission may by order require the interested carrier or carriers to keep accurate account in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts are paid, and upon completion of the hearing and decision may by further order require the interested carrier or carriers to refund, with interest, to the persons in whose behalf such amounts were paid, such portion of such increased rates or charges as by its decision shall be found not justified. At any hearing involving a change in a rate, fare, charge, or classification, or in a rule, regulation, or practice, after September 18, 1940, the burden of proof shall be upon the carrier to show that the proposed changed rate, fare, charge, classification, rule, regulation, or practice is just and reasonable, and the Commission shall give to the hearing and decision of such questions preference over all other questions pending before it and decide the same as speedily as possible. This paragraph shall not apply to common carriers by railroad subject to this chapter.

(8) Commission to determine lawfulness of new rates; applicability to common carrier by railroad; suspensions; accounts; hearing and basis of decision

(a) Whenever a schedule is filed with the Commission by a common carrier by railroad stating a new individual or joint rate, fare, or charge, or a new individual or joint classification, regulation, or practice affecting a rate, fare, or charge, the Commission may, upon the complaint of an interested party or upon its own initiative, order a hearing concerning the lawfulness of such rate, fare, charge, classification, regulation, or practice. The hearing may be conducted without answer or other formal pleading, but reasonable notice shall be provided to interested parties. Such hearing shall be completed and a final decision rendered by the Commission not later than 7 months after such rate, fare, charge, classification, regulation, or practice was scheduled to become effective, unless, prior to the expiration of such 7-month period, the Commission reports in writing to the Congress that it is unable to render a decision within such period, together with a full explanation of the reason for the delay. If such a report is made to the Congress, the final decision shall be made not later than 10 months after the date of the filing of such schedule. If the final decision of the Commission is not made within the applicable time period, the rate, fare, charge, classification, regulation, or practice shall go into effect

# ATTACHMENT 2

*Table 6 Set Forth in*
*Opinion 511-A, 137 FERC ¶ 61,220*

Table 6.  Comparison of after-tax returns of MLP and Corporation at the entity level and the relative value of a partner and the shareholder interest assuming a required after-tax return of 10 percent and a 35 percent tax on dividends

| Example 1 – Partnership without tax allowance | | Example 2 - Corporation without tax allowance | | Example 3 - Partnership with tax allowance | | Example 4 - Corporation with tax allowance | |
|---|---|---|---|---|---|---|---|
| Equity Rate Base | $1,000 | Equity Rate Base | $1,000 | Equity Rate Base | $1,000 | Equity Rate Base | $1,000 |
| Operating Exp. | $ 900 | Operating Exp. | $ 900 | Operating Exp. | $ 900 | Operating Exp. | $ 900 |
| Equity Return | $ 100 | Equity Return | $ 100 | Equity Return | $ 100 | Equity Return | $ 100 |
| Income Tax All. | $   - | Income Tax All. | $   - | Income Tax All. | $   54 | Income Tax All. | $   54 |
| Cost of Service | $1,000 | Cost of Service | $1,000 | Cost of Service | $1,054 | Cost of Service | $1,054 |
| Pretax Return | $ 100 | Pretax Return | $ 100 | Pretax Return | $ 154 | Pretax Return | $ 154 |
| (Sum of the after-tax return plus income tax allowance) | | (Sum of the after-tax return plus income tax allowance) | | (Sum of the after-tax return plus income tax allowance) | | (Sum of the after-tax return plus income tax allowance) | |
| Partner Pretax Income/Return | $ 100 | No Pass Through Same as above | N.A. | Partner Pretax Income/Return | $ 154 | No Pass Through Same as above | N.A. |
| Tax at 35 Percent | $   35 | Tax at 35 Percent | $   35 | Tax at 35 Percent | $   54 | Tax at 35 Percent | $   54 |
| After Tax Income | $   65 | After Tax Income | $   65 | After Tax Income | $ 100 | After Tax Income | $ 100 |
| Return on Equity | 6.5% | Return on Equity | 6.5% | Return on Equity | 10.0% | Return on Equity | 10.0% |
| Partner After tax Income/Return | $   65 | Corporate Dividend | $   65 | Partner After tax Income/Return | $ 100 | Corporate Dividend | $ 100 |
| | | Shareholder Rate | 35% | | | Shareholder Rate | 35% |
| | | Dollar Tax Paid | $   23 | | | Dollar Tax Paid | $   35 |
| | | After Tax Return | $   42 | | | After Tax Return | $   65 |
| Partner Value | $ 650 | Shareholder Value | $ 423 | Partner Value | $1,000 | Shareholder Value | $ 650 |
| Does Equity Earn the Required Return? | No | Does Equity Earn the Required Return? | No | Does Equity Earn the Required Return? | Yes | Does Equity Earn the Required Return? | Yes |

Conclusion - Under the stated assumptions the partnership will not earn the required return on equity if denied an income tax allowance but the corporation earns the required return on equity if granted an income tax allowance.  If the partnership is denied an income tax allowance, then partner and shareholder after tax values are the same, but the partnership does not recover its regulatory cost of service.

# ATTACHMENT 3

*Revised Exhibits SFP-98 and SFP-99*
*Discussed in Opinion 511*

Revised  Exh. No. SFP-98
Docket No. IS08-390-002
Page 1 of 1

**Hypothetical Example of an Oil Pipeline**
**Under Corporate and MLP Organizational Structures: Scenario 1**
(32% MLP Tax Allowance; 32% Marginal Investor Tax Rate)

| Line | | Description | Source | Alternative Organizational Structures | |
|---|---|---|---|---|---|
| (1) | | (2) | (3) | (4) | (5) |
| | | **Assumptions:** | | | |
| | | **Case** | | 1 | 2 |
| | | **Pipeline structure** | | MLP | C-Corporation |
| | 1 | Tax rate for marginal investor and return on equity | | | |
| 1 | a | Required after-tax equity return of the marginal investor | Assumption | 9.207% | 9.207% |
| 2 | b | Tax rate for the marginal investor | Assumption | 32% | 32% |
| 3 | c | Required return on equity (ROE) | Ln 1 / ( 1 - Ln 2 ) | 13.540% | 13.540% |
| 4 | 2 | Marginal tax rate for calculation of income tax allowance | Assumption | 32% | 35% |
| 5 | 3 | Other pipeline costs and share/units outstanding | | | |
| 6 | a | Operating costs | Assumption | $4,000,000 | $4,000,000 |
| 7 | b | Rate base | Assumption | $100,000,000 | $100,000,000 |
| 8 | c | Equity in capital structure | Assumption | 50% | 50% |
| 9 | c | Debt in capital structure | 1 - Ln 8 | 50% | 50% |
| 10 | d | Cost of debt | Assumption | 6% | 6% |
| 11 | e | Share/units outstanding | Assumption | 735,294 | 735,294 |
| 12 | f | Income tax rate of pipeline entity | Assumption | 0% | 35% |
| | | **Calculations:** | | | |
| 13 | | Equity return on rate base | Ln 3 * Ln 8 * Ln 7 | $6,769,853 | $6,769,853 |
| 14 | | Income tax allowance | Ln 13 * ( Ln 4 / ( 1 - Ln 4 ) ) | $3,185,813 | $3,645,305 |
| 15 | | Interest expense | Ln 10 * Ln 9 * Ln 7 | $3,000,000 | $3,000,000 |
| 16 | | Operating costs | Assumption | $4,000,000 | $4,000,000 |
| 17 | | Revenue requirement | Sum ( Ln 13 to 16 ) | $16,955,666 | $17,415,158 |
| | | **Less:** | | | |
| 18 | | Operating costs | Assumption | $4,000,000 | $4,000,000 |
| 19 | | Interest expense | Ln 15 | $3,000,000 | $3,000,000 |
| 20 | | Income taxes paid by pipeline entity | ( Ln 17 - Ln 18 - Ln 19 ) * Ln 12 | $0 | $3,645,305 |
| 21 | | Income available to share/unitholders after entity taxes and before investor taxes | ( Ln 17 - Ln 18 - Ln 19 - Ln 20 ) | $9,955,666 | $6,769,853 |
| 22 | | Income per share/unit after entity taxes and before investor taxes | Ln 21 / Ln 11 | $13.5397 | $9.2070 |
| 23 | | Tax rate for the marginal investor | Ln 2 | 32% | 32% |
| 24 | | After tax income per share/unit for the marginal investor | Ln 22 * ( 1 - Ln 23 ) | $9.2070 | $6.2608 |
| 25 | | Implied market price per share/unit | Ln 24 / Ln 1 | $100.0000 | $68.0000 |
| 26 | | Resulting after-tax equity return of the marginal investor | Ln 24 / Ln 25 | 9.207% | 9.207% |
| 27 | | DCF Method estimate of the ROE for the pipeline | ( Ln 22 / Ln 25 ) | 13.540% | 13.540% |
| | | **Addendum** | | | |
| 28 | | Income taxes paid by pipeline entity | Ln 20 | $0 | $3,645,305 |
| 29 | | Taxes paid by the marginal investor | Ln 21 * Ln 23 | $3,185,813 | $2,166,353 |
| 30 | | Income taxes paid by entity and investor | Ln 28 + Ln 29 | $3,185,813 | $5,811,658 |

USCA Case #11-1479     Document #1597530          Filed: 02/05/2016      Page 85 of 94

Revised Exh. No. SFP-99
Docket No. IS08-390-002
Page 1 of 1

### First Alternative Hypothetical Example of an Oil Pipeline
### Under Corporate and MLP Organizational Structures: Scenario 2
### (0% MLP Tax Allowance; 32% Marginal Investor Tax Rate)

| Line | | Description | Source | Alternative Organizational Structures | |
|---|---|---|---|---|---|
| (1) | | (2) | (3) | (4) | (5) |
| | | **Assumptions:** | | | |
| | | Case | | 1 | 2 |
| | | Pipeline structure | | MLP | C-Corporation |
| | | 1 Tax rate for marginal investor and return on equity | | | |
| 1 | a | Required after-tax equity return of the marginal investor | Assumption | 9.207% | 9.207% |
| 2 | b | Tax rate for the marginal investor | Assumption | 32% | 32% |
| 3 | c | Required return on equity (ROE) | Ln 1 / ( 1 - Ln 2 ) | 13.540% | 13.540% |
| 4 | 2 | Marginal tax rate for calculation of income tax allowance | Assumption | 0% | 35% |
| 5 | 3 | Other pipeline costs and share/units outstanding | | | |
| 6 | a | Operating costs | Assumption | $4,000,000 | $4,000,000 |
| 7 | b | Rate base | Assumption | $100,000,000 | $100,000,000 |
| 8 | c | Equity in capital structure | Assumption | 50% | 50% |
| 9 | c | Debt in capital structure | 1 - Ln 8 | 50% | 50% |
| 10 | d | Cost of debt | Assumption | 6% | 6% |
| 11 | e | Share/units outstanding | Assumption | 735,294 | 735,294 |
| 12 | f | Income tax rate of pipeline entity | Assumption | 0% | 35% |
| | | **Calculations:** | | | |
| 13 | | Equity return on rate base | Ln 3 * Ln 8 * Ln 7 | $6,769,853 | $6,769,853 |
| 14 | | Income tax allowance | Ln 13 * ( Ln 4 / ( 1 - Ln 4 ) ) | $0 | $3,645,305 |
| 15 | | Interest expense | Ln 10 * Ln 9 * Ln 7 | $3,000,000 | $3,000,000 |
| 16 | | Operating costs | Assumption | $4,000,000 | $4,000,000 |
| 17 | | Revenue requirement | Sum ( Ln 13 to 16 ) | $13,769,853 | $17,415,158 |
| | | Less: | | | |
| 18 | | Operating costs | Assumption | $4,000,000 | $4,000,000 |
| 19 | | Interest expense | Ln 15 | $3,000,000 | $3,000,000 |
| 20 | | Income taxes paid by pipeline entity | ( Ln 17 - Ln 18 - Ln 19 ) * Ln 12 | $0 | $3,645,305 |
| 21 | | Income available to share/unitholders after entity taxes and before investor taxes | ( Ln 17 - Ln 18 - Ln 19 - Ln 20 ) | $6,769,853 | $6,769,853 |
| 22 | | Income per share/unit after entity taxes and before investor taxes | Ln 21 / Ln 11 | $9.2070 | $9.2070 |
| 23 | | Tax rate for the marginal investor | Ln 2 | 32% | 32% |
| 24 | | After tax income per share/unit for the marginal investor | Ln 22 * ( 1 - Ln 23 ) | $6.2608 | $6.2608 |
| 25 | | Implied market price per share/unit | Ln 24 / Ln 1 | $68.0000 | $68.0000 |
| 26 | | Resulting after-tax equity return of the marginal investor | Ln 24 / Ln 25 | 9.207% | 9.207% |
| 27 | | DCF Method estimate of the ROE for the pipeline | ( Ln 22 / Ln 25 ) | 13.540% | 13.540% |
| | | **Addendum** | | | |
| 28 | | Income taxes paid by pipeline entity | Ln 20 | $0 | $3,645,305 |
| 29 | | Taxes paid by the marginal investor | Ln 21 * Ln 23 | $2,166,353 | $2,166,353 |
| 30 | | Income taxes paid by entity and investor | Ln 28 + Ln 29 | $2,166,353 | $5,811,658 |

# ATTACHMENT 4

*Appendix D to*
*Opinion 511-A, 137 FERC ¶ 61,220*

Docket Nos. IS08-390-004 and IS08-390-006                                                    - 212

## Appendix D

### Partial Modification of Ex. SFP-99 to Conform to
### FERC Ratemaking Protocols for Return

Display A

#### Ex. SFP-99 Lines 13 through Line 17 As Currently Stated

|         |                                        | MLP              | Corporation      |
|---------|----------------------------------------|------------------|------------------|
| Line 13 | Equity Return on Rate Base             | $ 6,900,000.00   | $ 6,900,000.00   |
| Line 14 | Income Tax  Allowance                  | $          -     | $ 3,715,385.00   |
| Line 15 | Interest Expense                       | $ 3,000,000.00   | $ 3,000,000.00   |
| Line16  | Operating Costs                        | $ 4,000,000.00   | $ 4,000,000.00   |
| Line 17 | Revenue Required                       | $ 13,900,000.00  | $17,615,385.00   |
|         | Less                                   |                  |                  |
| Line 18 | Operating Costs                        | $ 4,000,000.00   | $ 4,000,000.00   |
| Line 19 | Interest Expense                       | $ 3,000,000.00   | $ 3,000,000.00   |
| Line 20 | Income Taxes By the Pipeline           | $          -     | $ 3,715,385.00   |
| Line 21 | Income for Shareholder or the MLP Partner | $ 6,900,000.00 | $ 6,900,000.00   |

Analysis:  This portion of Ex. SFP-99 includes both a revenue gross up and an
income tax allowance for the corporation, but only a revenue gross
up for the MLP.  In Ex. SFP-99 the revenue gross up is calculated as
Line 3 (13.800 percent pre-tax return) times line 8 (50 percent capital
structure) times Line 7 (total rate base of $100,000,000).

Ex. SFP-99 assumes that the MLP (and its partners) have a different
cost of service than the corporation, which is fundamentally
incorrect.  Moreover, the inclusion of the income tax allowance
means the Corporation will have significantly higher rates because of
its cost of service even though the income on Line 21 is the same for
partner and the shareholder.  That occurs because the income tax
allowance dollars wash out when the taxes are paid. But they would
still be in the rates. Finally, the exhibit implies that that the partner
will have the same after-tax dollar return if the MLP is denied on
income tax allowance.  As shown below, this is not mathematically
possible in a Commission rate design context.

Docket Nos. IS08-390-004 and IS08-390-006                                  - 213

Display B

**Ex. SFP-99 Partially Modified to Reflect FERC Rate Design Methodology**

|        |                                                  | MLP            | Corporation     |
|--------|--------------------------------------------------|----------------|-----------------|
| Line 13 | Equity Return on Rate Base                       | $  4,692,000.00 | $ 4,692,000.00  |
| Line 14 | Income Tax Allowance                             | $  2,208,000.00 | $ 2,208,000.00  |
| Line 15 | Interest Expense                                 | $  3,000,000.00 | $ 3,000,000.00  |
| Line 16 | Operating Costs                                  | $  4,000,000.00 | $ 4,000,000.00  |
| Line 17 | Revenue Required                                 | $ 13,900,000.00 | $13,900,000.00  |
|        | Less                                             |                |                 |
| Line 18 | Operating Costs                                  | $  4,000,000.00 | $ 4,000,000.00  |
| Line 19 | Interest Expense                                 | $  3,000,000.00 | $ 3,000,000.00  |
| Line 20 | Income Taxes By the Pipeline                     | $         -     | $ 2,208,000.00  |
| Line 21 | Income for Shareholder or the MLP Partner        | $  6,900,000.00 | $ 4,692,000.00  |
|        | Taxes Paid by Partner or the Shareholder at      |                |                 |
| FERC 22 | 32% rate                                         | $  2,208,000.00 | $ 1,501,440.00  |
| FERC 23 | After-Tax Return to Partner or the Shareholder   | $  4,692,000.00 | $ 3,190,560.00  |

Analysis: Under this analysis the equity return on rate base does not include the revenue gross because the FERC ratemaking methodology does not provide for either an MLP or the Corporation to do so. The return component is derived as follows from Ex. SFP-99: Line 1 (9.384%) times Line 8 (50 percent capital structure) times Line 7 (total rate base of $100,000,000). The income tax allowance is calculated using a .32 percent marginal tax rate by applying the standard tax computation formula to equity return on Line 13. Line 13 of the analysis shows that the equity return on rate base is the same for the MLP and the corporation per FERC regulatory protocols. It also shows that if an income tax allowance is provided both the MLP and the Corporation, both will have an after-tax return that is equal to the required equity return on Line 13. Please compare Line 21 to Line 23. However the after-tax dollar income to the shareholder on Line 23 is less than the after-tax income to the partner on Line 23 due to the impact of double taxation.

Docket Nos. IS08-390-004 and IS08-390-006                                          - 214

Display C

**Display B Modified to Reflect the Absence of an MLP Income Tax Allowance.**

|         |                                      | MLP | Corporation |
|---------|--------------------------------------|-----|-------------|
| Line 13 | Equity Return on Rate Base           | $ 4,692,000.00 | $ 4,692,000.00 |
| Line 14 | Income Tax Allowance                 | $ - | $ 2,208,000.00 |
| Line 15 | Interest Expense                     | $ 3,000,000.00 | $ 3,000,000.00 |
| Line16  | Operating Costs                      | $ 4,000,000.00 | $ 4,000,000.00 |
| Line 17 | Revenue Required                     | $ 11,692,000.00 | $13,900,000.00 |
|         | Less                                 |     |             |
| Line 18 | Operating Costs                      | $ 4,000,000.00 | $ 4,000,000.00 |
| Line 19 | Interest Expense                     | $ 3,000,000.00 | $ 3,000,000.00 |
| Line 20 | Income Taxes Paid by Pipeline        | $ - | $ 2,208,000.00 |
| Line 21 | Income for Shareholder or the MLP Partner | $ 4,692,000.00 | $ 4,692,000.00 |
| FERC 22 | Taxes Paid by Partner or the Shareholder at 32% rate | $ 1,501,440.00 | $ 1,501,440.00 |
| FERC 23 | After-Tax Return to Partner or the Shareholder | $ 2,484,000.00 | $ 3,190,560.00 |

Analysis: This analysis repeats Display B, but without an MLP income tax allowance. As with Display B, the after-tax equity return on rate base is the same for MLP and the Corporation ($4,692,000) as are the operating and interest expenses as shown on Line 13. Line 21 shows that the pretax return to the partner, and therefore the partnership, is the same as the corporate shareholder. The MLP has a lower cost of service than the corporation because the income tax allowance is omitted from its cost of service. However, the after-tax return to the partner, and therefore the partnership, stated on Line 23 is less than the required equity return on Line 13 and is also less than the after-tax return to the shareholder. As such, the partnership and the partners do not recover an adequate return on the equity invested in the partnership and the related rate structure fails the capital attraction standard.

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the 12,000 word limit set by the Court because it contains 11,995 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Circuit Rule 32(a)(2).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Circuit Rule 32(a)(1) and type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word and 14 point Times New Roman.

*/s/ Thomas J. Eastment*
Thomas J. Eastment

## CERTIFICATE OF SERVICE

Pursuant to Rule 25 of the Federal Rules of Appellate Procedure, I hereby certify that I have this 5th day of February, 2016, served a copy of the foregoing document electronically through the Court's CM/ECF system on all registered counsel.

*/s/ Thomas J. Eastment*
Thomas J. Eastment

| | |
|---|---|
| FEDERAL ENERGY REGULATORY COMMISSION | Robert H. Solomon, Solicitor<br>Office of the Solicitor<br>Federal Energy Regulatory Commission<br>888 First Street, NE<br>Washington, DC  20426<br>robert.solomon@ferc.gov |
| | Elizabeth Evans Rylander, Attorney<br>Office of the Solicitor<br>Federal Energy Regulatory Commission<br>888 First Street, NE<br>Washington, DC  20426<br>elizabeth.rylander@ferc.gov |
| | Lisa Barbas Luftig, Attorney<br>Office of General Counsel<br>Federal Energy Regulatory Commission<br>888 First Street, NE<br>Washington, DC  20426<br>lisa.luftig@ferc.gov |
| UNITED STATES OF AMERICA | Robert J. Wiggers<br>U.S. Department of Justice<br>Antitrust Division, Appellate Section<br>950 Pennsylvania Avenue, NW<br>Room 3224<br>Washington, D.C.  20530-0001<br>robert.wiggers@usdoj.gov |
| | James Joseph Fredricks<br>U.S. Department of Justice<br>Antitrust Division, Appellate Section<br>950 Pennsylvania Avenue, NW<br>Room 3224<br>Washington, D.C.  20530-0001<br>james.fredricks@usdoj.gov |

SFPP, L.P.

Charles F. Caldwell
Caldwell Boudreaux Lefler PLLC
1800 West Loop South, Suite 1680
Houston, TX  77027
ccaldwell@cblpipelinelaw.com

Elizabeth Barnidge Kohlhausen
Caldwell Boudreaux Lefler PLLC
1800 West Loop South, Suite 1680
Houston, TX  77027
ekohlhausen@cblpipelinelaw.com

Dean Hyrum Lefler
Caldwell Boudreaux Lefler PLLC
1800 West Loop South, Suite 1680
Houston, TX  77027
dlefler@cblpipelinelaw.com

CHEVRON PRODUCTS COMPANY

Steven A. Adducci
Venable LLP
575 7th Street, N.W.
Washington, D.C.  20004
saadducci@venable.com

UNITED AIRLINES, INC.
SOUTHWEST AIRLINES CO.,
AND US AIRWAYS, INC.

Richard E. Powers, Jr.
Venable LLP
575 7th Street, N.W.
Washington, D.C.  20004
repowers@venable.com

TESORO REFINING AND MARKETING
COMPANY

Melvin Goldstein
Goldstein & Associates, P.C.
1757 P Street, N.W.
Washington, D.C.  20036
mgoldstein@goldstein-law.com

VALERO MARKETING AND SUPPLY
COMPANY

Steven A. Adducci
Venable LLP
575 7th Street, N.W.
Washington, D.C.  20004
saadducci@venable.com

PHILLIPS 66 COMPANY,
SUCCESSOR TO CONOCOPHILLIPS
COMPANY

Marcus W. Sisk
Frederick G. Jauss
Dorsey & Whitney LLP
1801 K Street, NW
Washington, DC  20006
sisk.marcus@dorsey.com
jauss.fred@dorsey.com